EXHIBIT "1"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------x

GREAT AMERICAN INSURANCE COMPANY, )

                                  Plaintiff, )

                      -against- )

ARCH REAL ESTATE HOLDINGS, LLC, JEFFREY )
SIMPSON, JARED CHASSEN, WIGGIN AND DANA )
LLP, GRIFFIN LLP, and OFFIT KURMAN PA, )

                     Defendants. )

| | |
|---|---|
| Index No.: | |
| Date Filed: June 25, 2024 | |
| **SUMMONS** | |

-------------------------------------------------------------------------x

To the Above-Named Interpleader-Defendants:

       YOU ARE HEREBY SUMMONED to answer the complaint in this action, and to serve a copy of your Interpleader-Answer, or, if the Interpleader-Complaint is not served with this summons, to serve a notice of appearance on the Interpleader-Plaintiffs' attorneys within twenty days (20) after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or, within thirty (30) days after completion of service where service is made in any other manner. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

       Interpleader-Plaintiff designates New York County as the place of trial.

       Venue is proper in this county pursuant to C.P.L.R § 503, in that this Interpleader Action is brought in the same venue as the underlying New York County Lawsuit filed under Index Number 158055/2023, which substantially and materially impacts the Limit of Liability of the Asset Management Liability Policy, Policy Number PEPE246619 (the "Policy"), for which the Interpleader-Defendants have alleged adverse claims, and in which a substantial part of the events giving rise to the claim(s) occurred.

       [SIGNATURE BLOACK AND SERVICE ADDRESS NEXT PAGE]

Dated: June 25, 2024

Respectfully submitted,

By: /s/ Edward C. Carleton
Edward C. Carleton, Esq.
Karl J. Fisher, Esq.


SKARZYNSKI MARICK & BLACK, LLP
One Battery Park Plaza – 32nd Floor
New York, New York 10004
Telephone: (212) 820-7750
ecarleton@skarzynski.com
kfisher@skarzynski.com

By: /s/ Scott A. Schechter
Scott A. Schechter, Esq.
Joshua DiLena, Esq.


KAUFMAN BORGEEST & RYAN, LLP
200 Summit Lake Drive
Valhalla, New York 10595
Telephone: (914) 449-1119
jdilena@kbrlaw.com

**Attorneys for Interpleader-Plaintiff**
**Great American Insurance Company**


TO INTERPLEADER-DEFENDANTS:

ARCH REAL ESTATE HOLDINGS LLC
88 University Place, 2nd Floor
New York, NY 10003

JEFFREY SIMPSON
1230 Park Avenue
Apt. 16E
New York, NY 10128

JARED CHASSEN
47 Bridge Street
Apt. 6A
Brooklyn, NY 11201

[Service Addresses Continue to Next Page]

2

WIGGIN AND DANA LLP
437 Madison Avenue, 35th Floor
New York, NY 10022

GRIFFIN LLP
420 Lexington Avenue, Suite 400
New York, NY 10170

OFFI KURMAN PA
590 Madison Avenue, 6th Floor
New York, NY 10022

3

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------------------x

GREAT AMERICAN INSURANCE COMPANY, )
                                     )    **Index No.:**

            Plaintiff, )

                                     )    **INTERPLEADER**

         -against- )   **COMPLAINT**

                                       )    **PURSUANT TO**

ARCH REAL ESTATE HOLDINGS, LLC, JEFFREY )   **STATUTORY**

SIMPSON, JARED CHASSEN, WIGGIN AND DANA )   **INTERPLEADER CPLR**

LLP, GRIFFIN LLP, and OFFIT KURMAN PA, )   **§ 1006**

                                       )

           Defendants. )

---------------------------------------------------------------------------x

     Interpleader-Plaintiff, GREAT AMERICAN INSURANCE COMPANY ("GAIC"),

pursuant to C.P.L.R. § 1006 through its attorneys, Skarzynski, Marick & Black LLP, by way of

Interpleader Complaint against the Interpleader-Defendants, ARCH REAL ESTATE

HOLDINGS, LLC ("Arch"), JEFFREY SIMPSON ("Simpson"), JARED CHASSEN

("Chassen"), WIGGIN AND DANA LLP ("Wiggin"), GRIFFIN LLP ("Griffin"), and OFFIT

KURMAN PA ("Offit"), allege as follows:

I.     <u>**NATURE OF THE ACTION**</u>

     1.     This is an Interpleader-Action brought pursuant to C.P.L.R. § 1006 against the

above captioned Interpleader Defendants.

     2.     GAIC is the insurer of Interpleader-Defendant Arch, and its directors and officers,

as defined by and pursuant to the terms and conditions of an Asset Management Liability Policy,

Policy Number PEPE246619 (the "Policy"). The Policy contains an aggregate limit of liability of

$ 3 million. The Policy is annexed hereto as **Exhibit A**.

3.      Interpleader-Defendants Simpson and Chassen have sought, and Simpson has been extended, coverage under the Policy as **Insureds**.[1]  The **Insureds** are currently engaged in a lawsuit in New York County Supreme Court filed under Index No.158055/2023) ("The New York County Lawsuit"); the lawsuit concerns the corporate dissolution of Arch and the pleadings filed by Simpson and Chassen in the Lawsuit are annexed hereto as **Exhibit B**.

4.      Interpleader-Defendant Griffin was retained as counsel to JJ Arch LLC, a member in interest of the **Insured** (Arch), and debtor in the pending Chapter 11 Bankruptcy filed in the Southern District of New York filed under 1:24-BK-10381 (referred to herein as the "SDNY Bankruptcy"). The initial Chapter 11 filing by Griffin in the SDNY Bankruptcy matter is annexed hereto as **Exhibit C**. As a result, Griffin has incurred fees that are potentially covered under the Policy.

5.      Interpleader-Defendant Wiggin was retained as counsel to JJ Arch LLC, a member in interest of the **Insured** (Arch), and debtor in the pending Chapter 11 SDNY Bankruptcy; Wiggin is also counsel to JJ Arch LLC in an adversarial proceeding stemming from the SDNY Bankruptcy; the adversarial proceeding was commenced under Index No. 1:24-AP-01335 (referred to herein as the "adversarial proceeding").  The Appearances by Wiggin in the SDNY Bankruptcy matter and the adversarial proceeding are annexed collectively hereto as **Exhibit D**. As a result, Wiggin has incurred fees that are potentially covered under the Policy.

6.      Interpleader-Defendant Offit is counsel to interested party Simpson, who is also a member of JJ Arch LLC, the debtor in the pending Chapter 11 SDNY Bankruptcy. The Notice of

---

[1] Unless otherwise specified, capitalized and bolded terms used in this Interpleader Action have the same meaning that is ascribed to them in the Policy, **Exhibit A**.

2

Appearance by Offit in the SDNY Bankruptcy matter is annexed hereto as **Exhibit E**. As a result, Offit has incurred fees that are potentially covered under the Policy.

7.      As discussed in detail below, GAIC faces competing demands from at least two **Insureds** (Simpson and Chassen), each seeking coverage for the Policy's remaining available **Limit of Liability**. At the time of this filing, factoring in **Costs of Defense** advanced on behalf of Simpson, the remaining limit of liability is $2,105,999.29.

8.      As an offer of compromise, GAIC offered to divide the remaining policy proceeds equally between Simpson and Chassen.  Simpson rejected the proposal unequivocally and has threatened to sue GAIC if GAIC advances any **Costs of Defense** incurred on Chassen's behalf.

9.      Upon information and belief, Simpson's and Chassen's claims for **Costs of Defense**, along with any anticipated indemnity payments made to resolve the Lawsuit, as well as claims made by the additional Interpleader-Defendants (Griffin, Wiggin, Offit) will exceed the remaining Policy proceeds.

10.      GAIC has initiated this Interpleader Action to resolve multiple and competing demands to the proceeds of the Policy by the Interpleader-Defendants, which may expose GAIC to liability. GAIC seeks relief from liability as an uninterested stakeholder by depositing the remaining sum of the policy to the Court, which can then be distributed pursuant to the Court's equitable findings and determinations for the claimants.

II.      **JURISDICTION AND VENUE**

11.      This Court has jurisdiction over this controversy under C.P.L.R §§ 301, 302, and 1006. This is a New York State civil statutory interpleader action, involving the Policy, and is raised due to multiple claims on the Policy by Interpleader-Defendants whose residence and/or principal place of business is in the State of New York.

3

12. Venue is proper in this county pursuant to C.P.L.R § 503, in that this Interpleader-Action is brought in the same venue as the underlying New York County Lawsuit, and in which a substantial part of the events giving rise to the claim occurred.

13. Pursuant to C.P.L.R § 1006, this Court may issue its process for all claimants to the Policy and enter an Order restraining Interpleader-Defendants from instituting or prosecuting any proceeding in any State or United States Court affecting GAIC's obligations under the Policy.

## III. **PARTIES**

14. Interpleader-Plaintiff, GREAT AMERICAN INSURANCE COMPANY, is an insurance corporation existing under the laws of the State of Ohio and with its principal place of business in the State of Ohio. GAIC issued the Policy in the State of New York.

15. Interpleader-Defendant, ARCH REAL ESTATE HOLDINGS LLC, is an **Insured** under the Policy and upon information and belief has its principal place of business in the State of New York.

16. Interpleader-Defendant, JEFFREY SIMPSON, is an **Insured Person** under the Policy, subject to GAIC's reservation of rights, and upon information and belief is a citizen of the State of New York.

17. Interpleader-Defendant, JARED CHASSEN, is an **Insured Person** under the Policy, subject to GAIC's reservation of rights, and upon information and belief is a citizen of the State of New York.

18. Interpleader-Defendant, WIGGIN AND DANA LLP, on information and belief may be entitled to the Policy proceeds in connection with its representation of an interested

member of the **Insured**; it is a limited liability partnership with its principal place of business in the State of New York.

19.    Interpleader-Defendant, GRIFFIN LLP, on information and belief may be entitled to the Policy proceeds in connection with its representation of an interested member of the **Insured**; it is a limited liability partnership with its principal place of business in the State of New York.

20.    Interpleader-Defendant, OFFIT KURMAN PA, on information and belief may be entitled to the Policy Proceeds in connection with its representation of Simpson; it is a professional association with its principal place of business in the State of New York.

## IV.    **THE POLICY**

21.    The Policy Period runs from April 18, 2023, to April 18, 2024. The Policy provides a $3 million aggregate Limit of Liability.  A true and correct copy of the Policy is attached to this Complaint as **Exhibit A**.

22.    Subject to its complete terms and conditions, the Policy provides specified coverage to **Insureds** for **Loss** (including **Cost of Defense** expenses) resulting from **Claims** first made during the **Policy Period** for **Wrongful Acts**.  See **Exhibit A**, Section I(A)-(C) Insuring Agreements.

23.    Section V of the Policy's General Terms and Conditions states, "The **Insurer** shall be liable to pay one hundred (100%) of Loss in excess of the applicable **Retention** amount . . . **Costs of Defense** shall be part of, and not in addition to, the Limit of Liability . . . and such **Costs of Defense** shall reduce the Limit of Liability . . . The **Insurer's** liability for all **Loss** shall be the amount shown in item 3 of the Declarations [$3 million] *which shall be the maximum aggregate Limit of Liability of the Insurer for the **Policy Period***." (emphasis added).

5

24.    Section VII(C) of the Policy's General Terms and Conditions states, "[t]he **Insurer** shall advance on behalf of the **Insureds**, excess of any applicable **Retention**, covered **Costs of Defense** which the **Insureds** have incurred in connection with covered **Claims** . . . Any amounts advanced by the **Insurer** shall serve to reduce the **Limit of Liability** stated in Item 3 [$3 million]."

25.    Section VII(E)((4) of the Policy's General Terms and Conditions states, "[t]he exhaustion of the **Limit of Liability** by the payment of **Loss**, and the resulting end of the **Insurer's** duty to pay on behalf of the **Insureds,** will not be affected by the **Insurer's** failure to comply with and of the provisions of this Policy."

26.    Therefore, when GAIC has paid $3 million in **Loss**, it shall have no further obligations under the Policy to pay any further **Cost of Defense** expenses or indemnify any **Insured**.

27.    The Policy defines **Loss**, as "compensatory damages, settlements, pre-judgment interest, post-judgment interest and **Cost of Defense** . . .." See Definition Section III(N) of the Policy.

28.    The Policy defines **Cost of Defense**, as "reasonable and necessary legal fees, costs and expenses incurred in the investigation, defense or appeal of any **Claim** . . .." See Definition Section III(B) of the Policy.

29.    The Policy defines **Wrongful Act**, as "any actual or alleged **Employment Practices Wrongful Act** or any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, or any actual or alleged error or omission in the rendering of or the failure to render **Professional Services:** (1) by the **Insured Persons**, in their capacity as such; (2) with respect to Insuring Agreement (B)(2), by the **Insured Organization**; or (3) with

6

FILED: NEW YORK COUNTY CLERK 06/25/2024 11:23 AM

Case 1.24-cv-07139 Document 1-1 Filed 09/20/24 Page 11 of 482

respect to Insuring Agreement (C), by the **Insured Persons** while serving in an **Outside Position**." See Definition Section III(Z) of the Policy.

30.     Lastly, The Policy states under Section IX(B), "insolvency or bankruptcy of the **Insureds** . . . shall not release the **Insurer** from the payment of . . . **Loss** or **Costs of Defense** occasioned during the life of and within the coverage of this Policy."

## V.     **THE NOTICED MATTERS**

31.     The Interpleader-Defendants have provided notice of three related matters for coverage under the Policy, which collectively stem from the corporate dissolution of the **Insured** (Arch) and the claims and cross claims between Simpson and Chassen. The three related matters are:

> i.   New York County Lawsuit with claims and cross claims by **Insureds**, subject to GAIC's reservation of rights, filed under Index No. 158055/2023, filed on August 15, 2023, (annexed as **Exhibit B**);
>
> ii.  Chapter 11 SDNY Bankruptcy filed by a member in interest (JJ Arch LLC) of the **Insured** company (Arch) under Index No. 1:24-BK-10381, filed on March 7, 2024 (annexed as **Exhibit C**);
>
> iii. Chapter 11 SDNY Bankruptcy Adversary Proceeding filed by Simpson, a member in interest of the debtor JJ Arch LLC, seeking to remove the matter to New York County Supreme Court under Index No 1:24-AP-01335, filed on April 3, 2024 (annexed as **Exhibit D**).  (the New York County Lawsuit, the Bankruptcy and Adversary Proceeding are referred to collectively as the "Noticed Matters").

32.     The Interpleader-Defendants, Simpson and Chassen, have sought and continue to seek from GAIC advancement of **Loss**, including **Cost of Defense** expenses, in connection with the Noticed Matters. It is anticipated that Interpleader-Defendants Wiggin, Griffin, and Offit will demand from GAIC advancement of Loss in connection with fees on behalf of the **Insured**'s connection with the Bankruptcy and Adversary Proceeding.

7

33.    As of the date of the filing of this declaratory judgment action, GAIC has advanced $894,000.71 in **Costs of Defense** incurred by Simpson connection with the Noticed Matters.

34.    Chassen has requested, and GAIC has acknowledged partial coverage for Chassen in connection with **Costs of Defense** Chassen has incurred in connection with the Noticed Matters.   Upon information and belief, Chassen's **Costs of Defense** total at least $500,000.00.

35.     In light of the payments already made on Simpson's behalf, $2,105,999.29 remains of the Policy's Limit of Liability.

## VI.    CURRENT LAWSUIT AGAINST GAIC

36.    On June 7, 2024, GAIC was named as a defendant in an action brought by Arch Real Estate Holdings, LLC ("Arch"), filed in New York County Supreme Court under Index No. 652914/2024; Plaintiff alleges that GAIC is wrongfully misappropriating the Policy proceeds in connection with the SDNY Bankruptcy matter and adversarial proceeding. Arch seeks a Judgment and Order stating, *inter alia*, that GAIC extended coverage related to these matters does not erode the Policy Limit, breach of the Policy contract, as well as damages. The Summons and Complaint are annexed hereto as **Exhibit F**.

## VII.    JEFFREY SIMPSON'S DEMAND

37.    In the New York County Lawsuit, Simpson alleges that Chassen illegitimately sought to remove him as the managing member of Arch Real Estate Holdings (**the Insured**). Simpson's claims include breach of contract related to the Arch Operating Agreement; breach of fiduciary duty; conversion; tortious interference with contractual relations; and he demands money damages in an amount to be determined at trial.

8

38.     As noted above, GAIC has acknowledged coverage for, and Simpson has incurred

at least $894,000.71 in **Costs of Defense** in connection with the Noticed Matters.  Simpson has

demanded that GAIC continue to advance **Costs of Defense** on his behalf, and has insisted that

no **Costs of Defense** payments be made on behalf of Chassen.

VIII.   **JARED CHASSEN'S DEMAND**

39.     In the New York County Lawsuit, Chassen asserted cross claims alleging¸ *inter*

*alia*, that Simpson's business missteps led to his forced resignation under the Arch Operating

Agreement, and that he breached his fiduciary duty as a member of Arch; that the Arch operating

agreement is void; and he seeks compensatory and equitable relief.

40.     Chassen seeks coverage for at least $500,000 in **Costs of Defense** incurred in

connection with the Noticed Matters, and has demanded that GAIC continue to advance

Chassen's going-forward **Costs of Defense**.  GAIC has acknowledged partial coverage for

Chassen under the Policy.

IX.     **ADDITIONAL CLAIMS TO THE POLICY PROCEEDS**

41.     GAIC anticipates that Simpson will seek to enjoin GAIC from advancing any

**Costs of Defense** on behalf of Chassen, and that Chassen will in turn sue GAIC in order to

obtain coverage if GAIC does not advance on behalf of Chassen.

42.     Upon information and belief, one or more Interpleader-Defendants Wiggin,

Griffin, and Offit, which provided attorney's services to JJ Arch LLC, a member in interest of

the **Insured** (Arch), in relation to its Chapter 11 Bankruptcy filing and adversarial proceeding,

may be entitled to recover incurred costs and fees that are potentially covered under the Policy.

43.     GAIC anticipates receiving a claim for compensation by the Interpleader-Defendants, Wiggin, Griffin, and Offit, for **Costs of Defense** incurred on Simpson's and/or JJ Arch's behalf.

X.     **NEED FOR INTERPLEADER**

44.     As set forth above, GAIC is subject to inconsistent obligations with respect to the remaining Policy limits. Further, GAIC is the subject of a pending lawsuit brought by Arch for its extended coverage (see **Exhibit F**).

45.     The claims for the remaining Policy proceeds will be exhausted by the **Cost of Defense** incurred by Simpson and Chassen.  GAIC cannot pay continued **Cost of Defense** expenses to both Simpson and Chassen without being exposed to additional lawsuits alleging that it favors the rights of one Insured Interpleader-Defendant over the rights of another Insured Interpleader-Defendant.

46.     Likewise, GAIC cannot refuse to pay either Simpson's or Chassen's continued **Cost of Defense** without exposing GAIC to yet another lawsuit that it favors the rights of one Insured Interpleader-Defendant over the rights of another Insured Interpleader-Defendant.

**FIRST CLAIM FOR RELIEF**
**(Statutory Interpleader Against All Interpleader-Defendants pursuant to C.P.L.R. § 1006)**

47.     GAIC incorporates by reference all of the preceding paragraphs of this complaint as if fully set forth herein.

48.     GAIC is a disinterested stakeholder in the Policy.

10

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 15 of 482

49.     GAIC faces conflicting adverse claims with respect to the Policy's proceeds thereby exposing GAIC to multiple litigations and liability, absent resolution of all such issues in one proceeding.

50.     GAIC has available and is prepared to deposit the remaining policy proceeds with the Court, which is the Policy's remaining Limit of Liability.

51.     It is just and equitable that the Court declare the rights and legal obligations of the Parties to this lawsuit.

## SECOND CLAIM FOR RELIEF
### (Preliminary Injunction and Temporary Restraining Order pursuant to C.P.L.R. § 6301)

52.     GAIC incorporates by reference all of the preceding paragraphs of this complaint as if fully set forth herein.

53.     Arch Real Estate Holdings LLC commenced a lawsuit against Great American Insurance Company in New York County Supreme Court under Index No. 652914/2024; Plaintiff alleges that GAIC is wrongfully misappropriating the Policy proceeds in connection with the SDNY Bankruptcy matter and adversarial proceeding.

54.     As a result of this lawsuit, as well as other potential lawsuits by adverse claimants named herein, GAIC will suffer imminent and irreparable harm defending itself against this lawsuit; further, based on the circumstances alleged in this Interpleader-Complaint, GAIC can establish a probable chance of success on the merits of this Interpleader Complaint brought pursuant to C.P.L.R. § 1006; lastly, the balance of equities is in GAIC's favor because it has committed to depositing the remaining policy proceeds with the Court until the priority of the adverse claimants are established.

55.     Thus, it is just and equitable to enjoin Arch Real Estate Holdings LLC from proceeding in its prosecution of the lawsuit styled as Arch Real Estate Holdings LLC against Great American Insurance Company, New York County Supreme Court (Index No. 652914/2024); and also issuing a temporary restraining order enjoining all other named Interpleader-Defendants from commencing a lawsuit against GAIC with respect to the Policy proceeds.

**WHEREFORE**, Interpleader-Plaintiff, GAIC, respectfully requests that this Court enter judgment as follows:

(1)  permitting and directing GAIC to deposit the sum of $2,105,999.29 into the Registry of this Court, in full satisfaction of its obligations under the Policy;

(2)  entering an Order requiring the Interpleader-Defendants to interplead their rights to the proceeds of the Policy; and discharging GAIC from any and all liability to Interpleader-Defendants and any and all current or future claims and/or obligations relating to the Policy;

(3)  entering, pursuant to C.P.L.R. § 1006 and this Court's inherent equitable powers, a preliminary injunction during the pendency of this Interpleader Action, and thereafter permanently and perpetually enjoin each and every Interpleader-Defendant from instituting or prosecuting any action or proceeding against GAIC with respect to or arising out of the Policy in dispute in any state or federal court or other forum;

(4)  granting any other relief necessary to effectuate the purposes of interpleader;

(5)  Issuing an Order and Judgment enjoining the current lawsuit filed under Index No. 652914/2024 and enjoining the named co-defendants/adverse claimants from bringing a lawsuit again GAIC regarding the Policy proceeds;

12

(6)  granting such other and further relief as this Court deems just and

appropriate.

Dated:   June 25, 2024
New York, New York

Respectfully submitted,

By:  __/s/ Edward C. Carleton
Edward C. Carleton, Esq.
Karl J. Fisher, Esq.

SKARZYNSKI BLACK, LLP
One Battery Park Plaza – 32nd Floor
New York, New York 10004
Telephone: (212) 820-7750
ecarleton@skarzynski.com
kfisher@skarzynski.com

By:  __/s/Scott A. Schechter
Scott A. Schechter, Esq.
Joshua DiLena, Esq.

KAUFMAN BORGEEST & RYAN, LLP
200 Summit Lake Drive
Valhalla, New York 10595
Telephone: (914) 449-1119
sschechter@kbrlaw.com
jdilena@kbrlaw.com

**Attorneys for Interpleader-Plaintiff**
**Great American Insurance Company**

4888-9195-5654, v. 2

13





**GREAT**AMERICAN®

**INSURANCE GROUP**

301 E. Fourth Street, Cincinnati, OH 45202

Asset Management Liability Solution
**DECLARATIONS**

## THIS IS A CLAIMS MADE POLICY, READ IT CAREFULLY

Insurance is afforded by the company indicated below:  (Each a capital stock corporation)

☒ Great American Insurance Company          ☐ Great American Insurance Company of New York

☐ Other

Note:  The Insurance Company selected above shall herein be referred to as the **Insurer**.

Policy Number: PEPE246619          Policy Form Number:  D18100-F

Note:  This is a   claims made policy, please read it carefully.  Amounts incurred as **Costs of Defense** shall  reduce the Limit of Liability available to pay judgments or settlements and shall also be applied against the retention.  This Policy does not provide for any duty by the **Insurer** to defend those insured under the Policy.

| | | | | | |
|---|---|---|---|---|---|
| Item 1. | **Named Insured**: | ARCH REAL ESTATE HOLDINGS, LLC | | | |
| | Mailing Address: | 88 UNIVERSITY PLACE, 2ND FLOOR<br>NEW YORK, NY 10003 | | | |
| | Attention: | | | | |

Item 2.  **Policy Period**:          From:          4/18/2023          To:          4/18/2024
                                                    *(Month, Day, Year)*                *(Month, Day, Year)*
                      (Both dates at 12:01 a.m. Standard Time at the address of the **Corporation** as stated in Item 1)

Item 3.  Limit of Liability (Inclusive of **Costs of Defense**):

          $3,000,000          Aggregate Limit of Liability for the **Policy Period**

Item 4.  Retentions:

| | | | |
|---|---|---|---|
| Insuring Agreement A: | Each **Claim**: | | $0 |
| Insuring Agreements B: | Each **Claim** other than an **Employment Practices Claim**: | | $150,000 |
| | Each **Employment Practices Claim**: | | $150,000 |
| Insuring Agreement C: | Each **Claim**: | | $0 |

Item 5.  Premium: (Prepaid)                                                                    $41,820

Item 6.  Endorsements Attached

| D18408NY | D18712 (6) | D18712 (22) | D18712 (50) | D18712NY (15 | D18716 | DTCOV |
|---|---|---|---|---|---|---|
| IL7324 | | | | | | |

Item 7.  Prior and Pending Date  12/31/2018

Item 8.  **Discovery Period**
          (A)    Additional Premium                                        $41,820
          (B)    Additional Period                                          365 Days

Item 9.  Notices:  **Notice of Claim or Wrongful Act(s)** shall be addressed to:          All other notice shall be addressed to:
          Great American Insurance Companies,                              Great American Insurance Companies,
          Attn: Claims Department                                          Executive Liability Division,
          1450 American Lane, 8th Floor                                    P.O. Box 66943
          Schaumburg, IL 60173                                            Chicago, IL 60666

These Declarations, along with the completed and signed Proposal Form and the *Private Equity Liability Insurance Policy*, shall constitute the contract between the **Insured** and the **Insurer**.

**Countersignature
Not Required**

_____          _____
          (Authorized Representative)                              (Countersignature Date)

**NOTE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT.  HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.**

**New York Declarations Page**
**Attachment**

Notice:     Except to such extent as may be provided herein, the coverage provided by this policy is limited to liability for only those claims that are first made against the insureds during the Policy Period and reported in writing to the Insurer pursuant to the terms herein.  Please read the policy carefully and discuss the coverage thereunder with your agent or broker.

Notice:     The Limit of Liability available to pay judgments or settlements may be reduced by amounts incurred by the Insured for legal defenses pursuant to Section V.C.

**GREATAMERICAN**®
**INSURANCE GROUP**

Asset Management
Liability Solution

# AMENDMENT TO DECLARATIONS PAGE

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

It is understood and agreed that Item <u>4.</u> of the Declarations is hereby amended to read as follows::

Item 4.  Retentions:

Insuring Agreement A:

Each **Insured Person, Claim**:                    $ ___5,000___

But in no event exceeding:                    $ ___50,000___
for all Insured Persons, each Claim

Insuring Agreement B:

Each **Claim** other than an
**Employment Practices Claim**:                 $ __150,000__

Each **Employment Practices Claim**:            $ __150,000__

Insuring Agreement C:

Each **Claim**:                                 $ _____0_____

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

Insured:  ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:  4/18/2023 to Policy Expiration                Policy Number:  PEPE246619

Countersigned by: _____            Endorsement Effective Date:  4/18/2023
                    *Authorized Representative*

D 18408NY (06/07)                         Endorsement:  1            Page 1 of 1
2-14176

**GREATAMERICAN.**
**INSURANCE GROUP**

Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

## PRE-CLAIM EXPENSES ENDORSEMENT

It is understood and agreed that the Policy is amended as follows:

1.      Section III.B. is amended by the addition of the following:

        If, pursuant to Section VIII.B. of the Policy, notice is provided by an **Insured** and accepted in writing by the **Insurer** ("Noticed Matter"), then, with respect to any covered **Claim** arising out of such Noticed Matter, **Costs of Defense** shall also mean reasonable and customary legal fees, costs and expenses incurred from the date such Noticed Matter is accepted by the **Insurer** until the date such Noticed Matter develops into a covered **Claim** ("Pre-Claim Expenses").  However, this coverage is available only to **Insureds** who:

        (i)     are in material compliance with all terms and conditions of the Policy;
        (ii)    agree to provide the **Insurer** with the same rights to associate with the **Insureds** as afforded for any **Claim** as set forth in Section VII.B. of the Policy; and
        (iii)   obtain the **Insurer's** prior written consent to incur such Pre-Claim Expenses.

2.      For purposes of coverage extended by this endorsement, Section IV.H. is deleted and replaced with the following:

        **H.**   based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any prior and/or pending civil, criminal, administrative or investigative proceeding involving any **Insured** as of _____12/31/2018_____ , or any fact, circumstance or situation underlying or alleged in such proceeding;

3.      For purposes of coverage extended by this endorsement, Section VII.A. is deleted and replaced with the following:

Insured:  ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:  4/18/2023 to Policy Expiration                    Policy Number:  PEPE246619

Countersigned by: _____                    Endorsement Effective Date:  4/18/2023
                  *Authorized Representative*

**GREATAMERICAN.**
**INSURANCE GROUP**

Asset Management
Liability Solution

## PRE-CLAIM EXPENSES ENDORSEMENT

**A.**   No **Costs of Defense**, including any Pre-Claim Expenses, shall be incurred or settlements made, obligations assumed or liability admitted with respect to any **Claim** without the **Insurer's** written consent, which shall not be unreasonably withheld or delayed. The **Insurer** shall not be liable for any **Costs of Defense**, including any Pre-Claim Expenses, settlement, assumed obligation or admission to which it has not consented. Notwithstanding any of the foregoing, if all **Insureds** are able to dispose of all **Claims** that are subject to one Retention amount (inclusive of **Costs of Defense**) for an amount not exceeding any applicable Retention amount, then the **Insurer's** consent shall not be required for such disposition.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

**GREAT**_AMERICAN_®
**INSURANCE GROUP**

Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# COST OF CORRECTIONS WITH SEPARATE RETENTION

It is understood and agreed that the following changes are made to the Policy:

| AMENDMENT TO INSURING AGREEMENT |
|---|

1.      Section I. is amended by the addition of the following:

Subject to the terms and conditions this Policy, the **Insurer** shall reimburse the **Insured** for amounts paid by the **Insured** in connection with a **Claim** for **Costs of Correction** but only if:

(1)     the **Insurer** is notified in writing within fifteen (15) business days of the discovery of the **Trade Error** and such notification is received as soon as practicable from the date during the **Policy Period** that the **Trade Error** occurred but in no event later than thirty (30) days after the expiration date of this Policy;

(2)     such **Trade Error** arose in the ordinary course of the **Insured's** operations and occurred during the **Policy Period**;

(3)     if not corrected, the **Trade Error** would reasonably be the basis for a **Claim** against the **Insureds** for quantifiable **Loss** which would be payable and not otherwise excluded under this Policy;

(4)     the **Insured** reasonably establishes that a **Trade Error** has in fact taken place and that payments constituting **Costs of Correction** were paid and in what amount they were paid.

| AMENDMENT TO DEFINITIONS |
|---|

1.      Solely with respect to coverage afforded under this endorsement, Section III. A. is amended by the addition of the following:

**Claim** means a request by the **Insured** for approval to incur any **Costs of Correction**.

Insured:   ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:   4/18/2023 to Policy Expiration                    Policy Number:   PEPE246619

Countersigned by:   _____                    Endorsement Effective Date:   4/18/2023
                            *Authorized Representative*

**GREAT**AMERICAN®
INSURANCE GROUP

Asset Management
Liability Solution

## COST OF CORRECTIONS WITH SEPARATE RETENTION

2.      Solely with respect to coverage afforded under this endorsement, Section III. is amended by the addition of the following:

"**Alteration**" means any act done upon an instrument, document or security by which its meaning, legal effect, rights or obligations attendant to it, or interests in it are changed.

"**Costs of Correction**" means any payments made to an **Investment Fund** or **Separately Managed Account** for the benefit of an investor(s) in such **Investment Fund** or **Separately Managed Account** provided such payments were made to avoid or reduce financial loss to such investor(s) resulting from any **Trade Error**.

"**Forgery**" means the signing of another person's name, by either mechanical, electronic or handwritten means, with the intent to deceive.

"**Theft**" means:

(1)     The wrongful taking of money or other property; or

(2)     Dishonest or fraudulent acts committed by or on behalf of an **Insured** acting alone or in collusion with others with the intent (a) to cause a financial loss to an **Insured** or **Insured's** customer, or (b) to obtain a financial benefit for any person or entity.

"**Trade Error**" means any trades performed by an **Insured**: (1) that were incorrectly executed: (a) in the wrong security; (b) on the wrong side of the market; (c) for a quantity different than specified in the instructions; or (d) duplicating a prior execution of the same original order; or (2) where the **Insured** failed to execute a written order that was executable when rendered.

"**Separately Managed Account**" means any **Organization** that is an investment vehicle which is created or established prior to or during the **Policy Period** by an **Insured Organization** for the purpose of making investments pursuant to a written investment mandate or agreement and where the capital of such **Organization** was contributed solely by an unaffiliated investor.

| AMENDMENT TO EXCLUSIONS |
|---|

Solely with respect to coverage afforded under this endorsement, Section IV. is amended by the addition of the following:

based upon, arising from, or in any way related to diminution in value or damages resulting from the diminution in value of money, securities, property or any other item of value, unless such diminution in value or damages are established to have been caused by a **Trade Error**;



Asset Management
Liability Solution

## COST OF CORRECTIONS WITH SEPARATE RETENTION

for any contractual obligation to a customer or client of the **Insured** guaranteeing any rate of return or the fulfillment of any minimum performance standards;

for any act committed within the scope of any **Insured's** discretionary authority for which the **Insured** would not be held legally liable;

for which no coverage would have been afforded under the Policy had the **Trade Error** resulted in a **Claim**;

for any **Trade Error** of which the **Insured** had knowledge or information prior to the inception date of this Policy or the first policy in an uninterrupted series of policies issued by the **Insurer**, or any insurance company controlling, controlled by, or under common control with the **Insurer**, of which this policy is a direct or indirect renewal or replacement;

based upon, arising from, or in any way related to wire or electronic transfer of funds not directly related to an order or trade;

based upon, arising from, or in any way related to unauthorized access, use or operation of the **Insured's** computer or other electronic systems;

based upon, arising from, or in any way related to loss of physical possession of money, securities or other property in the care, custody or control of the **Insured**; or

based upon, arising from, or in any way related to **Theft**, **Forgery** or **Alteration**.

| AMENDMENT TO DECLARATIONS |
| --- |

1.  Solely for the purposes of any **Claim** for **Costs of Correction** to which this endorsement may in whole or in part apply, Item 3. of the Declarations is  amended to read as follows:

    $ __3,000,000__ in the aggregate each **Policy Period**, including **Costs of Defense**

    The extension of coverage afforded by this endorsement shall in no way serve to increase the **Insurer's** maximum aggregate Limit of Liability as shown under Item 3. of the Declarations. Such Limit of Liability is part of and not in addition to the Limit of Liability set forth in Item 3. of the Declarations.

**GREATAMERICAN**®
**INSURANCE GROUP**

Asset Management
Liability Solution

## COST OF CORRECTIONS WITH SEPARATE RETENTION

2.    Solely for the purposes of any **Claim** to which this endorsement may in whole or in part apply Item 4. of the Declarations is amended to read as follows:

Each **Claim** for **Costs of Correction**:      $ _____500,000_____

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.



Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# EXCESS ADDITIONAL LIMIT OF LIABILITY
# FOR CHIEF COMPLIANCE OFFICER

Solely with respect to **Claims** by any **Regulatory Authority** against a **Chief Compliance Officer** for a **Regulatory Violation**, it is understood and agreed that the Policy is amended as follows:

1.     Section III.is amended by the addition of the following:

   "**Chief Compliance Officer**" means any **Insured Person** appointed pursuant to Rule 206(4)-7 of the Investment Advisers Act of 1940, Rule 38a-1 of the Investment Company Act of 1940 and/or Section 4s(k) of the Commodities Exchange Act as the chief compliance officer of the **Insured Entity**, or the functional equivalent to the foregoing in any foreign jurisdiction.

   "**Regulatory Authority**" means:

   (1)     any federal, state, local or foreign law enforcement authority or other governmental Investigation authority (including, but not limited to, the U.S. Department of Justice, the U.S. Securities and Exchange Commission and any attorney general); or

   (2)     the enforcement unit of any securities or commodities exchange or other **Self-Regulatory Organization**.

   "**Regulatory Violation**" means an actual or alleged violation of:

   (1)     the Investment Advisor Act of 1940;

   (2)     the Investment Company Act of 1940; or

   (3)     the Securities Act of 1933 or the Securities Exchange Act of 1934;

   regarding the adoption and implementation of written policies and procedures to prevent violation of law pursuant to Rule 206(4)-7 of the Investment Advisers Act of 1940, Rule 38a-1 of the Investment Company Act of 1940 and/or Section 4s(k) of the Commodities Exchange Act, or any similar law, including, without limitation, any equivalent law in any foreign jurisdiction.

Insured:   ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:   4/18/2023 to Policy Expiration                    Policy Number:   PEPE246619

Countersigned by:   _____          Endorsement Effective Date:   4/18/2023
                        *Authorized Representative*

D18712(50)     (03/18)                              Endorsement:   4                Page 1 of 2
2-14176



Asset Management
Liability Solution

## EXCESS ADDITIONAL LIMIT OF LIABILITY
## FOR CHIEF COMPLIANCE OFFICER

2.    Section III.Y. is amended by the addition of the following:

With respect to a **Chief Compliance Officer**, a **Wrongful Act** shall also include a **Regulatory Violation**.

3.    Section V.C. is amended by the addition of the following:

provided, however:

(1)    An Additional Limit of Liability in an amount not to exceed $ __150,000__ is available solely for **Loss** resulting from any **Claim** made against **Chief Compliance Officer** and which is otherwise covered under Insuring Agreement I.A. This Additional Limit of Liability is in addition to and not part of the Limit of Liability set forth in Item 3. of the Declarations.

(2)    This Additional Limit of Liability shall be excess of any insurance available that is specifically excess of this Policy. Such excess insurance must be completely exhausted by payment of **Loss** thereunder before the **Insurer** shall have any obligation to make any payment under this Additional Limit of Liability.

(3)    Any **Loss** covered under Insuring Agreement I.A. shall first be paid under the Limit of Liability set forth in Item 3. of the Declarations, and only when such Limit of Liability is completely exhausted by payment of **Loss** under any Insuring Agreements shall **Loss** be paid under this Additional Limit of Liability.

4.    Section VI. is amended by the addition of the following:

Any **Claims** subject to this additional Limit of Liability shall not be shall not be subject to any Retention.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.



Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# RT ELITE REAL ESTATE ENDORSEMENT

It is understood and agreed that the following changes are made to the Policy:

| Amendment to Insuring Agreements |
|---|

Section I. is deleted and replaced with the following:

**Section I.  Insuring Agreements**

A.  Except for **Loss** which the **Insurer** pays pursuant to Sections I.B. or I.C. of this Policy, the **Insurer** will pay on behalf of the **Insured Persons** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

B.  The **Insurer** will pay on behalf of the **Insured Organization**:

    (1)  **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** but only to the extent an **Insured Organization** is permitted or required by law to indemnify such **Insured Persons**; or

    (2)  **Loss** which the **Insured Organization** becomes legally obligated to pay as a result of a **Claim**;

    provided that such **Claim** is first made during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

C.  Except for **Loss** which the **Insurer** pays pursuant to Sections I.A. and I.B. and subject to all of this Policy's terms and conditions, the **Insurer** will pay on behalf of the **Insured Persons** serving in an **Outside Position** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Person** during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**;

D.  The **Insurer** shall pay on behalf of the **Insured Organization** all **Investigative Costs** resulting from any **Shareholder Derivative Demand** first made during the **Policy Period** or the **Discovery Period** for any actual or alleged **Wrongful Act** of an **Insured Person**.

| Amendment to Declarations |
|---|

Item 3. of the Declarations is amended by the addition of the following:

$ 3,000,000  Aggregate  Sub-Limit of Liability for **Investigative Costs** for any **Shareholder Derivative Demand** for the **Policy Period**.  This sub-limit is part of and not in addition to the Limit of Liability stated in Item 3.(a).

Insured:  ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:  4/18/2023 to Policy Expiration

Policy Number:  PEPE246619

Countersigned by: _____
        *Authorized Representative*

Endorsement Effective Date:  4/18/2023



Asset Management
Liability Solution

## RT ELITE REAL ESTATE ENDORSEMENT

| Amendment to Discovery Period |
| --- |

Section II.B. is deleted and replaced with the following:

**B.** As a condition precedent to the right to purchase the **Discovery Period**, the total premium for this Policy must have been paid, and a written request together with payment of the appropriate premium for the **Discovery Period** must be provided to the **Insurer** no later than sixty (60) days after the **Termination of Coverage**.

| Amendment to Definitions |
| --- |

1. Section III. is amended by adding the following:

    "**Business Practices Wrongful Act**" shall mean any actual or alleged act of discrimination, sexual harassment or the violation of any individual's civil rights related to such discrimination or sexual harassment.

    "**Controlling Person**" shall have the same meaning as set forth in Section 15 of the Securities Act of 1933 or Section 20 (a) of the Securities Exchange Act of 1934, as amended, or under the common law or under any other applicable statute, rule, regulation or law or any foreign equivalent thereof.

    "**Extradition**" shall mean any formal process by which an **Insured Person** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

    "**Foreign Jurisdiction**" means any jurisdiction, other than the United States of America or any of its territories or possessions.

    "**Insured Capacity**" shall mean the position or capacity of an **Insured Person** that causes him or her to meet the definition of **Insured Person** under the Policy, but does not include any position or capacity held by such **Insured Person** in any entity other than the **Insured Organization** or **Portfolio Company**, even if directed or requested by the **Insured Organization**.

    "**Investigative Costs**" shall mean reasonable and necessary costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses (other than regular or overtime wages, salaries or fees of the **Directors, Officers**, or employees of the **Insured Organization**) incurred by the **Insured Organization** (including its Board of Directors or similar management body or any committee thereof) in connection with the investigation or evaluation of any **Shareholder Derivative Demand**.

    "**Investigation**" shall mean any civil, criminal, administrative or regulatory investigation of an **Insured** by a federal, state, local, foreign or offshore government authority or agency (including without limitation an investigation by the Equal Employment Opportunity Commission, Securities and Exchange Commission, Commodity Futures Trading Commission, Department of Justice, Department of the Treasury, Department of Labor, Pension Benefit Guarantee Corporation, the Financial Services Authority or Grand Jury) or **Self-Regulatory Organization** but only after receipt or service of a formal order of investigation or matter under inquiry, subpoena, grand-jury subpoena, receipt of a Wells Notice, receipt of a target letter (within the meaning of Title 9-11.151 of the United States Attorney's Manual), civil investigative demand, search warrant or similar document; provided, however, that the foregoing shall not include a routine examination, inspection, or industry sweep of a type periodically conducted by any administrative or regulatory authority that appears to be unrelated to any **Wrongful Act** of an **Insured**.



Asset Management
Liability Solution

## RT ELITE REAL ESTATE ENDORSEMENT

"**Inquiry**" means:

(1)    a request or demand for an **Insured Person** either to appear at a meeting, deposition or interview or to produce documents relating to the business of the **Insured Organization** or such **Insured Person's** capacity with the **Insured Organization**, where such request or demand is:

    (a)    by any federal, state, local or foreign law enforcement authority or other governmental investigative authority (including but not limited to the U.S. Securities and Exchange Commission, U.S. Department of Justice or any attorney general);

    (b)    by the enforcement organization of any securities or commodities exchange or other self-regulatory entity;

    (c)    by or on behalf of the **Insured Organization**, the **Insured Organization's** Board of Directors (or similar management body) or a committee thereof: (i) arising out of a request or demand set forth in subparagraphs (a) or (b) above; or (ii) which is part of the **Insured Organization's** investigation and evaluation of a **Shareholder Derivative Demand**; or

(2)    the arrest or confinement of an **Insured Person**, whether residential or custodial, by a law enforcement authority, relating to the business of the **Insured Organization** or the **Insured Person's** capacity with the **Insured Organization**.

**Inquiry** shall not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production or audit, including any request for mandatory information from a regulated entity, conducted in the normal review or compliance process of the **Insured Organization** by a law enforcement authority, governmental investigative authority or enforcement organization of a securities or commodities exchange or other self-regulatory entity.

Coverage, subject to all other terms and conditions of the Policy, will be extended for an **Inquiry** whether or not a **Wrongful Act** is alleged.

"**Pollutants**" shall mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, dust, fibers, mold, spores, fungi, germs, soot, fumes, acids, alkalis, asbestos, chemicals or waste of any kind, including any materials to be recycled, reconditioned or reclaimed.

**GREAT**A**MERICAN**®
**INSURANCE GROUP**

Asset Management
Liability Solution

## RT ELITE REAL ESTATE ENDORSEMENT

"**Securities Claim**" shall mean any **Claim** (including a civil lawsuit or criminal proceeding brought by the Securities and Exchange Commission) made against an **Insured** alleging a violation of any law, regulation or rule, whether statutory or common law, which is:

(1)     brought by any person or entity alleging, arising out of , based upon or attributable to, in part or in whole, the: (a) purchase or sale of, or (b) offer or solicitation of an offer to purchase or sell, any securities of an **Insured Organization** or **Portfolio Company**; or

(2)     brought by a security holder of an **Insured Organization** or **Portfolio Company**, arising solely with respect to such security holder's interest in such securities of the **Insured Organization** or **Portfolio Company**, whether directly, by class action, or derivatively on behalf of the **Insured Organization** or **Portfolio Company**.

"**Shareholder Derivative Demand**" shall mean a written demand by one or more shareholders of the **Insured Organization**, upon the Board of Directors (or similar management body or any committee thereof) of the **Insured Organization** to initiate a civil proceeding in a court of law against any individual **Insured Person**.

"**SOX 304/Dodd-Frank 954 Costs**" shall mean the reasonable and necessary fees, costs and expenses (including the premium or origination fee for a loan or bond) consented to by the **Insurer** and incurred by any **Insured Person** solely to facilitate the return of amounts required to be repaid by such **Insured Person** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010; provided, however, **SOX 304/Dodd-Frank 954 Costs** shall not include any payment, reimbursement, disgorgement or restitution of any such amounts requested or required to be repaid by such **Insured Person** pursuant to Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.

"**Third Party Claim**" shall mean any **Claim** brought by a customer, client, supplier, distributor, or independent contractor of the **Insured Organization**, or any other individual or group of individuals for any **Business Practices Wrongful Act**.

"**Whistleblower Conduct**" shall mean any of the activity set forth in 18 U.S.C. 1514A (a), engaged in by a whistleblower with any federal regulatory or law enforcement agency, member of the Congress or any committee of the Congress, or persons with supervisory authority over the employee, or an enforcement action by the whistleblower set forth in 18 U.S.C. 1514A (b) or any similar 'whistleblower' protection provision of any applicable federal, state, local or foreign securities law.

2.     Section III.A. is deleted and replaced with the following:

**A.**     "**Claim**" means:

(1)     A written demand, other than a **Shareholder Derivative Demand**, for monetary, non-monetary or injunctive relief against an **Insured** commenced by such **Insured's** receipt of such demand;



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

(2)    an administrative, regulatory, arbitration, or other alternative dispute resolution proceeding including but not limited to a proceeding before the Equal Employment Opportunity Commission, any **Self-Regulatory Organization** or similar state agency, initiated against any **Insured** commenced by such **Insured's** receipt of a demand for arbitration, mediation or other alternative dispute resolution proceeding, notice of charges, formal investigative order or similar document, including the foreign equivalent thereof;

(3)    a criminal or civil proceeding including any appeal therefrom made against any **Insured** and commenced by the return of an indictment, similar charging document, service of a complaint, pleading, or information or similar document including the foreign equivalent thereof;

(4)    a written agreement to toll any applicable statute of limitations prior to the commencement of any judicial, administrative, regulatory or arbitration proceeding;

(5)    any **Investigation**;

(6)    an **Employment Practices Claim**;

(7)    a **Third Party Claim**;

(8)    any **Securities Claim**; or

(9)    an official request for **Extradition** of any **Insured Person** or the execution of a warrant for the arrest of an **Insured Person** where such execution is an element of **Extradition**.

(10)    an **Inquiry**, if reported to the **Insurer** pursuant to Section VIII. of the Policy.

3.    Section III.B. is deleted and replaced with the following:

**B.**    "**Costs of Defense**" means reasonable legal fees, costs and expenses (including but not limited to attorneys, experts, consultants, mediator and arbitrator fees, costs and expenses, document production fees and expenses) incurred in the investigation, defense or appeal of any **Claim** including the costs of an appeal bond, attachment bond or similar bond (but without obligation on the part of the **Insurer** to apply for or furnish such bonds); provided, however, **Costs of Defense** shall not include salaries, wages, overhead or benefit expenses associated with any **Insured Persons**.

Solely with respect to any **Extradition**, **Costs of Defense** shall also mean reasonable fees, costs and expenses incurred through legal counsel and consented to by the **Insurer** resulting from an **Insured Person** lawfully:

(a)    opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of that **Insured Person**; or

(b)    appealing any order or other grant of **Extradition** of that **Insured Person**.



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

If, pursuant to Section VIII.B. of the Policy, notice is provided by an **Insured** and accepted in writing by the **Insurer** ("Noticed Matter"), then, with respect to any covered **Claim** arising out of such Noticed Matter, **Costs of Defense** shall also mean reasonable and customary legal fees, costs and expenses incurred from the date such Noticed Matter is accepted by the **Insurer** until the date such Noticed Matter develops into a covered **Claim** ("Pre-Claim Expenses"). However, this coverage is available only to **Insureds** who:

(1)     are in material compliance with all terms and conditions of the Policy;

(2)     agree to provide the **Insurer** with the same rights to associate with the **Insureds** as afforded for any **Claim** as set forth in Section VII.B. of the Policy; and

(3)     obtain the **Insurer's** prior written consent to incur such Pre-Claim Expenses, such consent to not be unreasonably withheld.

4.     Section III.D. is deleted and replaced with the following:

**D.**     "**Employment Practices Claim**" means any **Claim** brought by or on behalf of any past, present or future employee of an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity**, or any applicant for employment with an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity** alleging an **Employment Practices Wrongful Act**.

5.     Section III.E. is amended by the addition of the following:

(13)     wrongful demotion;

(14)     negligent reassignment;

(15)     violation of any federal, state or local civil rights laws;

(16)     negligent hiring;

(17)     negligent supervision;

(18)     negligent training;

(19)     negligent retention; or

(20)     acts described in (1) through (19) above, arising from the use of the **Insured Organization's** internet, e-mail, telecommunication or similar systems, including the failure to provide and enforce adequate policies and procedures relating to such use of the **Insured Organization's** internet, e-mail, telecommunication or similar systems.

(21)     with respect to any of the foregoing items (1) through (19) of this definition:  infliction of emotional distress and failure to provide or enforce adequate or consistent corporate policies.

6.     Section III.F. is deleted and replaced with the following:

**F.**     "**Executive Officer**" means the functional equivalent of a chief financial officer or in-house general counsel, regardless of the actual title or position.

**GREATAMERICAN.**
**INSURANCE GROUP**

Asset Management
Liability Solution

## RT ELITE REAL ESTATE ENDORSEMENT

7.     Section III.J. is deleted and replaced with the following:

    **J.**    "**Insured Person(s)**" means:

        (1)    any natural person who was, is or shall become a director, officer, general partner, manager, managing member, member of the board of managers, management committee member, equivalent executive or employee (including any part-time, seasonal, temporary or leased employees) of an **Insured Organization**;

        (2)    any natural person who was, is or shall serve in equivalent positions to those noted in subsection (1) above in a foreign-domiciled **Insured Organization**;

        (3)    any natural person representative of an investor in an **Investment Fund** while serving in his or her capacity as a member of any advisory board or other committee of an **Investment Fund**; or

        (4)    any natural person other than a director, officer, general partner, manager, equivalent executive or employee; provided, however, the **Insured Organization** has agreed to indemnify such natural person for any **Wrongful Act(s)**.

8.     Section III.M. is deleted and replaced with the following:

    **M.**    "**Investment Fund**" means:

        (1)    any **Organization** that is a pooled investment vehicle which is created or established prior to or during the **Policy Period** by an **Insured Organization**; and

        (2)    any **Organization** which is created or established prior to or during the **Policy Period** for the purpose of monitoring, liquidating, dissolving or winding down an **Organization** identified in subsection (1) above or for the purpose of holding investments in connection with monitoring, liquidating, dissolving or winding down such an **Organization** identified in subsection (1) above.

9.     Section III.N. is deleted and replaced with the following:

    **N.**    "**Loss**" means compensatory damages, punitive or exemplary damages, the multiple portion of any multiplied damage award, **SOX 304/Dodd-Frank 954 Costs**, **Investigative Costs**, settlements, pre-judgment interest, post-judgment interest and **Costs of Defense.**

        **Loss** shall also include any reasonable fees and expenses of any attorney representing any party who has brought a **Claim** against any **Insured** where such fees and expenses are awarded pursuant to a covered judgment against an **Insured** or a covered settlement (consented to by the **Insurer**, which consent shall not be unreasonably withheld, delayed or denied) to which an **Insured** is a party.

        It is understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages or the multiple portion of any multiplied damage award.

**GREAT**AMERICAN®
**INSURANCE GROUP**

Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

**Loss**, other than **Costs of Defense**, shall not include:

((1)     taxes, criminal or civil fines or penalties imposed by law;

(2)     amounts which may be deemed uninsurable under the law pursuant to which this Policy is construed;

(3)     non-monetary relief;

(4)     employment-related benefits, stock options, perquisites, deferred compensation, severance, or any other type of compensation other than front pay or back pay;

(5)     any portion of damages, settlements or judgments, or settlements arising out of any **Claim** alleging the **Insured Organization** paid an inadequate price or consideration for any securities but solely with respect to coverage provided under Insuring Agreement I. B. (2) and solely to the extent such portion of damages, settlements or judgments, or settlements constitute an increase in consideration paid to the underlying claimant

(6)     costs incurred in connection with cleaning up, removing, eliminating, abating, containing, treating, detoxifying, neutralizing, assessing the effects of, testing for, or monitoring **Pollutants**;

For clarification, this subsection (1), shall not in itself exclude from the definition of **Loss** any damages, settlements or judgments incurred by an **Insured** that are calculated based upon, or that flow directly from, any taxes, fines or penalties imposed upon a client where such taxes, fines or penalties result from a **Wrongful Act** of an **Insured**.

Notwithstanding sub-paragraph (2) above, in a **Securities Claim** alleging violations of Section 11, 12 or 15 of the Securities Act of 1933, as amended, the **Insurer** shall not assert the portion of any amounts incurred by any **Insureds** attributable to such violations constitutes uninsurable loss and shall treat that portion of all settlements, judgments and **Costs of Defense** as constituting **Loss** under the Policy.

Further, notwithstanding subparagraphs (1) and (2) above and solely with respect to coverage provided by Insuring Agreement I.A., "**Loss**" shall also mean civil penalties assessed against any **Insured Person** pursuant to Section 2(g)(2)(B) of the U.S. Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-2(g)(2)(B).

10.     Section III.Q. is deleted and replaced with the following:

**Q.     "Operating Entity"** means any **Organization** (including any **Investment Fund** and its **General Partner(s)**) created or acquired prior to or during the **Policy Period** of which an **Insured** or several **Insureds** collectively possess, directly or indirectly, the power to control, manage or direct by reason of an **Insured's**:

(1)     ownership of greater than 50% voting securities in such **Organization**;



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

(2) right to elect or appoint a majority of the directors, officers, trustees, trust managers, managers, members, **General Partner(s)**, partnership managers, or joint venture managers of such **Organization**; or

(3) rights and obligations pursuant to a written agreement governing the management and operation of such **Organization**.

**Operating Entity** shall include any entity (including, but not limited to, any holding company, special purpose vehicle or other acquisition vehicle) formed to hold a direct or indirect interest in a **Portfolio Company**.

**Operating Entity** shall not include any **Organization** created or acquired by any **Insured Person(s)** where such **Organization**: (i) was not created or established in connection with or to support an **Investment Fund**; and (ii) the **Named Insured** is not responsible for the financial reporting and tax filings of such **Organization**.

11. Section III.R. is deleted and replaced with the following:

**R.** "**Organization**" means any corporation, trust (including any grantor trust), limited liability company, limited liability partnership, limited partnership, general partnership or joint venture. **Organization** shall also include any entity organized outside of the United States that is the functional equivalent of any corporation, trust (including any grantor trust), limited liability company, limited liability partnership, limited partnership, general partnership or joint venture.

12. Section III.S. is deleted and replaced with the following:

**S.** "**Outside Position**" means the position of director, officer, board observer, member of a creditor committee, member, manager, trustee, member of an advisory board, shareholder representative or other equivalent executive or management position in any:

(1) **Portfolio Company**;

(2) **Non-Profit Entity**; or

(3) other entity specifically scheduled by endorsement to this Policy,

provided, however, that service in such position is with the knowledge and consent or at the request of the **Insured**.

**Outside Position** shall also include service by an **Insured Person** in any other capacity with a **Portfolio Company** other than the capacities listed above, provided such service entitles the **Insured Person** to the same rights of indemnification and advancement afforded individuals in the capacities listed above.

13. Section III.U. is deleted and replaced with the following:

**U.** "**Portfolio Company**" means any entity, including without limitation any pooled investment vehicle sponsored, established and managed by an unaffiliated entity, in which an **Investment Fund** directly or indirectly maintains, maintained or may maintain a debt, equity or other investment interest and any direct or indirect majority-owned subsidiaries of such entity(ies).

**GREATAMERICAN® INSURANCE GROUP**

Asset Management
Liability Solution

## RT ELITE REAL ESTATE ENDORSEMENT

14.     Section III.V. is deleted and replaced with the following:

**V.     "Professional Services"** means:

(1)     any financial, economic, investment advice, investment management, advisory, asset allocation services, portfolio management, or any other management services (including the hiring and supervision of third party vendors), administrative or other consultative services performed by an **Insured** for an **Insured Organization** or other third party; provided that any such services rendered to a third party are (i) pursuant to an express contract; (ii) for a fee or other compensation; and (iii) in furtherance of the business objectives of any **Insured Organization**;

(2)     the formation, creation, distribution or sale of securities in, or the management, administration or investment decision or potential investment decision (including but not limited to any decisions based upon an **Insured's** due diligence of, investment in, or disposition of any **Portfolio Company**) of any **Investment Fund**;

(3)     any advisory, management, administrative or other services performed by an **Insured** for or on behalf of any **Portfolio Company**, including but not limited to, advice as to the **Portfolio Company's** capital structure, purchase or sale of assets, merger or acquisitions, stock issuance, contemplated financing or capitalization, internal controls, legal or regulatory compliance programs, software and/or hardware systems, hiring of experts, marketing policies, financial reporting, risk management programs or other operational or business matters;

(4)     identification of property and arranging of financing for, the purchase or sale of, or investment in, real properties or any potential properties on behalf of an **Insured Organization**;

(5)     legal services provided by an **Insured Person** as an attorney, but only if such services are performed for an **Insured Organization** and in the **Insured Person's** capacity as an employee of an **Insured Organization**. **Professional Services** shall also include pro bono legal services rendered by an **Insured Person** for indigent clients or for non-profit public interest groups; provided that such legal services are rendered with the knowledge and prior written consent of the **Named Insured**; or

(6)     the publication of written material, whether in tangible or electronic format, in connection with any of the activities identified in (1) through (5) above;

**Professional Services** also means the direction of, control of, management of or influence over a **Portfolio Company**, directly or indirectly, by an **Insured** in his, her or its capacity as a **Controlling Person** of such **Portfolio Company**, including, without limitation, the exercising of actual or alleged control over funding or management of, being a fiduciary of, or controlling, any pension, employee benefit or welfare plan established by a **Portfolio Company** and regulated by ERISA or any regulation promulgated thereunder or any similar, federal, state or local law or regulation.



Asset Management
Liability Solution

## RT ELITE REAL ESTATE ENDORSEMENT

**Professional Services** shall also mean:

(1)     an agreement or refusal to grant or extend any loan, lease or extension of credit or the granting or extension of any loan, lease or extension of credit (including but not limited to the administration of any loan, lease or extension of credit);

(2)     declaring an event of default, accelerating any loan, lease or extension of credit or foreclosing on any collateral or asset or pursuing any of these remedies (including but not limited to any debt collection activities, taking possession of or assignment of, or the subordination of any collateral or asset), with respect to any loan, lease or extension of credit;

(3)     the termination, cancellation, acceleration, withdrawal or failure to advance funds in connection with any loan, lease or extension of credit or the releasing of or failure to release any information in connection with any loan, lease or extension of credit;

(4)     the imposition of financial, business or management controls or requirements upon any customer of an **Insured** to whom any loan, lease or extension of credit has been granted;

(5)     servicing, monitoring and administration of any loan, lease or extension of credit including (including but not limited to, the selection and oversight of a third party that performs such services pursuant to a written contract or agreement, record keeping, billing or disbursement of principal or interest, receipt or payment of insurance premiums or taxes, credit reporting or amount of property value, restructuring, monitoring and maintaining the attachment and perfection of security interests and other functions relating to collateral, and the termination, transfer, repossession, or foreclosure of the subject loans and related collateral); or

(6)     due diligence services performed in any of the foregoing.

15.     Section III.Z. is deleted and replaced with the following:

**Z.**     "**Wrongful Act**" means any actual or alleged **Employment Practices Wrongful Act**, any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, or any actual or alleged error or omission in the rendering of or the failure to render **Professional Services**:

(1)     by the **Insured Persons** in their capacity as such or solely because of their status as such;

(2)     with respect to Insuring Agreement (B)(2), by the **Insured Organization**;



Asset Management
Liability Solution

## RT ELITE REAL ESTATE ENDORSEMENT

    (3)    with respect to Insuring Agreement (C), by the **Insured Persons** while serving in an **Outside Position**;

    (4)    by an **Insured** solely by reason of their status as a **Controlling Person** or as a selling shareholder; or

    (5)    With respect to (1) and (2) above, **Wrongful Act** shall also include any **Business Practices Wrongful Act**.

| Amendments to Exclusions |
|---|

1.    Section IV.A. is deleted and replaced with the following:

    **A.**    for any actual or alleged:

        (1)    bodily injury, sickness, disease, or death of any person;

        (2)    damage to or destruction of any tangible property, including the loss of use thereof; or

        (3)    mental anguish, emotional distress, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, libel or slander; provided, however, that part (3) of this exclusion shall not apply to any:

            (a)    **Employment Practices Claim**; or

            (b)    **Third Party Claim**;

    provided, however, that this exclusion shall not apply to any **Securities Claim** or to any **Claim** arising from the performance of or failure to perform **Professional Services**;

2.    Section IV.C. is deleted and replaced with the following:

    **C.**    by or on behalf of an **Insured Organization** provided, however, this exclusion shall not apply to any **Claim** against any **Insured Person** if such **Claim**:

        (1)    is brought solely and entirely in a jurisdiction other than the United States of America, its territories and possessions;

        (2)    is in the event of **Financial Insolvency**;

        (3)    is brought by any security holder of an **Insured Organization** whether directly or derivatively, if the security holder bringing such **Claim** is acting totally independent of, and without the solicitation, assistance, active participation or intervention of any **Insured**;

        (4)    is against any **Insured Person** who is no longer acting in an **Insured Capacity**; or

**GREAT**AMERICAN®
**INSURANCE GROUP**

Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

(5)      is brought by an **Insured Organization**, where prior to bringing such **Claim**, independent legal counsel for such **Insured Organization** has stated in a written opinion that a failure to bring or maintain such **Claim** would be a breach of fiduciary duty owed by any **Insured** to such **Insured Organization** or investors in such **Insured Organization**;

For the purposes of Section IV.C.(3), where one or more security holders allege, certify or affirm there is likely support for their **Claim** by referring to any of the following actions taken by an **Insured Person**, such allegations, certification or affirmation shall not, in itself, demonstrate such security holder is not "acting totally independent of, and without solicitation, assistance, active participation or intervention of any **Insured**":

(a)      providing information to, causing information to be provided to, or otherwise assisting in an investigation conducted by a federal regulatory agency, a federal law enforcement agency, or any member or committee of the United States Congress regarding the possible violation by an **Insured** of the laws, rules, and regulations listed in 18 U.S.C. 1514A(a)(2);

(b)      filing, causing to be filed, testifying, participating in, or otherwise assisting in a proceeding relating to the possible violation by an Insured of law, rules, or regulations listed in 18 U.S.C. 1514A(a)(2);

(c)      filing a complaint with the United States Secretary of Labor, as authorized by 18 U.S.C. 1514A(b)(1)(A); or

(d)      a bringing an action at law or equity to the extent that such action seeks relief pursuant to 18 U.S.C. 1514A(b)(1)(B).

3.      Section IV.D. is deleted and replaced with the following:

**D.**      brought about or contributed to by:

(1)      any **Insureds** gaining any personal profit, financial advantage or remuneration to which they were not legally entitled; or

(2)      the deliberately fraudulent or deliberately criminal acts of any **Insureds**;

provided, however: (a) this exclusion shall only apply if it is established by any final, non-appealable adjudication in the underlying proceeding that such conduct in fact occurred, provided, further, that this exclusion shall not apply to any **Costs of Defense** occurring prior to such final non-appealable adjudication; (b) this exclusion shall not apply to coverage provided under Insuring Agreement I.B.(1); and (c) with respect to subsection (2) above, for acts or omissions which are considered a criminal violation in a **Foreign Jurisdiction** that are not considered a criminal violation in the United States of America, the imposition of a criminal fine or criminal sanction in such **Foreign Jurisdiction** will not trigger this exclusion.



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

4.      Section IV.E. is deleted in its entirety.

5.      Section IV.G. is deleted and replaced with the following:

**G.**      for any **Wrongful Act** of any **Insureds** in connection with the activities of any **Insured(s)** as a fiduciary for, or in the administration of, any pension or welfare plans of an **Insured Organization**; provided, however, solely with respect to an **Employment Practices Claim**, this Exclusion **G.** shall not apply to any **Claim** based upon, arising out of, relating to, or directly or indirectly resulting from any actual or alleged retaliation including but not limited to any **Claim** for an actual or alleged violation of Section 510 of the Employee Retirement Income Security Act (ERISA).

6.      Section IV.H. is deleted and replaced with the following:

**H.**      based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any prior and/or pending civil, criminal, administrative or investigative proceeding against any **Insured** as of the date stated in Item 7 of the Declarations, or any fact, circumstance or situation underlying or alleged in such proceeding;

7.      Section IV.J. is deleted and replaced with the following:

**J.**      solely with respect to the **Insured Organization**, for any actual or alleged breach of a written contract or agreement; provided, however, this exclusion shall not apply to:

(1)      liability for **Loss** which would have attached even in the absence of such contract or agreement;

(2)      any actual or alleged breach of any contract describing or calling for **Professional Services**;

(3)      any indemnification obligation between an **Insured Organization** and an **Insured Person**;

(4)      any actual or alleged breach of an **Investment Fund's** partnership agreement, articles of incorporation, by-laws, trust indenture, limited partnership agreement, operating agreement, or similar organizational or constituting document; or

(5)      **Costs of Defense**;

8.      Section IV.L. is deleted in its entirety.

9.      Section IV.M. is deleted and replaced with the following:

**M.**      for any actual or alleged violation by an **Insured** of workers' compensation, unemployment compensation, disability benefits, or social security laws, or Fair Labor Standards Act, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act of 1970, the Workers' Adjustment and Retraining Notification Act, or any similar federal, state, local or foreign law except a **Claim** alleging retaliation for the exercise of any rights under such laws.

10.     The last paragraph of Section IV. is deleted and replaced with the following:

Note:   It is agreed that the acts of an **Insured** shall not be imputed to any other **Insured** for the purpose of determining the applicability of the above stated exclusions.



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

| Amendments to Retention |
| --- |

Section VI. is amended by the addition of the following:

**D.** With respect to a **Claim** against an **Insured Person** for a **Wrongful Act** while serving in an **Outside Position**, no Retention shall apply to such **Claim**.

**E.** Coverage for **Investigative Costs** shall not be subject to any Retention;

| Amendments to Costs of Defense and Settlements |
| --- |

Section VII. A. of the Policy is deleted and replaced with the following:

**A.** No **Costs of Defense**, including any Pre-Claim Expenses, shall be incurred or settlements made, obligations assumed or liability admitted with respect to any **Claim** without the **Insurer's** written consent, which shall not be unreasonably withheld or delayed. The **Insurer** shall not be liable for any **Costs of Defense**, including any Pre-Claim Expenses, settlement, assumed obligation or admission to which it has not consented. Notwithstanding any of the foregoing, if all **Insureds** are able to dispose of all **Claims** that are subject to one Retention amount (inclusive of **Costs of Defense**) for an amount not exceeding any applicable Retention amount, then the **Insurer's** consent shall not be required for such disposition.

| Amendment to Notice of Claim |
| --- |

Section VIII. A. of the Policy is deleted and replaced with the following:

**A.**

(1) The **Insureds** shall, as a condition precedent to their rights under this Policy, give to the **Insurer** written notice of any **Claim**, other than an **Inquiry,** made against any **Insureds** as soon as practicable after the **Named Insured's** Chief Financial Officer or General Counsel first becomes aware of such **Claim** but in no event later than: (i) ninety (90) days after the termination of the **Policy Period**; or (ii) the expiration date of the **Discovery Period**, if applicable; or

(2) If, during the **Policy Period**, the **Insureds** first become aware of an **Inquiry**, and if the **Insureds** give written notice to the **Insurer** as soon as practicable from the date the Chief Financial Officer or General Counsel first becomes aware of the **Inquiry**, but in no event later than ninety (90) days after the end of the **Policy Period** of:

(i) the entity conducting the **Inquiry**;

(ii) the circumstances by which the **Insureds** first became aware of the **Inquiry**; and

(iii) the particulars as to dates and persons involved;

then the **Inquiry** shall be treated as a **Claim** under this Policy and the reasonable and necessary costs, charges, fees and expenses incurred by an **Insured Person** solely in connection with his or her preparation for and response to the **Inquiry** shall be covered, subject to all terms, conditions and limitations of this Policy. Any other **Claim** which arises out of such **Inquiry** shall be deemed to have been first made at the time such written notice of the **Inquiry** was received by the **Insurer**. However, if the **Insureds** elect not to report an **Inquiry**, then any subsequent **Claim** which arises out of the **Inquiry** shall be subject to the reporting requirements set forth in subparagraph A. (1) above, and coverage for such subsequent **Claim** will not be denied because of the **Insureds'** failure to report the **Inquiry** pursuant to this section of the Policy.



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

| Addition to General Conditions |
| --- |

Section IX. is amended by the addition of the following:

**Supplemental Coverage for UK Corporate Manslaughter Act Investigation Costs**
The **Insurer** shall, subject to prior written consent, pay on behalf of or reimburse an **Insured Person** for reasonable costs and expenses that result solely from the investigation, adjustment, defense and/or appeal of a **Claim** against the **Insured Organization** for any actual or alleged violations of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute in any jurisdiction, provided, however, such costs and expenses shall not include any salary, wages, overhead or benefit expenses associated with such **Insured Person**. Any payment pursuant to this supplemental coverage shall be considered **Loss** for purposes of the exhaustion of the Limit of Liability and shall be subject to the Retention applicable to " each **Claim** other than an **Employment Practices Claim**" as stated for Insuring Agreement B in Item 4. of the Declarations. In the event the **Insured Person** is not indemnified by the **Insured Organization** for any reason, the **Insurer** shall advance payment hereunder without requiring payment of the Retention.

**Other Insurance Provisions**
This Policy shall apply only as excess over, and shall not contribute with, any other valid and collectible policy or policies (except with respect to: (1) any excess beyond the amount or amounts of coverage under such other policy or policies; and (2) any personal umbrella liability policy, independent directors' liability or other personal liability policy providing coverage to **Insured Persons** and only to the extent coverage is otherwise provided to such **Insured Persons** under this Policy whether such other policy or policies are stated to be primary, contributory, excess, contingent, or otherwise, unless such other insurance is specifically written as excess insurance over the Limit of Liability provided by this Policy.

Notwithstanding the foregoing, such insurance as is provided by this Policy shall apply as primary to any contractual right of indemnification that an **Insured Organization** has from any **Portfolio Company**, **Non-Profit Entity**, or any other entity in which an **Insured Person** serves in an **Outside Position** (collectively, "**Outside Entity**").

In the event of a **Claim** covered under Insuring Agreement I.C. that is made against an **Insured Person** for a **Wrongful Act**, coverage provided under this Policy shall be specifically excess of: (a) any indemnification provided by an **Outside Entity**; and (b) any valid and collectible insurance coverage afforded to an **Outside Entity** or its executives applicable to such **Claim**. Notwithstanding the foregoing sentence, and without prejudice to the Insurer's excess position, if:

(a)     for any reason (including but not limited to **Financial Insolvency**) an **Outside Entity** fails or refuses to advance, pay or indemnify **Loss** from a **Claim** made against an **Insured Person**; or

(b)     **Loss** from such **Claim** is not actually paid to, or on behalf of, the **Insured Person** by insurance afforded to an **Outside Entity** or its executives;

then this Policy will respond as if it were primary with no Retention being applicable, but subject to all its other terms, conditions and limitations including the **Insurer's** subrogation rights under Section IX.J.

Advancement, payment or indemnification of an **Insured Person** by an **Outside Entity** is deemed "failed" if it has been requested by an **Insured Person** in writing and has not been provided by, agreed to be provided by or acknowledged as an obligation by an **Outside Entity** within sixty (60) days of such request; and advancement, payment or indemnification by an **Outside Entity** is deemed "refused" if such **Outside Entity** gives a written notice of the refusal to the **Insured Person**.



Asset Management
Liability Solution

## RT ELITE REAL ESTATE ENDORSEMENT

| Amendments to General Conditions |

1.  Section IX.D.(1) is deleted and replaced with the following:

    (1)  This Policy may be canceled by the **Named Insured** at any time by written notice to the **Insurer**. In the event the **Named Insured** cancels this Policy for reasons other than the downgrade of the **Insurer's** rating by A.M. Best, Standard & Poor's or Moody's, the **Insurer** shall retain the customary short rate premium. However, if the **Named Insured** cancels the Policy due to a downgrade of the **Insurer's** rating to below [A-] by A.M. Best or [BBB] by Standard & Poor's Ratings Services, the **Insurer** shall refund any unearned premium on a pro rata basis. Payment of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

2.  Section IX.G. is deleted and replaced with the following:

    **G.    Merger or Acquisition**

    If, during the **Policy Period**, an **Insured Organization** acquires the assets of another entity other than a **Portfolio Company**, by merger or otherwise, and the acquired assets of such other entity exceed fifty percent (50%) of the assets of such **Insured Organization** as of the inception date of the Policy, written notice thereof shall be given to the **Insurer** as soon as practicable, but in no event later than ninety (90) days from the effective date of the transaction, together with such information as the **Insurer** may request. Premium adjustment and coverage revisions shall be effected as may be required by the **Insurer**.

3.  Section IX.H.(3) is deleted and replaced with the following:

    (3)  Sale of **Portfolio Company**

    If before or during the **Policy Period** an organization ceases to be a **Portfolio Company**, coverage with respect to: (i) an **Insured Person** serving in an **Outside Position** of such **Portfolio Company**; or (ii) any **Professional Services** rendered by an **Insured** to such **Portfolio Company** shall continue until termination of this Policy but only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Portfolio Company**.

    An entity ceases to be a **Portfolio Company** when all **Insured Organizations** no longer maintain a financial interest in such entity.

4.  Sections IX.I.(2) and IX.I.(3) are deleted and replaced with the following:

    (2)  Worldwide Provision

    The coverage provided under this Policy shall apply worldwide.

    (3)  Estates and Legal Representatives

    The coverage provided by this Policy shall also apply to the estates, heirs, legal representatives assigns, or any trust (including but not limited to any grantor trust, irrevocable trust, revocable trust, bypass trust, GST trust, marital trust) or any entity (including but not limited to any corporation, partnership, limited liability company) used for estate planning purposes or any other estate planning or wealth management devices, maintained by or for the benefit of any **Insured Persons** in the event of their death, incapacity or bankruptcy, but only for **Claims** arising out of any actual or alleged **Wrongful Acts** of such **Insured Persons**.



Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

## Amendment to Subrogation

Section IX.J. is deleted and replaced with the following:

**J.    Subrogation**

In the event of any payment under this Policy, the **Insurer** shall be subrogated to all the **Insureds'** rights of recovery.  The **Insured Organization** and **Insured Persons** shall do everything necessary to secure such rights, including the execution of such documents necessary to enable the **Insurer** to effectively bring suit in the name of any **Insured Persons** or the **Insured Organization**.  In no event, however, shall the **Insurer** exercise its rights to subrogation against an **Insured Person** under this Policy unless, such **Insured Person**:

(1)    has been convicted of a deliberate criminal act; or

(2)    has been determined by a final adjudication adverse to the **Insured Person** to have committed a deliberate fraudulent act, or to have obtained any personal profit, financial advantage or remuneration to which such **Insured Person** was not legally entitled.

In the event the **Insurer** shall for any reason pay indemnifiable **Loss** on behalf of an **Insured Person**, the **Insurer** shall have the contractual right hereunder to recover from the **Insured Organization** the amount of such **Loss** equal to the amount of the Retention not satisfied by the **Insured Organization** and shall be subrogated to rights of the **Insured Persons** hereunder.

## Amendment to Representations and Severability

Section IX.Q. is deleted and replaced with the following:

**Q.    Representations and Severability**

It is agreed by the **Insureds** that the particulars and statements contained in the **Proposal Form** and any information provided therewith (which shall be on file with the **Insurer** and be deemed attached hereto as if physically attached hereto), are the basis of this Policy and are to be considered as incorporated in and constituting a part of the Policy. It is further understood and agreed by the **Insureds** that the statements in the **Proposal Form** or in any information provided therewith are their representations, and that this Policy is issued in reliance upon the truth of such representations. In the event any of the statements, representations or information in the **Proposal Form** and/or any information provided therewith (hereafter referred to as "Facts"), are not true and accurate and materially affect either the acceptance of the risk or the hazard assumed by the **Insurer** under the policy:

(1)    There shall be no coverage for any **Claims** made pursuant to Insuring Agreement A. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form** if such **Insured Person** knew of such disclosure in the **Proposal Form**. The knowledge of any **Insured** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement A;

**GREATAMERICAN.**
**INSURANCE GROUP**

Asset Management
Liability Solution

# RT ELITE REAL ESTATE ENDORSEMENT

(2)    There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.1. of this Policy to the extent an **Insured Organization** indemnifies any **Insured Person** who had knowledge, as of the effective date of the **Policy Period**, of any facts that were not truthfully and accurately disclosed in the **Proposal Form** if such **Insured Person** knew of such disclosure in the **Proposal Form**. For purposes of this paragraph (2), knowledge of any Insured shall not be imputed to any other **Insured Person**;

(3)    There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.2. of this Policy if the person(s) who signed the **Proposal Form** for this coverage or any **Insured Person** who is or was a past, present or future **Executive Officer** of the **Named Insured** had knowledge, as of the effective date of the **Policy Period**, of any facts that were not truthfully and accurately disclosed in the **Proposal Form** if such **Insured Person** knew of such disclosure in the **Proposal Form**; for purposes of this paragraph (3), knowledge of any **Insured** other than an **Executive Officer** of the **Named Insured** shall not be imputed to any **Insured Organization**;

(4)    There shall be no coverage for any **Claims** made pursuant to Insuring Agreement C. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form** if such **Insured Person** knew of such disclosure in the **Proposal Form**. The knowledge of any **Insured** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement C.; and

(5)    The **Policy** shall not be rescinded by the **Insurer**.

| Amendment to Insured Capacity |
|---|

It is understood and agreed that the **Insurer** shall not be liable to make any payment for that portion of **Loss** for any **Claim** made against an **Insured Organization** for the rendering or failure to render services in its capacity as a(n):

(1)    Property Manager;
(2)    General Contractor;
(3)    Real Estate Developer;
(4)    Architect or Engineer;
(5)    Insurance Broker or Agent;
(6)    Real Estate Broker or Agent;
(7)    Securities Broker or Dealer (provided, however, subpart (7) of this exclusion shall not apply to transactions sponsored by the **Insured Organization**);

Notwithstanding the foregoing, this exclusion shall not apply to any **Employment Practices Claim** or any **Claim** brought by a security holder of an **Investment Fund** relating to the diminution of value of real property owned by an **Investment Fund** as a result of an **Insured Organization's** negligent rendering or failing to render professional services in any of the above scheduled capacities.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.



Asset Management
Liability Solution

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# MOCK REGULATORY COMPLIANCE EXAMINATION
## RENEWAL PREMIUM CREDIT

If, during the **Policy Period**, the **Insured** undergoes a mock regulatory compliance examination conducted by a qualified consulting firm, then the **Insurer** will offer a premium credit toward the renewal of this Policy. The premium credit may be up to: (1) fifty percent (50%) of the cost of such examination; or (2) ten percent (10%) of the annualized premium for such renewal; whichever is less.  However, in no event shall the premium credit exceed $25,000.  The **Insured** will be not be eligible for another premium credit attributable to any future mock regulatory compliance examination until the **Policy Period** following the expiration of the second renewal of this Policy.

Notwithstanding the foregoing, the premium credit is subject to the following conditions:

(1)     any such examination shall not be conducted without the prior written consent of the **Insurer** (such consent not to be unreasonably withheld); and

(2)     receipt and review of a copy of the consultant's statement for such work and letter of findings and recommendations or similar documents.

This endorsement should not be construed to guarantee an offer to renew coverage with the **Insurer**.

Other than as stated above, nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the Policy to which this endorsement is attached.

Insured:  ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:  4/18/2023 to Policy Expiration          Policy Number:  PEPE246619

Countersigned by:  _____          Endorsement Effective Date:  4/18/2023
                    *Authorized Representative*



**GREAT**_AMERICAN_®
**INSURANCE GROUP**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

## TERRORISM COVERAGE ENDORSEMENT
## CAP ON LOSS FROM CERTIFIED ACTS

Subject to all terms and conditions of this Policy, including any follow-form provisions, this Policy is amended by the addition of the following:

**CERTIFIED ACTS OF TERRORISM COVERAGE**

"Certified Act of Terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of Homeland Security and the Attorney General of the United States, to be an act pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "Certified Act of Terrorism" include the following:

1.    the act resulted in insured losses in excess of $5 million in the aggregate attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.    the act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States government by coercion.

If the aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year in the aggregate and the Insurer has met its deductible under the Terrorism Risk Insurance Act, the Insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rate allocation in accordance with procedures established by the Secretary of the Treasury.

> It is understood and agreed that the Premium section of the Declarations is amended by the addition of the following:
>
> Terrorism Premium: $ 0.00
>
> The Policyholder Disclosure Offer of Terrorism Coverage is attached to and is to be considered as incorporated in and constituting a part of this Policy.

_This coverage shall not apply to any commercial crime or errors & omissions coverages that may be included in this policy._

This endorsement does not extend any additional coverage or otherwise change the terms and conditions of any coverage under this Policy.

Insured:   ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:   4/18/2023 to Policy Expiration                Policy Number:  PEPE246619

Countersigned by: _____                Endorsement Effective Date:   4/18/2023
                        _Authorized Representative_

DTCOV        (02/15)                              Endorsement:   7              Page 1 of 1
2-14176

**GREAT**AMERICAN®
**INSURANCE GROUP**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK INSURANCE LAW AND REGULATIONS. HOWEVER, THE FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

# ECONOMIC AND TRADE SANCTIONS CLAUSE

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance.

Insured:  ARCH REAL ESTATE HOLDINGS, LLC

Policy Period:  4/18/2023 to Policy Expiration

Policy Number:  PEPE246619

Countersigned by: _____

    *Authorized Representative*

Endorsement Effective Date:  4/18/2023

IL 73 24  (Ed. 08/12)
2-14176

Endorsement:  8                Page 1 of 1

**GREAT AMERICAN.**
**INSURANCE GROUP**

# POLICYHOLDER DISCLOSURE
# OFFER OF TERRORISM COVERAGE

The Terrorism Risk Insurance Act establishes a program within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. The Act applies when the Secretary of the Treasury certifies that an event meets the definition of an act of terrorism. The Act provides that, to be certified, an act of terrorism must cause losses of at least five million dollars and must have been committed by an individual or individuals as part of an effort to coerce the government or population of the United States.

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 80% beginning on January 1, 2020, of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

In accordance with the Terrorism Risk Insurance Act, we are required to offer you coverage for losses resulting from an act of terrorism **that is certified under the federal program** as an act of terrorism. The policy's other provisions will still apply to such an act.

*This coverage shall not apply to any commercial crime coverage that may be included in this policy.*

**Terrorism coverage** for acts of terrorism that are certified under the federal program as an act of terrorism is included for no additional premium.  Nonetheless, if you would like to reject such Terrorism coverage, please provide Great American written confirmation of such, and an exclusion will be attached to your policy.

*This coverage shall not apply to any commercial crime or errors & omissions coverages that may be included in this policy.*

DTDIS    (09/20)



**THIS IS A CLAIMS MADE POLICY.  UPON TERMINATION OF COVERAGE FOR ANY REASON, A SIXTY (60) DAY AUTOMATIC DISCOVERY PERIOD WILL APPLY. FOR AN ADDITIONAL PREMIUM AN ADDITIONAL THREE YEAR DISCOVERY PERIOD CAN BE PURCHASED. EXCEPT TO SUCH EXTENT AS MAY BE PROVIDED HEREIN, THE COVERAGE PROVIDED BY THIS POLICY IS LIMITED TO LIABILITY FOR THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD, THE AUTOMATIC DISCOVERY PERIOD, ANY APPLICABLE DISCOVERY PERIOD OR ANY RENEWAL.  HOWEVER, MORE THAN ONE CLAIM INVOLVING THE SAME WRONGFUL ACT OR RELATED WRONGFUL ACTS OF ONE OR MORE INSUREDS SHALL BE CONSIDERED A SINGLE CLAIM, AND ONLY ONE RETENTION SHALL BE APPLICABLE TO SUCH SINGLE CLAIM.  ALL SUCH CLAIMS, CONSTITUTING A SINGLE CLAIM SHALL BE DEEMED TO HAVE BEEN MADE ON THE EARLIER OF THE FOLLOWING DATES (1) THE EARLIEST DATE ON WHICH ANY SUCH CLAIM WAS FIRST MADE; OR (2) THE EARLIEST DATE ON WHICH ANY SUCH WRONGFUL ACT OR RELATED WRONGFUL ACT WAS REPORTED UNDER THIS POLICY OR ANY OTHER POLICY PROVIDING SIMILAR COVERAGE.**

**THERE IS NO COVERGE FOR INCIDENTS THAT TOOK PLACE PRIOR TO THE RETROACTIVE DATE.  NO COVERAGE WILL EXIST AFTER THE EXPIRATION OF THE AUTOMATIC DISCOVERY PERIOD, OR IF PURCHASED, THE ADDITIONAL DISCOVERY PERIOD, WHICH MAY RESULT IN A POTENTIAL COVERAGE GAP IF PRIOR ACTS COVERAGE IS NOT PROVIDED BY ANOTHER INSURER. DURING THE FIRST SEVERAL YEARS OF A CLAIMS MADE RELATIONSHIP, CLAIMS MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND THE INSURED CAN EXPECT SUBSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE INCREASES, UNTIL THE CLAIMS MADE RELATIONSHIP REACHES MATURITY.**

Asset Management Liability Solution

### Asset Management Liability Solution

Great American Insurance Company - Executive Liability Division
Headquarters:  301 E. Fourth Street, Cincinnati, Ohio 45202

# Table of Contents

| | | |
|---|---|---|
| I. | Insuring Agreement | Page 1 |
| II. | Discovery Period | Page 2 |
| III. | Definitions | Page 3 |
| IV. | Exclusions | Page 7 |
| V. | Limit of Liability | Page 10 |
| VI. | Retention | Page 10 |
| VII. | Costs of Defense and Settlements | Page 10 |
| VIII. | Notice of Claim | Page 12 |
| IX. | General Conditions | Page 13 |
| | (A) Payment of Judgment | Page 13 |
| | (B) Bankruptcy/Insolvency | Page 13 |
| | (C) Claim Information | Page 13 |
| | (D) Cancellation | Page 13 |
| | (E) Nonrenewal | Page 14 |
| | (F) Action Against the Insurer | Page 15 |
| | (G) Merger or Acquisition | Page 15 |
| | (H) Run-Off Coverage | Page 15 |
| | (I) Coverage Extensions | Page 16 |
| | (J) Subrogation | Page 17 |
| | (K) Assignment | Page 17 |
| | (L) Conformity of Statute | Page 17 |
| | (M) Entire Agreement | Page 17 |
| | (N) Named Insured Represents Insured | Page 17 |
| | (O) Representative of the Insured | Page 17 |
| | (P) Order of Payments | Page 17 |
| | (Q) Representations and Severability | Page 18 |

# GREAT AMERICAN INSURANCE COMPANIES®

### Headquarters: 301 E. Fourth Street, Cincinnati, Ohio 45202

## THIS IS A CLAIMS MADE POLICY.  READ IT CAREFULLY

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to the insurance company shown in the Declarations (a stock insurance company, hereinafter called the **Insurer**), including the statements made in the **Proposal Form** and subject to all terms, conditions and limitations of this Policy, the **Insured** and the **Insurer** agree:

## Section I.  Insuring Agreements

**A.**     Except for **Loss** which the **Insurer** pays pursuant to Sections I.B. or I.C. of this Policy, the **Insurer** will pay on behalf of the **Insured Persons** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Persons** during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

**B.**     The **Insurer** will pay on behalf of the **Insured Organization**:

(1)     **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Persons** but only to the extent an **Insured Organization** is permitted or required by law to indemnify such **Insured Persons**; or

(2)     **Loss** which the **Insured Organization** becomes legally obligated to pay as a result of a **Claim** first made against the **Insured Organization**;

provided that such **Claim** is first made during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**.

**C.**     Except for **Loss** which the **Insurer** pays pursuant to Sections I.A. and I.B. and subject to all of this Policy's terms and conditions, the **Insurer** will pay on behalf of the **Insured Persons** serving in an **Outside Position** all **Loss** which the **Insured Persons** become legally obligated to pay as a result of a **Claim** first made against the **Insured Person** during the **Policy Period** or **Discovery Period**, if applicable, for a **Wrongful Act**; provided, however, that such coverage shall be specifically excess of any indemnity and/or valid and collectible insurance available from or provided by the entity in which the **Insured Person** serves in such **Outside Position**.

## Section II. Discovery Period

**A**.     If either the **Named Insured** or the **Insurer** cancels or does not renew this Policy, or if the **Insurer** offers to renew this Policy on terms which involve a decrease in the Limit of Liability, a reduction in coverage, an increase in Retention, an addition of an exclusion, or any change in coverage less favorable to the **Insured**, the **Named Insured** shall be entitled to acquire an additional reporting period for **Claims** first made against an **Insured** as set forth below, but only with respect to **Wrongful Acts** committed prior to the end of the **Policy Period**. This additional reporting period shall be referred to as the **Discovery Period.**

**B**.     If either the **Named Insured** or the **Insurer** cancels or does not renew this Policy, or if the **Insurer** offers to renew this Policy on terms which involve a decrease in the Limit of Liability, a reduction in coverage, an increase in Retention, an addition of an exclusion, or any change in coverage less favorable to the **Insured**, even if such change is requested by the **Insured**, it is understood and agreed that the **Discovery Period** shall be the period of sixty (60) days from the end of the **Policy Period**, and there shall be no additional charge. This sixty (60) day period shall be referred to as the **Automatic Discovery Period.**    If prior to the end of the **Automatic Discovery Period** the **Named Insured** pays the **Insurer** an additional amount equal to one hundred fifty percent (150%) of the annual premium of this Policy, the term of the **Discovery Period** shall be extended for an additional thirty-six (36) months from the end of the **Automatic Discovery Period**.

**C**.     The **Insurer** will provide written notice to the **Named Insured** of the **Automatic Discovery Period** and the availability of, the premium for, and the importance of purchasing, the **Discovery Period** within thirty (30) days after the **Termination of Coverage**. This provision shall not apply where the claims-made relationship has continued for less than one (1) year and the **Insurer** is canceling the Policy for non-payment of premium.

**D**.     The right to purchase the **Discovery Period** will terminate unless written notice is given to the **Insurer** within sixty (60) days from the **Termination of Coverage**, or within thirty (30) days after the mailing or delivery of the notice provided by the **Insurer** under Section C, above, whichever is greater, together with full payment of the premium for the **Discovery Period**. If such notice and premium payment are not so given to the **Insurer,** the **Named Insured** will not be able to exercise the right to purchase the **Discovery Period**. The premium charged for the **Discovery Period** shall be based upon the rates in effect on the date this Policy was issued or last renewed.

In the event the **Named Insured** is in liquidation or bankruptcy, or permanently ceases operation, and if the **Named Insured** or its designated trustee, although entitled to, does not purchase the **Discovery Period**, any **Insured Persons** who request the **Discovery Period** within one hundred twenty (120) days of the **Termination of Coverage** may purchase the **Discovery Period**, as provided in Section B, above.

**E**.     **Insured Persons** employed or otherwise affiliated with the **Named Insured** and covered by this Policy during such affiliation shall continue to be covered under this Policy and any **Discovery Period** after such affiliation has ceased for such person's covered acts or omissions during such affiliation.

**F**.     Upon **Termination of Coverage**, any return premium due the **Named Insured** shall be applied to the premium for the **Discovery Period** if the **Insured** elects to purchase such coverage. Where the premium is due to the **Insurer**, any payment received by the **Insurer** from the **Named Insured** as payment for the **Discovery Period** shall be first applied to any premium due for the Policy.

**G**.     In the event similar insurance to that provided by this Policy is in force during the **Discovery Period**, the coverage afforded during the **Discovery Period** shall be excess over any such valid and collectible insurance.

H.  Where a claims-made relationship has continued for at least three (3) years, the Policy's annual aggregate Limit of Liability for the Discovery Period, shall be equal to one hundred percent (100%) of the Policy's annual aggregate Limit of Liability.

Where a claims-made relationship has continued for less than three (3) years, the Policy's annual Limit of Liability for the Discovery Period, shall be at least equal to the greater of:
(1)     the amount of coverage remaining in the Policy's annual aggregate Limit of Liability; or
(2)     fifty percent (50%) of the Policy's annual aggregate Limit of Liability.


## Section III.    Definitions

A.  "**Claim**" means:

(1)     a written demand for monetary or non-monetary relief against an **Insured** commenced by such **Insured's** receipt of such demand;

(2)     an administrative, regulatory, or arbitration proceeding including but not limited to a proceeding before the Equal Employment Opportunity Commission, any **Self-Regulatory Organization** or similar state agency, initiated against any **Insured** commenced by such **Insured's** receipt of a demand for arbitration, notice of charges, formal investigative order or similar document;

(3)     a criminal or civil proceeding including any appeal therefrom made against any **Insured** and commenced by the return of an indictment, similar charging document, service of a complaint, pleading or similar document;

(4)     a written agreement to toll any applicable statute of limitations prior to the commencement of any judicial, administrative, regulatory or arbitration proceeding;

(5)     any civil, criminal, administrative or regulatory investigation of an **Insured** by a federal, state, local or foreign government authority or agency (including without limitation an investigation by the Equal Employment Opportunity Commission, Securities and Exchange Commission, Commodity Futures Trading Commission, Department of Justice, Department of the Treasury, Department of Labor, Pension Benefit Guarantee Corporation, the Financial Services Authority or Grand Jury) or **Self-Regulatory Organization** but only after service of a subpoena, receipt of a Wells Notice, receipt of a target letter or receipt of a formal order of investigation; or

(6)     an **Employment Practices Claim**.

B.  "**Costs of Defense**" means reasonable and necessary legal fees, costs and expenses incurred in the investigation, defense or appeal of any **Claim** including the costs of an appeal bond, attachment bond or similar bond (but without obligation on the part of the **Insurer** to apply for or furnish such bonds); provided, however, **Costs of Defense** shall not include salaries, wages, overhead or benefit expenses associated with any **Insured Persons**.

C.  "**Domestic Partner**" means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law.

D.  "**Employment Practices Claim**" means any **Claim** brought by or on behalf of any past, present or future employee of an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity**, or any applicant for employment with an **Insured Organization**, **Portfolio Company** or **Non-Profit Entity** alleging an **Employment Practices Wrongful Act**.

**E.**    **"Employment Practices Wrongful Act**" means:

(1)    wrongful dismissal, discharge or termination of employment, whether actual or constructive;

(2)    employment related misrepresentation;

(3)    sexual or workplace harassment of any kind;

(4)        discrimination;

(5)    wrongful failure to employ or promote;

(6)    wrongful discipline;

(7)    wrongful deprivation of career opportunity, including defamatory statements made in connection with an employee reference;

(8)    failure to grant tenure;

(9)    negligent evaluation;

(10)    failure to provide adequate workplace or employment policies and procedures;

(11)    wrongful retaliation; or

(12)    employment related libel, slander, defamation, or invasion of privacy.

Coverage is provide only if the actual or alleged **Employment Practices Wrongful Act** is based on disparate impact or actual or alleged vicarious liability.

**F.**    **"Executive Officer"** means the functional equivalent of a chief executive officer, chief financial officer, or in-house general counsel, regardless of the actual title or position.

**G.**    "**Financial Insolvency**" means the status of the **Insured Organization** as a result of the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Insured Organization**, or the **Insured Organization** becoming a debtor in possession.

**H.**    **"General Partner(s)"** means any natural person or organization identified as such in the limited partnership agreement of an **Operating Entity** formed as a limited partnership.

**I.**    "**Insured Organization**" means the **Named Insured** and any **Operating Entity**.    **Insured Organization** shall not include any **Portfolio Company**.

**J.**    "**Insured Person(s)**" means:

(1)    any natural person who was, is or shall become a director, officer, general partner, manager, equivalent executive or employee of an **Insured Organization**;

(2)    any natural person representative of an investor in an **Investment Fund** while serving in his or her capacity as a member of any advisory board or committee of an **Investment Fund**; or

(3)    any natural person other than a director, officer, general partner, manager, equivalent executive or employee while serving in an **Outside Position**; provided, however, the **Insured Organization** has agreed to indemnify such natural person for any **Wrongful Act(s)** while serving in such **Outside Position**.

**K.**    **"Insured(s)"** means the **Insured Persons** and the **Insured Organization**.

Case 1:24-cv-07139   Document 1-1   Filed 09/20/24   Page 59 of 482

**L.**   "**Interrelated Wrongful Acts**" means **Wrongful Acts** which are logically or causally connected by reason of any common fact, circumstance, situation, transaction, casualty, event or decision.

**M.**   "**Investment Fund**" means an **Organization** which is created or established prior to or during the **Policy Period** by an **Insured Organization** consisting of a sum of money whose principal is invested pursuant to the objectives set forth in such **Organization's** private placement, prospectus, or similar document.

**N.**   "**Loss**" means compensatory damages, settlements, pre-judgment interest, post-judgment interest and **Costs of Defense**.  Loss shall also mean punitive or exemplary damages and the multiple portion of any multiplied damage if allowed by law.

It is understood and agreed that the enforceability of the foregoing coverage shall be governed by such applicable law which most favors coverage for punitive or exemplary damages or the multiple portion of any multiplied damage award.

"**Loss**" shall not include:

(1)   taxes, fines or penalties, or matters that may be deemed uninsurable under the law pursuant to which this Policy shall be construed;

(2)   non-monetary relief;

(3)   employment-related benefits, stock options, perquisites, deferred compensation, severance, or any other type of compensation other than front pay or back pay; or

(4)   any portion of damages, judgments, or settlements arising out of any **Claim** alleging the **Insured Organization** paid an inadequate price or consideration for any securities.

**O.**   "**Named Insured**" means the entity named in Item 1 of the Declarations.

**P.**   "**Non-Profit Entity**" means any non-profit and/or eleemosynary organizations.

**Q.**   "**Operating Entity**" means any **Organization** (including any **Investment Fund** and its **General Partner(s)**) created or acquired prior to or during the **Policy Period** of which an **Insured** or several **Insured's** collectively possess, directly or indirectly, the power to control, manage or direct by reason of an **Insured's**:

(1)   ownership of greater than 50% voting securities in such **Organization**;

(2)   right to elect or appoint a majority of the directors, officers, trustees, trust managers, managers, members, **General Partner(s)**, partnership managers, or joint venture managers of such **Organization**; or

(3)   rights and obligations pursuant to a written agreement governing the management and operation of such **Organization**.

**Operating Entity** shall not include any **Organization** created or acquired by any **Insured Person(s)** where such **Organization**: (i) was not created or established in connection with or to support an **Investment Fund**; and (ii) the **Named Insured** is not responsible for the financial reporting and tax filings of such **Organization**.

**R.**   "**Organization**" means any corporation, trust, limited liability company, limited liability partnership, limited partnership, general partnership or joint venture.  **Organization** shall also include any entity organized outside of the United States that is the functional equivalent of any corporation, trust, limited liability company, limited liability partnership, limited partnership, general partnership or joint venture.

**S.** **"Outside Position"** means the position of director, officer, board observer, member of a creditor committee, member, manager, trustee, member of an advisory board or other equivalent executive or management position in any:

(1)  **Portfolio Company**;

(2)  **Non-Profit Entity**; or

(3)  other entity specifically scheduled by endorsement to this Policy,

provided, however, that service in such position is with the knowledge and consent or at the request of the **Insured**.

**T.** "**Policy Period**" means the period set forth in Item 2 of the Declarations or any shorter period that may occur as a result of a cancellation or termination of this Policy.

**U.** "**Portfolio Company**" means any entity in which any **Investment Fund** has or had or proposes to have a financial interest pursuant to the investment objectives set forth in any private placement memorandum, prospectus or similar document issued by an **Insured Organization**. **Portfolio Company** shall also mean any entity in which an **Insured Organization** other than an **Investment Fund** has or had or proposes to have a financial interest provided that such financial interest was acquired in connection with an investment in such entity by an **Investment Fund**.

**V.** "**Professional Services**" means:

(1)  any advisory, management, administrative or other consultative services performed by an **Insured** for an **Insured Organization** or other third party; provided that any such services rendered to a third party are (i) pursuant to an express contract; (ii) for a fee or other compensation; and (iii) in furtherance of the business objectives of any **Insured Organization**;

(2)  the formation, creation, distribution or sale of securities in, or the management, administration or investment decision of any **Investment Fund**;

(3)  any advisory or other consultative services performed by an **Insured** for any **Portfolio Company**, including but not limited to, advice as to the **Portfolio Company's** capital structure, sale of assets, stock issuance, contemplated financing or capitalization, internal controls, legal compliance programs, software and/or hardware systems, hiring of experts, marketing policies, financial reporting, risk management programs or other operational or business matters; or

(4)  legal services provided by an **Insured Person** as an attorney, but only if such services are performed for an **Insured Organization** and in the **Insured Person's** capacity as an employee of an **Insured Organization**. **Professional Services** shall also include pro bono legal services rendered by an **Insured Person** for indigent clients or for non-profit public interest groups; provided that such legal services are rendered with the knowledge and prior written consent of the **Named Insured**.

**W.** "**Proposal Form**" means the application for this Policy, any attachments to such application, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this Policy.

**X.** "**Self-Regulatory Organization**" means any association of investment advisors or securities dealers registered under state or federal securities laws or any national securities exchange registered with the Securities Exchange Commission under the Securities and Exchange Act of 1934, as amended, or any similar Canadian or other national or international exchange or commission.

**Y.** "**Termination of Coverage**" means, whether made by the **Insurer** or the **Insured** at any time: (1) cancellation or nonrenewal of the Policy; or (2) a decrease in limits, a reduction in coverage, increased deductible or self-insured retention, new exclusion, or any other change less favorable to the **Insured.**

**Z.** "**Wrongful Act**" means any actual or alleged **Employment Practices Wrongful Act** or any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty, or any actual or alleged error or omission in the rendering of or the failure to render **Professional Services**:

  (1)    by the **Insured Persons**, in their capacity as such;

  (2)    with respect to Insuring Agreement (B)(2), by the **Insured Organization**; or

  (3)    with respect to Insuring Agreement (C), by the **Insured Persons** while serving in an **Outside Position**.

## Section IV.    Exclusions

The **Insurer** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against an **Insured**:

**A.**    for any actual or alleged:

  (1)    bodily injury, sickness, disease, or death of any person;

  (2)    damage to or destruction of any tangible property, including the loss of use thereof; or

  (3)    mental anguish, emotional distress, invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, libel or slander; provided, however, that part (3) of this exclusion shall not apply to any **Employment Practices Claim**;

**B.**    based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any **Wrongful Act** or **Interrelated Wrongful Acts**, or any fact, circumstance or situation which has been the subject of any notice or **Claim** given under any other policy of which this Policy is a renewal or replacement;

**C.**    brought or maintained by or on behalf of any **Insured**, provided, however, this exclusion shall not apply to:

  (1)    any **Claim** brought by any security holder of an **Insured Organization** whether directly or derivatively, if the security holder bringing such **Claim** is acting totally independent of, and without the solicitation, assistance, active participation or intervention of any **Insured**;

  (2)    any **Employment Practices Claim**;

  (3)    any **Claim** brought by any **Insured Person** where such **Claim** is in the form of a cross-claim or third party claim for contribution or indemnity which is part of and results directly from a **Claim** which is not otherwise excluded by the terms of this Policy;

(4)   any **Claim** brought by the bankruptcy trustee or examiner of an **Insured Organization** or any assignee of such bankruptcy trustee or examiner, or any receiver, conservator, rehabilitator, or liquidator or comparable authority of an **Insured Organization**;

(5)   any **Claim** brought by any **Insured Person** who is no longer employed, contractually or otherwise, by an **Insured Organization**; provided, however, that when such **Claim** is made and maintained, such natural person is acting independently of, and without the solicitation, assistance, participation or intervention of any **Insured**;

(6)   any **Claim** made in a jurisdiction outside of the United States of America, Canada or Australia by an **Insured Person** of an **Insured Organization** created in such jurisdiction;

(7)   any **Claim** brought by an **Insured Organization**, where prior to bringing such **Claim**, independent legal counsel for such **Insured Organization** has stated in a written opinion that a failure to bring or maintain such **Claim** would be a breach of fiduciary duty owed by any **Insured** to such **Insured Organization** or investors in such **Insured Organization**; or

(8)   any **Claim** brought by an **Insured Person** serving as a member of an **Investment Fund's** advisory board, advisory committee or any similar board or committee; provided, however, that such **Insured Person** is serving in such capacity at the request and direction of a security holder of an **Investment Fund**.

**D.**   brought about or contributed to by:

(1)   any **Insureds** gaining any profit, advantage or remuneration to which they were not legally entitled; or

(2)   the deliberately fraudulent or criminal acts of any **Insureds**;

provided, however, this exclusion shall only apply if it is finally adjudicated that such conduct in fact occurred; and this exclusion shall not apply to coverage provided under Insuring Agreement I.B(1);

**E.**   for: (1) the actual, alleged or threatened discharge, dispersal, release or escape of pollutants; or (2) any direction, request or voluntary decision to test for, abate, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, nuclear material or nuclear waste;

"Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

**F.**   for, based upon, arising from, or in any way related to any **Wrongful Act** of any **Insured  Person** serving as a director, officer, board observer, member of a creditor committee, member, manager, trustee, member of an advisory board or other equivalent executive or management position of any entity other than the **Insured Organization** even if such service is at the direction or request of the **Insured Organization**, provided, however, this exclusion does not      apply to any **Claim** for any **Wrongful Act** of an **Insured Person** while serving in an **Outside Position**;

**G.**   for any **Wrongful Act** of any **Insureds** in connection with the activities of any **Insured(s)** as a fiduciary for, or in the administration of, any pension or welfare plans of an **Insured Organization** or a **Portfolio Company**;

**H.**   based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving any prior and/or pending civil, criminal, administrative or investigative proceeding involving any **Insured** as of the date stated in Item 7 of the Declarations, or any fact, circumstance or situation underlying or alleged in such proceeding;

I.     for any **Wrongful Act** of any **Operating Entity** or the **Insured Persons** of such **Operating Entity** occurring:

    (1)     prior to the date such entity became an **Operating Entity**;

    (2)     subsequent to the date such entity became an **Operating Entity** or was merged with an **Insured Organization** which, together with a **Wrongful Act** occurring prior to the date such entity became an **Operating Entity** or was merged with an **Insured Organization**, would constitute **Interrelated Wrongful Acts**; or

    (3)     subsequent to the date an **Insured** ceased to possess, directly or indirectly, the power to control, manage or direct such **Operating Entity**;

J.     solely with respect to the **Insured Organization**, for, based upon, arising from, or in any way related to any actual or alleged breach of contract or agreement, whether written or oral; provided, however, this exclusion shall not apply to:

    (1)     liability for **Loss** which would have attached even in the absence of such contract or agreement;

    (2)     any actual or alleged breach of any contract describing or calling for **Professional Services**;

    (3)     any indemnification obligation between an **Insured Organization** and an **Insured Person**; or

    (4)     any actual or alleged breach of an **Investment Fund's** partnership agreement, articles of incorporation, by-laws, trust indenture or similar organizational or constituting document;

K.     for, based upon, arising from, or in any way related to any public offering of securities of an **Insured Organization** or the purchase or sale of such securities subsequent to such public offering; provided, however, that this exclusion shall not apply to the offering of securities of an **Insured Organization** that is exempt from registration under the Securities Act of 1933;

L.     which is insured in whole or in part by another valid and collectible policy or policies (except with respect to any excess beyond the amount or amounts of coverage under such other policy or policies), whether such other policy or policies are stated to be primary, contributory, excess, contingent or otherwise;

M.     for any actual or alleged violation by an **Insured** of workers' compensation, unemployment compensation, disability benefits, or social security laws, or the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act of 1970, the Workers' Adjustment and Retraining Notification Act, or any similar federal, state, local or foreign law except a **Claim** alleging retaliation for the exercise of any rights under such laws.

    NOTE: For the purpose of determining the applicability of the aforementioned Exclusion D., it is understood and agreed that:

    (1)     the **Wrongful Act** of any **Insured Person** shall not be imputed to any other **Insured Person**; and

    (2)     only the **Wrongful Acts** of any past, present or future **Executive Officer** shall be imputed to the **Insured Organization**.

## Section V.    Limit of Liability

**A.**    The **Insurer** shall be liable to pay one hundred percent (100%) of **Loss** in excess of the applicable Retention amount stated in Item 4 of the Declarations and subject to applicable retention amount stated in Section VII.F. of the policy, up to the Limit of Liability stated in Item 3 of the Declarations.

**B.**    **Costs of Defense** shall be part of, and not in addition to, the Limit of Liability stated in Item 3 of the Declarations, and such **Costs of Defense** shall serve to reduce the Limit of Liability.

**C.**    The **Insurer's** liability for all **Loss** shall be the amount shown in Item 3 of the Declarations which shall be the maximum aggregate Limit of Liability of the **Insurer** for the **Policy Period**, regardless of the time of payment or the number of **Claims**.

## Section VI.    Retention

**A.**    One Retention shall apply to each and every **Claim**.  The **Insured Organization** shall be responsible for, and shall hold the **Insurer** harmless from, any amount within the Retention.  With respect to Insuring Agreement B.(1), if the **Insured Organization** is permitted or required by the **Insured Organization** agreement, by-laws, certificate of incorporation, or similar document to indemnify the **Insured Persons** for **Loss**, or to advance **Costs of Defense** on their behalf, and does not in fact do so other than for reasons of **Financial Insolvency**, then the **Insurer** shall pay all such **Loss** on behalf of such **Insured Persons** subject to the Retention applicable to Insuring Agreement B.(1) and all terms and conditions of this Policy. For purposes of this paragraph, any partnership agreement, operating agreement, shareholder and/or board of director's resolutions of an **Insured Organization** shall be deemed to provide indemnification and advancement for such **Loss** to the fullest extent permitted or required by the law.

**B.**    More than one **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** of one or more **Insureds** shall be considered a single **Claim**, and only one Retention shall be applicable to such single **Claim**.  All such **Claims** constituting a single **Claim** shall be deemed to have been made on the earlier of the following dates: (1) the earliest date on which any such **Claim** was first made; or (2) the earliest date on which any such **Wrongful Act** or **Interrelated Wrongful Acts** was reported under this Policy or any other policy providing similar coverage.

**C.**    In the event **Loss** arising from a single **Claim** is subject to more than one Retention, the largest Retention amount set forth in Item 4 of the Declarations shall be the maximum Retention applicable to such **Claim**.

## Section VII.    Costs of Defense and Settlements

**A.**    No **Costs of Defense** shall be incurred or settlements made, obligations assumed or liability admitted with respect to any **Claim** without the **Insurer's** written consent, which shall not be unreasonably withheld. The **Insurer** shall not be liable for any **Costs of Defense**, settlement, assumed obligation or admission to which it has not consented.  Notwithstanding any of the foregoing, if all **Insureds** are able to dispose of all **Claims** that are subject to one Retention amount (inclusive of **Costs of Defense**) for an amount not exceeding any applicable Retention amount, then the **Insurer's** consent shall not be required for such disposition.

**B.**    The **Insurer** shall have the right to associate itself in the defense and settlement of any **Claim** that appears reasonably likely to involve this Policy. The **Insurer** may make any investigation it deems appropriate. However, it shall be the duty of the **Insureds**, not the **Insurer**, to defend any **Claim** provided that the **Insureds** shall only retain counsel as is mutually agreed upon with the **Insurer**.

C.   The **Insurer** shall advance on behalf of the **Insureds**, excess of any applicable Retention, covered **Costs of Defense** which the **Insureds** have incurred in connection with covered **Claims** made against them prior to disposition of such **Claims** and within ninety (90) days of receipt and review of the invoices containing such **Insured's Costs of Defense**, provided that to the extent it is finally established that any such **Costs of Defense** are not covered under this Policy, the **Insureds**, severally according to their relative interests, agree to repay the **Insurer** such non-covered **Costs of Defense**.  Any amounts advanced by the **Insurer** shall serve to reduce the Limit of Liability stated in Item 3 of the Declarations to the extent they are not in fact repaid.

D.   The **Insureds** shall as a condition precedent to their rights under this Policy, give to the **Insurer** all information and cooperation as the **Insurer** may reasonably require and shall do nothing that may hinder the **Insurer's** position or its potential or actual rights of recovery.

E.   **(1)**   If the **Insurer** concludes that, based on **Claims** which have been reported to the **Insurer** and to which this Policy may apply, the Policy's Limit of Liability is likely to be exhausted by the payment of **Loss**, the **Insurer** will notify the **Named Insured**, in writing, to  that effect.

**(2)**   When the Limit of Liability set forth in Item 3. of the Declarations has actually been exhausted by the payment of **Loss**:

**(a)**   The **Insurer** will notify the **Named Insured**, in writing, as soon as practicable, that:

**(i)**   The Limit of Liability has actually been exhausted; and

**(ii)**   The **Insurer's** duty to pay on behalf of the **Insured(s)** all **Loss** which the **Insured(s)** shall be legally obligated to pay as a result of **Claims** has ceased.

**(b)**   The **Insurer** will initiate and cooperate in the transfer of control to any appropriate **Insured** all **Claims** subject to that Limit of Liability and which were reported to the **Insurer** prior to the exhaustion of the Limit of Liability.  The **Insured** must cooperate in the transfer of control of these **Claims**.

The **Insurer** agrees to take such steps as it deems appropriate to avoid a default in, or to continue the defense of, such **Claims** until the transfer is completed, provided the appropriate **Insured** is cooperating in completing such transfer.

The **Insurer** will take no action whatsoever with respect to any **Claim** that would have been subject to the Limit of Liability had it not been exhausted, if the **Claim** is reported to the **Insurer** after the Limit of Liability is exhausted.

**(c)**   The **Named Insured** and any other **Insured** involved in a **Claim** subject to the Limit of Liability, must arrange for the defense of any **Claim** within such time period as agreed to between the **Insurer** and the **Insured**.  Absent such agreement, arrangements for the defense of such **Claim** must be made as soon as practicable.

**(3)**   The **Insured** will reimburse the **Insurer** for expenses the **Insurer** incurs in taking those steps deemed appropriate by the **Insurer** in accordance with Section E. (2)(b) above.

The duty of the **Insured** to reimburse the **Insurer** will begin on:

**(a)**   The date the applicable Limit of Liability is exhausted, if the **Insurer** sent notice in accordance with Section E**.** (1) above; or

**(b)**   The date the **Insurer** sent notice in accordance with Section E.(2)(a) above, if the **Insurer** did not send notice in accordance with Section E. (1) above

**(4)** The exhaustion of the Limit of Liability by the payment of **Loss**, and the resulting end of the **Insurer's** duty to pay on behalf of the **Insureds,** will not be affected by the **Insurer's** failure to comply with any of the provisions of this Policy.

**F**.  It is agreed that to the extent that this policy of insurance could result in indemnifying the **Insured Persons** in instances where they may not otherwise be indemnified by the **Insured Organization** under the provisions of the Business Corporation Law of the State of New York: (a) an individual retention amount as set forth in Item 4. of the Declarations will apply to each such **Insured Person,** and (b) the first $1,000,000 of the Limit of Liability afforded by this Policy shall only apply to 99.5% of **Loss** if the Insured Organization has assets greater than $20,000,000; 99.6% of Loss if the **Insured Organization** has assets greater than $10,000,000 but less than $20,000,000; 99.7% of Loss if the **Insured Organization** has assets greater than $5,000,000 but less than $10,000,000; and 99.8% of Loss if the **Insured Organization** has assets less than $5,000,000.  The remaining percentage shall be uninsured and borne by such **Insured Persons**.

## Section VIII.   Notice of Claim

**A.**  The **Insureds** shall, as a condition precedent to their rights under this Policy, give to the **Insurer** written notice of any **Claim** made against any **Insureds** as soon as practicable after the **Named Insured's** Chief Financial Officer or General Counsel first becomes aware of such **Claim** but in no event later than: (i) ninety (90) days after the termination of the **Policy Period**; or (ii) the expiration date of the **Discovery Period**, if applicable.  Provided, however, that failure by the **Insureds** to give notice will not invalidate any coverage that would otherwise have been available if the **Insureds** show that (1) it was not reasonably possible to do so and (2) notice was given as soon as reasonably possible.

**B.**  If during the **Policy Period** or **Discovery Period** any **Insureds** become aware of a specific **Wrongful Act** that may reasonably be expected to give rise to a **Claim** against any **Insureds**, and, if such **Wrongful Act** is reported to the **Insurer** during the **Policy Period** or **Discovery Period** in writing with particulars as to the reasons for anticipating such a **Claim**, the nature and dates of the alleged **Wrongful Act**, the alleged injuries or damages sustained, the names of potential claimants, any **Insureds** involved in the alleged **Wrongful Act** and the manner in which the **Insureds** first became aware of the specific **Wrongful Act**, then any **Claim** subsequently arising from such specific **Wrongful Act** duly reported in accordance with this paragraph shall be deemed under this Policy to be a **Claim** made during the **Policy Period** or **Discovery Period**.

**C.**  All notices under any provision of this Policy shall be in writing and given by prepaid express courier, certified mail, or by email, properly addressed to the appropriate party.  Notice to the **Insured(s)** may be given to the **Named Insured** at the address shown in Item 1 of the Declarations.  Notice to the **Insurer** of any **Claim** or **Wrongful Act(s)** shall be given to the **Insurer** at the following address:

GREAT AMERICAN INSURANCE COMPANIES
EXECUTIVE LIABILITY DIVISION
CLAIMS DEPARTMENT
P.O. Box 66943
Chicago, IL 60666

or

By Email:  ELDClaims@gaig.com
Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or one day following the date such notice is sent, whichever is earlier.

D.    Written notice given by or on behalf of the **Insureds** or written notice by or on behalf of the injured person or any other claimant, to any licensed agent of the **Insurer** in this State shall be deemed notice to the **Insurer**.

## Section IX.    General Conditions

### A.    Payment of Judgment

If the **Insurer** does not pay any judgment covered by the terms of this Policy within thirty (30) days after the serving of notice of entry of judgment upon the **Insureds** or their attorney and upon the **Insurer,** then, except during a stay or limited stay of execution against the **Insured** on such judgment, an action may be maintained against the **Insurer** under the Policy for the amount of such judgment not exceeding this applicable Limit of Liability under the Policy.  Nothing in this paragraph is intended, however, nor shall it be construed, to obligate the **Insurer** to make any payment it would not otherwise be obligated to make under the terms, conditions, limitations and endorsements of this Policy, or to pay any **Loss** in excess of the then available Limit of Liability under this Policy.

### B.    Bankruptcy/Insolvency

The insolvency or bankruptcy of the **Insureds**, or the insolvency of their estates, shall not release the **Insurer** from the payment of damages for injury sustained or **Loss** or **Costs of Defense** occasioned during the life of and within the coverage of this Policy.

### C.    Claim Information

Upon written request by the **Named Insured** or such **Insured's** authorized agent or broker, the **Insurer** shall mail or deliver the following information for the time the Policy was in effect within twenty (20) days of such request:

**(1)**  information on closed **Claims**, including the date and description of the **Claim,** and any payments;

**(2)**  information on open **Claims**, including date and description of the **Claim**, and amounts of any payments; and

**(3)**  information on notice of any **Wrongful Acts**, including date and description of such notice.

### D.    Cancellation

**(1)**  This Policy may be canceled by the **Named Insured** at any time by written notice to the **Insurer**.  In the event the **Named Insured** cancels this Policy for reasons other than the downgrade of the **Insurer's** rating by A.M. Best, the **Insurer** shall retain the customary short rate premium.  However, if the **Named Insured** cancels the Policy due to a downgrade of the **Insurer's** rating to below [A-], the **Insurer** shall refund any unearned premium on a pro rata basis.  Payment of any unearned premium by the **Insurer** shall not be a condition precedent to the effectiveness of cancellation but such payment shall be made as soon as practicable.

**(2)**  During the first sixty (60) days this Policy is initially in effect, except for the reasons for cancellation set forth in paragraph (2) of this section, no cancellation shall become effective until twenty (20) days after written notice is mailed or delivered to the **Named Insured** at the mailing address shown in the Policy and to its authorized agent or broker.

**(3)** After this Policy has been in effect for sixty (60) days or on or after the effective date if such Policy is a renewal, no notice of cancellation shall become effective until sixty (60) days, or fifteen (15) days for non payment of premium, after written notice is mailed or delivered to the **Named Insured** and to its authorized agent or broker, and such cancellation is based on one or more of the following reasons:

**(a)** non payment of premium; Notice of Non-payment shall include amounts Past Due.

**(b)** conviction of a crime arising out of acts increasing the hazard insured against;

**(c)** discovery of fraud or material misrepresentation in the obtaining of the Policy or in the presentation of a **Claim** thereunder;

**(d)** after issuance of the Policy or after the last renewal date, discovery of an act or omission, or a violation of any Policy condition, that substantially and materially increases the hazard insured against, and which occurred subsequent to inception of the current **Policy Period.**

**(e)** a determination by the New York Superintendent of Insurance that continuation of the present premium volume of the insurer would jeopardize that insurers solvency or be hazardous to the interests of policyholders of the **Insurer**, its creditors or the public; or

**(f)** a determination by the New York Superintendent that continuation of this Policy would violate, or would place the **Insurer** in violation of, any provision of the New York Insurance Code.

After this Policy has been in effect for sixty (60) days or on or after the effective date if the Policy is a renewal, no premium increase for the term of the Policy shall be made to become effective unless due to and commensurate with insured value added, subsequent to issuance or the last renewal date, pursuant to the Policy or at the **Insured's** request or, in lieu of cancellation, where such increase is based upon Section (3) (d) of Section D. Cancellation.

### E.    Nonrenewal

**(1)** If the **Insurer** elects not to renew this Policy, or conditions its renewal upon a change in the Limit of Liability, change in type of coverage, reduction of coverage, increased retention, the addition of any exclusion or an increase in premium in excess of ten percent (10%), then the **Insurer** shall mail or deliver written notice of the refusal to renew or the conditional renewal to the **Named Insured** at the mailing address shown on the Policy and to the **Named Insured's** authorized agent at least sixty (60) days but not more than one hundred and twenty (120) days in advance of the Policy's expiration date.  The notice shall contain the specific reasons for the refusal to renew or the conditional renewal and shall set forth the amount or a reasonable estimate of any premium increase and describe any additional proposed changes.

If the **Insurer** does not provide notice of nonrenewal or conditional renewal as provided in the paragraph above, coverage will remain in effect at the same terms and conditions of this Policy at the lower of the current rates or the prior period's rates until sixty (60) days after such notice is mailed or delivered, unless the **Named Insured**, during this sixty (60) day period, has replaced the coverage or elects to cancel.  The Limit of Liability of the expiring Policy will be increased in proportion to the Policy extension provided for in this provision.

(2) If the **Insurer** provides notice of nonrenewal or conditional renewal on or after the expiration date of this Policy, coverage will remain in effect at the same terms and conditions of this Policy for another **Policy Period**, at the lower of the current rates or the prior period's rates, unless the **Named Insured**, during the additional **Policy Period**, has replaced the coverage or elects to cancel.

(3) The **Insurer** will not send the **Named Insured** notice of nonrenewal or conditional renewal if the **Named Insured**, the **Insured Persons**, their authorized agent or another insurer of the **Insureds** mails or delivers notice that the Policy has been replaced or is no longer desired.

(4) If the **Insureds** elect to accept the terms, conditions and rates of the conditional renewal notice, a new aggregate Limit of Liability shall become effective as of the inception date of renewal, subject to regulations promulgated by the New York Superintendent of Insurance.

**F.  Action Against the Insurer**

(1) No action shall be taken against the **Insurer** unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy, and until the **Insured's** obligation to pay shall have been finally determined by an adjudication against the **Insured** or by written agreement of the **Insured**, claimant and the **Insurer**.

(2) No person or organization shall have any right under this Policy to join the **Insurer** as a party to any **Claim** against the **Insureds** nor shall the **Insurer** be impleaded by any **Insured** or their legal representative in any such **Claim**.

**G.  Merger or Acquisition**

If, during the **Policy Period**, an **Insured Organization** acquires the assets of another entity other than a **Portfolio Company**, by merger or otherwise, and the acquired assets of such other entity exceed twenty-five percent (25%) of the assets of such **Insured Organization** as of the inception date of the Policy, written notice thereof shall be given to the **Insurer** as soon as practicable, but in no event later than ninety (90) days from the effective date of the transaction, together with such information as the **Insurer** may request. Premium adjustment and coverage revisions shall be effected as may be required by the **Insurer**.

**H.  Run-Off Coverage**

(1) Acquisition of **Named Insured**

If, during the **Policy Period**, a transaction occurs wherein another entity gains control of the **Named Insured** through the ownership of more than fifty percent (50%) of the voting stock of the **Named Insured**, or the **Named Insured** merges into another entity or consolidates with another entity such that the **Named Insured** is not the surviving entity, then:

(a) the **Named Insured** must give written notice of such transaction to the **Insurer** within ninety (90) days after the effective date of such transaction and provide the **Insurer** with such information in connection therewith as the **Insurer** may deem necessary;

(b) this Policy shall only apply to **Wrongful Acts** actually or allegedly committed on or before the effective date of such transaction; and

(c) the entire premium for this Policy shall be deemed earned as of the date of such transaction;

provided, however, this condition shall not apply if the transaction is a reorganization or restructuring of security ownership of the **Named Insured** among **Insured Persons**.

**(2)** Withdrawal, Resignation, Replacement or Substitution of **General Partner**

If, during the **Policy Period,** the **General Partner** of an **Investment Fund** withdraws, resigns, is replaced or is substituted with another entity that is not an **Operating Entity,** then:

**(a)** the **Named Insured** must give written notice of such transaction to the **Insurer** within ninety (90) days after the effective date of such transaction and provide the **Insurer** with such information in connection therewith as the **Insurer** may deem necessary; and

**(b)** with respect to coverage for such **Investment Fund**, this Policy shall only apply to **Wrongful Acts** actually or allegedly committed on or before the effective date of such transaction.

**(3)** Sale of **Portfolio Company**

If before or during the **Policy Period** an organization ceases to be a **Portfolio Company**, coverage with respect to: (i) an **Insured Person** serving in an **Outside Position** of such **Portfolio Company**; or (ii) any **Professional Services** rendered by an **Insured** shall continue until termination of this Policy but only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Portfolio Company**.

An entity ceases to be a **Portfolio Company** when all **Insured Organizations** no longer maintain a financial interest in such entity.

**I.      Coverage Extensions**

**(1)** Spousal/Domestic Partner Provision

In the event a **Claim** made against an **Insured Person**, which is otherwise within the coverage afforded by this Policy, also includes a **Claim** against such **Insured Person's** lawful spouse or **Domestic Partner** solely by reason of (a) such spousal or **Domestic Partner** status, or (b) such spouse or **Domestic Partner's** ownership interest in property or assets that are sought as recovery for **Wrongful Acts**, then any and all **Loss** for which such spouse or **Domestic Partner** becomes legally obligated to pay on account of such **Claim** shall be deemed **Loss** which such **Insured Person** of the spouse or **Domestic Partner** becomes legally obligated to pay as a result of the **Claim** made against such **Insured Person**.

All terms and conditions of this Policy, including the Retention, applicable to **Loss** sustained by such **Insured Person** in the **Claim** shall also apply to loss sustained by such spouse or **Domestic Partner**. The extension of coverage afforded by this Section IX.E. shall only apply to the extent the **Claim** arises out of any actual or alleged **Wrongful Act** of an **Insured Person**.

**(2)** Worldwide Provision

The coverage provided under this Policy shall apply worldwide.  The term **Insured Persons** is deemed to include individuals who serve in equivalent positions in foreign **Operating Entities**.

**(3)** Estates and Legal Representatives

The coverage provided by this Policy shall also apply to the estates, heirs, legal representatives or assigns of any **Insured Persons** in the event of their death, incapacity or bankruptcy, but only for **Claims** arising out of any actual or alleged **Wrongful Acts** of any **Insured Persons**.

**J.      Subrogation**

In the event of any payment under this Policy, the **Insurer** shall be subrogated to all of the **Insureds**' rights of recovery and the **Insured Organization** and **Insured Persons** shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents as may be necessary to enable the **Insurer** to effectively bring suit in the name of any **Insured Persons** or the **Insured Organization**.

**K.      Assignment**

Assignment of interest under this Policy shall not bind the **Insurer** until its consent is endorsed hereon.

**L.      Conformity to Statute**

To the extent that any of the terms, conditions or limitations of this Policy, including any endorsement, may be inconsistent with applicable New York law or regulations, the provisions of New York law will prevail.

**M.      Entire Agreement**

By acceptance of this Policy, the **Insureds** and the **Insurer** agree that this Policy (including the Declarations, **Proposal Forms** submitted to the **Insurer** and any information provided therewith) and any written endorsements attached hereto constitute the entire agreement between the parties.  The terms, conditions and limitations of this Policy can be waived or changed only by written endorsement.

**N.      Named Insured Represents Insured**

By acceptance of this Policy, the **Named Insured** shall be designated to act on behalf of the **Insureds** for all purposes including, but not limited to, the giving and receiving of all notices and correspondence, the cancellation or non-renewal of this Policy, the payment of premiums, and the receipt of any return premiums that may be due under this Policy.

**O.      Representative of the Insurer**

Great American Insurance Companies, Executive Liability Division, P.O. Box 66943, Chicago, Illinois 60666 shall act on behalf of the **Insurer** for all purposes including, but not limited to, the giving and receiving of all notices and correspondence, provided, however, notice of **Claims** shall be given pursuant to Section VIII. of the Policy.

**P.      Order of Payments**

In the event of **Loss** arising from a covered **Claim** for which payment is due under the provisions of this Policy, then the **Insurer** shall in all events:

**(1)**  first, pay **Loss** for which coverage is provided under Insuring Agreement A of this Policy; then

**(2)**  only after payment of **Loss** has been made pursuant to Insuring Agreement A of this Policy, with respect to whatever remaining amount of the Limit of Liability is available after such payment, the **Insurer** shall pay such other **Loss** for which coverage is provided under any other applicable Insuring Agreements in Section I of this Policy.

The **Financial Insolvency** of any **Insured** shall not relieve the **Insurer** of any of its obligations to prioritize payment of covered **Loss** under this Policy.

**Q.    Representations and Severability**

It is agreed by the **Insureds** that the particulars and statements contained in the **Proposal Form** and any information provided therewith (which shall be on file with the **Insurer** and be deemed attached hereto as if physically attached hereto), are the basis of this Policy and are to be considered as incorporated in and constituting a part of the Policy.  It is further understood and agreed by the **Insureds** that the statements in the **Proposal Form** or in any information provided therewith are their representations, and that this Policy is issued in reliance upon the truth of such representations.  In the event any of the statements, representations or information in the **Proposal Form** and/or any information provided therewith (hereafter referred to as "Facts"), are not true and accurate:

**(1)** There shall be no coverage for any **Claims** made pursuant to Insuring Agreement A. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form**, whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**.  The knowledge of any **Insured Person** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement A;

**(2)** There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.1. of this Policy to the extent an **Insured Organization** indemnifies any **Insured Person** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form,** whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**.  For purposes of this paragraph (2), knowledge of any **Insured Person** shall not be imputed to any other **Insured Person**;

**(3)** There shall be no coverage for any **Claims** made pursuant to Insuring Agreement B.2. of this Policy if the person(s) who signed the **Proposal Form** for this coverage or any **Insured Person** who is or was a past, present or future **Executive Officer** of the **Named Insured** had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form**, whether or not such **Insured Person** knew of such disclosure in the **Proposal Form**;

**(4)** There shall be no coverage for any **Claims** made pursuant to Insuring Agreement C. of this Policy with respect to any **Insured Persons** who had knowledge, as of the effective date of the **Policy Period**, of any Facts that were not truthfully and accurately disclosed in the **Proposal Form**.  The knowledge of any **Insured Person** shall not be imputed to any other **Insured Person** for the purposes of determining coverage under Insuring Agreement C.; and

**(5)** Solely with respect to Insuring Agreement A, under no circumstances shall the **Insurer** be entitled to rescind such coverage.

In witness whereof the **Insurer** has caused this Policy to be signed by its President and Secretary and countersigned, if required, on the Declarations page by a duly authorized agent of the **Insurer**.

## GREAT AMERICAN INSURANCE COMPANIES®

*President*                                 *Secretary*

B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC, suing
derivatively as managing member of ARCH REAL
ESTATE HOLDINGS LLC, and JJ ARCH LLC,

　　　　　　　*Plaintiffs-Counter-Claim
　　　　　　　Defendants*,

　　　　　　　- against -

JARED CHASSEN, individually and derivatively on
behalf of JJ ARCH LLC, as member, and derivatively
on behalf of ARCH REAL ESTATE HOLDINGS
LLC, as member of JJ ARCH,

　　　　　　　*Defendant/Counter-Claim
　　　　　　　Plaintiffs*

FIRST REPUBLIC BANK,

　　　　　　　*Defendant*

Index No. 158055/2023

---

### DEFENDANT JARED CHASSEN'S VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT AND COUNTER-CLAIMS

　　　　Defendant Jared Chassen ("Chassen" or "Defendant"), by and through his undersigned counsel, for his verified answer to Plaintiff Jeffrey Simpson's ("Simpson" or "Plaintiff") complaint answers and alleges to each of Plaintiff's allegations in the Complaint, quoted herein followed by Defendant's answer in bold font, as well as for his affirmative defenses, and counter-claims, as follows:

<u>NATURE OF THE ACTION</u>

　　　　1.　　This action is brought by Plaintiffs to undo a coup d'état executed by Defendant Jared Chassen ("Chassen") in an effort to seize, from Plaintiff Jeffrey Simpson ("Simpson"), control over Plaintiff entities Arch Real Estate Holdings LLC ("Arch") and JJ Arch LLC ("JJ

1

Arch") (collectively, Arch and JJ Arch are the "Arch Entities"). In addition, Plaintiffs seek to redress one of Chassen's successes in his efforts to wrest control of the Arch Entities from Simpson, *i.e.*, Chassen's inducement of a stalemate that has left Simpson unable to exercise control over bank accounts maintained by Arch Entities and their affiliates and subsidiaries at Defendant First Republic Bank ("First Republic"), which has left Arch Entities unable to use such accounts to pay for such necessities as payroll, subcontractors, materialmen, and insurance. Plaintiffs also seek to require Chassen to act to restore Simpson's access to his company email account with Arch Entities, to the Dropbox account where Arch Entities' documents are stored, and Simpsons' ability to communicate with the domain company that hosts Arch Entities' web site.

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations as to Plaintiff's motives in commencing the action, and otherwise denies the allegations in paragraph 1.**

2.      Plaintiff Simpson is a natural person who resides in the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 2.**

3.      Plaintiff Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 3.**

4.      Arch is a real estate investment management, construction management, property management, and development company.

**Answer: Defendant admits the allegations in paragraph 4.**

5.      Plaintiff JJ Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 5.**

6.      Defendant Chassen is a natural person who resides in the State of New York, County of Kings.

**Answer: Defendant admits that he is a natural person who resides in the State of New York, but denies that he resides in the County of Kings.**

7.      Defendant First Republic is a nationally chartered bank that maintains offices for the transaction of business in, among other places, the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 7.**

## FACTS APPLICABLE TO ALL CAUSES OF ACTION
## BACKGROUND

### Simpson's Tenure at Greystone

8.      Simpson grew up under modest economic circumstances in Lakewood, New Jersey. His father, who was a public planning, zoning, and construction official, passed away when Simpson was 22. For four consecutive generations including his own, Simpson's family has been in the construction business.

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations in paragraph 8.**

9.      Prior to 2017 and the start of Arch, Simpson worked for eleven (11) years at Greystone Development ("Greystone Development"), a property development company within a host of companies under the "Greystone" umbrella that performed functions related to real estate investment, capital raising, financing, development, construction, management, leasing, and sales. For the last five of those years, Simpson was the Chief Executive Officer of Greystone Development. By the time he left Greystone Development, he was supervising approximately thirty (30) employees at Greystone Development, with a total payroll of approximately $5 million. The total project volume was over $2 billion, and involved properties located in New York, Miami, and California. While he was there, he also was responsible for raising several large capital initiatives for real estate investing in multi-family housing in the southeastern United States with an institutional partner, individual loan origination on complex assignments, and capital raising for structured finance.

**Answer: Defendant admits that Plaintiff worked at Greystone, and held the role of Chief Executive Officer of Greystone Development, but lacks information sufficient to form a belief as to the truth of the remaining allegations in paragraph 9.**

10.      One employee Simpson supervised at Greystone Development was Chassen. Simpson originally hired Chassen at Greystone Development to replace an administrative assistant at Greystone Development. Once hired, Chassen performed the same duties as that administrative assistant, for the same salary as she had earned. Over time, Chassen took on other responsibilities, including helping to source properties, equity, and debt. Throughout his time at Greystone Development, Chassen reported to Simpson.

**Answer: Defendant admits that he worked for Simpson at Greystone but otherwise denies the characterization of his role at Greystone as contained in paragraph 10.**

11.      Another employee Simpson supervised at Greystone was nonparty Tristan Last ("Last"). "). Last was formerly of Brookfield with a MBA from Cornell University. She was hired as an acquisitions associate and quickly was promoted to the Director of Investments.

3

**Answer: Defendant admits that Tristan Last was an employee at Greystone who Simpson supervised, and had the title of Director of Investments, and otherwise lacks information sufficient to form a belief as to the truth of the allegations in paragraph 11.**

12.     A third employee Simpson supervised at Greystone was nonparty Michelle Miller ("Miller"). She was also an analyst. Miller started at Greystone Development as an intern, as a career switcher to real estate following the completion of her MBA from Northwestern. She was eventually hired full time as an analyst and grew in her role over time.

**Answer: Defendant admits that Michelle Miller was an employee at Greystone who Simpson supervised and who started as intern, but otherwise lacks information sufficient to form a belief as the truth of the allegations in paragraph 12.**

<u>Simpson's Formation of Arch and JJ Arch</u>

13.     In 2017, Simpson left Greystone Development on amicable terms with that company, and formed a new company, Plaintiff Arch.

**Answer: Defendant denies the allegations in paragraph 13, except that he admits that Simpson formed JJ Arch together with Chassen.**

14.     The original business address for Arch was Simpson's personal residence address at the time.

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations in paragraph 14.**

15.     At all times since the formation of Arch, eighty percent (80%) of the membership interest in Arch has been held by Plaintiff JJ Arch, which is the managing member of Arch. (*See* Exhibit 1, Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC ["Arch Operating Agreement"], p. 17, §§ 6.1-6.2 [providing for distributions of cash flow and acquisition fees of 80% to "JJ Member" and 20% to "Investor Member"]; *id.* p. 1 preamble [defining JJ Arch LLC as "JJ Member"]; *id.* § 1.1, p. 7 [defining "Managing Member" as JJ Member].)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 15.**

16.     At all times since the formation of Arch, the remaining twenty percent (20%) of the membership interest in Arch has been held by 608941 NJ Inc., a New Jersey corporation ("NJ Inc."), which is the investor member of Arch. (*See* Exhibit 1, Arch Operating Agreement, p. 17, §§ 6.1-6.2; *id.* p. 1 preamble [defining NJ Inc. as "Investor Member"].) NJ Inc. made an investment of approximately $50 million in Arch, but has no authority to control the operation of Arch's business.

4

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 16.**

17.    Since the formation of JJ Arch, Simpson has been the managing member of JJ Arch and has held a majority of the membership interest in JJ Arch.

**Answer: Defendant admits that Simpson was the managing member at the time JJ Arch was formed, and held a majority of the membership interests, and for four years thereafter, but otherwise denies the allegations in paragraph 17.**

18.    From the formation of JJ Arch until his forced resignation from his membership therein effective August 5, 2023, as discussed below, Chassen was a member of JJ Arch and held a minority of the membership interest in JJ Arch, and his job started out as administrative in nature.

**Answer: Defendant denies the allegations in paragraph 18.**

19.    Simpson and Chassen are the only persons who have ever been members of JJ Arch.

**Answer: Defendant admits the allegations in paragraph 19.**

<u>The Arch Companies' Growth Under Simpson's Leadership</u>

20.    Through JJ Arch, the managing member of Arch, Simpson has run all of Arch's businesses since the inception.

**Answer: Defendant denies the allegations in paragraph 20.**

21.    By 2022, five years after Simpson formed Arch with no assets, Arch had owned and invested in over $1 billion in assets.

**Answer: Defendant denies the allegations in paragraph 21 insofar as it alleges that Arch was formed with no assets, or that Simpson formed Arch, but admits that Arch owned over $1 billion in assets in 2022.**

22.    Arch has several affiliated companies, including a property management company, advising company, construction company, and asset management company, each of which provides services relating to real properties that Arch controls.

 **Answer: Defendant admits the allegations in paragraph 22.**

23.    Together, Arch and its affiliated companies have a total of approximately 100 employees. (Collectively, Arch Entities and Arch's affiliated companies are the "Arch Companies.")

5

**Answer: Defendant admits the allegations in paragraph 23.**

24.     The licenses and permits for each of the construction projects performed by the Arch Companies are in Simpson's name, as a licensed general contractor.

**Answer: Defendant denies the allegations in paragraph 24.**

25.     Simpson holds responsibility for managing Arch Companies' commercial real estate construction projects and coordinating licensing and permitting matters.

**Answer: Defendant denies the allegations in paragraph 25.**

<u>Chassen's Role with the Arch Companies</u>

26.     With Greystone's permission, Simpsons brought three Greystone Development employees with him to work at Arch, *i.e.*, Chassen, Last, and Miller.

**Answer: Defendant denies that Simpson brought Chassen to work with him at Arch, which he formed together with Simpson, but admits that Last and Miller were brought by Simpson and Chassen to work at JJ Arch.**

27.     From the formation of JJ Arch and Arch, Chassen has been a minority member in JJ Arch, and thus has not had the authority to exercise control over Arch as Arch's managing member.

**Answer: Defendant admits that Simpson was the majority or managing member at the formation of JJ Arch and Arch, but denies that Chassen has not had authority to exercise control over JJ Arch as JJ Arch's managing member since.**

28.     While the initial plan was for Chassen ultimately to become co-managing member, with Simpson, of JJ Arch, and thus share in Simpson's authority to control JJ Arch's exercise of its authority as managing member of Arch, Chassen's performance did not warrant this expansion of his authority, and Chassen consented to remain in his role as a minority member of JJ Arch on or about May 22, 2021.

**Answer: Defendant admits that Chassen was to become a co-managing member under the Operating Agreement, and otherwise denies the allegations in paragraph 28.**

29.     The original plan, at the time JJ Arch was formed, was that Simpson was to be its managing member, with the authority to manage, arrange, and cause to be coordinated the business, affairs, and assets of JJ Arch. (Exhibit 2, JJ Arch Limited Liability Company Operating Agreement ["JJ Arch Original Operating Agreement"], p. 7, ¶ 3.1(a).) This was to be the case prior to the fourth anniversary of JJ Arch's operating agreement, *i.e.*, December 11, 2021. (*Id.*)

6

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 29.**

30.     However, following the fourth anniversary of the operating agreement, both Simpson and Chassen were to act as managing members of JJ Arch, with each of them holding the authority to manage, arrange, and cause to be coordinated JJ Arch's business, affairs, and assets. (Exhibit 2, JJ Arch Original Operating Agreement, p. 9 § 3.2.)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 30.**

31.     In addition, the JJ Arch Original Operating Agreement provided Chassen with a veto over certain decisions or actions with regard to JJ Arch even prior to the fourth anniversary of the JJ Arch Original Operating Agreement, such that Simpson could make certain decisions defined as "Company Major Decisions" only if he had Chassen's prior written consent. These actions included, among others, selling any asset of Arch Entities, borrowing or raising monies on behalf of Arch Entities, mortgaging Arch Entities' properties, Arch Entities' entering into any lease of space, and hiring any employee, consultant, or other personnel for Arch Entities. (*See* Exhibit 2, JJ Arch Original Operating Agreement, pp. 8-9, ¶¶ 3.1(b)(iii), (v)-(viii); *see also id.* p. 8 ¶ 3.1(b) [stating that "any action or decision that would constitute a Company Majority Decision shall be a Company Major Decision if made or taken by any Investment Entity"]; *id.* p. 4 [defining "Investment Entity" as including "AREH"]; *id.* p. 1 [defining "AREH" as Arch].)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 31.**

32.     On the other hand, Simpson could take other actions without Chassen's consent, including but not limited to conducting, managing, and controlling the affairs and business of Arch Entities; opening, maintaining and closing bank accounts and drawing checks; bringing legal actions on claims of Arch Entities; and depositing, withdrawing, investing, paying, retaining, and distributing Arch Entities' funds in a manner consistent with the provisions of the JJ Arch Original Operating Agreement. (Exhibit 2, JJ Arch Original Operating Agreement, pp. 7-8 ¶¶ 3.1(a)(i)-(ii), (v)-(vi).)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 32.**

33.     However, prior to the fourth anniversary of the JJ Arch Original Operating Agreement, Simpson had a discussion with Chassen, and informed him that Simpson did not believe Chassen had sufficient acumen in the business to be a co-managing member of JJ Arch and, by virtue of JJ Arch's managing membership in Arch, a co-managing member of Arch. Chassen agreed with Simpson about this.

**Answer: Defendant denies the allegations in paragraph 33.**

7

34.    JJ Arch's operating agreement was thus amended, with Chassen's consent, on or about May 22, 2021. The amendment removed the authority that Chassen would have had, following the fourth anniversary of the JJ Arch Original Operating Agreement, to manage, arrange, and cause to be coordinated the business, affairs and assets of JJ Arch. (Exhibit 3, JJ Arch LLC Agreement Amendment No. 1, p. 3 ¶ 2(d) [deleting § 3.2 of the JJ Arch Original Operating Agreement].) (The JJ Arch Original Operating Agreement, as amended by JJ Arch LLC Agreement Amendment No. 1, shall be referred to as the "JJ Arch Amended Operating Agreement".) Thus, Chassen never had such authority. Because the list of actions and decisions for which Chassen's consent was required, *i.e.*, the "Company Major Decisions," remained effective only until the fourth anniversary of the JJ Arch Original Operating Agreement (*compare id.* p. 3 § 2(d) [new § 3.2] *with* Exhibit 2, JJ Arch Original Operating Agreement, p. 8 ¶ 3.1(b)), this meant that Chassen would lose, and ultimately did lose, his right to refuse consent to Company Major Decisions after that anniversary, which occurred in December 2021.

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 32.**

35.    In addition, JJ Arch's operating agreement was amended to bar Chassen from becoming an equal equity owner in JJ Arch. When JJ Arch was formed, it was agreed that my share of JJ Arch's distributions, which would initially be 66.6667%, would decrease, and Chassen's share of JJ Arch's distributions, which would initially be 33.3333%, would commensurately increase, on an annual basis, such that, by the fourth anniversary of the operating agreement, *i.e.*, December 11, 2021, each of them would receive equal 50% shares of the distributions. (Exhibit 2, JJ Arch Original Operating Agreement, p. 4 § 1.1, Definition of "Distribution Percentages"; *id.* p. 12 ¶ 5.1(a)(ii); *id.* Exhibit A.)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 35.**

36.    However, JJ Arch's operating agreement was amended, with Chassen's consent and as part of JJ Arch LLC Agreement Amendment No. 1 (the same amendment as discussed above), to provide that, indefinitely, Simpson is to receive 50.1% of the distributions from JJ Arch, and Chassen is to receive 49.9% of the distributions from JJ Arch. (Exhibit 3, JJ Arch LLC Agreement Amendment No. 1, p. 1 ¶ 2(a).)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 36.**

37.    In addition, Arch's operating agreement provides that "the business, affairs and assets of [Arch] shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in [the operating agreement] (including, but not limited to, in Section 7.1.3), full, exclusive and complete discretion with respect thereto." (Exhibit 1, Arch Operating Agreement, p. 17, ¶ 7.1.1.) The Managing Member, *i.e.*, JJ Arch, has "the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which [Arch] has the authority to perform both directly and indirectly through one or more Subsidiaries" (*id.* p. 18 ¶ 7.1.1), including, *inter alia*, those to "conduct,

8

manage and control the affairs and business of [Arch]" (*id.* p. 18 ¶ 7.1.1(i)); "open, maintain and close bank accounts and drew checks or other orders for the payment of monies" (*id.* ¶ 7.1.1(ii)); "deposit, withdraw, invest, pay, retain and distribute [Arch's] funds in a manner consistent with the provisions of [the Arch Operating Agreement]) (*id.* ¶ 7.1.1(vi)); and "bring or defend . . . resort to legal action, or otherwise adjust claims . . . of [Arch]" (*id.* ¶ 7.1.1(v)).

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 37.**

38.    Thus, at all times Simpson has been, and remains, the managing member of JJ Arch, and Simpson has always had exclusive authority to, *inter alia*, open, maintain, and close bank accounts on behalf of Arch Entities; to draw checks on those accounts; to deposit, withdraw, pay, and distribute Arch Entities' funds; and to bring legal actions on behalf of the Arch Entities.

**Answer:    Defendant denies the allegations in paragraph 38.**

39.    Chassen worked for Arch, and reported to Simpson. Simpson had the authority to give Chassen work assignments to do for Arch, and to take Arch work assignments away from Chassen.

**Answer: Defendant admits that he is a member of JJ Arch and that he works for JJ Arch and otherwise denies the allegations in paragraph 39.**

40.    Until the events beginning August 4, 2023, as set forth below, Last had served as managing director of Arch.

**Answer: Defendant denies the allegations in paragraph 40.**

<u>Means of Removing Members of Arch and JJ Arch</u>

41.    Under both the Arch Operating Agreement and the JJ Arch Amended Operating Agreement, members may be removed, on certain enumerated grounds, through a process that is initiated by the occurrence of a "Cause Event." The Arch Operating Agreement provides an enumerated list of eight acts, the commission of which, by the managing member, serves as a "Cause Event." (*See* Exhibit 1, Arch Operating Agreement, pp. 4-5, § 1.1, definition of "Cause Event".) The JJ Arch Amended Operating Agreement extends this definition of "Cause Event" to any member of JJ Arch. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 3, § 1.1, definition of "Cause Event.")

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 41.**

42. The acts constituting "Cause Event[s]" include, but are not limited to, "willful misconduct in relation to the business or affairs of [Arch] or a Subsidiary," "breach of fiduciary duty in relation to the business or affairs of [Arch] or a Subsidiary," and "misappropriation of

9

[Arch] or Subsidiary funds or property." (Exhibit 1, Arch Operating Agreement, § 1.1, pp. 4-5, Definition of "Cause Event.").

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 42.**

43.     Under the JJ Arch Operating Agreement, a member in JJ Arch is required to resign if a Cause Event has occurred with respect to such member, and the other member has delivered written notice thereof to that member. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 5, § 1.1, definition of "Resignation.") Notably, only "the other Member" may deliver such notice (*id.*); accordingly, only a current member of JJ Arch could trigger a member's resignation through delivering notice of a Cause Event. Upon such Resignation, that member is no longer deemed a "member" of JJ Arch, and "shall not be entitled to any rights as a Member of the Company for any period from and after such Resignation." (*Id.*, p. 15, § 7.5(a).)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 43.**

44.     Under the Arch Operating Agreement, in the event written notice of a Cause Event is delivered to JJ Arch, JJ Arch may be removed effective ten (10) business days after such delivery, or at such later date or as specified in such notice. (Exhibit 1, Arch Operating Agreement, p. 20, ¶ 7.1.4.)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 44.**

## CHASSEN'S MISCONDUCT

### Chassen Placed His Interests, and Those of His Family and Friends, Above Those of JJ Arch

45.     In or about July 2023, Chassen acknowledged that his duties and role could not be compensated at the same level as previously, due to higher interest rates and a slowdown in business, and Arch would not be able to afford to pay Simpson, Chassen, and other key employees their full salaries, and Simpson asked Chassen whether he would be willing to accept a substantial reduction in his pay in order to enable Arch to remain in its status quo rather than building up debt.

**Answer: Defendant denies the allegations in paragraph 45.**

46.     Chassen initially indicated to Simpson that Chassen would be willing to take such a pay cut, although at the time he did not inform Simpson how large of a pay cut he would be willing to take.

**Answer: Defendant denies the allegations in paragraph 46.**

10

47. In or about early July 2023, Simpson asked Chassen how large of a pay reduction Chassen would agree to. Chassen repeatedly avoided answering Simpson's requests on this point.

**Answer: Defendant denies the allegations in paragraph 47.**

48. Finally, on or about August 2, 2023, Chassen informed Simpson that, in fact, Chassen would not be willing to accept any pay reduction.

**Answer: Defendant denies the allegations in paragraph 48.**

<u>The Coup Begins</u>

49. Chassen, apparently working in concert with NJ Inc. and with several other employees of Arch, undertook a series of actions designed to steal control of Arch and JJ Arch from Simpson, in violation of Arch and JJ Arch's respective operating agreements. First, upon information and belief, at approximately 1:15 p.m. on Friday, August 4, 2023, Chassen contacted the bank at which Arch maintains its accounts, Defendant First Republic, and instructed First Republic to remove Simpson as an authorized signatory on all accounts he maintained with First Republic in either his corporate or individual capacity, including all bank accounts that the Arch Companies maintain with First Republic (the "Arch Accounts"), and also accounts Simpson maintained individually with no connection to the Arch Companies.

**Answer: Defendant denies the allegations in paragraph 49.**

50. Chassen was neither authorized to make this change, nor did he provide Simpson with any advance notice thereof.

**Answer: Defendant denies the allegations in paragraph 50.**

51. First Republic complied with Chassen's demand. First Republic informed Simpson that it no longer permits Simpson to make transactions from any of the accounts he maintains with First Republic in either his corporate or individual capacity, or, indeed, any other account on which Simpson was the signatory, including the Arch Accounts, accounts on which he was the signatory on behalf of entities other than the Arch Companies, and his own individual accounts.

**Answer: Defendant denies the allegations in paragraph 51.**

<u>The Forced Resignation of Chassen from Arch</u>

52. On August 5, 2023, Simpson sent Chassen an email wherein Simpson provided him written notice that he had committed a Cause Event, and that accordingly, under the JJ Arch

11

Amended Operating Agreement, Chassen ceased to be a member of JJ Arch. (*See* Exhibit 4 ["Notice to Chassen of Cause Event"].)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 52.**

53. Chassen had committed a Cause Event prior to the Notice to Chassen of Cause Event, in that Chassen had, without authority, acted to deprive Simpson of his ability to make transactions on the Arch Accounts and to seize that ability for himself.

**Answer: Defendant denies the allegations in paragraph 53.**

54. Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted willful misconduct in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 54.**

55. Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a breach of fiduciary duty in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 55.**

56. Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a misappropriation of funds of Arch, JJ Arch, and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 56.**

57. Accordingly, the Notice of Chassen Cause Event triggered immediately Chassen's removal as a member of JJ Arch.

**Answer: Defendant denies the allegations in paragraph 57.**

The Coup Continues

58. Notwithstanding, Chassen proceeded in disregard of the Notice to Chassen of Cause Event. Specifically, over the weekend of August 5-6, 2023, the administrator of Arch's email and information technology systems, acting upon Chassen's instructions, locked Simpson out of his Arch Companies email account and all other Arch IT systems. Beginning no later than 5 p.m. on Sunday, August 6, 2023, Simpson no longer had access to his Arch Companies email account. At or about 10-11 a.m. on Monday, August 7, 2023, Simpson could no longer log onto his Arch-

12

issued computer. As a result, Simpson could not obtain access to the business records of the Arch Companies, or the computer payroll program that Arch Companies use to pay their employees. Simpson was also locked out of the server hosting Arch Companies' web site, and Chassen made changes to such site, without Simpson's authorization, to remove references thereon to Simpson as a managing member.

**Answer: Defendant admits that he resigned Simpson from JJ Arch, and that Simpson was locked from accounts when he was removed and removed as a member on the company website but lacks information sufficient to form a belief as to the truth of the exact times Simpson could no longer access company systems and otherwise denies the allegations in paragraph 58.**

59. Chassen also retaliated for his removal as a member of JJ Arch by sending Simpson, by electronic mail, a signed letter on August 6, 2023, wherein he purported to inform Simpson that Simpson was required to resign pursuant to the JJ Arch Amended Operating Agreement ("Chassen 8/6/23 Letter"). The Chassen 8/6/23 Letter asserted that Simpson had committed multiple Cause Events, none of which had actually occurred, and asserted that, as a result, a resignation from JJ Arch had occurred on Simpson's part and Simpson was no longer a member of JJ Arch, nor did Simpson have any right to act on behalf of JJ Arch, Arch, or any subsidiary of JJ Arch.

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 59.**

60. However, by the time of the Chassen 8/6/23 Letter, Chassen had already been removed as a member of JJ Arch pursuant to the Notice to Chassen of Cause Event. Accordingly, as noted above, Chassen could not, under the JJ Arch Amended Operating Agreement, trigger Simpson's own resignation by delivering to him a purported notice of Cause Event.

**Answer: Defendant denies the allegations in paragraph 60.**

61. Moreover, even if the Chassen 8/6/23 Letter had been effective as a notice of Cause Event, it was not sent to Simpson until after Chassen's instruction on August 4, 2023 to First Republic to strip Simpson of his signatory authority, so as of the time Chassen provided such instruction Simpson remained JJ Arch's managing member with exclusive authority over the Arch Companies' bank accounts, and Chassen's instruction was in violation of Arch's and JJ Arch's operating agreements.

**Answer: Defendant denies the allegations in paragraph 61.**

62. In addition, on August 6, 2023, NJ Inc., sent Simpson a letter (the "8/6/23 NJ Inc. Letter"), wherein NJ Inc. asserted that JJ Arch, through Simpson's actions, had committed multiple Cause Events under the Arch Operating Agreement, again none of which had actually occurred, and asserted that NJ Inc. reserved the right to remove JJ Arch as the managing member of Arch.

13

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 62.**

63. In addition, Chassen arranged for the deactivation of the device Simpson uses to gain access to Arch's physical office located at 88 University Place, New York, New York 10003, such that when Simpson attempted to enter his office there at 9:00 a.m. on Monday, August 7, 2023, he was unable to do so.

**Answer: Defendant denies the allegations in paragraph 63.**

64. Upon information and belief, on or about August 7, 2023, after he had already been duly removed as a member of JJ Arch, Chassen sent an email to employees of Arch Companies in which he instructed them not to come into the office to work that day, and falsely informed them that Simpson was deemed to have resigned from his managerial roles with Arch Companies. He further instructed employees to not respond to any outreach from Simpson. Even before his removal as a member of JJ Arch, Chassen had no authority to do so.

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 64.**

65. Simpson has since been able to regain access to his physical office at Arch. However, he still has only limited access to Arch's computer system, and is still unable to gain access to Arch's bank accounts. Through counsel, he demanded that First Republic restore him as a signatory on such accounts, and remove Chassen as a signatory. First Republic has refused to do so, and has advised Simpson that because it has "received conflicting instructions regarding the ownership and control" of such accounts, First Republic has placed a hold on those accounts, and will not permit any deposits or withdrawals from such accounts. (Exhibit 5, Letter from Christy Santoro, Preferred Banker at First Republic, to Jeffrey Simpson, dated Aug. 6, 2023, first page.) One hundred and fifty (150) accounts are subject to this hold. (*See id.*, second through fifth pages.) (Collectively, these are the "Arch Accounts.") These include accounts for Arch Companies, as well as accounts maintained for the purpose of holding monies held in trust for subcontractors, materialmen, and other persons involved in Arch Companies' construction projects who are beneficiaries under Article 3-A of the New York State Lien Law. First Republic has advised that it will not release the hold until it "receive[s] evidence satisfactory to us that there is no longer a dispute as to who has authority over the accounts" (*id.*, first page), or there is a court order requiring its release (*see* Exhibit 6, email from First Republic's in-house counsel to Plaintiffs' counsel).

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 65.**

66. Continuation of First Republic's hold on the Arch Companies' bank accounts would wreak havoc on the Arch Companies. Arch Companies would be unable to meet their payroll, inflicting hardship both on Arch Companies' employees, who number approximately 100, and on Arch Companies themselves when such employees ultimately leave their positions for

14

employment with companies whose minority members are not sabotaging company finances in order to extract concessions.

**Answer: Defendant denies the allegations in paragraph 66.**

67. With the hold on those bank accounts, Arch will also stand unable to pay its bills to vendors, such as insurance premiums (*see* Exhibit 7 hereto). Indeed, Arch Companies are now in default on many obligations as a result of their inability to make payments due to the hold. Arch Companies would also be unable to pay rent and other bills, and to make payments on construction loans and to investors in Arch Companies.

**Answer: Defendant denies the allegations in paragraph 67.**

68. The bank accounts that are subject to First Republic's hold also include trust accounts under Article 3-A of the New York State Lien Law, which hold funds in trust for, among others, subcontractors and materialmen on construction projects being performed for Arch Company entities. Thus, the existing account hold prevents Arch Company entities from being able to pay their subcontractors and materialmen. This is doubly harmful to the Arch Companies, in that they now cannot pay those subcontractors and materialmen, which may cause them to cease performing their present construction work, and it also may dissuade them from performing projects for the Arch Companies in the future, out of fear that another, future frivolous dispute over company control may lead to another hold on Arch Companies' bank accounts and a recurrence of delays in paying them.

**Answer: Defendant denies the allegations in paragraph 68.**

69. With both Arch Companies' employees and their subcontractors leaving active job sites, there is a further risk that such sites will not be adequately staffed or supervised, or machinery there adequately maintained, creating a public safety risk that will result in injury to those remaining employees or subcontractors, and nearby members of the public.

**Answer: Defendant denies the allegations in paragraph 69.**

70. The aforesaid effects also endanger the general reputation of Arch Companies going forward, tarnishing it with the appearance that it cannot be trusted to fulfill its obligations.

**Answer: Defendant denies the allegations in paragraph 70.**

71. Another consequence of the coup perpetrated by Chassen is that Last, Arch's managing director, has resigned from her position with Arch on or about August 7, 2023, in response to said coup. Consequently, Arch has lost the benefit of Last's performance.

**Answer: Defendant admits that the Last resigned but otherwise denies the allegations in paragraph 71.**

15

72. In addition, Chassen and Computero Inc. ("Computero"), the outside company acting as Arch's information technology consultant, have colluded to deny Simpson access to his Arch company email account. Computero first disregarded his instructions to remove Chassen's access to Arch's computer network and his Arch email account beginning shortly before the time Simpson provided the Notice to Chassen of Cause Event, then cut off Simpson's access to the Arch computer network and his Arch email account. Then, after Simpson made repeated requests to regain access to his email account, Computero restored his email access on the evening of Wednesday, August 9. However, approximately one hour after his email access was reinstated, it was again cut off, this time ostensibly by Microsoft. However, Chassen was Microsoft's only contact person at Arch Companies, and thus the only person who could have instructed Microsoft to cut off Simpson's email access. Simpson remains unable to gain access to his Arch email account, and thus unable to receive or respond to email communications from Arch's many employees.

**Answer: Defendant denies the allegations in paragraph 72.**

73. In addition, Simpson's access to Dropbox has not been restored, thus making it impossible for him to view the Arch Companies' internal documents, which are stored in Dropbox. Also, Chassen has engineered a situation in which he is the only contact person for the domain company that hosts Arch Companies' web site. Thus, Simpson cannot communicate with the domain company in order to update the web site, including restoring references to himself as the managing member and removing those to Chassen as a continuing employee and member of the Arch Companies following his resignation.

**Answer: Defendant denies the allegations in paragraph 73.**

74. The combined loss of email and Dropbox access have left Simpson, as the chief managerial figure at Arch Companies, effectively blind (unable to view documents) and deaf and mute (unable to communicate with the Arch Companies' employees, or with the public through Arch Companies' web site). This has rendered him unable to exercise his authority as managing member of JJ Arch, and left the Arch Companies as a rudderless ship.

**Answer: Defendant denies the allegations in paragraph 74.**

AS AND FOR A FIRST CAUSE OF ACTION
(Breach of the Amended JJ Arch Operating Agreement, Brought by Arch and by Simpson, Against Defendant Chassen)

75. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 75 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

76. The Amended JJ Arch Operating Agreement is a valid and binding agreement between Simpson and Chassen.

16

**Answer: Paragraph 76 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

77. The Amended JJ Arch Operating Agreement is supported by valuable consideration.

**Answer: Paragraph 77 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

78. Arch is expressly mentioned in the Amended JJ Arch Operating Agreement and defined therein as an "Investment Entity".

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 78.**

79. Paragraph 3.1 of the Amended JJ Arch Operating Agreement sets forth powers that Simpson has with regard to matters which JJ Arch has the authority to perform "indirectly through an Investment Entity," *i.e.*, through Arch.

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 79.**

80. The Amended JJ Arch Operating Agreement was intended for Arch's benefit.

**Answer: Defendant denies the allegations in paragraph 80.**

81. The benefit to Arch from the Amended JJ Arch Operating Agreement is sufficiently to indicate the assumption by the contracting parties of a duty to compensate Arch if is lost.

**Answer: Defendant denies the allegations in paragraph 81.**

82. Arch is a third-party beneficiary of the Amended JJ Arch Operating Agreement.

**Answer: Paragraph 77 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

83. Chassen materially breached the Amended JJ Arch Operating Agreement by conducting, managing, and controlling the affairs and business of JJ Arch, when, under ¶ 3.1(i) of the Amended JJ Arch Operating Agreement, only Simpson had the authority to do so.

**Answer: Paragraph 83 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegations are denied.**

84. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to conduct, manage, and control the affairs of Arch Entities, and, so long as a hold remains on the Arch Companies' bank accounts,

17

he will continue to suffer a diminished ability to conduct, manage, and control the affairs of JJ Arch and of Arch.

**Answer: Defendant denies the allegations in paragraph 84.**

85. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that such breach has resulted in the resignation of Last and the loss of the value of her work to Arch; so long as a hold remains on the Arch Companies' bank accounts, it will be unable to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers; and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 85.**

86. Chassen materially breached ¶ 3.1(ii) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to control the Arch Companies' bank accounts and draw checks thereon, and transferring such authority to himself.

**Answer: Paragraph 86 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

87. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to control the Arch Companies' bank accounts and draw checks thereon, and such injury will continue into the future so long as a hold remains on the Arch Companies' bank accounts.

**Answer: Defendant denies the allegations in paragraph 87.**

88. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 88.**

89. Chassen materially breached ¶ 3.1(vi) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to withdraw, pay, and distribute the funds of Arch Companies, and transferring such authority to himself.

**Answer: Paragraph 89 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

90. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to withdraw, pay, and distribute the funds of Arch Companies, and such injury will continue into the future so long as a hold remains on the Arch Companies' bank accounts.

18

**Answer: Defendant denies the allegations in paragraph 90.**

91. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 91.**

92. Chassen materially breached the "Resignation" provision of § 1.1 of the Amended JJ Arch Operating Agreement by purporting to deliver a notice of Cause Event to Simpson, when, by the time he had done so, Chassen had been removed as a member of JJ Arch, and thus had no authority to do so, and when the purported Cause Events set forth in such notice had not occurred.

**Answer: Paragraph 92 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegations are denied.**

93. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Chassen has used it as a pretext to continue to conduct, manage, and control the affairs of Arch Entities, to the exclusion of Simpson.

**Answer: Defendant denies the allegations in paragraph 93.**

94. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that, with Chassen having using it as a pretext to dispute, to First Republic, Simpson's authority to control Arch Companies' bank accounts with First Republic, a hold has been placed on such accounts, and Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 94.**

95. By law, the Amended JJ Arch Operating Agreement contains an implied covenant of good faith and fair dealing, pursuant to which Chassen had an obligation not to act in such a manner as to injure Simpson's rights to receive the fruits of said agreement or to prevent Simpson from performing his duties under said agreement.

**Answer: Paragraph 95 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

96. Chassen prevented Simpson from performing his duties under the Amended JJ Arch Operating Agreement by acting so as to deny Simpson:

19

(a)  the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;
(b)  physical access to his office;
(c)  the use of Simpson's email account to communicate with employees of the Arch Companies;
(d)  the use of Dropbox to obtain access to the Arch Companies' corporate documents; and
(e)  the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

**Answer: Defendant denies the allegations in paragraph 96.**

97. Chassen prevented Simpson from receiving the fruits of the Amended JJ Arch Operating Agreement by purporting to terminate, upon false pretenses and without authority to do so, Simpson's role as managing member of JJ Arch by sending the Chassen 8/6/23 Letter.

**Answer: Defendant denies the allegations in paragraph 97.**

98. By his aforesaid conduct, Chassen has injured Simpson's rights to receive the fruits of the Amended JJ Arch Operating Agreement and prevented Simpson from performing his duties under said agreement.

**Answer: Defendant denies the allegations in paragraph 98.**

99. By his aforesaid conduct, Chassen has breached the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

**Answer: Paragraph 99 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

100. For the reasons set forth above, Simpson and JJ Arch have been injured by Chassen's breach of the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 100.**

101. Simpson has complied with the Amended JJ Arch Operating Agreement in all respects.

**Answer: Defendant denies the allegations in paragraph 101.**

102. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

20

**Answer: Paragraph 102 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

103. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 103 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

104. Simpson and Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 104.**

AS AND FOR A SECOND CAUSE OF ACTION
(Breach of Fiduciary Duty, Brought by JJ Arch and by Simpson, Against Defendant Chassen)

105. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 105 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

106. Chassen, as a member of JJ Arch, had a fiduciary duty to JJ Arch and to the other member of JJ Arch, Simpson.

**Answer: Paragraph 106 states a conclusion of law for which no responsive pleading is required, but to the extent one is required the allegations are denied.**

107. Chassen had a duty of loyalty to JJ Arch and to Simpson.

**Answer: Paragraph 107 states a conclusion of law for which no responsive pleading is required, but to the extent one is required the allegations are denied.**

108. This duty of loyalty obligated Chassen to act in the best interests of JJ Arch and Simpson, and not to pursue Chassen's own personal interest at the expense of the well-being of JJ Arch and Simpson.

**Answer: Paragraph 108 states a conclusion of law for which no responsive pleading is required, but to the extent one is required the allegations are denied.**

109. Chassen engaged in misconduct by numerous means, including but not limited to by acting so as to deny Simpson:

(a) the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;

21

(b)  physical access to his office;
(c)  the use of Simpson's email account to communicate with employees of the Arch Companies;
(d)  the use of Dropbox to obtain access to the Arch Companies' corporate documents; and
(e)  the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

**Answer: Defendant denies the allegations in paragraph 109.**

110. Chassen's misconduct resulted directly in damages to Simpson, in that it deprived Simpson of the ability to manage the Arch Companies' finances, gain access to his office, communicate with the Arch Companies' employees, gain access to Arch Companies' corporate documents, and manage the Arch Companies' web site.

**Answer: Defendant denies the allegations in paragraph 110.**

111. Chassen's misconduct resulted directly in damages to JJ Arch, in that it made it impossible for Simpson to pay financial obligations of JJ Arch, communicate with the Arch Companies' employees through email, and gain access to Arch Companies' corporate documents, and it made it impossible for anyone at Arch Companies, other than Chassen, who had already been duly removed from JJ Arch, to manage the Arch Companies' web site.

**Answer: Defendant denies the allegations in paragraph 111.**

112. By seizing control of JJ Arch in violation of the JJ Arch Amended Operating Agreement, and by conducting himself, as a member of JJ Arch, in a manner that placed his own interests and those of his personal associates above those of JJ Arch and Simpson, Chassen breached his duty of loyalty.

**Answer: Defendant denies the allegations in paragraph 112.**

113. Simpson has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, as set forth above.

**Answer: Defendant denies the allegations in paragraph 113.**

114. JJ Arch has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, in that such conduct has caused economic harm to Arch as set forth above, and is expected to continue to cause such harm in the future, by virtue of present and expected future decreases in the value of JJ Arch's equity interest in Arch and decreases in the distributions JJ Arch is to receive from Arch.

**Answer: Defendant denies the allegations in paragraph 114.**

22

Case 1:24-cv-07139 Document 1-1 Filed 09/20/24 Page 96 of 482

115. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 115 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

116. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 116 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

117. Simpson and JJ Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 117.**

AS AND FOR A THIRD CAUSE OF ACTION
(Conversion, Brought by All Plaintiffs Against Defendant Chassen)

118. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 105 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

119. The funds Arch Companies have on deposit in the Arch Accounts ("Arch Companies Funds") belong to Arch Companies.

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations in paragraph 119.**

120. Simpson, Arch, and JJ Arch have an immediate superior right of possession, relative to Chassen, to the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 120.**

121. The Arch Companies Funds are personal property.

23

**Answer: The allegations in paragraph 121 state a conclusion of law for which nor responsive pleading is required, but to the extent a responsive pleading is required, the allegations are denied.**

122. The Arch Companies Funds are specific, identifiable funds.

**Answer: The allegations in paragraph 121 state a conclusion of law for which nor responsive pleading is required, but to the extent a responsive pleading is required, the allegations are denied.**

123. Chassen, intentionally and without authority, acted to deprive Simpson of Simpson's authority, under the JJ Arch Amended Operating Agreement and the Arch Operating Agreement, to possess and control the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 123.**

124. Chassen has exercised unauthorized dominion over the Arch Companies Funds to the exclusion of the rights of Simpson, Arch, and JJ Arch.

**Answer: Defendant denies the allegations in paragraph 124.**

125. Chassen has an obligation to return control over the Arch Companies Funds to Simpson, Arch, and JJ Arch, but has not done so.

**Answer: Defendant denies the allegations in paragraph 125.**

126. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 126 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

127. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 127 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

128. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 128 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

24

129. Simpson, Arch, and JJ Arch have been injured, and continue to be injured, by Chassen's conversion of the Arch Companies Funds, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 129.**

AS AND FOR A FOURTH CAUSE OF ACTION
(Tortious Interference with Contractual Relations, Brought by Arch and JJ Arch Against Chassen)

130. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 130 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

131. Arch and JJ Arch have a valid and binding contract with a third party, *i.e.*, First Republic, pursuant to which JJ Arch, Arch, and the other Arch Companies deposit funds in bank accounts maintained by First Republic (the Arch Companies Funds), and First Republic holds such funds for the benefit of JJ Arch, Arch, and the other Arch Companies (the "First Republic Agreement").

**Answer: Defendant admits that Arch and JJ Arch have a banking relationship with First Republic, and have bank accounts there, but otherwise denies the allegations in paragraph 131.**

132. Pursuant to the First Republic Agreement, the Arch Companies Funds may be spent and distributed by a person duly authorized by JJ Arch.

**Answer: Defendant refers the court to the original documents and otherwise denies the allegations in paragraph 132.**

133. The sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds is Simpson.

**Answer: Defendant denies the allegations in paragraph 133.**

134. At all relevant times, Chassen knew of the First Republic Agreement, and that Simpson was the sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 134.**

135. Chassen is a non-party to the First Republic Agreement.

25

**Answer: Defendant denies the allegations in paragraph 134.**

136.    Chassen intentionally procured the breach, by First Republic, of the First Republic Agreement, by misrepresenting to First Republic that Chassen, and not Simpson, is the person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 136.**

137.    Arch and JJ Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result Simpson has been unable to spend, distribute, or otherwise control the Arch Companies Funds, on behalf of Arch and JJ Arch, as the duly authorized person pursuant to the First Republic Agreement, and pursuant to his authority under the Arch Operating Agreement and the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 137.**

138. JJ Arch and Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result, as set forth above, they have been, and remain, unable to fulfill their obligations to others, including but not limited to their employees, vendors, subcontractors, and materialmen, and as a result, those persons may cease performing services for JJ Arch and Arch, and JJ Arch and Arch may incur further obligations to those persons or to other persons in the future, or having difficulty in the future finding other persons who will be willing to work for or contract with them.

**Answer: Defendant denies the allegations in paragraph 138.**

139. Chassen's actions constitute tortious interference with the First Republic Agreement.

**Answer: Paragraph 139 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

140. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

141. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

26

**Answer: Paragraph 126 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

142. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 126 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

143. Arch and JJ Arch have been injured, and continue to be injured, by Chassen's tortious interference with the Arch Contracts, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 143.**

AS AND FOR A FIFTH CAUSE OF ACTION
(Declaratory Judgment, Brought by All Plaintiffs, Against Chassen)

144. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 144 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

145. There is a justiciable controversy between Plaintiffs on the one hand, and Chassen on the other, as to whether
(a) the Notice to Chassen of Cause Event removed Chassen as a member of JJ Arch; and
(b) the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch.

**Answer: Paragraph 145 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

146. Plaintiffs have taken the position that the Notice of Chassen of Cause Event removed Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter did not remove Simpson as a member of JJ Arch.

**Answer: Defendant admits the allegations in paragraph 146.**

147. Chassen has taken the position that the Notice of Chassen of Cause Event did not remove Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch. However, both positions taken by Chassen are incorrect.

**Answer: Defendant admits that he has taken those positions but denies that they are incorrect.**

27

Case 1:24-cv-07139   Document 1-1   Filed 09/20/24   Page 101 of 482

148. The aforesaid dispute between the parties represents a genuine, concrete dispute involving substantial legal interests.

**Answer: Defendant denies the allegations in paragraph 148 because both letters were declared nullities by order of the Court.**

149. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

150. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

151. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

152. Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to resolve the aforesaid dispute.

**Answer: Paragraph 152 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

153. There is no adequate remedy at law.

**Answer: Paragraph 153 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

AS AND FOR A SIXTH CAUSE OF ACTION
(Declaratory Judgment, Brought by All Plaintiffs, Against Chassen and First Republic)

28

154. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 154 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

155. There is a justiciable controversy between Plaintiffs on the one hand, and Defendants on the other, as to whether Simpson or Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and whether the hold on the Arch Accounts should be removed.

**Answer: Paragraph 155 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

156. Plaintiffs have taken the position that Simpson is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and the hold on the Arch Accounts must be released.

**Answer: Defendant admits the allegations in paragraph 156.**

157. Chassen has taken the position that Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts. However, the position taken by Chassen is incorrect.

**Answer: Defendant admits that he has taken the position but denies the position is incorrect.**

158. First Republic has taken the position that it cannot determine whether Simpson or Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and that the hold should remain on the Arch Accounts. However, the position taken by First Republic is incorrect.

**Answer: Defendant admits that First Republic has taken the position, but denies the position is incorrect.**

159. The aforesaid dispute among the parties represents a genuine, concrete dispute involving substantial legal interests.

**Answer: Paragraph 159 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

160. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

29

**Answer: Paragraph 160 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

161. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 161 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

162. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 162 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

163. Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to resolve the aforesaid dispute.

**Answer: Paragraph 163 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

164. There is no adequate remedy at law.

**Answer: Paragraph 164 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

AS AND FOR A SEVENTH CAUSE OF ACTION
(Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen and First Republic)

165. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 165 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

166. Plaintiffs have a likelihood of success on the merits on their claim that Simpson has the right to control, on the behalf of JJ Arch and Arch, the Arch Accounts.

**Answer: Paragraph 166 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

30

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 104 of 482

167. In the event that the hold First Republic has placed on the Arch Accounts is not lifted immediately, and the right to control the Arch Accounts is not restored to Simpson, Plaintiffs, and third parties, will experience imminent and irreparable injury.

**Answer: Paragraph 167 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

168. Such injury will be in the form of Arch Companies being unable to pay their employees, resulting in economic harm to such employees, and at least some of such employees imminently leaving employment with the Arch Companies and seeking work elsewhere; lack of supervision on construction projects supervised by the Arch Companies, imminently resulting in physical injury to members of the public at the construction sites; Arch Companies being unable to pay subcontractors and materialmen on projects, imminently resulting in such subcontractors and materialmen ceasing work on the projects, again imminently resulting in physical injury to members of the public at unsupervised construction sites, as well as economic injury to the Arch Companies owning the project sites, due to delayed completion of projects; and long-term economic damage to Arch Companies, as future efforts at recruiting employees and contracting with third parties are hindered due to damage to Arch Companies' reputation due to a sustained inability to fulfill their obligations.

**Answer: Defendant denies the allegations in paragraph 168.**

169. The only way forward, therefore, to protect Arch Companies, their employees, subcontractors, materialmen, and vendors, and members of the public at large, is for the Court to order that First Republic release its hold on Arch Companies' bank accounts, and restore to Simpson his contractually guaranteed exclusive right to control the finances, and the checkbooks, of Arch Companies.

**Answer: Defendant denies the allegations in paragraph 169.**

170. The balance of the equities favors Plaintiffs.

**Answer: Defendant denies the allegations in paragraph 170.**

171. Plaintiffs are entitled to a preliminary and permanent injunction requiring First Republic, immediately, to lift the hold it has placed on the Arch Accounts, and to restore to Simpson the exclusive right to control the Arch Accounts on behalf of JJ Arch and Arch.

**Answer: Paragraph 171 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

172. There is no adequate remedy at law.

**Answer: Paragraph 172 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

31

Case 1:24-cv-07139   Document 1-1   Filed 09/20/24   Page 105 of 482

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen)

173. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 173 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

174. Plaintiffs have a likelihood of success on the merits of their claim that Simpson is entitled to have access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

**Answer: Paragraph 174 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

175. In the event that Simpson is unable to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site, and Plaintiffs will suffer irreparable injury.

**Answer: Paragraph 175 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

176. The balance of the equities favors Plaintiffs.

**Answer: Paragraph 176 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

177. Plaintiffs are entitled to a preliminary and permanent injunction requiring Chassen to take, immediately, all actions necessary to enable Simpson to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

**Answer: Paragraph 177 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

178. There is no adequate remedy at law.

32

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 106 of 482

**Answer: Paragraph 178 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiffs fail to state a claim as a matter of law.

### Second Affirmative Defense

Plaintiffs' claims fail based on documentary evidence.

### Third Affirmative Defense

Plaintiffs improperly intermingle their direct and derivative claims, which mandates the dismissal of the entire complaint.

### Fourth Affirmative Defense

Plaintiffs' claims should be dismissed as duplicative.

### Fifth Affirmative Defense

Plaintiffs' claims fail under the doctrine of in pari delicto.

### Sixth Affirmative Defense

Plaintiffs' claims fail because of Plaintiff's unclean hands.

### Seventh Affirmative Defense

Plaintiffs' claims fail under the doctrines of waiver and estoppel.

### Eighth Affirmative Defense

Plaintiffs' derivative claims fail because under Section 10.2 of the JJ Arch Operating Agreement, JJ Arch is obligated to indemnify Defendant for any claim "for any loss, damage, or claim  incurred" by Defendant "by reason of any act or omission performed or omitted . . . in good faith  on behalf of the Company and in a manner reasonably believed to be within the scope

33

of authority conferred . . . by this Agreement." Defendant's conduct has been entirely in good faith, on behalf of the company, and in a manner reasonably believed to be within the scope of the authority conferred by the Operating Agreement.

### Ninth Affirmative Defense

Plaintiffs' claims fail because the Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority after December 11, 2021 is unconscionable. Despite Chassen vocalizing his disagreement, Simpson presented him with the Amendment on a take-it-or-leave-it basis, threatening him that he would remove him from the business entirely if he did not sign the Amendment. Chassen signed the Amendment under undue pressure and threats. Simpson pressured Chassen not to hire his own counsel review the Amendment and limited his involvement in calls Simpson took with the shared Arch Entities' counsel David Heymann who Simpson had draft the amendment in his favor, while Heymann purported to represent both of them. Chassen was never disclosed Hyemann's actual conflicts, and Chassen did not execute any conflict waiver. Simpson was also in a relationship of confidence and trust with Defendant, who had been his mentor in the industry. Simpson took advantage of that relationship of trust.

Because of their unequal bargaining power, prior relationship, Simpson's threats, and deceptive and coercive tactics, and the parties' confidential relationship, Chassen lacked meaningful choice in entering into the Amendment.

And the Amendment itself was substantively unconscionable as it contained only favorable terms to Simpson and gave away Chassen's managerial rights as well as his membership percentage under the Operating Agreement for nothing.

34

### Tenth Affirmative Defense

Plaintiffs' claims fail because the Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority fails for lack of consideration. The Amendment contained only favorable terms to Simpson for nothing of real value.

### Eleventh Affirmative Defense

Plaintiffs' claims fail because the Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority was the product of duress and undue influence and breaches of fiduciary duty.

### Twelfth Affirmative Defense

Plaintiffs' claims fail because Simpson was in a relationship of trust and confidence at the time of the drafting and execution of the Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority, and a special burden should be shifted to the party in whom the trust is reposed, Simpson, to disprove fraud or overreaching. *In re Estate of Greiff*, 92 N.Y.2d 341, 345 (1998). Given Chassen relationship of trust and confidence with Simpson, the burden is on Simpson to establish that he did not enter the Amended JJ Arch Operating Agreement by undue influence or coercion, which burden he cannot meet.

### Thirteenth Affirmative Defense

Plaintiffs' claims fail because Simpson breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, 35 Oak, and Arch's investors.

### Fourteenth Affirmative Defense

Plaintiffs' claims fail because Simpson was lawfully resigned from JJ Arch.

### Fifteenth Affirmative Defense

Plaintiffs' claims fail because he failed to properly serve Chassen.

35

### Sixteenth Affirmative Defense

Defendant reserves his right to assert additional affirmative defenses as additional information is learned during the course of this action.

WHEREFORE, the Court should award and enter judgment in Defendant's favor, dismiss the Complaint in its entirety, and award Defendant his legal fees and costs.

### VERIFIED COUNTER-CLAIMS

Jared Chassen ("Chassen"), individually and derivatively on behalf of JJ Arch, LLC ("JJ Arch") and Arch Real Estate Holdings, LLC ("Arch Real Estate"), for his counterclaims against Jeffrey Simpson ("Simpson"), alleges as follows:

1.      This is an action for breach of fiduciary duty, breach of contract, recission, and declaratory relief and a permanent injunction brought by Chassen in his own individual capacity, and derivatively on behalf of JJ Arch and Arch Real Estate against Simpson. Chassen seeks, among other things, to recover for Simpson's breaches of fiduciary duty and other corporate wrongdoing, to declare that Chassen is the sole managing member of JJ Arch, and to declare Simpson resigned as a member of JJ Arch.

### Parties

2.      Plaintiff Chassen is an individual residing in the State of New York. He is a member of JJ Arch, which in turn is the managing member of Arch Real Estate. Chassen has over 15 years of experience in the real estate industry. Among other work, before forming JJ Arch, he worked at Greystone Development ("Greystone") an affiliate of Greystone & Co., Inc. a firm that provides real estate services.

36

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 110 of 482

3.      Defendant Jeffery Simpson is an individual residing in the State of New York. He is a member of JJ Arch, which in turn is the managing member of Arch Real Estate. Before forming JJ Arch with Chassen, Simpson worked with Chassen at Greystone.

4.      Nominal Defendant JJ Arch is a New York limited liability corporation. It was formed by Chassen and Simpson on or about December 11, 2017.

5.      Nominal Defendant Arch Real Estate is a New York limited liability corporation. It was formed by JJ Arch and non-party 608941 NJ Inc. ("35 Oak") on or about December 11, 2017. JJ Arch and 35 Oak are the Members of Arch Real Estate.

### The JJ Arch Operating Agreement

6.      On December 11, 2017, Chassen and Simpson entered into the JJ Arch Operating Agreement. A true and correct copy of the JJ Arch Operating Agreement is annexed hereto as **Exhibit A**. The JJ Arch Operating Agreement identifies both Simpson and Chassen as the two Members.  *See* Ex. A § 1.1. Section 3.1(a) of the JJ Arch Operating Agreement provides that, prior to the fourth anniversary of the Agreement, the business and affairs of JJ Arch shall be managed by Simpson subject to the limitations set forth in subsection (b), which provides that any Company Major Decision, as defined in the Agreement, shall only be undertaken with Chassen's prior written consent.  *See* Ex. A § 3.1(a)-(b).

7.      Section 3.2 of the JJ Arch Operating Agreement provides that, after the fourth anniversary of the Agreement, that is, December 12, 2021, Simpson and Chassen were to both have managerial authority over JJ Arch, with consent by both required for Company Major Decisions. *See id*. § 3.2. Further, Chassen and Simpson were to be entitled to 50% of all distributions from December 12, 2021.

### The Arch Real Estate Operating Agreement

37

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 111 of 482

8.      On December 11, 2017, the same day that Chassen and Simpson entered into the JJ Arch Operating Agreement, JJ Arch and 35 Oak entered into the Arch Real Estate Operating Agreement. A true and correct copy of the Arch Real Estate Operating Agreement is annexed hereto as **Exhibit B**. Under the Arch Real Estate Operating Agreement, JJ Arch is the Managing Member, while 35 Oak is the Investor Member. While JJ Arch has managerial rights over Arch Real Estate, 35 Oak has consent rights to certain major decisions.

### Before Becoming Partners, Simpson Had a Prior Relationship of Confidence and Trust With Chassen

9.      Chassen first met Simpson when he worked with him at Greystone, a firm that provides real estate services.  Greystone Development is a New York based full-service developer of commercial and residential real estate that provides investment, development, construction, marketing, operations, and asset management services.

10.     Simpson joined Greystone in 2007 and became the Chief Executive Officer of its development subsidiary in 2013. At the time, Dough Benach, the head of the division hired Chassen and placed him in the Development and Acquisitions team in 2012 to work with Benach and Simpson. Simpson and Benach taught him essential skills for acquiring, financing debt and equity, developing and running real estate projects, and he was promoted as the Director of Acquisitions in 2014.

11.     During his tenure at Greystone, Simpson had a reputation of being an aggressive businessperson who would pursue opportunities that others would view as unfeasible but would never yield to opposition and often caused internal conflict.

12.     Chassen viewed Simpson as his mentor and developed a close relationship with him. He reposed the utmost confidence and trust in him and even put his financial well-being in his hands.

38

13.    In 2017, Simpson left Greystone under less than favorable circumstances.

14.    Despite the public perception that the separation between Simpson and Greystone was amicable, the separation came after internal dissensions caused by numerous failed and over budget projects led by Simpson.  As a result, the Greystone Development brand downsized from 30 people to currently 3 persons and Simpson was forced to leave Greystone, and Chassen left alongside many others as the brand downsized and the jobs disappeared.

### Chassen Brings Simpson 35 Oak as an Investor and they Form JJ Arch

15.    After departing Greystone, Simpson struggled to find investors for a new business. While still employed by Greystone, he held many meetings by himself to launch a new business which yielded no success. Through Chassen's own connections, Chassen introduced 35 Oak to Simpson while still at Greystone. Chassen and Simspon planned a new company together relying on Chassen's capital connections to make the company feasible.

16.    35 Oak is an active investor in many industries, and its principal place of business is in Toronto, Canada. After a few meetings, 35 Oak decided to invest in a joint venture with Chassen and Simpson, and on December 11, 2017, established Arch Real Estate, which is governed by the Arch Real Estate Operating Agreement. On the same day, Simpson and Chassen signed the operating agreement for JJ Arch.

17.    The real estate portfolio owned and controlled by the Arch Entities ultimately grew to more than $1Bn in assets under management, held in various single purpose companies that are affiliates of and/or controlled by the Arch Entities. The Arch Entities also have other affiliated companies, including a property management company, brokerage company, construction company, each of which provides services relating to real properties that the Arch Entities control.

### Simpson Uses His Relationship of Trust with Chassen to Coerce Chassen to Sign an Unconscionable Amended JJ Arch Operating Agreement

39

18.     On May 22, 2021, the JJ Arch Operating Agreement was amended forcibly without Chassen's input or drafting (the "Amendment"). A true and correct copy of the Amendment is annexed hereto as **Exhibit C**. The Amendment eliminated the language in Section 3.2 of the original Agreement providing Simpson and Chassen equal rights and authority to manage the company beginning on December 11, 2021. Under the Amendment, Chassen purported to give away his managerial rights to Simpson for another four years, though Chassen retains consent right to limit Simpson's authority with respect to any Company Major Decision. *See* Ex. C § 3.1-3.2. Instead of becoming entitled to 50% of the distributions, as he was to be as of December 11, 2021, under the Amendment, Chassen was to be entitled to 49.9% of all distributions, with Simpson entitled to 50.1%.

19.     Because of their unequal bargaining power, Simpson's threats, and deceptive and coercive tactics, and the parties' confidential relationship, Chassen lacked meaningful choice in entering into the Amendment.

20.     Simpson took advantage of his confidential relationship with Chassen, as his mentor, to push a one-sided agreement. He heaped abuse on him in pressuring him to sign, repeatedly telling him he was incapable and inept. Simpson pressured Chassen to not have his own counsel review the Amendment and limited his involvement in calls Simpson took with JJ Arch's counsel David Heymann, who purported to also represent both of them, and who Simpson had draft the amendment in his favor. Heymann did not even disclose his actual conflicts in representing both JJ Arch, Simpson, and Chassen, and no conflict waiver was ever presented or agreed-to. Simpson presented Chassen with the Amendment on a take-it-or-leave-it basis, threatening him that he would just remove him from JJ Arch if he did not sign the Amendment. Chassen signed the Amendment under undue pressure and threats.

40

21.    The Amendment itself was substantively unconscionable as it contained only favorable terms to Simpson and gave away Chassen's rights under the Operating Agreement for nothing of value.

## Simpson Takes Various Unlawful and Improper Actions

22.    When they first started their new business, Simpson promised Chassen, Michelle Miller, and Tristan Last, employees/junior partners of the Arch Entities, that he would learn lessons from Greystone and change his aggressive behaviors. The operation of the Arch Entities did well initially, but it went downhill over the past two years.

23.    Simpson's aggressive business demeanor increasingly turned menacing inside the company, with partners, lenders and lawyers. He repeatedly acted in an intimidating manner towards employees and others. Simpson not only overloaded employees, but also regularly yelled and threatened to fire them causing a huge turnover of employees and tarnishing the Arch Entities' brand in the hiring markets. He regularly called people stupid, inept and other demeaning names, to the point of bringing them to tears. Simpson created a toxic work environment that forced many employees to leave, leading to understaffing and mismanagement of the company's real estate projects. Simpson would send messages to key employees such as "So now everyone is going to have to come to me every time they go to the bathroom to get my yes or no."

24.    Putting the companies' and investors' interests first, Chassen was willing to work to mitigate the damage caused in his wake and endure the harsh and abusive workplace that Simpson created, even to Chassen's personal detriment. Yet Simpson committed a series of misconducts that crossed the line of breaching his fiduciary duties, which the company could not withstand, and Chassen had to step up eventually.

41

Case 1:24-cv-07139   Document 1-1   Filed 09/20/24   Page 115 of 482

25.      First, Simpson forced the team to make various misrepresentations about real estate projects to induce investments. Simpson and team members including Chassen were forced to pitch grossly under budgeted projects and promised unrealistic returns on investment to induce investors, such as 35 Oak and many others to contribute additional capital without ever disclosing risks.

26.      Disregarding the opposition of the other Arch Entities' partners and employees, including Chassen, Simpson pushed numbers aggressively and used unachievable assumptions to amplify financial outcomes. Over the years, several internal investment meetings occurred where Chassen and many team members aggressively pushed backed on his financial assumptions, but he would aggressively fight us and ultimately tell everyone to follow his path or be sidelined or fired.  Simpson also provided minimal reporting to investors, leaving them in the dark and keeping the staff overworked and understaffed and unable to do simple tasks like reporting or reconciliation. 35 Oak, the Arch Real Estate funding partner, kept funding the business and projects without proper capital calls, reporting or communication from JJ Arch, and if they ever questioned Simpson, he would threaten retribution if they did not continue to fund. He would tell them they were only good for capital and guarantees, and nothing else.

27.      Second, Simpson prioritized his personal gains over the success of the Arch Entities' projects.  For instance, the Myrtle Point development in Ridgewood, Queens, was grossly under budgeted and experienced significant delays from lack of supervision. Simpson didn't even visit the project for weeks at a time.  Recently, the project relied on one time-sensitive forbearance to move forward, yet Simpson instructed his lawyer for the Arch Entities to put pencils down and not turn over the necessary documents to 35 Oak, the guarantor.  He was planning to hold documents as leverage to cut a deal with one major lender and force 35 Oak to take certain actions

42

that would favor his personal interests.  As a result of the delay, the Myrtle Point development has been stalled for months, causing the Arch Entities to lose more than fifty percent of its necessary revenue and putting additional strain on the business and putting over $45 million of equity at risk for full loss.

28.     Third, Simpson failed to properly supervise and manage projects.  Across various projects, Simpson was not involved for months and in many instances disappeared to focus on his other businesses or personal ventures.

29.     Fourth, as cash flow started to become limited at Arch, at the extreme detriment of our managed investments and to increase income streams for the company, Simpson started a plan forcing the team leaders to take on even heavier workloads amongst senior employees, and shedding necessary employees such as project managers, construction managers, accountants, and other crucial roles to run projects. Simpson's attempt to cut expenses to generate additional income deprived many projects of proper supervision, which led to numerous failures. Despite desperate pleas from many senior Arch Entities' employees to properly staff the properties, Simpson pushed to continue to cut staff, and increase fees to JJ Arch. Investors were never made aware of these issues.

30.     Fifth, days before Chassen was forced as a fiduciary to remove Simpson, Simpson in text messages and in verbal communications to Chassen and Michelle Miller, a junior partner/employee, threatened to put all the Arch Entities into bankruptcy in order to leverage to us and 35 Oak to follow his orders without resistance or he would crash the business.  Knowing it was against the Arch and JJ Arch Operating Agreements to file such bankruptcy, Simpson openly declared his plan to blow up the business and warned others that he would do so if they disobeyed

43

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 117 of 482

him saying, "[a]nybody that chooses to do anything without my permission or my consent is no longer going to be a part of this organization."

31.     Simpson also misappropriated Arch Real Estate's funds and employees for an independent auto business owned by JJ Arch—Rêver Motors ("Rêver). Rêver is a vintage car dealership and repair shop located in Southampton, New York. For the last two years, Simpson often dedicated two to three days per week on running the Rêver business while shirking his other responsibilities. Simpson directed Arch Entities' employees to manage accounting, logistics, and facility of the Rêver business. Simpson even hired one of the Arch Real Estate's employees to work exclusively for the Rêver business and transferred funds from Arch Real Estate's construction projects to pay for their wages. In connection with the Rêver business to which he devoted much of his time, Simpson engaged in illegality such as switching a VIN number on a car. This was done without Chasen's consent.

32.     From the very beginning of the Rêver business, Chassen was very clear to Simpson that if JJ Arch purchased this business, it had to be a weekend side-business that would need full third-party management and should never at the expense of Arch Real Estate's investments. Repeatedly, Chassen asked Simpson to stop directing Arch Real Estate's employees to work for the business, but he always disregarded Chassen's pleas. Simpson also never obtained Chassen's consent before doing this despite being obligated to do so. *See* Ex. C § 3.1(b)(viii).

33.     Simpson also began devoting much of his time to other business at the expense of JJ Arch such as purchasing a farm and several unaffiliated investment properties, many with large construction components that he oversaw. Because of these other businesses, he was devoting at most 65% of his business time to JJ Arch, when the JJ Arch Operating Agreement requires that he devote substantially all his business time to JJ Arch.

**The Company Enters Dire Financial Circumstances Because of Simpson and Simpson Proposes that 35 Oak Take-Over JJ Arch**

34.    In July 2023, Chassen asked JJ Arch's accountant about Simpson's diversion of money. Chassen had just seen a Paylocity report, a payroll document, that showed payments from Arch Real Estate to a worker at Rever, a business not associated with Arch Real Estate.

35.    The accountant confirmed that Simpson was using company funds from Arch Real Estate to pay JJ Arch expenses. She confirmed that he took Arch Real Estate money to pay auto employees and that he owed Arch Real Estate money. She also confirmed that due to extreme lack of staff there was minimal accounting of funds.

36.    JJ Arch earned its operating income from a flow of acquisitions of new properties and property management fees. For example, it earned income from finance fees from brokering loans on new acquisitions and new deals, property management fees for overseeing the properties that were owned by Arch, and construction fees on its development of properties acquired by Arch.

37.    Before 2022, Arch owned approximately 5500 units around the country, but in 2022 it sold approximately 2000 of the units, thus lessening its base for property management fees. The rise in interest rates also made Arch unable to acquire new properties to be able to earn income from finance and construction fees. Without this income, Arch was forced to lay-off employees, but without these employees, it could not properly manage the properties spread-out in different states, thus causing the properties to start failing from mismanagement.

38.    In other words, the investors were being harmed by Arch remaining as the property manager because Arch could not maintain the economies of scale required to properly run the properties once it sold many of the units in 2022. And with the real estate markets faltering, Arch also no longer had the regular income from financing fees on acquisitions by which it otherwise obtained income, or construction fees from developing newly acquired properties.

45

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 119 of 482

39.     And into these dire circumstances, Simpson's erratic, volatile, and abusive behavior only made the situation worse. For example, Arch's construction entity, Arch Builders, LLC, had a staff of seven people on the ground, plus people in the office, including project managers and executives. Beginning in the summer of 2022, these people were either abused and quit or were fired by Simpson. That left no one track budgets and no one to oversee or handle Arch's ongoing construction projects, leading to the projects to fail.

40.     Chassen, and others at JJ Arch, including Jason Paul and Michelle Miller, JJ Arch employees/junior partners, regularly suggested to Simpson that Arch outsource property management to independent third-party property managers who had the necessary economies of scale to oversee the properties and ensure that the investor's assets were adequately managed and protected. But JJ Arch would have less revenue by doing so, and would become a mere investment holding company, something that Simpson's ego and self-interestedness could not tolerate, even at the expense of the investors whose interests he was supposed to protect.

41.     With properties failing, funds running out, and investors unprotected, in July 2023, even Simpson appeared to recognize that he should walk away and give control to Arch Real Estate's investor member, 35 Oak, who had the funds to right the ship but were not willing to continue funding a black hole where their money just disappeared into Simpson's mismanagement. On July 13, 2023, he sent a proposal through Michelle Miller, a JJ Arch employee/junior partner, to 35 Oak to "unwind" Arch. In the proposal, among other things, 35 Oak would take over ownership of JJ Arch after 60 days, and Simpson would execute a separation agreement. A true and correct copy of the July 13, 2023 email chain is annexed hereto as **Exhibit D**.

42.     Later that day, Simpson responded to the email to say, among other things, "[w]e sent this email this AM seeking feedback on a path forward for everyone . . . I urge you to reply

46

and get to a conclusive agreement below by tomorrow, as we set up timeframes in the proposal for a particular reason. *If not, we will have to take more extreme measures to exercise Dissolution via the Agreement.*" *Id.* (emphasis added). Simpson recognized, expressed of course as a threat, that his remaining at the company would lead to the destruction of the company.

### 35 Oak's Response Enrages Simpson

43.     For its own reasons, 35 Oak responded via its counsel, Haynes and Boone, LLP, on July 19, 2023 that they would agree to a proposal whereby, among other things, "Jeff immediately steps away from active day-to-day management of Arch and its subsidiaries and relinquishes authority to act on behalf of Arch and its subsidiaries . . . [and] [t]he JJ Operating Agreement is amended such that Jared has sole control over JJ." A true and correct copy of this email is annexed hereto as **Exhibit E**.

44.     Chassen had no knowledge of 35 Oak's deliberations, or that it was going to make this proposal to Simpson, but now understands that 35 Oak made this proposal that Chassen have sole control of JJ Arch, rather than 35 Oak itself as suggested by Simpson, because 35 Oak was concerned it might face financial liability on its Arch loan agreements if neither Simpson nor Chassen were in control of JJ Arch. The proposal that Chassen be placed in charge, however, enraged, Simpson, and he appears to have believed that, though he himself made the proposal to 35 Oak to walk away in their stead, that Chassen somehow was behind their counterproposal that Chassen be placed in charge of JJ Arch instead. Chassen was not.

45.     Rather, 35 Oak recognized that unlike Simpson, Chassen was and is a thoughtful, careful, diligent and stable person who acted with his fiduciary duties foremost in his mind and who could be trusted as a steward and fiduciary.

47

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 121 of 482

**Simpson Becomes Fixated on His Battle with 35 Oak, Which He Escalates, and
Chassen Acts to Protect Arch**

46.     Simpson's relationship with 35 Oak then deteriorated even more and he engaged in

a campaign of extortion, abuse, and threats that led 35 Oak to file an action in federal court against

him. *See 608941 NJ Inc. v. Jeffrey Simpson*, 1:23-cv-07089-AT (S.D.N.Y.). A true and correct

copy of the Complaint is annexed hereto as **Exhibit F**.

47.     In the beginning of August, Chassen again told Simpson, the company should

transition to third-party management. He responded that he would not do that because he did not

want to have to rely on 35 Oak's money with whom he was fighting.

48.     As detailed in 35 Oak's Complaint, as well the emails and documents attached to it

showing the extensive deterioration of Simpson's relationship with Arch Real Estate's investing

partner, Simpson's breached his fiduciary duties to 35 Oak and Arch Real Estate by: (1) threatening

to stop work on time sensitive matters in order to blackmail 35 Oak; (2) directing counsel for Arch

Real Estate not to speak to 35 Oak; (3) making misrepresentations to 35 Oak, and entering

agreements at 35 Oak's expense without consent; (4) falsely advising 35 Oak that it had made

capital calls to other investors to induce 35 Oak to make capital contributions; (5) threatening to

fire Arch Real Estate employees and cease operations if 35 Oak did not provide money; (6)

refusing to execute documents unless terms were included that would only benefit him; (7)

entering into major decisions without 35 Oak's consent; (8) creating a hostile business atmosphere

damaging critical relationships with lenders, contractors, tenants, etc.; and (9) making defamatory

statements.

49.     Simpson's battle with 35 Oak continued escalating. On or about August 3, 2023,

Simpson told Chassen that if 35 Oak "didn't stop messing" with him, he was going to file for

bankruptcy on all the properties and "blow the company up." This, of course, was prohibited by

48

the operating agreements, and further demonstrated to Chassen that Simpson was entirely focused on himself and his petty battle with 35 Oak.

50.     After 35 Oak's counterproposal, Simpson wanted Chassen to take a pay-cut, apparently on the delusional purported belief that such a pay-cut would make him not have to rely on 35 Oak or would demonstrate his loyalty to Simpson. When Chassen suggested that he might accede to such a pay-cut if both were to do so, Simpson refused and grew further enraged.

51.     Chassen learned on August 4, 2023 that Simpson was going to terminate Chassen and free himself to destroy the company and misappropriate company assets at will. Chassen then acted to protect the company.

52.     On August 5, 2023, Simpson sent Chassen an email with the subject line "Jared Chassen - Resignation of JJ Arch LLC." In this email, he "advised" Chassen that he had been "forced to resign as a Member" of the Arch Entities and would no longer be affiliated with the Arch Entities or any of its affiliates "effective immediately."

53.     Simpson's email to remove Chassen as a Member of JJ Arch did not comply with the JJ Arch Operating Agreement. Under the Agreement, the resignation of a Member occurs when "a Cause Event has occurred with respect to a Member and the other Member has delivered written notice thereof to such Member requiring such Member to resign." Ex. A at § 1.1 ("Resignation"). A Cause Event, as defined in the Arch Operating Agreement, includes, but is not limited to, "(i) willful misconduct in relation to the business or affairs of [the Arch Entities]," "(ii) breach of fiduciary duty in relation to the business or affairs of [the Arch Entities]," "(iii) gross negligence in relation to the business or affairs of [the Arch Entities] which results in a material loss to [the Arch Entities] or its Members," and "(v) misappropriation of [the Arch Entities' funds or property]." Ex. A at § 1.1 ("Cause Event").

49

54.     Simpson made no allegation that would constitute a Cause Event warranting Chassen's resignation. In fact, all Chassen's actions have been to protect the company and its assets. Simpson's purported notice removing Chassen as a Member of the Arch Entities was nothing more than a blatant attempt to wrest sole control and management of the Arch Entities to insulate himself from his bad acts and render himself a dictator, without any checks or balances.

55.     To protect the Arch Entities from further damage, on August 6, 2023, Chassen sent Simpson an email with the subject line "Limited Liability Company Operating Agreement of JJ Arch LLC/Cause Event Notice" and an attachment titled "Notice JJ Arch." In the Notice, Chassen rejected all of Simpson's assertions in the August 5, 2023 resignation email, and his purported forced resignation of Chassen as a Member of JJ Arch, noting that that he had not done any conduct that would constitute a Cause Event because "no such conduct occurred." A true and correct copy of the termination letter is annexed hereto as **Exhibit G**.

56.     Chassen then informed Simpson, as required by the JJ Arch Operating Agreement, that Simpson had committed multiple Cause Events that fall into the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating Agreement, including "(a) directing lawyers for one or more Subsidiaries to stop work on extremely time sensitive matters for [his] own personal leverage, (b) making various misrepresentations to [35 Oak] and other investors to induce them to invest in deals and contribute additional capital to Subsidiaries, (c) misapplying Company resources for [his] personal use, (d) breaching [his] fiduciary duty under the LLC Agreement by *inter alia* failing to obtain [my] consent required for certain decisions as required under the LLC Agreement, (e) engaging in willful misconduct as to the business and affairs of the Company . . . [and] (f) engaging in gross negligence, which [would] result in material loss as to the business and affairs of the Company …" *Id.*

50

57.    Chassen advised Simpson that, as a result of these Cause Events, he had to resign, and no longer had the right to act on behalf of the Arch Entities.

58.    Further, Simpson's resignation was independently mandated by the JJ Arch Operating Agreement's provision that makes it a resignation event if the member fails to devote "substantially all business time for JJ Arch." Ex. A at 5. Notice is not a prerequisite to resignation for a failure to provide "substantially all" business time to JJ Arch, *id.*, as notice is only required for Cause Event.

59.    On August 6, 2023, 35 Oak also sent Simpson an email with the subject line "Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC/Cause Event Notice" and an attachment titled "Notice from 35 Oak to JJ Member (Final)." 35 Oak advised Simpson that he had committed multiple Cause Events that fall into the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating Agreement.

### Simpson Files this Action and is Restored to His Managerial Position by an Injunction

60.    In response to his resignation from JJ Arch, on August 14, 2023, Simpson, individually and derivatively, as managing member of JJ Arch, sued derivatively as managing member of Arch and JJ Arch, Chassen and First Republic Bank.

61.    On August 21, 2023, the Court entered an Interim Order which restored Simpson to his managerial position but required that "[b]oth Simpson and Chassen shall maintain access to view the Arch Accounts online, and such access shall not be terminated without further order of the Court." A true and correct copy of the Interim Order is annexed hereto as **Exhibit H**. The Interim Order further provided that the "JJ Arch shall be managed in accordance with Section 3.1 of the Limited Liability Company Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended by Amendment No. 1 dated May 22, 2021." *Id.* That is, the Court ruled that "the

51

business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in Section 3.2 of the JJ Arch Operating Agreement, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen." *Id.* The Court expressly ruled that "The August 2023 instruments sent by Simpson and Chassen to the other purportedly resigning or terminating the other as a member or managing member of JJ Arch are hereby void and of no force or effect . . ." *Id.* Importantly, the Interim Order provided that "Simpson and Chassen shall cooperate with each other in good faith to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement and related agreements. . ." *Id.*

### Simpson Further Breaches His Fiduciary Obligations and Violates the Court's Orders, Including by Purporting to Again Terminate Chassen

62. Simpson began violating the Interim Order right from the get-go. He immediately rehired Tristan Last, an employee who had resigned the day after Chassen removed Simpson for cause and increased her salary without seeking my consent even though Chassen's consent was required. He hired a new IT company without Chassen's consent at an expense that required Chassen's consent.

63. He then moved all employees away from Chassen's desk, leaving Chassen on the outskirts of the office space, and clearly intending to show staff that Chassen was no longer a co-member of the company. While Chassen complied with the Interim Order and gave him access to Office.com, Dropbox, Go daddy, he then used that access to read all of Chassen's emails, including those with Chassen's counsel, and deleted Chassen's emails.

64. Simpson also stopped paying JJ Arch bills that are connected to Chassen's credit. For example, JJ Arch has 3 Arch trucks that are used for Arch builder entities, and Chassen received a call from each credit company this week that payments are not being made and they are

52

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 126 of 482

in collections. Likewise, JJ Arch's company Visa card, Divvy, is under Chassen's credit, and Simpson removed Chassen from these accounts even though these accounts are tied to Chassen's credit. Chassen also received calls that payments are not being made on these accounts.

65.     Simpson then shut off Chassen's access to his emails, Dropbox, all company systems, and bank accounts.

66.     He demanded that Chassen consent to switch banks from First Republic, without explanation or reason, something that especially frightening considering his repeated misappropriation of company assets and the fact that Chassen would then be unable to view the accounts as required by the Interim Order.

67.     He began telling employees and third-party partners that Chassen was no longer a member of JJ Arch and started defaming him to them.

68.     On September 1, 2023, he sent another formal forced resignation letter even though the Court has just nullified both August letters and directed the parties to cooperate. This September 1, 2023 letter was predicated on false claims and was a contempt of court. It was the product of Simpson's vindictiveness and scorched earth campaign to salvage his bruised ego at the price of the Arch Entities.

### Simpson Continues to Breach his Fiduciary Obligations and Ignores Additional Court Orders Even After Chassen Files A Contempt Motion

69.     On September 14, 2023, Chassen moved to hold Simpson in contempt of Court and to direct Simpson to restore him to JJ Arch and company systems. On September 15, 2023, the Court issued a temporary restraining order, restored Chassen, and barred any further unilateral terminations. A copy of the Court's order is annexed hereto as **Exhibit I**.

70.     Even then, Simpson continued to disobey the courts orders by (1) hiring three new employees without obtaining Chassen's consent, and actually firing employees he perceives as

53

allied with Chassen; (2) opening new bank accounts at Citizens Bank without giving Chassen full access to those accounts; (3) refusing to give Chassen signing authority on bank accounts, taking the position that the orders do not require him to do so; and (4) refusing to give Chassen's full access to Juniper Square, JJ Arch's investor portal. Simpson also directed employees at Arch not to talk to Chassen and has refused to share information with Chassen.

71.    Simpson's defiance of the Operating Agreement and the Supreme Court's orders constitute independent breaches of fiduciary duty.

### Chassen Discovers that Simpson Failed to Disclose Huge Tax and Investment Losses to Investors

72.    On or about September 29, 2023, Chassen discovered that Simpson had completely breached his fiduciary obligations with respect to recent IRC Section 1031 tax exchange vehicles that Simpson advocated investors join. Chassen has just been personally hit with hundreds of thousands of dollars in unexpected tax liability that he learned of in the past few days and must pay by October 15, 2023—as have dozens of other investors—because of Simpson's complete dereliction of his managerial role, as well as his failures to adequately disclose risks to investors or adverse information.

73.    As stated above, in 2022, Arch sold approximately 2000 units and after these units were sold, Arch reached out to investors asking if they wanted to reinvest the money from the sale into other potential properties into IRC Section 1031 tax exchange vehicles, without adequately disclosing the risks that such tax benefit might not be obtained. Chassen along with numerous others did so, though Simpson put only minimal proceeds from the sale into these new vehicles.

74.    Rather than inform investors that the IRC Section 1031 tax exchanges had failed, and that investors would face huge tax liabilities, Simpson hid the information, it only coming to Chassen's attention, and other investors' attention, as investors began to get hit with massive tax

Case 1:24-cv-07139   Document 1-1   Filed 09/20/24   Page 128 of 482

bills from the sale. Many investors have yet to learn of their tax liability, as their gains from the 2022 sale is reported as ordinary income, though their K-1s are not being sent out before their tax filing deadlines. Simpson has attempted to cover-up his failures through misleading communications to investors.

75.     And to top it off, Simpson put the funds into properties he is causing to fail by his insistence on mismanaging them, thus not only foisting on investors unexpected and hidden tax liability now, but the imminent complete loss of their investments.

**Demand Futility**

76.     Chassen did not make a pre-suit demand because such demand would be futile. Simpson is the acting as the sole managing member and is himself accused of the wrongdoing alleged herein. He is interested in the transactions alleged herein, and has, as alleged herein, completely abdicated his fiduciary responsibilities. Simpson is incapable of making an impartial decision as to whether to bring this suit against himself. Accordingly, any demand requirement is futile and excused.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**(Breach of fiduciary duty against Simpson-derivative claim on behalf of JJ Arch)**

77.     Chassen repeats each of the proceeding allegations as if fully set forth herein.

78.     Chassen has standing to bring a derivative claim on behalf of JJ Arch because he is a member.

79.     Simpson, as the managing member of JJ Arch, owes JJ Arch fiduciary duties, including the duty of loyalty and good faith.

80.     Simpson breached his fiduciary duties to JJ Arch, by among other things, (1) misappropriating JJ Arch's assets; (2) engaging in abusive behavior towards JJ Arch employees

and personal and investors; (3) knowingly and utterly mismanaging JJ Arch and its properties for his own self-interest, (4) failing to maintain internal controls, (5) failing to devote his business time to JJ Arch; (6) issuing misleading disclosures; (6) refusing to provide books and records to investors even though obligated to do so, and otherwise knowingly taking decision that breached JJ Arch's fiduciary obligations and expose it to liability; (7) making decisions that were harmful to JJ Arch and investors for self-interested reasons; (5) failing to make adequate disclosures to investors; (6) unlawfully attempting to terminate Chassen; (7) failing to obtain Chassen's consent prior to taking major decisions; and (8) refusing to take necessary steps to prevent JJ Arch's properties from failing and going into default.

81.     Simpson's breaches of fiduciary duty have damaged JJ Arch.

82.     Plaintiff is entitled to recover its damages, in an amount to be determined a trial, but estimated to exceed the Commercial Division minimum.

## SECOND CAUSE OF ACTION
### (Breach of fiduciary duty against Simpson-derivative claim on behalf of Arch Real Estate)

83.     Chassen repeats each of the proceeding allegations as if fully set forth herein.

84.     Chassen has standing to bring a derivative claim on behalf of JJ Arch because he is a member of JJ Arch, which in turn is the managing member of Arch Real Estate.

85.     Simpson, as the managing member of JJ Arch, owes Arch Real Estate fiduciary duties, including the duty of loyalty and good faith.

86.     Simpson breached his fiduciary duties to Arch Real Estate, by among other things, (1) misappropriating Arch Real Estate's assets; (2) engaging in abusive behavior towards Arch Real Estate employees and personal and investors; (3) knowingly and utterly mismanaging Arch Real Estate and its properties for his own self-interest, (4) failing to maintain internal controls, (5) failing to devote his business time to Arch Real Estate; (6) issuing misleading disclosures; (6)

56

Case 1:24-cv-07139 Document 1-1 Filed 09/20/24 Page 130 of 482

refusing to provide books and records to investors even though obligated to do so, and otherwise knowingly taking decision that breached his fiduciary obligations and exposed Arch Real Estate to liability; (7) making decisions that were harmful to Arch Real Estate and investors for self-interested reasons; (5) failing to make adequate disclosures to investors; (6) unlawfully attempting to terminate Chassen; (7) failing to obtain Chassen's consent prior to taking major decisions; and (8) refusing to take necessary steps to prevent Arch Real Estate's properties from failing and going into default.

87.    Simpson's breaches of fiduciary duty have damaged Arch Real Estate.

88.    Plaintiff is entitled to recover its damages, in an amount to be determined a trial, but estimated to exceed the Commercial Division minimum.

### THIRD CAUSE OF ACTION
**(Breach of fiduciary duty against Simpson-direct claim)**

89.    Chassen repeats each of the proceeding allegations as if fully set forth herein.

90.    Simpson, as the managing member of JJ Arch, owes Chassen fiduciary duties, including the duty of loyalty and good faith.

91.    Simpson breached his fiduciary duties to Simpson, by among other things, (1) entering into the Amended JJ Arch Operating Agreement by coercion, duress, and undue influence; (2) unlawfully attempting to terminate Chassen, (3) denying Chassen access to books and records, (4) failing to make adequate disclosures to Chassen, (5) knowingly making decisions that were harmful to Chassen for self-interested reasons; (6) failing to obtain Chassen's consent prior to taking major decisions; and (7) refusing to take necessary steps to prevent Chassen's investments from failing and going into default.

92.    Simpson's breaches of fiduciary duty have damaged Chassen.

93. Plaintiff is entitled to recover its damages, in an amount to be determined a trial, but estimated to exceed the Commercial Division minimum.

## FOURTH CAUSE OF ACTION
**(Declaratory Judgment that JJ Arch Amended Operating Agreement is void on grounds of unconscionability, lack of consideration, and undue influence-direct claim)**

94. Chassen repeats each of the proceeding allegations as if fully set forth herein.

95. There is a justiciable controversy between Simpson and Chassen whether the JJ Arch Amended Operating Agreement is a valid and binding agreement or is void as the result of unconscionability, lack of consideration, and undue influence.

96. The Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority after December 11, 2021 is void because it is unconscionable, was not supported by consideration, and is the product of undue influence.

97. Simpson was in a confidential relationship with Chassen, was Chassen's mentor, and held enormous power over him. Simpson took advantage of his relationship of trust with Chassen.

98. Despite Chassen vocalizing his disagreement, Simpson presented him with the Amendment on a take-it-or-leave-it basis, threatening him that he would remove him from the business entirely if he did not sign the Amendment.

99. Chassen signed the Amendment under undue pressure and threats. Simpson pressured Chassen not to hire his own counsel to review the Amendment and limited his involvement in calls Simpson took with the shared Arch Entities' counsel David Heymann who Simpson had draft the amendment in his favor, while Heymann purported to represent both of them. Chassen was not disclosed Hyemann's actual conflicts, and he did not execute any conflict waiver.

58

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 132 of 482

100.    Because of their unequal bargaining power, prior relationship, Simpson's threats, and deceptive and coercive tactics, and the parties' confidential relationship, Chassen lacked meaningful choice in entering into the Amendment, and it was procedurally unconscionable. And the Amendment itself was substantively unconscionable as it contained only favorable terms to Simpson.

101.    The Amendment and gave away Chassen's managerial rights as well as his membership percentage under the Operating Agreement for nothing of value and was unsupported by consideration. It is therefore void for lack of consideration.

102.    The Amendment was the product of undue influence, including abuse and deception and is therefore void as the product of undue influence.

103.    Further, given Chassen relationship of trust and confidence with Simpson, the burden is on Simpson to establish that he did not enter the Amended JJ Arch Operating Agreement by undue influence or coercion, which burden he cannot meet.

104.    Chassen lacks an adequate remedy at law.

105.    The Court should enter a judgment declaring that the Amendment is void and that under the Operating Agreement, Chassen is a managing member of JJ Arch.

### FIFTH CAUSE OF ACTION
### (Declaratory judgment against Simpson-direct claim)

106.    Chassen repeats each of the proceeding allegations as if fully set forth herein.

107.    There is a justiciable controversy between Simpson and Chassen whether Chassen properly terminated Simpson because of his misconduct, breaches of fiduciary duty, and failure to devote substantially all his business time to JJ Arch.

59

108.    As alleged herein, Simpson has breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, and investors, and these breaches constitute Cause Events under the JJ Arch Operating Agreement, each warranting Simpson's resignation.

109.    Chassen lacks an adequate remedy at law.

110.    The Court should enter a judgment declaring that Chassen lawfully terminated Simpson, that Simpson may be terminated, and that Simpson is no longer a member of JJ Arch.

### SIXTH CAUSE OF ACTION
### (Permanent Injunction against Simpson-Direct Claim)

111.    Chassen repeats each of the proceeding allegations as if fully set forth herein.

112.    Simpson has breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, and investors.

113.    These breaches constitute Cause Events under the JJ Arch Operating Agreement, each warranting Simpson's resignation.

114.    Absent injunctive relief, Simpson is liable to continue to purport to act as the managing member, or member, of JJ Arch.

115.    Chassen faces irreparable injury if Simpson continues to act as managing member or member of JJ Arch.

116.    Chassen lacks an adequate remedy at law.

117.    The Court should enter a judgment permanently enjoining Simpson from acting as a member or managing member of JJ Arch.

### CLAIMS FOR RELIEF

**WHEREFORE**, plaintiff demands judgment as follows:

(a) On the First Cause of Action, awarding compensatory damages in an amount to be determined at trial, plus pre-judgment interest.

60

(b) On the Second Cause of Action, awarding compensatory damages in an amount to be determined at trial, plus pre-judgment interest.

(c) On the Third Cause of Action, awarding compensatory damages in an amount to be determined at trial, plus pre-judgment interest.

(d) On the Fourth Cause of Action, declaring that the Amendment is void and that under the Operating Agreement, Chassen is a managing member of JJ Arch.

(e) On the Fifth Cause of Action, declaring Chassen lawfully terminated Simpson, that Simpson may be terminated, and that Simpson is no longer a member of JJ Arch.

(f) On the Sixth Cause of Action, permanently enjoining Simpson from acting as a member or managing member of JJ Arch.

(g) Awarding Plaintiff all costs and expenses incurred in this action, including, but not limited to, its reasonable attorneys' fees; and

(h) Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 13, 2023

AIDALA, BERTUNA & KAMINS, P.C.

By: *John M. Leventhal*

John M. Leventhal, Esq.
546 Fifth Avenue - Sixth Floor
New York, New York 10036
(212) 486-0011 / (212) 750-9700
judgeleventhal@aidalalaw.com

*Counsel for Defendant Chassen*

Allen Schwartz, Esq. (of-counsel to Aidala, Bertuna & Kamins, P.C.)

61

## VERIFICATION

State of New York

County of Westchester

    Jared Chassen, duly deposed, swears under penalty of perjury that I have reviewed the annexed answer and affirm that the contents are true to the best of my knowledge, unless stated on information and belief, and those allegations I believe to be true.

By: _____
        Jared Chassen

Sworn and subscribed before me

On this 13th day of _____, 2023

_____
Notary Public

STACY FRENCH
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01FR6187456
Qualified in WESTCHESTER County
Commission Expires May 19, 20 24

62

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively as
managing member of ARCH REAL ESTATE HOLDINGS
LLC, and JJ ARCH LLC,

*Plaintiffs,*

-against-

JARED CHASSEN and FIRST REPUBLIC BANK,

*Defendants.*

Index No. _____

Date Filed:

**SUMMONS**

Venue is placed in New
York County because a
substantial part of the
events or omissions
giving rise to the claims
occurred there

TO THE ABOVE-NAMED DEFENDANTS:

     **YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve
a copy of your answer, or, if the Complaint is not served with this Summons, to serve a Notice of
Appearance, on Plaintiffs' attorneys within twenty (20) days after service of this Summons,
exclusive of the day of service (or within thirty (30) days after service is complete if this Summons
is not personally delivered to you within the State of New York); and in case of your failure to
appear or answer, judgment will be taken against you by default for the relief demanded in the
Complaint.

Dated: New York, New York
     August 14, 2023

Yours, etc.

ADAM LEITMAN BAILEY, P.C.

By: _____
    Adam Leitman Bailey, Esq.
    Brandon M. Zlotnick, Esq.
    One Battery Park Plaza, 18th Floor
    New York, NY 10004
    Phone: (212) 825-0365
    *Attorneys for Plaintiffs*

**DEFENDANTS' ADDRESSES:**
Jared Chassen
47 Bridge Street, 6A

[938485/1]          1

Brooklyn, NY 11201

First Republic Bank
c/o New York State Secretary of State

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively as
managing member of ARCH REAL ESTATE HOLDINGS
LLC, and JJ ARCH LLC,

<em>Plaintiffs,</em>

-against-

JARED CHASSEN and FIRST REPUBLIC BANK,

<em>Defendants.</em>

Index No. _____

**COMPLAINT**

---

Plaintiffs JEFFREY SIMPSON, individually and derivatively, as managing member of JJ

ARCH LLC, suing derivatively as managing member of ARCH REAL ESTATE HOLDINGS

LLC, and JJ ARCH LLC, by their attorneys, ADAM LEITMAN BAILEY, P.C., complaining of

the defendants, allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This action is brought by Plaintiffs to undo a coup d'état executed by Defendant

Jared Chassen ("Chassen") in an effort to seize, from Plaintiff Jeffrey Simpson ("Simpson"),

control over Plaintiff entities Arch Real Estate Holdings LLC ("Arch") and JJ Arch LLC ("JJ

Arch") (collectively, Arch and JJ Arch are the "Arch Entities"). In addition, Plaintiffs seek to

redress one of Chassen's successes in his efforts to wrest control of the Arch Entities from

Simpson, *i.e.*, Chassen's inducement of a stalemate that has left Simpson unable to exercise control

over bank accounts maintained by Arch Entities and their affiliates and subsidiaries at Defendant

First Republic Bank ("First Republic"), which has left Arch Entities unable to use such accounts

to pay for such necessities as payroll, subcontractors, materialmen, and insurance. Plaintiffs also

seek to require Chassen to act to restore Simpson's access to his company email account with Arch

[938459/1]                                    1

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 139 of 482

Entities, to the Dropbox account where Arch Entities' documents are stored, and Simpsons' ability to communicate with the domain company that hosts Arch Entities' web site.

## PARTIES

2.     Plaintiff Simpson is a natural person who resides in the State of New York, County of New York.

3.     Plaintiff Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

4.     Arch is a real estate investment management, construction management, property management, and development company.

5.     Plaintiff JJ Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

6.     Defendant Chassen is a natural person who resides in the State of New York, County of Kings.

7.     Defendant First Republic is a nationally chartered bank that maintains offices for the transaction of business in, among other places, the State of New York, County of New York.

## FACTS APPLICABLE TO ALL CAUSES OF ACTION

## BACKGROUND

### Simpson's Tenure at Greystone

8.     Simpson grew up under modest economic circumstances in Lakewood, New Jersey. His father, who was a public planning, zoning, and construction official, passed away when Simpson was 22. For four consecutive generations including his own, Simpson's family has been in the construction business.

9.     Prior to 2017 and the start of Arch, Simpson worked for eleven (11) years at Greystone Development ("Greystone Development"), a property development company within a

[938459/1]                                    2

host of companies under the "Greystone" umbrella that performed functions related to real estate investment, capital raising, financing, development, construction, management, leasing, and sales. For the last five of those years, Simpson was the Chief Executive Officer of Greystone Development. By the time he left Greystone Development, he was supervising approximately thirty (30) employees at Greystone Development, with a total payroll of approximately $5 million. The total project volume was over $2 billion, and involved properties located in New York, Miami, and California. While he was there, he also was responsible for raising several large capital initiatives for real estate investing in multi-family housing in the southeastern United States with an institutional partner, individual loan origination on complex assignments, and capital raising for structured finance.

10. One employee Simpson supervised at Greystone Development was Chassen. Simpson originally hired Chassen at Greystone Development to replace an administrative assistant at Greystone Development. Once hired, Chassen performed the same duties as that administrative assistant, for the same salary as she had earned. Over time, Chassen took on other responsibilities, including helping to source properties, equity, and debt. Throughout his time at Greystone Development, Chassen reported to Simpson.

11. Another employee Simpson supervised at Greystone was nonparty Tristan Last ("Last"). "). Last was formerly of Brookfield with a MBA from Cornell University. She was hired as an acquisitions associate and quickly was promoted to the Director of Investments.

12. A third employee Simpson supervised at Greystone was nonparty Michelle Miller ("Miller"). She was also an analyst. Miller started at Greystone Development as an intern, as a career switcher to real estate following the completion of her MBA from Northwestern. She was eventually hired full time as an analyst and grew in her role over time.

[938459/1]                                   3

Case 1:24-cv-07139   Document 1-1   Filed 09/20/24   Page 141 of 482

### Simpson's Formation of Arch and JJ Arch

13.    In 2017, Simpson left Greystone Development on amicable terms with that company, and formed a new company, Plaintiff Arch.

14.    The original business address for Arch was Simpson's personal residence address at the time.

15.    At all times since the formation of Arch, eighty percent (80%) of the membership interest in Arch has been held by Plaintiff JJ Arch, which is the managing member of Arch. (*See* Exhibit 1, Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC ["Arch Operating Agreement"], p. 17, §§ 6.1-6.2 [providing for distributions of cash flow and acquisition fees of 80% to "JJ Member" and 20% to "Investor Member"]; *id.* p. 1 preamble [defining JJ Arch LLC as "JJ Member"]; *id.* § 1.1, p. 7 [defining "Managing Member" as JJ Member].)

16.    At all times since the formation of Arch, the remaining twenty percent (20%) of the membership interest in Arch has been held by 608941 NJ Inc., a New Jersey corporation ("NJ Inc."), which is the investor member of Arch. (*See* Exhibit 1, Arch Operating Agreement, p. 17, §§ 6.1-6.2; *id.* p. 1 preamble [defining NJ Inc. as "Investor Member"].) NJ Inc. made an investment of approximately $50 million in Arch, but has no authority to control the operation of Arch's business.

17.    Since the formation of JJ Arch, Simpson has been the managing member of JJ Arch and has held a majority of the membership interest in JJ Arch.

18.    From the formation of JJ Arch until his forced resignation from his membership therein effective August 5, 2023, as discussed below, Chassen was a member of JJ Arch and held a minority of the membership interest in JJ Arch, and his job started out as administrative in nature.

19.    Simpson and Chassen are the only persons who have ever been members of JJ Arch.

[938459/1]                                     4

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 142 of 482

### The Arch Companies' Growth Under Simpson's Leadership

20.    Through JJ Arch, the managing member of Arch, Simpson has run all of Arch's businesses since the inception.

21.    By 2022, five years after Simpson formed Arch with no assets, Arch had owned and invested in over $1 billion in assets.

22.    Arch has several affiliated companies, including a property management company, advising company, construction company, and asset management company, each of which provides services relating to real properties that Arch controls.

23.    Together, Arch and its affiliated companies have a total of approximately 100 employees. (Collectively, Arch Entities and Arch's affiliated companies are the "Arch Companies.")

24.    The licenses and permits for each of the construction projects performed by the Arch Companies are in Simpson's name, as a licensed general contractor.

25.    Simpson holds responsibility for managing Arch Companies' commercial real estate construction projects and coordinating licensing and permitting matters.

### Chassen's Role with the Arch Companies

26.    With Greystone's permission, Simpsons brought three Greystone Development employees with him to work at Arch, *i.e.*, Chassen, Last, and Miller.

27.    From the formation of JJ Arch and Arch, Chassen has been a minority member in JJ Arch, and thus has not had the authority to exercise control over Arch as Arch's managing member.

28.    While the initial plan was for Chassen ultimately to become co-managing member, with Simpson, of JJ Arch, and thus share in Simpson's authority to control JJ Arch's exercise of its authority as managing member of Arch, Chassen's performance did not warrant this expansion of

[938459/1]                              5

his authority, and Chassen consented to remain in his role as a minority member of JJ Arch on or about May 22, 2021.

29.     The original plan, at the time JJ Arch was formed, was that Simpson was to be its managing member, with the authority to manage, arrange, and cause to be coordinated the business, affairs, and assets of JJ Arch. (Exhibit 2, JJ Arch Limited Liability Company Operating Agreement ["JJ Arch Original Operating Agreement"], p. 7, ¶ 3.1(a).) This was to be the case prior to the fourth anniversary of JJ Arch's operating agreement, *i.e.*, December 11, 2021. (*Id.*)

30.     However, following the fourth anniversary of the operating agreement, both Simpson and Chassen were to act as managing members of JJ Arch, with each of them holding the authority to manage, arrange, and cause to be coordinated JJ Arch's business, affairs, and assets. (Exhibit 2, JJ Arch Original Operating Agreement, p. 9 § 3.2.)

31.     In addition, the JJ Arch Original Operating Agreement provided Chassen with a veto over certain decisions or actions with regard to JJ Arch even prior to the fourth anniversary of the JJ Arch Original Operating Agreement, such that Simpson could make certain decisions defined as "Company Major Decisions" only if he had Chassen's prior written consent. These actions included, among others, selling any asset of Arch Entities, borrowing or raising monies on behalf of Arch Entities, mortgaging Arch Entities' properties, Arch Entities' entering into any lease of space, and hiring any employee, consultant, or other personnel for Arch Entities. (*See* Exhibit 2, JJ Arch Original Operating Agreement, pp. 8-9, ¶¶ 3.1(b)(iii), (v)-(viii); *see also id.* p. 8 ¶ 3.1(b) [stating that "any action or decision that would constitute a Company Majority Decision shall be a Company Major Decision if made or taken by any Investment Entity"]; *id.* p. 4 [defining "Investment Entity" as including "AREH"]; *id.* p. 1 [defining "AREH" as Arch].)

32.    On the other hand, Simpson could take other actions without Chassen's consent, including but not limited to conducting, managing, and controlling the affairs and business of Arch Entities; opening, maintaining and closing bank accounts and drawing checks; bringing  legal actions on claims of Arch Entities; and depositing, withdrawing, investing, paying, retaining, and distributing Arch Entities' funds in a manner consistent with the provisions of the JJ Arch Original Operating Agreement. (Exhibit 2, JJ Arch Original Operating Agreement, pp. 7-8 ¶¶ 3.1(a)(i)-(ii), (v)-(vi).)

33.    However, prior to the fourth anniversary of the JJ Arch Original Operating Agreement, Simpson had a discussion with Chassen, and informed him that Simpson did not believe Chassen had sufficient acumen in the business to be a co-managing member of JJ Arch and, by virtue of JJ Arch's managing membership in Arch, a co-managing member of Arch. Chassen agreed with Simpson about this.

34.    JJ Arch's operating agreement was thus amended, with Chassen's consent, on or about May 22, 2021. The amendment removed the authority that Chassen would have had, following the fourth anniversary of the JJ Arch Original Operating Agreement, to manage, arrange, and cause to be coordinated the business, affairs and assets of JJ Arch. (Exhibit 3, JJ Arch LLC Agreement Amendment No. 1, p. 3 ¶ 2(d) [deleting § 3.2 of the JJ Arch Original Operating Agreement].) (The JJ Arch Original Operating Agreement, as amended by JJ Arch LLC Agreement Amendment No. 1, shall be referred to as the "JJ Arch Amended Operating Agreement".) Thus, Chassen never had such authority. Because the list of actions and decisions for which Chassen's consent was required, *i.e.*, the "Company Major Decisions," remained effective only until the fourth anniversary of the JJ Arch Original Operating Agreement (*compare id.* p. 3 § 2(d) [new § 3.2] *with* Exhibit 2, JJ Arch Original Operating Agreement, p. 8 ¶ 3.1(b)), this meant that Chassen

[938459/1]                                        7

would lose, and ultimately did lose, his right to refuse consent to Company Major Decisions after that anniversary, which occurred in December 2021.

35.     In addition, JJ Arch's operating agreement was amended to bar Chassen from becoming an equal equity owner in JJ Arch. When JJ Arch was formed, it was agreed that my share of JJ Arch's distributions, which would initially be 66.6667%, would decrease, and Chassen's share of JJ Arch's distributions, which would initially be 33.3333%, would commensurately increase, on an annual basis, such that, by the fourth anniversary of the operating agreement, *i.e.*, December 11, 2021, each of them would receive equal 50% shares of the distributions. (Exhibit 2, JJ Arch Original Operating Agreement, p. 4 § 1.1, Definition of "Distribution Percentages"; *id.* p. 12 ¶ 5.1(a)(ii); *id.* Exhibit A.)

36.     However, JJ Arch's operating agreement was amended, with Chassen's consent and as part of JJ Arch LLC Agreement Amendment No. 1 (the same amendment as discussed above), to provide that, indefinitely, Simpson is to receive 50.1% of the distributions from JJ Arch, and Chassen is to receive 49.9% of the distributions from JJ Arch. (Exhibit 3, JJ Arch LLC Agreement Amendment No. 1, p. 1 ¶ 2(a).)

37.     In addition, Arch's operating agreement provides that "the business, affairs and assets of [Arch] shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in [the operating agreement] (including, but not limited to, in Section 7.1.3), full, exclusive and complete discretion with respect thereto." (Exhibit 1, Arch Operating Agreement, p. 17, ¶ 7.1.1.) The Managing Member, *i.e.*, JJ Arch, has "the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which [Arch] has the authority to perform both directly and indirectly through one or more Subsidiaries" (*id.* p. 18 ¶ 7.1.1), including, *inter alia*, those to "conduct, manage and

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 146 of 482

control the affairs and business of [Arch]" (*id.* p. 18 ¶ 7.1.1(i)); "open, maintain and close bank accounts and drew checks or other orders for the payment of monies" (*id.* ¶ 7.1.1(ii)); "deposit, withdraw, invest, pay, retain and distribute [Arch's] funds in a manner consistent with the provisions of [the Arch Operating Agreement]) (*id.* ¶ 7.1.1(vi)); and "bring or defend . . . resort to legal action, or otherwise adjust claims . . . of [Arch]" (*id.* ¶ 7.1.1(v)).

38.     Thus, at all times Simpson has been, and remains, the managing member of JJ Arch, and Simpson has always had exclusive authority to, *inter alia*, open, maintain, and close bank accounts on behalf of Arch Entities; to draw checks on those accounts; to deposit, withdraw, pay, and distribute Arch Entities' funds; and to bring legal actions on behalf of the Arch Entities.

39.     Chassen worked for Arch, and reported to Simpson. Simpson had the authority to give Chassen work assignments to do for Arch, and to take Arch work assignments away from Chassen.

40.     Until the events beginning August 4, 2023, as set forth below, Last had served as managing director of Arch.

### Means of Removing Members of Arch and JJ Arch

41.     Under both the Arch Operating Agreement and the JJ Arch Amended Operating Agreement, members may be removed, on certain enumerated grounds, through a process that is initiated by the occurrence of a "Cause Event." The Arch Operating Agreement provides an enumerated list of eight acts, the commission of which, by the managing member, serves as a "Cause Event." (*See* Exhibit 1, Arch Operating Agreement, pp. 4-5, § 1.1, definition of "Cause Event".) The JJ Arch Amended Operating Agreement extends this definition of "Cause Event" to any member of JJ Arch. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 3, § 1.1, definition of "Cause Event.")

[938459/1]                                    9

42.     The acts constituting "Cause Event[s]" include, but are not limited to, "willful misconduct in relation to the business or affairs of [Arch] or a Subsidiary," "breach of fiduciary duty in relation to the business or affairs of [Arch] or a Subsidiary," and "misappropriation of [Arch] or Subsidiary funds or property." (Exhibit 1, Arch Operating Agreement, § 1.1, pp. 4-5, Definition of "Cause Event.")

43.     Under the JJ Arch Operating Agreement, a member in JJ Arch is required to resign if a Cause Event has occurred with respect to such member, and the other member has delivered written notice thereof to that member. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 5, § 1.1, definition of "Resignation.") Notably, only "the other Member" may deliver such notice (*id.*); accordingly, only a current member of JJ Arch could trigger a member's resignation through delivering notice of a Cause Event. Upon such Resignation, that member is no longer deemed a "member" of JJ Arch, and "shall not be entitled to any rights as a Member of the Company for any period from and after such Resignation." (*Id.*, p. 15, § 7.5(a).)

44.     Under the Arch Operating Agreement, in the event written notice of a Cause Event is delivered to JJ Arch, JJ Arch may be removed effective ten (10) business days after such delivery, or at such later date or as specified in such notice. (Exhibit 1, Arch Operating Agreement, p. 20, ¶ 7.1.4.)

## CHASSEN'S MISCONDUCT

### Chassen Placed His Interests, and Those of His Family and Friends, Above Those of JJ Arch

45.     In or about July 2023, Chassen acknowledged that his duties and role could not be compensated at the same level as previously, due to higher interest rates and a slowdown in business, and Arch would not be able to afford to pay Simpson, Chassen, and other key employees

their full salaries, and Simpson asked Chassen whether he would be willing to accept a substantial reduction in his pay in order to enable Arch to remain in its status quo rather than building up debt.

46.     Chassen initially indicated to Simpson that Chassen would be willing to take such a pay cut, although at the time he did not inform Simpson how large of a pay cut he would be willing to take.

47.     In or about early July 2023, Simpson asked Chassen how large of a pay reduction Chassen would agree to. Chassen repeatedly avoided answering Simpson's requests on this point.

48.     Finally, on or about August 2, 2023, Chassen informed Simpson that, in fact, Chassen would not be willing to accept any pay reduction.

### The Coup Begins

49.     Chassen, apparently working in concert with NJ Inc. and with several other employees of Arch, undertook a series of actions designed to steal control of Arch and JJ Arch from Simpson, in violation of Arch and JJ Arch's respective operating agreements. First, upon information and belief, at approximately 1:15 p.m. on Friday, August 4, 2023, Chassen contacted the bank at which Arch maintains its accounts, Defendant First Republic, and instructed First Republic to remove Simpson as an authorized signatory on all accounts he maintained with First Republic in either his corporate or individual capacity, including all bank accounts that the Arch Companies maintain with First Republic (the "Arch Accounts"), and also accounts Simpson maintained individually with no connection to the Arch Companies.

50.     Chassen was neither authorized to make this change, nor did he provide Simpson with any advance notice thereof.

51.     First Republic complied with Chassen's demand. First Republic informed Simpson that it no longer permits Simpson to make transactions from any of the accounts he maintains with First Republic in either his corporate or individual capacity, or, indeed, any other account on which

[938459/1]                                        11

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 149 of 482

Simpson was the signatory, including the Arch Accounts, accounts on which he was the signatory on behalf of entities other than the Arch Companies, and his own individual accounts.

**The Forced Resignation of Chassen from Arch**

52.     On August 5, 2023, Simpson sent Chassen an email wherein Simpson provided him written notice that he had committed a Cause Event, and that accordingly, under the JJ Arch Amended Operating Agreement, Chassen ceased to be a member of JJ Arch. (*See* Exhibit 4 ["Notice to Chassen of Cause Event"].)

53.     Chassen had committed a Cause Event prior to the Notice to Chassen of Cause Event, in that Chassen had, without authority, acted to deprive Simpson of his ability to make transactions on the Arch Accounts and to seize that ability for himself.

54.     Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted willful misconduct in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

55.     Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a breach of fiduciary duty in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

56.     Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a misappropriation of funds of Arch, JJ Arch, and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

57.     Accordingly, the Notice of Chassen Cause Event triggered immediately Chassen's removal as a member of JJ Arch.

[938459/1]                                    12

## The Coup Continues

58.    Notwithstanding, Chassen proceeded in disregard of the Notice to Chassen of Cause Event. Specifically, over the weekend of August 5-6, 2023, the administrator of Arch's email and information technology systems, acting upon Chassen's instructions, locked Simpson out of his Arch Companies email account and all other Arch IT systems. Beginning no later than 5 p.m. on Sunday, August 6, 2023, Simpson no longer had access to his Arch Companies email account. At or about 10-11 a.m. on Monday, August 7, 2023, Simpson could no longer log onto his Arch-issued computer. As a result, Simpson could not obtain access to the business records of the Arch Companies, or the computer payroll program that Arch Companies use to pay their employees. Simpson was also locked out of the server hosting Arch Companies' web site, and Chassen made changes to such site, without Simpson's authorization, to remove references thereon to Simpson as a managing member.

59.    Chassen also retaliated for his removal as a member of JJ Arch by sending Simpson, by electronic mail, a signed letter on August 6, 2023, wherein he purported to inform Simpson that Simpson was required to resign pursuant to the JJ Arch Amended Operating Agreement ("Chassen 8/6/23 Letter"). The Chassen 8/6/23 Letter asserted that Simpson had committed multiple Cause Events, none of which had actually occurred, and asserted that, as a result, a resignation from JJ Arch had occurred on Simpson's part and Simpson was no longer a member of JJ Arch, nor did Simpson have any right to act on behalf of JJ Arch, Arch, or any subsidiary of JJ Arch.

60.    However, by the time of the Chassen 8/6/23 Letter, Chassen had already been removed as a member of JJ Arch pursuant to the Notice to Chassen of Cause Event. Accordingly, as noted above, Chassen could not, under the JJ Arch Amended Operating Agreement, trigger Simpson's own resignation by delivering to him a purported notice of Cause Event.

[938459/1]                                    13

61.     Moreover, even if the Chassen 8/6/23 Letter had been effective as a notice of Cause Event, it was not sent to Simpson until after Chassen's instruction on August 4, 2023 to First Republic to strip Simpson of his signatory authority, so as of the time Chassen provided such instruction Simpson remained JJ Arch's managing member with exclusive authority over the Arch Companies' bank accounts, and Chassen's instruction was in violation of Arch's and JJ Arch's operating agreements.

62.     In addition, on August 6, 2023, NJ Inc., sent Simpson a letter (the "8/6/23 NJ Inc. Letter"), wherein NJ Inc. asserted that JJ Arch, through Simpson's actions, had committed multiple Cause Events under the Arch Operating Agreement, again none of which had actually occurred, and asserted that NJ Inc. reserved the right to remove JJ Arch as the managing member of Arch.

63.     In addition, Chassen arranged for the deactivation of the device Simpson uses to gain access to Arch's physical office located at 88 University Place, New York, New York 10003, such that when Simpson attempted to enter his office there at 9:00 a.m. on Monday, August 7, 2023, he was unable to do so.

64.     Upon information and belief, on or about August 7, 2023, after he had already been duly removed as a member of JJ Arch, Chassen sent an email to employees of Arch Companies in which he instructed them not to come into the office to work that day, and falsely informed them that Simpson was deemed to have resigned from his managerial roles with Arch Companies.  He further instructed employees to not respond to any outreach from Simpson. Even before his removal as a member of JJ Arch, Chassen had no authority to do so.

65.     Simpson has since been able to regain access to his physical office at Arch. However, he still has only limited access to Arch's computer system, and is still unable to gain access to Arch's bank accounts. Through counsel, he demanded that First Republic restore him as

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 152 of 482

a signatory on such accounts, and remove Chassen as a signatory. First Republic has refused to do so, and has advised Simpson that because it has "received conflicting instructions regarding the ownership and control" of such accounts, First Republic has placed a hold on those accounts, and will not permit any deposits or withdrawals from such accounts. (Exhibit 5, Letter from Christy Santoro, Preferred Banker at First Republic, to Jeffrey Simpson, dated Aug. 6, 2023, first page.) One hundred and fifty (150) accounts are subject to this hold. (*See id.*, second through fifth pages.) (Collectively, these are the "Arch Accounts.") These include accounts for Arch Companies, as well as accounts maintained for the purpose of holding monies held in trust for subcontractors, materialmen, and other persons involved in Arch Companies' construction projects who are beneficiaries under Article 3-A of the New York State Lien Law. First Republic has advised that it will not release the hold until it "receive[s] evidence satisfactory to us that there is no longer a dispute as to who has authority over the accounts" (*id.*, first page), or there is a court order requiring its release (*see* Exhibit 6, email from First Republic's in-house counsel to Plaintiffs' counsel).

66.     Continuation of First Republic's hold on the Arch Companies' bank accounts would wreak havoc on the Arch Companies. Arch Companies would be unable to meet their payroll, inflicting hardship both on Arch Companies' employees, who number approximately 100, and on Arch Companies themselves when such employees ultimately leave their positions for employment with companies whose minority members are not sabotaging company finances in order to extract concessions.

67.     With the hold on those bank accounts, Arch will also stand unable to pay its bills to vendors, such as insurance premiums (*see* Exhibit 7 hereto). Indeed, Arch Companies are now in default on many obligations as a result of their inability to make payments due to the hold. Arch

Companies would also be unable to pay rent and other bills, and to make payments on construction loans and to investors in Arch Companies.

68.      The bank accounts that are subject to First Republic's hold also include trust accounts under Article 3-A of the New York State Lien Law, which hold funds in trust for, among others, subcontractors and materialmen on construction projects being performed for Arch Company entities. Thus, the existing account hold prevents Arch Company entities from being able to pay their subcontractors and materialmen. This is doubly harmful to the Arch Companies, in that they now cannot pay those subcontractors and materialmen, which may cause them to cease performing their present construction work, and it also may dissuade them from performing projects for the Arch Companies in the future, out of fear that another, future frivolous dispute over company control may lead to another hold on Arch Companies' bank accounts and a recurrence of delays in paying them.

69.      With both Arch Companies' employees and their subcontractors leaving active job sites, there is a further risk that such sites will not be adequately staffed or supervised, or machinery there adequately maintained, creating a public safety risk that will result in injury to those remaining employees or subcontractors, and nearby members of the public.

70.      The aforesaid effects also endanger the general reputation of Arch Companies going forward, tarnishing it with the appearance that it cannot be trusted to fulfill its obligations.

71.      Another consequence of the coup perpetrated by Chassen is that Last, Arch's managing director, has resigned from her position with Arch on or about August 7, 2023, in response to said coup. Consequently, Arch has lost the benefit of Last's performance.

72.      In addition, Chassen and Computero Inc. ("Computero"), the outside company acting as Arch's information technology consultant, have colluded to deny Simpson access to his

[938459/1]                                   16

Arch company email account. Computero first disregarded his instructions to remove Chassen's access to Arch's computer network and his Arch email account beginning shortly before the time Simpson provided the Notice to Chassen of Cause Event, then cut off Simpson's access to the Arch computer network and his Arch email account. Then, after Simpson made repeated requests to regain access to his email account, Computero restored his email access on the evening of Wednesday, August 9. However, approximately one hour after his email access was reinstated, it was again cut off, this time ostensibly by Microsoft. However, Chassen was Microsoft's only contact person at Arch Companies, and thus the only person who could have instructed Microsoft to cut off Simpson's email access. Simpson remains unable to gain access to his Arch email account, and thus unable to receive or respond to email communications from Arch's many employees.

73.     In addition, Simpson's access to Dropbox has not been restored, thus making it impossible for him to view the Arch Companies' internal documents, which are stored in Dropbox. Also, Chassen has engineered a situation in which he is the only contact person for the domain company that hosts Arch Companies' web site. Thus, Simpson cannot communicate with the domain company in order to update the web site, including restoring references to himself as the managing member and removing those to Chassen as a continuing employee and member of the Arch Companies following his resignation.

74.     The combined loss of email and Dropbox access have left Simpson, as the chief managerial figure at Arch Companies, effectively blind (unable to view documents) and deaf and mute (unable to communicate with the Arch Companies' employees, or with the public through Arch Companies' web site). This has rendered him unable to exercise his authority as managing member of JJ Arch, and left the Arch Companies as a rudderless ship.

[938459/1]                                17

## AS AND FOR A FIRST CAUSE OF ACTION

**(Breach of the Amended JJ Arch Operating Agreement, Brought by Arch and by Simpson, Against Defendant Chassen)**

75.     Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

76.     The Amended JJ Arch Operating Agreement is a valid and binding agreement between Simpson and Chassen.

77.     The Amended JJ Arch Operating Agreement is supported by valuable consideration.

78.     Arch is expressly mentioned in the Amended JJ Arch Operating Agreement and defined therein as an "Investment Entity".

79.     Paragraph 3.1 of the Amended JJ Arch Operating Agreement sets forth powers that Simpson has with regard to matters which JJ Arch has the authority to perform "indirectly through an Investment Entity," *i.e.*, through Arch.

80.     The Amended JJ Arch Operating Agreement was intended for Arch's benefit.

81.     The benefit to Arch from the Amended JJ Arch Operating Agreement is sufficiently immediate to indicate the assumption by the contracting parties of a duty to compensate Arch if the benefit is lost.

82.     Arch is a third-party beneficiary of the Amended JJ Arch Operating Agreement.

83.     Chassen materially breached the Amended JJ Arch Operating Agreement by conducting, managing, and controlling the affairs and business of JJ Arch, when, under ¶ 3.1(i) of the Amended JJ Arch Operating Agreement, only Simpson had the authority to do so.

84.     Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to conduct, manage, and control the affairs

[938459/1]                              18

of Arch Entities, and, so long as a hold remains on the Arch Companies' bank accounts, he will continue to suffer a diminished ability to conduct, manage, and control the affairs of JJ Arch and of Arch.

85.    Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that such breach has resulted in the resignation of Last and the loss of the value of her work to Arch; so long as a hold remains on the Arch Companies' bank accounts, it will be unable to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers; and Arch is likely to suffer reputational harm in the future.

86.    Chassen materially breached ¶ 3.1(ii) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to control the Arch Companies' bank accounts and draw checks thereon, and transferring such authority to himself.

87.    Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to control the Arch Companies' bank accounts and draw checks thereon, and such injury will continue into the future so long as a hold remains on the Arch Companies' bank accounts.

88.    Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

89.    Chassen materially breached ¶ 3.1(vi) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to withdraw, pay, and distribute the funds of Arch Companies, and transferring such authority to himself.

[938459/1]                                   19

90.     Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to withdraw, pay, and distribute the funds of Arch Companies, and such injury will continue into the future so long as a hold remains on the Arch Companies' bank accounts.

91.     Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

92.     Chassen materially breached the "Resignation" provision of § 1.1 of the Amended JJ Arch Operating Agreement by purporting to deliver a notice of Cause Event to Simpson, when, by the time he had done so, Chassen had been removed as a member of JJ Arch, and thus had no authority to do so, and when the purported Cause Events set forth in such notice had not occurred.

93.     Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Chassen has used it as a pretext to continue to conduct, manage, and control the affairs of Arch Entities, to the exclusion of Simpson.

94.     Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that, with Chassen having using it as a pretext to dispute, to First Republic, Simpson's authority to control Arch Companies' bank accounts with First Republic, a hold has been placed on such accounts, and Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

[938459/1]                                          20

95.    By law, the Amended JJ Arch Operating Agreement contains an implied covenant of good faith and fair dealing, pursuant to which Chassen had an obligation not to act in such a manner as to injure Simpson's rights to receive the fruits of said agreement or to prevent Simpson from performing his duties under said agreement.

96.    Chassen prevented Simpson from performing his duties under the Amended JJ Arch Operating Agreement by acting so as to deny Simpson:

(a)    the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;

(b)    physical access to his office;

(c)    the use of Simpson's email account to communicate with employees of the Arch Companies;

(d)    the use of Dropbox to obtain access to the Arch Companies' corporate documents; and

(e)    the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

97.    Chassen prevented Simpson from receiving the fruits of the Amended JJ Arch Operating Agreement by purporting to terminate, upon false pretenses and without authority to do so, Simpson's role as managing member of JJ Arch by sending the Chassen 8/6/23 Letter.

98.    By his aforesaid conduct, Chassen has injured Simpson's rights to receive the fruits of the Amended JJ Arch Operating Agreement and prevented Simpson from performing his duties under said agreement.

99.    By his aforesaid conduct, Chassen has breached the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

[938459/1]                                      21

100.    For the reasons set forth above, Simpson and JJ Arch have been injured by Chassen's breach of the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

101.    Simpson has complied with the Amended JJ Arch Operating Agreement in all respects.

102.    As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

103.    In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

104.    Simpson and Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty, Brought by JJ Arch and by Simpson, Against Defendant Chassen)

105.    Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

106.    Chassen, as a member of JJ Arch, had a fiduciary duty to JJ Arch and to the other member of JJ Arch, Simpson.

107.    Chassen had a duty of loyalty to JJ Arch and to Simpson.

108.    This duty of loyalty obligated Chassen to act in the best interests of JJ Arch and Simpson, and not to pursue Chassen's own personal interest at the expense of the well-being of JJ Arch and Simpson.

[938459/1]                                    22

109.    Chassen engaged in misconduct by numerous means, including but not limited to by acting so as to deny Simpson:

(a)    the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;

(b)    physical access to his office;

(c)    the use of Simpson's email account to communicate with employees of the Arch Companies;

(d)    the use of Dropbox to obtain access to the Arch Companies' corporate documents; and

(e)    the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

110.    Chassen's misconduct resulted directly in damages to Simpson, in that it deprived Simpson of the ability to manage the Arch Companies' finances, gain access to his office, communicate with the Arch Companies' employees, gain access to Arch Companies' corporate documents, and manage the Arch Companies' web site.

111.    Chassen's misconduct resulted directly in damages to JJ Arch, in that it made it impossible for Simpson to pay financial obligations of JJ Arch, communicate with the Arch Companies' employees through email, and gain access to Arch Companies' corporate documents, and it made it impossible for anyone at Arch Companies, other than Chassen, who had already been duly removed from JJ Arch, to manage the Arch Companies' web site.

112.    By seizing control of JJ Arch in violation of the JJ Arch Amended Operating Agreement, and by conducting himself, as a member of JJ Arch, in a manner that placed his own

[938459/1]                                               23

interests and those of his personal associates above those of JJ Arch and Simpson, Chassen breached his duty of loyalty.

113.    Simpson has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, as set forth above.

114.    JJ Arch has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, in that such conduct has caused economic harm to Arch as set forth above, and is expected to continue to cause such harm in the future, by virtue of present and expected future decreases in the value of JJ Arch's equity interest in Arch and decreases in the distributions JJ Arch is to receive from Arch.

115.    As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

116.    In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

117.    Simpson and JJ Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

**AS AND FOR A THIRD CAUSE OF ACTION**

**(Conversion, Brought by All Plaintiffs Against Defendant Chassen)**

118.    Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

119.    The funds Arch Companies have on deposit in the Arch Accounts ("Arch Companies Funds") belong to Arch Companies.

[938459/1]                                    24

Case 1:24-cv-07139   Document 1-1   Filed 09/26/24   Page 162 of 482

120.    Simpson, Arch, and JJ Arch have an immediate superior right of possession, relative to Chassen, to the Arch Companies Funds.

121.    The Arch Companies Funds are personal property.

122.    The Arch Companies Funds are specific, identifiable funds.

123.    Chassen, intentionally and without authority, acted to deprive Simpson of Simpson's authority, under the JJ Arch Amended Operating Agreement and the Arch Operating Agreement, to possess and control the Arch Companies Funds.

124.    Chassen has exercised unauthorized dominion over the Arch Companies Funds to the exclusion of the rights of Simpson, Arch, and JJ Arch.

125.    Chassen has an obligation to return control over the Arch Companies Funds to Simpson, Arch, and JJ Arch, but has not done so.

126.    As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

127.    In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

128.    As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

129.    Simpson, Arch, and JJ Arch have been injured, and continue to be injured, by Chassen's conversion of the Arch Companies Funds, in an amount to be determined at trial.

[938459/1]                          25

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Tortious Interference with Contractual Relations, Brought by Arch and JJ Arch Against Chassen)

130.    Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

131.    Arch and JJ Arch have a valid and binding contract with a third party, *i.e.*, First Republic, pursuant to which JJ Arch, Arch, and the other Arch Companies deposit funds in bank accounts maintained by First Republic (the Arch Companies Funds), and First Republic holds such funds for the benefit of JJ Arch, Arch, and the other Arch Companies (the "First Republic Agreement").

132.    Pursuant to the First Republic Agreement, the Arch Companies Funds may be spent and distributed by a person duly authorized by JJ Arch.

133.    The sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds is Simpson.

134.    At all relevant times, Chassen knew of the First Republic Agreement, and that Simpson was the sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

135.    Chassen is a non-party to the First Republic Agreement.

136.    Chassen intentionally procured the breach, by First Republic, of the First Republic Agreement, by misrepresenting to First Republic that Chassen, and not Simpson, is the person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

137.    Arch and JJ Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result Simpson has been unable to spend, distribute, or otherwise control the Arch Companies Funds, on behalf of Arch and JJ Arch, as the

[938459/1]

26

Case 1:24-cv-07139    Document 1-1    Filed 09/20/24    Page 164 of 482

duly authorized person pursuant to the First Republic Agreement, and pursuant to his authority under the Arch Operating Agreement and the JJ Arch Amended Operating Agreement.

138.    JJ Arch and Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result, as set forth above, they have been, and remain, unable to fulfill their obligations to others, including but not limited to their employees, vendors, subcontractors, and materialmen, and as a result, those persons may cease performing services for JJ Arch and Arch, and JJ Arch and Arch may incur further obligations to those persons or to other persons in the future, or having difficulty in the future finding other persons who will be willing to work for or contract with them.

139.    Chassen's actions constitute tortious interference with the First Republic Agreement.

140.    As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

141.    In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

142.    As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

143.    Arch and JJ Arch have been injured, and continue to be injured, by Chassen's tortious interference with the Arch Contracts, in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION

**(Declaratory Judgment, Brought by All Plaintiffs, Against Chassen)**

144.   Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

145.   There is a justiciable controversy between Plaintiffs on the one hand, and Chassen on the other, as to whether

(a)   the Notice to Chassen of Cause Event removed Chassen as a member of JJ Arch; and

(b)   the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch.

146.   Plaintiffs have taken the position that the Notice of Chassen of Cause Event removed Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter did not remove Simpson as a member of JJ Arch.

147.   Chassen has taken the position that the Notice of Chassen of Cause Event did not remove Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch. However, both positions taken by Chassen are incorrect.

148.   The aforesaid dispute between the parties represents a genuine, concrete dispute involving substantial legal interests.

149.   As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

150.   In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

[938459/1]                                      28

151.    As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

152.    Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to resolve the aforesaid dispute.

153.    There is no adequate remedy at law.

### AS AND FOR A SIXTH CAUSE OF ACTION

**(Declaratory Judgment, Brought by All Plaintiffs, Against Chassen and First Republic)**

154.    Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

155.    There is a justiciable controversy between Plaintiffs on the one hand, and Defendants on the other, as to whether Simpson or Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and whether the hold on the Arch Accounts should be removed.

156.    Plaintiffs have taken the position that Simpson is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and the hold on the Arch Accounts must be released.

157.    Chassen has taken the position that Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts. However, the position taken by Chassen is incorrect.

158.    First Republic has taken the position that it cannot determine whether Simpson or Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and that the hold should remain on the Arch Accounts. However, the position taken by First Republic is incorrect.

[938459/1]                                        29

159.    The aforesaid dispute among the parties represents a genuine, concrete dispute involving substantial legal interests.

160.    As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

161.    In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

162.    As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

163.    Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to resolve the aforesaid dispute.

164.    There is no adequate remedy at law.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### (Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen and First Republic)

165.    Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

166.    Plaintiffs have a likelihood of success on the merits on their claim that Simpson has the right to control, on the behalf of JJ Arch and Arch, the Arch Accounts.

167.    In the event that the hold First Republic has placed on the Arch Accounts is not lifted immediately, and the right to control the Arch Accounts is not restored to Simpson, Plaintiffs, and third parties, will experience imminent and irreparable injury.

[938459/1]                           30

168.    Such injury will be in the form of Arch Companies being unable to pay their employees, resulting in economic harm to such employees, and at least some of such employees imminently leaving employment with the Arch Companies and seeking work elsewhere; lack of supervision on construction projects supervised by the Arch Companies, imminently resulting in physical injury to members of the public at the construction sites; Arch Companies being unable to pay subcontractors and materialmen on projects, imminently resulting in such subcontractors and materialmen ceasing work on the projects, again imminently resulting in physical injury to members of the public at unsupervised construction sites, as well as economic injury to the Arch Companies owning the project sites, due to delayed completion of projects; and long-term economic damage to Arch Companies, as future efforts at recruiting employees and contracting with third parties are hindered due to damage to Arch Companies' reputation due to a sustained inability to fulfill their obligations.

169.    The only way forward, therefore, to protect Arch Companies, their employees, subcontractors, materialmen, and vendors, and members of the public at large, is for the Court to order that First Republic release its hold on Arch Companies' bank accounts, and restore to Simpson his contractually guaranteed exclusive right to control the finances, and the checkbooks, of Arch Companies.

170.    The balance of the equities favors Plaintiffs.

171.    Plaintiffs are entitled to a preliminary and permanent injunction requiring First Republic, immediately, to lift the hold it has placed on the Arch Accounts, and to restore to Simpson the exclusive right to control the Arch Accounts on behalf of JJ Arch and Arch.

172.    There is no adequate remedy at law.

[938459/1]                                 31

## <u>AS AND FOR AN EIGHTH CAUSE OF ACTION</u>

### (Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen)

173. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

174. Plaintiffs have a likelihood of success on the merits of their claim that Simpson is entitled to have access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

175. In the event that Simpson is unable to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site, and Plaintiffs will suffer irreparable injury.

176. The balance of the equities favors Plaintiffs.

177. Plaintiffs are entitled to a preliminary and permanent injunction requiring Chassen to take, immediately, all actions necessary to enable Simpson to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

178. There is no adequate remedy at law.

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a) On the First Cause of Action, awarding damages to Arch and Simpson against Chassen in an amount to be determined at trial;

(b) On the Second Cause of Action, awarding damages to JJ Arch and Simpson against Chassen in an amount to be determined at trial;

(c) On the Third Cause of Action, awarding damages to all Plaintiffs against Chassen in an amount to be determined at trial;

[938459/1] 32

(d)     On the Fourth Cause of Action, awarding damages to Arch and JJ Arch against Chassen in an amount to be determined at trial;

(e)     On the Fifth Cause of Action, declaring that Simpson remains the managing member of JJ Arch, and Chassen is no longer a member of JJ Arch;

(f)     On the Sixth Cause of Action, declaring that Simpson is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and the hold on the Arch Accounts must be released;

(g)     On the Seventh Cause of Action, issuing a preliminary and permanent injunction First Republic, immediately, to lift the hold it has placed on the Arch Accounts, and to restore to Simpson the exclusive right to control the Arch Accounts on behalf of JJ Arch and Arch; and

(h)     On the Eighth Cause of Action, issuing a preliminary and permanent injunction requiring Chassen to take, immediately, all actions necessary to enable Simpson to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site;

(i)     Together with interest, costs, disbursements, and attorneys' fees, and such other and further relief as to the Court may seem just.

Dated: New York, New York
       August 14, 2023

Yours, etc.

ADAM LEITMAN BAILEY, P.C.

By: _____
      Adam Leitman Bailey, Esq.

[938459/1]                          33

Brandon M. Zlotnick, Esq.
One Battery Park Plaza, 18th Floor
New York, NY 10004
Phone: (212) 825-0365
*Attorneys for Plaintiffs*

[938459/1]                                   34



---

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

SOUTHERN District of NEW YORK
_(State)_

Case number _(if known)_: _____ Chapter  11

☐ Check if this is an
amended filing

---

## Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    06/22

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, _Instructions for Bankruptcy Forms for Non-Individuals_, is available.**

| | | |
|---|---|---|
| 1. | **Debtor's name** | JJ Arch LLC |

| | | |
|---|---|---|
| 2. | **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and _doing business as_ names | |

| | | |
|---|---|---|
| 3. | **Debtor's federal Employer Identification Number (EIN)** | 8 2 – 3 6 1 4 2 5 1 |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| 88 University Place | |
| Number   Street | Number     Street |
| 2nd Floor | |
| | P.O. Box |
| New York, NY 10003-4566 | |
| City            State     ZIP Code | City               State     ZIP Code |
| | **Location of principal assets, if different from principal place of business** |
| New York | |
| County | Number     Street |
| | |
| | City               State     ZIP Code |

5. **Debtor's website (URL)**      https://archcorealestate.com/

---

| Debtor | JJ Arch LLC | Case number (*if known*) | |
|---|---|---|---|
| | Name | | |

**6.** **Type of debtor**

■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding  LLP)

☐ Other. Specify: _____

**7.** **Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply:*

☐ Tax-exempt entity (as described in 26 U.S.C. § 501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)

☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
http://www.uscourts.gov/four-digit-national-association-naics-codes .

  5   3   1   3

**8.** **Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check **all** that apply:*

  ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

  ■ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

  ☐ A plan is being filed with this petition.

  ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

  ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

  ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

| Debtor | JJ Arch LLC | Case number (if known) |
|---|---|---|
| | Name | |

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

■ No

☐ Yes. District _____ When _____ Case number _____
                                    MM / DD / YYYY

District _____ When _____ Case number _____
                              MM / DD / YYYY

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

■ No

☐ Yes. Debtor _____ Relationship _____

District _____ When _____

Case number, if known _____     MM / DD / YYYY

**11. Why is the case filed in *this district*?**

*Check all that apply:*

■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____
                          Number        Street

_____

_____
City                              State ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

**Statistical and administrative information**

| Debtor | JJ Arch LLC | Case number (if known) | |
|---|---|---|---|
| | Name | | |

**13. Debtor's estimation of available funds**

Check one:

☐ Funds will be available for distribution to unsecured creditors.

■ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| ■ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
|---|---|---|
| ☐ 50-99 | ☐ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15. Estimated assets**

| ☐ $0-$50,000 | ■ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
|---|---|---|
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
|---|---|---|
| ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ■ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

---

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    03/07/2024
               MM / DD / YYYY

✘ /s/ Jeffrey Simpson                    Jeffrey Simpson
Signature of authorized representative of debtor    Printed name

Title    Managing Member

| Debtor | JJ Arch LLC | Case number (if known) |
|---|---|---|
| | Name | |

**18. Signature of attorney**    ✗ /s/ *Scott A. Griffin*    Date    03/07/2024

Signature of attorney for debtor                              MM / DD / YYYY

Scott A. Griffin

Printed name

Griffin LLP

Firm name

420 Lexington Avenue, Suite 400

Number        Street

New York                                    NY        10170

City                                        State      ZIP Code

646-998-5580                                sgriffin@grifflegal.com

Contact phone                               Email address

4594081                                     NY

Bar number                                  State

FILED: NEW YORK COUNTY CLERK 06/25/2024 11:23 AM
NYSCEF DOC. NO. 4
INDEX NO. 653208/2024
RECEIVED NYSCEF: 06/25/2024

24-10381 ... Doc 113 Filed 03/07/24 Entered 03/07/24 19:53:07 Main Document
Pg 6 of 15

**GRIFFIN LLP**
420 Lexington Avenue, Suite 400
New York, New York 10170
Telephone: (646) 998-5580
Facsimile: (646) 998-8284
Scott A. Griffin

*Proposed Counsel for the Debtor*
*and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                 :

In re:                            :    Chapter 11
                                 :    (Subchapter V)

JJ ARCH LLC,              :
                                 :    Case No. 24-_____ ( )

               Debtor.[1]    :
                                 :
-------------------------------------------------------------X

**DECLARATION OF JEFFREY SIMPSON**
**IN COMPLIANCE WITH 11 U.S.C. § 1116(1)(B)**

       I, Jeffrey Simpson, hereby declare under penalty of perjury that the following is true to the

best of my knowledge, information and belief: no statement of operations, cash flow statement,

balance sheet, or profit and loss statement has been prepared for the Debtor for the years ended

2022 and 2023.[2]

    Dated:  March 7, 2024

                               /s/ *Jeffrey Simpson*
                                Jeffrey Simpson
                                Managing Member
                                JJ Arch LLC

---

[1]    The last four digits of the Debtor's federal tax identification number are 4251.

[2]    Upon information and belief, the Debtor's last filed federal tax return was for the tax year 2021.

## WRITTEN CONSENT OF THE
## MANAGING MEMBER OF JJ ARCH LLC

### March 7, 2024

The undersigned, JJ ARCH LLC, a New York limited liability company, (the "Company" or "Arch"), hereby waives the calling, notice and holding of a meeting and, in lieu thereof, acting pursuant to the authority of that certain Limited Liability Company Operating Agreement dated December 11, 2017 and as amended on May 22, 2021 (the "Operating Agreement), of the Company and the New York Limited Liability Company Law, adopts the following resolutions by written consent, which consent has not been amended, rescinded or modified since its adoption and remains in full force and effect as of the date set forth below:

WHEREAS, the Company organized as a limited liability company pursuant to the Operating Agreement, with Jeffrey Simpson ("Simpson") as a member and as its manager and with Jared Chassen ("Chassen") as a member; and

WHEREAS, the Operating Agreement provides, in relevant part, that (i) a member's "failure to provide substantially all of his business time for the benefit of the Company," or (ii) upon the occurrence of a "Cause Event"[1] by a member and delivery of written notice of such event to the member by the other member requiring the member to resign, effects a "Resignation" of said member; and

WHEREAS, Section 7.5(a) of the Operating Agreement provides that the Resignation of a Member shall result in the termination of a member's membership interest in the Company; and

WHEREAS, Chassen has been removed from the Company for, *inter alia*, his conduct and for cause, having effected a Resignation with respect to his status as a member of the Company; and

WHEREAS, as the sole member and the manager of the Company, Simpson has sole and unrestricted authority to make any decision with respect to the filing of a petition for relief on behalf of the Company under chapter 11 of title 11 of the Bankruptcy Code (the "Bankruptcy Code"); and

WHEREAS, Simpson has had the opportunity to consider each of the strategic alternatives available to the Company; and

I.  Chapter 11 Filing

**NOW, THEREFORE, BE IT RESOLVED**, that in the judgment of Simpson, it is desirable and in the best interests of Arch, its creditors and other parties in interest, that Arch file or cause to be filed a voluntary petition for relief (the "Chapter 11 Case") under the provisions of

---

[1]  Capitalized terms used herein, but not otherwise defined, shall have the meanings ascribed to them in the Operating Agreement.

the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and be it

**FURTHER RESOLVED**, that Simpson, as the managing member of Arch (the "Authorized Officer"), is authorized, empowered, and directed to execute and file, on behalf of Arch, all petitions, schedules, lists and other motions, papers or documents, and to take any and all actions that he deems necessary or proper to obtain such relief, including, without limitation, any action necessary to maintain the ordinary course operation of Arch's business; and be it

## II. Retention of Advisors

**FURTHER RESOLVED**, that the Authorized Officer be, and he hereby is, authorized and directed to employ the law firm of Griffin LLP as general bankruptcy counsel to represent and assist Arch in carrying out its duties under the Bankruptcy Code, and to take any and all actions to advance Arch's rights and obligations, including filing any pleadings; and in connection therewith, the Authorized Officer is hereby authorized and directed to execute appropriate retention agreements, and cause to be filed an appropriate application for authority to retain the services of Griffin LLP; and be it

**FURTHER RESOLVED**, that the Authorized Officer be, and he hereby is, authorized and directed to employ any other professionals to assist Arch in carrying out its duties under the Bankruptcy Code; and in connection therewith, the Authorized Officer is hereby authorized and directed to execute appropriate retention agreements, and cause to be filed an appropriate application for authority to retain the services of any other professionals as necessary; and be it

## III. Further Actions and Prior Actions

**FURTHER RESOLVED**, that in addition to the specific authorizations heretofore conferred upon the Authorized Officer, or his designees shall be, and each of them, acting alone, hereby is, authorized, empowered, and directed, in the name of, and on behalf of Arch to take or cause to be taken any and all such further actions, to execute and deliver any and all such agreements, certificates, instruments and other documents and to pay all expenses, including filing fees, in each case as in such Authorized Party's or Authorized Officer's judgment shall be necessary or desirable to fully carry out the intent and accomplish the purposes of the resolutions adopted herein; and be it

**FURTHER RESOLVED**, that all acts, actions and transactions relating to the matters contemplated by the foregoing resolutions done in the name of and on behalf of Arch, which acts would have been approved by the foregoing resolutions except that such acts were taken before the adoption of these resolutions, are hereby in all respects approved and ratified as the true acts and deeds of Arch with the same force and effect as if each such act, transaction, agreement or certificate had been specifically authorized in advance by resolution and that the Authorized Officer did execute the same.

FILED: NEW YORK COUNTY CLERK 06/25/2024 11:23 AM
INDEX NO. 653208/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 06/25/2024

24-10381-mg Doc 113 Filed 08/07/24 Entered 08/07/24 19:58:07 Main Document
Pg 9 of 15

**IN WITNESS WHEREOF,** the undersigned now constituting the sole member and manager of JJ Arch LLC has executed this Written Consent effective as of the date first set forth above.

JJ ARCH LLC

/s/ *Jeffrey Simpson*___
Name: Jeffrey Simpson
Its: Managing Member

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor name | JJ Arch LLC |
| United States Bankruptcy Court for the: | **SOUTHERN DISTRICT OF NEW YORK** |
| Case number (if known): | |

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Adam Leitman Bailey, P.C. One Battery Park Plaza 18th Floor New York, NY 10004 Bailey, P.C. | Adam Leitman Bailey alb@alblawfirm.com 212-825-0365 | Professional Services | | | | $128,353.00 |
| A.Y. Strauss 535 Fifth Avenue 4th floor New York, NY 10017 | Aaron Strauss 646-374-0255 ays@aystrauss.com | Professional Services | | | | $6,074.05 |
| Geico 1 Geico Blvd. Fredricksburg, VA 22412 | 800-424-3426 | Trade Debt | | | | $166.63 |
| Intuit Inc. (Quickbooks) 2700 Coast Avenue Mountain View, CA 94043 | 800-446-8848 | Trade Debt | | | | $217.75 |
| State Farm Insurance Companies Insurance Support Center - East P.O Box 588002 North Metro, GA 30029 | 800-440-0998 | Trade Debt | | | | $1,295.93 |
| Verizon 1095 Avenue of the Americas New York, NY | 833-837-4966 | Trade Debt | | | | $143.32 |

# United States Bankruptcy Court
## Southern District of New York

**In re JJ Arch LLC**

Debtor(s)

Case No. _____

Chapter **11**

## LIST OF EQUITY SECURITY HOLDERS

Following is the list of the Debtor's equity security holders which is prepared in accordance with rule 1007(a)(3) for filing in this Chapter 11 Case

| Name and last known address or place of business of holder | Security Class | Number of Securities | Kind of Interest |
|---|---|---|---|

**See Schedule 1**

*Penalty for making a false statement or concealing property* Fine of up to $500,000 or imprisonment for up to 5 years or both.
18 U.S.C. §§ 152 and 3571.

FILED: NEW YORK COUNTY CLERK 06/25/2024 11:23 AM
NYSCEF DOC. NO. 4

INDEX NO. 653208/2024
RECEIVED NYSCEF: 06/25/2024

24-10381 Claim 24-cv-01139 Filed 03/07/24 Entered 03/07/24 19:53:07 Main Document
Pg 12 of 15

### SCHEDULE 1

| Name of Equity Interest Holder | Last Known Address of Equity Interest Holder | Kind of Interest | Total Number of Interests Held |
|---|---|---|---|
| Jeffrey Simpson | 1055 Park Avenue, #4<br>New York, NY 10028 | Membership Interests | 100%[1] |

---

[1] Jared Chassen of 55 Manor Pond Lane, Irvington, NY 10533, previously owned a 49.9% membership interest in the Debtor JJ Arch LLC ("JJ Arch"). Mr. Chassen, however, was deemed to have resigned as a member of JJ Arch, as of August 5, 2023, pursuant to the definition of "Resignation" as set forth in the Limited Liability Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended and restated on May 22, 2021, (the "Operating Agreement"), and Section 7.5 of the Operating Agreement. Accordingly, Mr. Simpson currently owns 100% of the equity interests in the Debtor.

FILED: NEW YORK COUNTY CLERK 06/25/2024 11:23 AM
INDEX NO. 653208/2024
NYSCEF DOC. NO. 4
RECEIVED NYSCEF: 06/25/2024

24-10381 Claim 24-1 Doc 1 Filed 03/07/24 Entered 03/07/24 19:53:07 Main Document
Pg 13 of 15

**GRIFFIN LLP**
420 Lexington Avenue, Suite 400
New York, New York 10170
Telephone: (646) 998-5580
Facsimile: (646) 998-8284
Scott A. Griffin

*Proposed Counsel for the Debtor*
*and Debtor in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                     :

In re:                               :     Chapter 11
                                  :     (Subchapter V)

JJ ARCH LLC,                 :

                                  :     Case No. 24-_____ (  )

                   Debtor.[1]     :
                                  :
-------------------------------------------------------------X

**CORPORATE OWNERSHIP STATEMENT OF JJ ARCH LLC**
**PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE**
**1007(a)(1) AND 7007.1 AND LOCAL RULE OF BANKRUPTCY PROCEDURE 1007-3**

       Pursuant to Rule 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, and Rule 1007-3 of the Local Bankruptcy Rules for the Southern District of New York, and to enable the Judges to evaluate possible disqualifications or recusals, on behalf of JJ Arch LLC (the "Debtor"), the undersigned authorized officer represents as follows:

**A.      Ownership of the Debtor's Equity Interests.**

       Jeffrey Simpson owns 100% of the equity interests in the Debtor.[2]

**B.      The Debtor's Ownership of Equity Securities, Partnership Interests and Joint Venture Interest.**

       The Debtor does not directly or indirectly own 10% or more of any class of equity interests in any corporation whose securities are publicly traded. The Debtor does not own an

---

[1]   The last four digits of the Debtor's federal tax identification number are 4251.

[2]   Jared Chassen of 55 Manor Pond Lane, Irvington, NY 10533, previously owned a 49.9% membership interest in the Debtor. Mr. Chassen, however, was deemed to have resigned as a member of the Debtor, as of August 5, 2023, pursuant to the definition of "Resignation" as set forth in the Limited Liability Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended and restated on May 22, 2021, (the "Operating Agreement"), and Section 7.5 of the Operating Agreement. Accordingly, Mr. Simpson currently owns 100% of the equity interests in the Debtor.

interest in any general or limited partnerships or joint ventures. The Debtor owns interests in the following entities: (i) JJ NY Schwenks LLC; (ii) JJ NY 550 LLC; (iii) 225 HPR LLC; (iv) 1640 Montauk LLC; (v) 1640 Motors LLC d/b/a Rever Motors; and (vi) 146 E 89 Borrower 1 LLC.

**Fill in this information to identify the case:**

Debtor name    __JJ Arch LLC__

United States Bankruptcy Court for the:    SOUTHERN DISTRICT OF NEW YORK

Case number (if known)    _____

☐ Check if this is an
     amended filing

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    **12/15**

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐    *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)
☐    *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)
☐    *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)
☐    *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)
☐    *Schedule H: Codebtors* (Official Form 206H)
☐    *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)
☐    Amended *Schedule* _____
■    *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)
■    Other document that requires a declaration    **Corporate Ownership Statement**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    __March 7, 2024__      X *_/s/ Jeffrey Simpson_*
                                     Signature of individual signing on behalf of debtor

                                     **Jeffrey Simpson**
                                     Printed name

                                     **Managing Member**
                                     Position or relationship to debtor

D

FILED: NEW YORK COUNTY CLERK 06/25/2024 11:23 AM
INDEX NO. 653208/2024
NYSCEF DOC. NO. 5
24-01335-jpm Doc 113 Filed 04/08/24 Entered 04/08/24 09:45:20 Main Document
Pg 1 of 363
RECEIVED NYSCEF: 06/25/2024

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY SIMPSON, individually and derivatively, as managing member of JJ ARCH LLC, suing derivatively as managing member of ARCH REAL ESTATE HOLDINGS LLC and JJ ARCH LLC,<br><br>          Plaintiffs,<br><br>          -against-<br><br>JARED CHASSEN, FIRST REPUBLIC BANK,<br><br>          Defendants. | Case No.: 1:24-cv-2478<br><br>NYS Supreme Court Index No.: 158055/2023 |

JARED CHASSEN, individually and derivatively, as managing member of JJ ARCH LLC, suing derivatively as managing member of ARCH REAL ESTATE HOLDINGS LLC and JJ ARCH LLC,

          Counterclaim-Plaintiff,

          -against-

JEFFREY SIMPSON and YJ SIMCO LLC,

          Counterclaim-Defendants,

And

JJ ARCH LLC and ARCH REAL ESTATE HOLDINGS LLC,

          Nominal Defendants.

608941 NJ INC,

          Intervenor-Plaintiffs,

          -against-

JEFFREY SIMPSON, JJ ARCH LLC, AND ARCH REAL ESTATE HOLDINGS LLC,

          Defendants

and
ARCH REAL ESTATE HOLDINGS, LLC

          Nominal Defendant.

## NOTICE OF REMOVAL

TO THE HONORABLE COURT:

Please take notice that JJ ARCH LLC ("JJ ARCH" or, the "Debtor"), a debtor in possession in the chapter 11 case captioned *In re JJ Arch LLC*, Case No. 24-10381 (JPM) (the "Bankruptcy Case"), pending before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), by and through its undersigned counsel, hereby files this notice (the "Notice of Removal") pursuant to 28 U.S.C. §§ 1334 and 1452 and Federal Rule of Bankruptcy Procedure 9027 to remove to this Court the action pending in New York State Supreme Court, New York County (the "State Court"), under Index No. 158055/2023 (the "Removed Action"), and respectfully states as follows:

### THE BANKRUPTCY CASE

1. On March 7, 2024, the Debtor filed a voluntary petition (the "Petition") for relief under chapter 11 of the United Stated Bankruptcy Code (the "Bankruptcy Code") in the Bankruptcy Court.

### THE REMOVED ACTION

2. The Removed Action is a civil action filed in New York Supreme Court on August 15, 2023. The caption of the Removed Action is *Jeffrey Simpson, individually and derivatively, as managing member of JJ Arch LLC, suing derivatively as managing member of Arch Real Estate Holdings LLC and JJ Arch LLC v. Jared Chassen, et al.*, Index No. 158055/2023.

3. Plaintiff Jeffrey Simpson ("Simpson"), both individually and as managing member of the Debtor, initially brought the Removed Action against, among others, Defendant Jared Chassen ("Chassen").

4. Thereafter, Chassen asserted counterclaims in the Removed Action.

5.      In addition, Intervenor-Plaintiff, 608941 NJ Inc. (with its principals Kevin and Michael Weiner, collectively "Oak") intervened in the Removed Case and asserted claims against Simpson, the Debtor, and Arch Real Estate Holdings LLC ("AREH").

6.      Defendants in the Removed Action were served with the summons, complaint and related documents.

## GROUNDS FOR REMOVAL

7.      The Removed Action is removable pursuant to 28 U.S.C. §§ 1334 and 1452.

8.      Pursuant to 28 U.S.C. §1452, "[a] party may remove any claim or cause of action . . . to the district court where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." 11 U.S.C. §1452(a); *see also* F.R.B.P. § 9027.

9.      Section 1334, in turn, provides that "[t]he district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate," 28 U.S.C. § 1334(e)(1), and "shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11," 28 U.S.C. § 1334(b).

10.     The District Court – and the Bankruptcy Court – have exclusive jurisdiction over the Removed Action because it directly affects the property of the estate—most notably, but not exclusively, the identity of the managing member in control of the Debtor-in-possession and the Debtor's assets and the Debtor's right to consent to Major Decisions. *See, e.g., In re Warner*, 480 B.R. 641, 647-48 (Bankr. N.D.W. Va. 2012) ("the right to participate in a LLC—a non-economic right—is property of the estate under 11 U.S.C. § 541(a)"). Furthermore, the ultimate disposition regarding the identity of the managing member and the Debtor's consent right will

also have a significant impact on the remainder of the Debtor's estate, as the consent right is the most important safeguard preventing the harm the Debtor's estate would suffer from Oak and Chassen's use of temporary State Court orders to effect an out-of-court restructuring free from the guardrails and procedures imposed by the bankruptcy process. In particular: (1) the Debtor is the 80% member of AREH, which is now effectively being run solely by Oak and Chassen by virtue of temporary orders in the Removed Action; (2) the Debtor is entitled by written agreement to manage AREH; and (3) Oak is taking actions for the benefit of Oak, to limit Oak's exposure to hundreds of millions of dollars in guarantee liability, and to the detriment of the Debtor and a host of investors in the Arch family of companies, which could unwind millions of dollars of value that would inure to the benefit of Debtor, but for Oak's actions. Ultimately, therefore, the question of whether Oak and Chassen should be permitted to unilaterally effect a transfer of value from the Debtor's estate to Oak is one that will have a dramatic impact on the property of the estate, and the Bankruptcy Court has exclusive jurisdiction over that question. *See In re WP Realty Acquisition III, LLC*, 626 B.R. 154, 161 (2021) ("Even in single asset real estate cases such as this one, control of the debtor can be key to the vision for and use of the property, which is how value is created.").

11.    Furthermore, even if the Bankruptcy Court did not have exclusive jurisdiction over the Removed Action pursuant to 28 U.S.C. § 1334(e)(1) (which it does), then the Bankruptcy Court would, under 28 U.S.C. § 1334(b), nevertheless have original but not exclusive jurisdiction over the Removed Action as a core proceeding for which mandatory abstention would be "inapplicable." *In re Petrie Retail, Inc.*, 304 F.3d 223, 232 (2d Cir. 2002) ("[W]here a matter constitutes a core proceeding, the mandatory abstention provisions of section 1334(c)(2) are inapplicable.").

12.     In particular, the Removed Action is a core proceeding because it (i) "concern[s] the administration of the estate," 28 U.S.C. § 157(b)(2)(A); and (ii) "affect[s] the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship," 28 U.S.C. § 157(b)(2)(O).

13.     *First*, where there is "a dispute over the management of the Debtor," and that dispute would "impact [the] reorganization," such a dispute is a core proceeding. *In re WP Realty Acquisition III, LLC*, 626 B.R. at 159-160. There can be no dispute that the Removed Action is a dispute over the management of the Debtor. Nor can there be any dispute that resolution of that dispute will dramatically impact the course of this reorganization. Indeed, Chassen and others have moved to dismiss the Bankruptcy Case—and have even threatened Simpson with criminal contempt for filing it—on the grounds that, *by virtue of orders entered in the Removed Action*, Simpson no longer controls the Debtor. It is difficult to imagine a question more fundamental to "the administration of the estate" than whether the filing of the petition was authorized in the first place. Accordingly, the Removed Action is a core proceeding over which the Bankruptcy Court has original jurisdiction.

14.     *Second*, the Removed Action is a core proceeding because, as explained above, it has a significant impact on the assets of the estate and the adjustment of the relationship between the Debtor, on the one hand, and Oak, AREH, Chassen, and Simpson, on the other. Depending on the resolution of the Removed Action, both the estate's assets and the estate's relationships with other relevant stakeholders will be significantly impacted. Accordingly, for this independent reason, the Removed Action is a core proceeding over which the Bankruptcy Court has original jurisdiction.

15.     Removal of the Removed Action is timely pursuant to Rule 9027(a)(2) of the Federal Rules of Bankruptcy Procedure because the Notice of Removal has been filed with the

FILED: NEW YORK COUNTY CLERK 06/25/2024 11:23 AM
INDEX NO. 653208/2024
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 06/25/2024

24-01335-mm Doc 1135 Filed 04/06/24 Entered 04/08/24 09:45:20 Main Document
Pg 6 of 363

Clerk of the Bankruptcy Court within 90 days after the order for relief in the case under the Code. F.R.B.P. 9027(a)(2).

16. In accordance with the requirements of Bankruptcy Rule 9027(a)(1), the Debtor asserts that, as explained above, upon removal, the causes of action asserted in the Removed Action are core proceedings pursuant to 28 U.S.C. §157(b)(2)(A) and (O) and 1334(b) and (e). Moreover, to the extent any claim asserted in the Removed Action is deemed a non-core proceeding, the Debtor consents to the entry of final orders or judgments by the Bankruptcy Court.

17. Copies of all process and pleadings filed in the Removed Action are attached hereto as Exhibit A.

18. Concurrently with the filing of this Notice of Removal, the Debtor is giving notice of this removal to all parties in the Removed Action.

## CONCLUSION

19. Pursuant to 28 U.S.C. §§ 1334 and 1452 and Federal Rule of Bankruptcy Procedure 9027, the Debtor hereby removes the Removed Action to this Court and requests that all further proceedings be held before this Court.

FILED: NEW YORK COUNTY CLERK 06/25/2024 11:23 AM
INDEX NO. 653208/2024
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 06/25/2024

24-01335-mm24-00x133-Filed04/08/24-Entered04/08/24-09:45:20e-1MainfDocument
Pg 7 of 363

Dated: April 1, 2024
New York, New York

Respectfully submitted,


/s/ *Nathan Denning*

WIGGIN AND DANA LLP
Nathan E. Denning, Esq.
Andrew Ritter, Esq. (*pro hac vice* pending)
Kate E. Cassidy
437 Madison Avenue 35th Floor
New York, New York 10022
Tel: (212) 551-2600
Email: ndenning@wiggin.com
aritter@wiggin.com
kcassidy@wiggin.com

*Proposed Co-Counsel for the Debtor and
Debtor in Possession*

FILED: NEW YORK COUNTY CLERK 06/25/2024 11:23 AM
NYSCEF DOC. NO. 5

INDEX NO. 653208/2024

RECEIVED NYSCEF: 06/25/2024

24-01338, Doc 24-1, Filed 04/08/24, Entered 04/08/24 09:45:20, Main Document
Pg 8 of 363

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on this 1st day of April 2024, a copy of the foregoing was served

electronically via the Court's ECF system.

<u>/s/ Nathan Denning</u>

Nathan Denning

FILED: NEW YORK COUNTY CLERK 06/25/2024 11:23 AM
INDEX NO. 653208/2024
NYSCEF DOC. NO. 5
RECEIVED NYSCEF: 06/25/2024

24-01335-jpm Doc 113 Filed 04/03/24 Entered 04/03/24 09:45:30 Main Document
Pg 9 of 363

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| JEFFREY SIMPSON, individually and derivatively, as managing member of JJ ARCH LLC, suing derivatively as managing member of ARCH REAL ESTATE HOLDINGS LLC, and JJ ARCH LLC,<br><br>*Plaintiffs,*<br><br>-against-<br><br>JARED CHASSEN and FIRST REPUBLIC BANK,<br><br>*Defendants.* | Index No. _____<br><br>Date Filed:<br><br>**SUMMONS**<br><br>Venue is placed in New York County because a substantial part of the events or omissions giving rise to the claims occurred there |

TO THE ABOVE-NAMED DEFENDANTS:

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a copy of your answer, or, if the Complaint is not served with this Summons, to serve a Notice of Appearance, on Plaintiffs' attorneys within twenty (20) days after service of this Summons, exclusive of the day of service (or within thirty (30) days after service is complete if this Summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

Dated: New York, New York
August 14, 2023

Yours, etc.

ADAM LEITMAN BAILEY, P.C.

By: _____
Adam Leitman Bailey, Esq.
Brandon M. Zlotnick, Esq.
One Battery Park Plaza, 18th Floor
New York, NY 10004
Phone: (212) 825-0365
*Attorneys for Plaintiffs*

**DEFENDANTS' ADDRESSES:**
Jared Chassen
47 Bridge Street, 6A

[938485/1]                                    1

Brooklyn, NY 11201

First Republic Bank
c/o New York State Secretary of State

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively as
managing member of ARCH REAL ESTATE HOLDINGS
LLC, and JJ ARCH LLC,

<em>Plaintiffs,</em>

-against-

JARED CHASSEN and FIRST REPUBLIC BANK,

<em>Defendants.</em>

Index No. _____

**COMPLAINT**

---

Plaintiffs JEFFREY SIMPSON, individually and derivatively, as managing member of JJ
ARCH LLC, suing derivatively as managing member of ARCH REAL ESTATE HOLDINGS
LLC, and JJ ARCH LLC, by their attorneys, ADAM LEITMAN BAILEY, P.C., complaining of
the defendants, allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This action is brought by Plaintiffs to undo a coup d'état executed by Defendant
Jared Chassen ("Chassen") in an effort to seize, from Plaintiff Jeffrey Simpson ("Simpson"),
control over Plaintiff entities Arch Real Estate Holdings LLC ("Arch") and JJ Arch LLC ("JJ
Arch") (collectively, Arch and JJ Arch are the "Arch Entities"). In addition, Plaintiffs seek to
redress one of Chassen's successes in his efforts to wrest control of the Arch Entities from
Simpson, *i.e.*, Chassen's inducement of a stalemate that has left Simpson unable to exercise control
over bank accounts maintained by Arch Entities and their affiliates and subsidiaries at Defendant
First Republic Bank ("First Republic"), which has left Arch Entities unable to use such accounts
to pay for such necessities as payroll, subcontractors, materialmen, and insurance. Plaintiffs also
seek to require Chassen to act to restore Simpson's access to his company email account with Arch

Entities, to the Dropbox account where Arch Entities' documents are stored, and Simpsons' ability to communicate with the domain company that hosts Arch Entities' web site.

## PARTIES

2.      Plaintiff Simpson is a natural person who resides in the State of New York, County of New York.

3.      Plaintiff Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

4.      Arch is a real estate investment management, construction management, property management, and development company.

5.      Plaintiff JJ Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

6.      Defendant Chassen is a natural person who resides in the State of New York, County of Kings.

7.      Defendant First Republic is a nationally chartered bank that maintains offices for the transaction of business in, among other places, the State of New York, County of New York.

## FACTS APPLICABLE TO ALL CAUSES OF ACTION

## BACKGROUND

### Simpson's Tenure at Greystone

8.      Simpson grew up under modest economic circumstances in Lakewood, New Jersey. His father, who was a public planning, zoning, and construction official, passed away when Simpson was 22. For four consecutive generations including his own, Simpson's family has been in the construction business.

9.      Prior to 2017 and the start of Arch, Simpson worked for eleven (11) years at Greystone Development ("Greystone Development"), a property development company within a

host of companies under the "Greystone" umbrella that performed functions related to real estate investment, capital raising, financing, development, construction, management, leasing, and sales. For the last five of those years, Simpson was the Chief Executive Officer of Greystone Development. By the time he left Greystone Development, he was supervising approximately thirty (30) employees at Greystone Development, with a total payroll of approximately $5 million. The total project volume was over $2 billion, and involved properties located in New York, Miami, and California. While he was there, he also was responsible for raising several large capital initiatives for real estate investing in multi-family housing in the southeastern United States with an institutional partner, individual loan origination on complex assignments, and capital raising for structured finance.

10.    One employee Simpson supervised at Greystone Development was Chassen. Simpson originally hired Chassen at Greystone Development to replace an administrative assistant at Greystone Development. Once hired, Chassen performed the same duties as that administrative assistant, for the same salary as she had earned. Over time, Chassen took on other responsibilities, including helping to source properties, equity, and debt. Throughout his time at Greystone Development, Chassen reported to Simpson.

11.    Another employee Simpson supervised at Greystone was nonparty Tristan Last ("Last"). "). Last was formerly of Brookfield with a MBA from Cornell University. She was hired as an acquisitions associate and quickly was promoted to the Director of Investments.

12.    A third employee Simpson supervised at Greystone was nonparty Michelle Miller ("Miller"). She was also an analyst. Miller started at Greystone Development as an intern, as a career switcher to real estate following the completion of her MBA from Northwestern. She was eventually hired full time as an analyst and grew in her role over time.

## Simpson's Formation of Arch and JJ Arch

13.    In 2017, Simpson left Greystone Development on amicable terms with that company, and formed a new company, Plaintiff Arch.

14.    The original business address for Arch was Simpson's personal residence address at the time.

15.    At all times since the formation of Arch, eighty percent (80%) of the membership interest in Arch has been held by Plaintiff JJ Arch, which is the managing member of Arch. (*See* Exhibit 1, Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC ["Arch Operating Agreement"], p. 17, §§ 6.1-6.2 [providing for distributions of cash flow and acquisition fees of 80% to "JJ Member" and 20% to "Investor Member"]; *id.* p. 1 preamble [defining JJ Arch LLC as "JJ Member"]; *id.* § 1.1, p. 7 [defining "Managing Member" as JJ Member].)

16.    At all times since the formation of Arch, the remaining twenty percent (20%) of the membership interest in Arch has been held by 608941 NJ Inc., a New Jersey corporation ("NJ Inc."), which is the investor member of Arch. (*See* Exhibit 1, Arch Operating Agreement, p. 17, §§ 6.1-6.2; *id.* p. 1 preamble [defining NJ Inc. as "Investor Member"].) NJ Inc. made an investment of approximately $50 million in Arch, but has no authority to control the operation of Arch's business.

17.    Since the formation of JJ Arch, Simpson has been the managing member of JJ Arch and has held a majority of the membership interest in JJ Arch.

18.    From the formation of JJ Arch until his forced resignation from his membership therein effective August 5, 2023, as discussed below, Chassen was a member of JJ Arch and held a minority of the membership interest in JJ Arch, and his job started out as administrative in nature.

19.    Simpson and Chassen are the only persons who have ever been members of JJ Arch.

[938459/1]                   4

### The Arch Companies' Growth Under Simpson's Leadership

20.     Through JJ Arch, the managing member of Arch, Simpson has run all of Arch's businesses since the inception.

21.     By 2022, five years after Simpson formed Arch with no assets, Arch had owned and invested in over $1 billion in assets.

22.     Arch has several affiliated companies, including a property management company, advising company, construction company, and asset management company, each of which provides services relating to real properties that Arch controls.

23.     Together, Arch and its affiliated companies have a total of approximately 100 employees. (Collectively, Arch Entities and Arch's affiliated companies are the "Arch Companies.")

24.     The licenses and permits for each of the construction projects performed by the Arch Companies are in Simpson's name, as a licensed general contractor.

25.     Simpson holds responsibility for managing Arch Companies' commercial real estate construction projects and coordinating licensing and permitting matters.

### Chassen's Role with the Arch Companies

26.     With Greystone's permission, Simpsons brought three Greystone Development employees with him to work at Arch, *i.e.*, Chassen, Last, and Miller.

27.     From the formation of JJ Arch and Arch, Chassen has been a minority member in JJ Arch, and thus has not had the authority to exercise control over Arch as Arch's managing member.

28.     While the initial plan was for Chassen ultimately to become co-managing member, with Simpson, of JJ Arch, and thus share in Simpson's authority to control JJ Arch's exercise of its authority as managing member of Arch, Chassen's performance did not warrant this expansion of

[938459/1]                                          5

his authority, and Chassen consented to remain in his role as a minority member of JJ Arch on or about May 22, 2021.

29.     The original plan, at the time JJ Arch was formed, was that Simpson was to be its managing member, with the authority to manage, arrange, and cause to be coordinated the business, affairs, and assets of JJ Arch. (Exhibit 2, JJ Arch Limited Liability Company Operating Agreement ["JJ Arch Original Operating Agreement"], p. 7, ¶ 3.1(a).) This was to be the case prior to the fourth anniversary of JJ Arch's operating agreement, *i.e.*, December 11, 2021. (*Id.*)

30.     However, following the fourth anniversary of the operating agreement, both Simpson and Chassen were to act as managing members of JJ Arch, with each of them holding the authority to manage, arrange, and cause to be coordinated JJ Arch's business, affairs, and assets. (Exhibit 2, JJ Arch Original Operating Agreement, p. 9 § 3.2.)

31.     In addition, the JJ Arch Original Operating Agreement provided Chassen with a veto over certain decisions or actions with regard to JJ Arch even prior to the fourth anniversary of the JJ Arch Original Operating Agreement, such that Simpson could make certain decisions defined as "Company Major Decisions" only if he had Chassen's prior written consent. These actions included, among others, selling any asset of Arch Entities, borrowing or raising monies on behalf of Arch Entities, mortgaging Arch Entities' properties, Arch Entities' entering into any lease of space, and hiring any employee, consultant, or other personnel for Arch Entities. (*See* Exhibit 2, JJ Arch Original Operating Agreement, pp. 8-9, ¶¶ 3.1(b)(iii), (v)-(viii); *see also id.* p. 8 ¶ 3.1(b) [stating that "any action or decision that would constitute a Company Majority Decision shall be a Company Major Decision if made or taken by any Investment Entity"]; *id.* p. 4 [defining "Investment Entity" as including "AREH"]; *id.* p. 1 [defining "AREH" as Arch].)

32.     On the other hand, Simpson could take other actions without Chassen's consent, including but not limited to conducting, managing, and controlling the affairs and business of Arch Entities; opening, maintaining and closing bank accounts and drawing checks; bringing legal actions on claims of Arch Entities; and depositing, withdrawing, investing, paying, retaining, and distributing Arch Entities' funds in a manner consistent with the provisions of the JJ Arch Original Operating Agreement. (Exhibit 2, JJ Arch Original Operating Agreement, pp. 7-8 ¶¶ 3.1(a)(i)-(ii), (v)-(vi).)

33.     However, prior to the fourth anniversary of the JJ Arch Original Operating Agreement, Simpson had a discussion with Chassen, and informed him that Simpson did not believe Chassen had sufficient acumen in the business to be a co-managing member of JJ Arch and, by virtue of JJ Arch's managing membership in Arch, a co-managing member of Arch. Chassen agreed with Simpson about this.

34.     JJ Arch's operating agreement was thus amended, with Chassen's consent, on or about May 22, 2021. The amendment removed the authority that Chassen would have had, following the fourth anniversary of the JJ Arch Original Operating Agreement, to manage, arrange, and cause to be coordinated the business, affairs and assets of JJ Arch. (Exhibit 3, JJ Arch LLC Agreement Amendment No. 1, p. 3 ¶ 2(d) [deleting § 3.2 of the JJ Arch Original Operating Agreement].) (The JJ Arch Original Operating Agreement, as amended by JJ Arch LLC Agreement Amendment No. 1, shall be referred to as the "JJ Arch Amended Operating Agreement".) Thus, Chassen never had such authority. Because the list of actions and decisions for which Chassen's consent was required, *i.e.*, the "Company Major Decisions," remained effective only until the fourth anniversary of the JJ Arch Original Operating Agreement (*compare id.* p. 3 § 2(d) [new § 3.2] *with* Exhibit 2, JJ Arch Original Operating Agreement, p. 8 ¶ 3.1(b)), this meant that Chassen

[938459/1]                                                    7

would lose, and ultimately did lose, his right to refuse consent to Company Major Decisions after that anniversary, which occurred in December 2021.

35.     In addition, JJ Arch's operating agreement was amended to bar Chassen from becoming an equal equity owner in JJ Arch.  When JJ Arch was formed, it was agreed that my share of JJ Arch's distributions, which would initially be 66.6667%, would decrease, and Chassen's share of JJ Arch's distributions, which would initially be 33.3333%, would commensurately increase, on an annual basis, such that, by the fourth anniversary of the operating agreement, *i.e.*, December 11, 2021, each of them would receive equal 50% shares of the distributions. (Exhibit 2, JJ Arch Original Operating Agreement, p. 4 § 1.1, Definition of "Distribution Percentages"; *id.* p. 12 ¶ 5.1(a)(ii); *id.* Exhibit A.)

36.     However, JJ Arch's operating agreement was amended, with Chassen's consent and as part of JJ Arch LLC Agreement Amendment No. 1 (the same amendment as discussed above), to provide that, indefinitely, Simpson is to receive 50.1% of the distributions from JJ Arch, and Chassen is to receive 49.9% of the distributions from JJ Arch. (Exhibit 3, JJ Arch LLC Agreement Amendment No. 1, p. 1 ¶ 2(a).)

37.     In addition, Arch's operating agreement provides that "the business, affairs and assets of [Arch] shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in [the operating agreement] (including, but not limited to, in Section 7.1.3), full, exclusive and complete discretion with respect thereto." (Exhibit 1, Arch Operating Agreement, p. 17, ¶ 7.1.1.) The Managing Member, *i.e.*, JJ Arch, has "the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which [Arch] has the authority to perform both directly and indirectly through one or more Subsidiaries" (*id.* p. 18 ¶ 7.1.1), including, *inter alia*, those to "conduct, manage and

control the affairs and business of [Arch]" (*id.* p. 18 ¶ 7.1.1(i)); "open, maintain and close bank accounts and drew checks or other orders for the payment of monies" (*id.* ¶ 7.1.1(ii)); "deposit, withdraw, invest, pay, retain and distribute [Arch's] funds in a manner consistent with the provisions of [the Arch Operating Agreement]) (*id.* ¶ 7.1.1(vi)); and "bring or defend . . . resort to legal action, or otherwise adjust claims . . . of [Arch]" (*id.* ¶ 7.1.1(v)).

38.    Thus, at all times Simpson has been, and remains, the managing member of JJ Arch, and Simpson has always had exclusive authority to, *inter alia*, open, maintain, and close bank accounts on behalf of Arch Entities; to draw checks on those accounts; to deposit, withdraw, pay, and distribute Arch Entities' funds; and to bring legal actions on behalf of the Arch Entities.

39.    Chassen worked for Arch, and reported to Simpson. Simpson had the authority to give Chassen work assignments to do for Arch, and to take Arch work assignments away from Chassen.

40.    Until the events beginning August 4, 2023, as set forth below, Last had served as managing director of Arch.

### Means of Removing Members of Arch and JJ Arch

41.    Under both the Arch Operating Agreement and the JJ Arch Amended Operating Agreement, members may be removed, on certain enumerated grounds, through a process that is initiated by the occurrence of a "Cause Event." The Arch Operating Agreement provides an enumerated list of eight acts, the commission of which, by the managing member, serves as a "Cause Event." (*See* Exhibit 1, Arch Operating Agreement, pp. 4-5, § 1.1, definition of "Cause Event".) The JJ Arch Amended Operating Agreement extends this definition of "Cause Event" to any member of JJ Arch. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 3, § 1.1, definition of "Cause Event.")

42.     The acts constituting "Cause Event[s]" include, but are not limited to, "willful misconduct in relation to the business or affairs of [Arch] or a Subsidiary," "breach of fiduciary duty in relation to the business or affairs of [Arch] or a Subsidiary," and "misappropriation of [Arch] or Subsidiary funds or property." (Exhibit 1, Arch Operating Agreement, § 1.1, pp. 4-5, Definition of "Cause Event.")

43.     Under the JJ Arch Operating Agreement, a member in JJ Arch is required to resign if a Cause Event has occurred with respect to such member, and the other member has delivered written notice thereof to that member. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 5, § 1.1, definition of "Resignation.") Notably, only "the other Member" may deliver such notice (*id.*); accordingly, only a current member of JJ Arch could trigger a member's resignation through delivering notice of a Cause Event. Upon such Resignation, that member is no longer deemed a "member" of JJ Arch, and "shall not be entitled to any rights as a Member of the Company for any period from and after such Resignation." (*Id.*, p. 15, § 7.5(a).)

44.     Under the Arch Operating Agreement, in the event written notice of a Cause Event is delivered to JJ Arch, JJ Arch may be removed effective ten (10) business days after such delivery, or at such later date or as specified in such notice. (Exhibit 1, Arch Operating Agreement, p. 20, ¶ 7.1.4.)

**CHASSEN'S MISCONDUCT**

**Chassen Placed His Interests, and Those of His Family and Friends, Above Those of JJ Arch**

45.     In or about July 2023, Chassen acknowledged that his duties and role could not be compensated at the same level as previously, due to higher interest rates and a slowdown in business, and Arch would not be able to afford to pay Simpson, Chassen, and other key employees

their full salaries, and Simpson asked Chassen whether he would be willing to accept a substantial reduction in his pay in order to enable Arch to remain in its status quo rather than building up debt.

46.     Chassen initially indicated to Simpson that Chassen would be willing to take such a pay cut, although at the time he did not inform Simpson how large of a pay cut he would be willing to take.

47.     In or about early July 2023, Simpson asked Chassen how large of a pay reduction Chassen would agree to. Chassen repeatedly avoided answering Simpson's requests on this point.

48.     Finally, on or about August 2, 2023, Chassen informed Simpson that, in fact, Chassen would not be willing to accept any pay reduction.

### The Coup Begins

49.     Chassen, apparently working in concert with NJ Inc. and with several other employees of Arch, undertook a series of actions designed to steal control of Arch and JJ Arch from Simpson, in violation of Arch and JJ Arch's respective operating agreements. First, upon information and belief, at approximately 1:15 p.m. on Friday, August 4, 2023, Chassen contacted the bank at which Arch maintains its accounts, Defendant First Republic, and instructed First Republic to remove Simpson as an authorized signatory on all accounts he maintained with First Republic in either his corporate or individual capacity, including all bank accounts that the Arch Companies maintain with First Republic (the "Arch Accounts"), and also accounts Simpson maintained individually with no connection to the Arch Companies.

50.     Chassen was neither authorized to make this change, nor did he provide Simpson with any advance notice thereof.

51.     First Republic complied with Chassen's demand. First Republic informed Simpson that it no longer permits Simpson to make transactions from any of the accounts he maintains with First Republic in either his corporate or individual capacity, or, indeed, any other account on which

[938459/1]                              11

Simpson was the signatory, including the Arch Accounts, accounts on which he was the signatory on behalf of entities other than the Arch Companies, and his own individual accounts.

**The Forced Resignation of Chassen from Arch**

52.  On August 5, 2023, Simpson sent Chassen an email wherein Simpson provided him written notice that he had committed a Cause Event, and that accordingly, under the JJ Arch Amended Operating Agreement, Chassen ceased to be a member of JJ Arch. (*See* Exhibit 4 ["Notice to Chassen of Cause Event"].)

53.  Chassen had committed a Cause Event prior to the Notice to Chassen of Cause Event, in that Chassen had, without authority, acted to deprive Simpson of his ability to make transactions on the Arch Accounts and to seize that ability for himself.

54.  Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted willful misconduct in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

55.  Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a breach of fiduciary duty in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

56.  Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a misappropriation of funds of Arch, JJ Arch, and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

57.  Accordingly, the Notice of Chassen Cause Event triggered immediately Chassen's removal as a member of JJ Arch.

[938459/1]                                   12

## The Coup Continues

58.     Notwithstanding, Chassen proceeded in disregard of the Notice to Chassen of Cause Event. Specifically, over the weekend of August 5-6, 2023, the administrator of Arch's email and information technology systems, acting upon Chassen's instructions, locked Simpson out of his Arch Companies email account and all other Arch IT systems. Beginning no later than 5 p.m. on Sunday, August 6, 2023, Simpson no longer had access to his Arch Companies email account. At or about 10-11 a.m. on Monday, August 7, 2023, Simpson could no longer log onto his Arch-issued computer. As a result, Simpson could not obtain access to the business records of the Arch Companies, or the computer payroll program that Arch Companies use to pay their employees. Simpson was also locked out of the server hosting Arch Companies' web site, and Chassen made changes to such site, without Simpson's authorization, to remove references thereon to Simpson as a managing member.

59.     Chassen also retaliated for his removal as a member of JJ Arch by sending Simpson, by electronic mail, a signed letter on August 6, 2023, wherein he purported to inform Simpson that Simpson was required to resign pursuant to the JJ Arch Amended Operating Agreement ("Chassen 8/6/23 Letter"). The Chassen 8/6/23 Letter asserted that Simpson had committed multiple Cause Events, none of which had actually occurred, and asserted that, as a result, a resignation from JJ Arch had occurred on Simpson's part and Simpson was no longer a member of JJ Arch, nor did Simpson have any right to act on behalf of JJ Arch, Arch, or any subsidiary of JJ Arch.

60.     However, by the time of the Chassen 8/6/23 Letter, Chassen had already been removed as a member of JJ Arch pursuant to the Notice to Chassen of Cause Event. Accordingly, as noted above, Chassen could not, under the JJ Arch Amended Operating Agreement, trigger Simpson's own resignation by delivering to him a purported notice of Cause Event.

61.     Moreover, even if the Chassen 8/6/23 Letter had been effective as a notice of Cause Event, it was not sent to Simpson until after Chassen's instruction on August 4, 2023 to First Republic to strip Simpson of his signatory authority, so as of the time Chassen provided such instruction Simpson remained JJ Arch's managing member with exclusive authority over the Arch Companies' bank accounts, and Chassen's instruction was in violation of Arch's and JJ Arch's operating agreements.

62.     In addition, on August 6, 2023, NJ Inc., sent Simpson a letter (the "8/6/23 NJ Inc. Letter"), wherein NJ Inc. asserted that JJ Arch, through Simpson's actions, had committed multiple Cause Events under the Arch Operating Agreement, again none of which had actually occurred, and asserted that NJ Inc. reserved the right to remove JJ Arch as the managing member of Arch.

63.     In addition, Chassen arranged for the deactivation of the device Simpson uses to gain access to Arch's physical office located at 88 University Place, New York, New York 10003, such that when Simpson attempted to enter his office there at 9:00 a.m. on Monday, August 7, 2023, he was unable to do so.

64.     Upon information and belief, on or about August 7, 2023, after he had already been duly removed as a member of JJ Arch, Chassen sent an email to employees of Arch Companies in which he instructed them not to come into the office to work that day, and falsely informed them that Simpson was deemed to have resigned from his managerial roles with Arch Companies.  He further instructed employees to not respond to any outreach from Simpson. Even before his removal as a member of JJ Arch, Chassen had no authority to do so.

65.     Simpson has since been able to regain access to his physical office at Arch. However, he still has only limited access to Arch's computer system, and is still unable to gain access to Arch's bank accounts. Through counsel, he demanded that First Republic restore him as

a signatory on such accounts, and remove Chassen as a signatory. First Republic has refused to do so, and has advised Simpson that because it has "received conflicting instructions regarding the ownership and control" of such accounts, First Republic has placed a hold on those accounts, and will not permit any deposits or withdrawals from such accounts. (Exhibit 5, Letter from Christy Santoro, Preferred Banker at First Republic, to Jeffrey Simpson, dated Aug. 6, 2023, first page.) One hundred and fifty (150) accounts are subject to this hold. (*See id.*, second through fifth pages.) (Collectively, these are the "Arch Accounts.") These include accounts for Arch Companies, as well as accounts maintained for the purpose of holding monies held in trust for subcontractors, materialmen, and other persons involved in Arch Companies' construction projects who are beneficiaries under Article 3-A of the New York State Lien Law. First Republic has advised that it will not release the hold until it "receive[s] evidence satisfactory to us that there is no longer a dispute as to who has authority over the accounts" (*id.*, first page), or there is a court order requiring its release (*see* Exhibit 6, email from First Republic's in-house counsel to Plaintiffs' counsel).

66. Continuation of First Republic's hold on the Arch Companies' bank accounts would wreak havoc on the Arch Companies. Arch Companies would be unable to meet their payroll, inflicting hardship both on Arch Companies' employees, who number approximately 100, and on Arch Companies themselves when such employees ultimately leave their positions for employment with companies whose minority members are not sabotaging company finances in order to extract concessions.

67. With the hold on those bank accounts, Arch will also stand unable to pay its bills to vendors, such as insurance premiums (*see* Exhibit 7 hereto). Indeed, Arch Companies are now in default on many obligations as a result of their inability to make payments due to the hold. Arch

Companies would also be unable to pay rent and other bills, and to make payments on construction loans and to investors in Arch Companies.

68.     The bank accounts that are subject to First Republic's hold also include trust accounts under Article 3-A of the New York State Lien Law, which hold funds in trust for, among others, subcontractors and materialmen on construction projects being performed for Arch Company entities. Thus, the existing account hold prevents Arch Company entities from being able to pay their subcontractors and materialmen. This is doubly harmful to the Arch Companies, in that they now cannot pay those subcontractors and materialmen, which may cause them to cease performing their present construction work, and it also may dissuade them from performing projects for the Arch Companies in the future, out of fear that another, future frivolous dispute over company control may lead to another hold on Arch Companies' bank accounts and a recurrence of delays in paying them.

69.     With both Arch Companies' employees and their subcontractors leaving active job sites, there is a further risk that such sites will not be adequately staffed or supervised, or machinery there adequately maintained, creating a public safety risk that will result in injury to those remaining employees or subcontractors, and nearby members of the public.

70.     The aforesaid effects also endanger the general reputation of Arch Companies going forward, tarnishing it with the appearance that it cannot be trusted to fulfill its obligations.

71.     Another consequence of the coup perpetrated by Chassen is that Last, Arch's managing director, has resigned from her position with Arch on or about August 7, 2023, in response to said coup. Consequently, Arch has lost the benefit of Last's performance.

72.     In addition, Chassen and Computero Inc. ("Computero"), the outside company acting as Arch's information technology consultant, have colluded to deny Simpson access to his

Arch company email account. Computero first disregarded his instructions to remove Chassen's access to Arch's computer network and his Arch email account beginning shortly before the time Simpson provided the Notice to Chassen of Cause Event, then cut off Simpson's access to the Arch computer network and his Arch email account. Then, after Simpson made repeated requests to regain access to his email account, Computero restored his email access on the evening of Wednesday, August 9. However, approximately one hour after his email access was reinstated, it was again cut off, this time ostensibly by Microsoft. However, Chassen was Microsoft's only contact person at Arch Companies, and thus the only person who could have instructed Microsoft to cut off Simpson's email access. Simpson remains unable to gain access to his Arch email account, and thus unable to receive or respond to email communications from Arch's many employees.

73.     In addition, Simpson's access to Dropbox has not been restored, thus making it impossible for him to view the Arch Companies' internal documents, which are stored in Dropbox. Also, Chassen has engineered a situation in which he is the only contact person for the domain company that hosts Arch Companies' web site. Thus, Simpson cannot communicate with the domain company in order to update the web site, including restoring references to himself as the managing member and removing those to Chassen as a continuing employee and member of the Arch Companies following his resignation.

74.     The combined loss of email and Dropbox access have left Simpson, as the chief managerial figure at Arch Companies, effectively blind (unable to view documents) and deaf and mute (unable to communicate with the Arch Companies' employees, or with the public through Arch Companies' web site). This has rendered him unable to exercise his authority as managing member of JJ Arch, and left the Arch Companies as a rudderless ship.

[938459/1]                                    17

## AS AND FOR A FIRST CAUSE OF ACTION

**(Breach of the Amended JJ Arch Operating Agreement, Brought by Arch and by Simpson, Against Defendant Chassen)**

75.     Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

76.     The Amended JJ Arch Operating Agreement is a valid and binding agreement between Simpson and Chassen.

77.     The Amended JJ Arch Operating Agreement is supported by valuable consideration.

78.     Arch is expressly mentioned in the Amended JJ Arch Operating Agreement and defined therein as an "Investment Entity".

79.     Paragraph 3.1 of the Amended JJ Arch Operating Agreement sets forth powers that Simpson has with regard to matters which JJ Arch has the authority to perform "indirectly through an Investment Entity," *i.e.*, through Arch.

80.     The Amended JJ Arch Operating Agreement was intended for Arch's benefit.

81.     The benefit to Arch from the Amended JJ Arch Operating Agreement is sufficiently immediate to indicate the assumption by the contracting parties of a duty to compensate Arch if the benefit is lost.

82.     Arch is a third-party beneficiary of the Amended JJ Arch Operating Agreement.

83.     Chassen materially breached the Amended JJ Arch Operating Agreement by conducting, managing, and controlling the affairs and business of JJ Arch, when, under ¶ 3.1(i) of the Amended JJ Arch Operating Agreement, only Simpson had the authority to do so.

84.     Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to conduct, manage, and control the affairs

[938459/1]                                              18

of Arch Entities, and, so long as a hold remains on the Arch Companies' bank accounts, he will continue to suffer a diminished ability to conduct, manage, and control the affairs of JJ Arch and of Arch.

85. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that such breach has resulted in the resignation of Last and the loss of the value of her work to Arch; so long as a hold remains on the Arch Companies' bank accounts, it will be unable to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers; and Arch is likely to suffer reputational harm in the future.

86. Chassen materially breached ¶ 3.1(ii) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to control the Arch Companies' bank accounts and draw checks thereon, and transferring such authority to himself.

87. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to control the Arch Companies' bank accounts and draw checks thereon, and such injury will continue into the future so long as a hold remains on the Arch Companies' bank accounts.

88. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

89. Chassen materially breached ¶ 3.1(vi) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to withdraw, pay, and distribute the funds of Arch Companies, and transferring such authority to himself.

[938459/1]                                    19

90.     Simpson has been injured by this breach of the Amended JJ Arch Operating
Agreement, in that it has caused him to lose the ability to withdraw, pay, and distribute the funds
of Arch Companies, and such injury will continue into the future so long as a hold remains on the
Arch Companies' bank accounts.

91.     Arch has been injured by this breach of the Amended JJ Arch Operating Agreement,
in that Arch has lost the ability to meet its financial obligations, including but not limited to paying
its employees and vendors, including but not limited to its insurers. Arch will continue to suffer
such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to
suffer reputational harm in the future.

92.     Chassen materially breached the "Resignation" provision of § 1.1 of the Amended
JJ Arch Operating Agreement by purporting to deliver a notice of Cause Event to Simpson, when,
by the time he had done so, Chassen had been removed as a member of JJ Arch, and thus had no
authority to do so, and when the purported Cause Events set forth in such notice had not occurred.

93.     Simpson has been injured by this breach of the Amended JJ Arch Operating
Agreement, in that Chassen has used it as a pretext to continue to conduct, manage, and control
the affairs of Arch Entities, to the exclusion of Simpson.

94.     Arch has been injured by this breach of the Amended JJ Arch Operating Agreement,
in that, with Chassen having using it as a pretext to dispute, to First Republic, Simpson's authority
to control Arch Companies' bank accounts with First Republic, a hold has been placed on such
accounts, and Arch has lost the ability to meet its financial obligations, including but not limited
to paying its employees and vendors, including but not limited to its insurers. Arch will continue
to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch
is likely to suffer reputational harm in the future.

[938459/1]                          20

95.     By law, the Amended JJ Arch Operating Agreement contains an implied covenant of good faith and fair dealing, pursuant to which Chassen had an obligation not to act in such a manner as to injure Simpson's rights to receive the fruits of said agreement or to prevent Simpson from performing his duties under said agreement.

96.     Chassen prevented Simpson from performing his duties under the Amended JJ Arch Operating Agreement by acting so as to deny Simpson:

(a)     the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;

(b)     physical access to his office;

(c)     the use of Simpson's email account to communicate with employees of the Arch Companies;

(d)     the use of Dropbox to obtain access to the Arch Companies' corporate documents; and

(e)     the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

97.     Chassen prevented Simpson from receiving the fruits of the Amended JJ Arch Operating Agreement by purporting to terminate, upon false pretenses and without authority to do so, Simpson's role as managing member of JJ Arch by sending the Chassen 8/6/23 Letter.

98.     By his aforesaid conduct, Chassen has injured Simpson's rights to receive the fruits of the Amended JJ Arch Operating Agreement and prevented Simpson from performing his duties under said agreement.

99.     By his aforesaid conduct, Chassen has breached the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

[938459/1]                    21

100.     For the reasons set forth above, Simpson and JJ Arch have been injured by Chassen's breach of the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

101.      Simpson has complied with the Amended JJ Arch Operating Agreement in all respects.

102.     As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

103.     In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

104.     Simpson and Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty, Brought by JJ Arch and by Simpson, Against Defendant Chassen)

105.     Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

106.     Chassen, as a member of JJ Arch, had a fiduciary duty to JJ Arch and to the other member of JJ Arch, Simpson.

107.     Chassen had a duty of loyalty to JJ Arch and to Simpson.

108.     This duty of loyalty obligated Chassen to act in the best interests of JJ Arch and Simpson, and not to pursue Chassen's own personal interest at the expense of the well-being of JJ Arch and Simpson.

[938459/1]                          22

109.     Chassen engaged in misconduct by numerous means, including but not limited to by acting so as to deny Simpson:

(a)     the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;

(b)     physical access to his office;

(c)     the use of Simpson's email account to communicate with employees of the Arch Companies;

(d)     the use of Dropbox to obtain access to the Arch Companies' corporate documents; and

(e)     the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

110.     Chassen's misconduct resulted directly in damages to Simpson, in that it deprived Simpson of the ability to manage the Arch Companies' finances, gain access to his office, communicate with the Arch Companies' employees, gain access to Arch Companies' corporate documents, and manage the Arch Companies' web site.

111.     Chassen's misconduct resulted directly in damages to JJ Arch, in that it made it impossible for Simpson to pay financial obligations of JJ Arch, communicate with the Arch Companies' employees through email, and gain access to Arch Companies' corporate documents, and it made it impossible for anyone at Arch Companies, other than Chassen, who had already been duly removed from JJ Arch, to manage the Arch Companies' web site.

112.     By seizing control of JJ Arch in violation of the JJ Arch Amended Operating Agreement, and by conducting himself, as a member of JJ Arch, in a manner that placed his own

interests and those of his personal associates above those of JJ Arch and Simpson, Chassen breached his duty of loyalty.

113.    Simpson has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, as set forth above.

114.    JJ Arch has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, in that such conduct has caused economic harm to Arch as set forth above, and is expected to continue to cause such harm in the future, by virtue of present and expected future decreases in the value of JJ Arch's equity interest in Arch and decreases in the distributions JJ Arch is to receive from Arch.

115.    As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

116.    In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

117.    Simpson and JJ Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

### AS AND FOR A THIRD CAUSE OF ACTION

**(Conversion, Brought by All Plaintiffs Against Defendant Chassen)**

118.    Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

119.    The funds Arch Companies have on deposit in the Arch Accounts ("Arch Companies Funds") belong to Arch Companies.

120.    Simpson, Arch, and JJ Arch have an immediate superior right of possession, relative to Chassen, to the Arch Companies Funds.

121.    The Arch Companies Funds are personal property.

122.    The Arch Companies Funds are specific, identifiable funds.

123.    Chassen, intentionally and without authority, acted to deprive Simpson of Simpson's authority, under the JJ Arch Amended Operating Agreement and the Arch Operating Agreement, to possess and control the Arch Companies Funds.

124.    Chassen has exercised unauthorized dominion over the Arch Companies Funds to the exclusion of the rights of Simpson, Arch, and JJ Arch.

125.    Chassen has an obligation to return control over the Arch Companies Funds to Simpson, Arch, and JJ Arch, but has not done so.

126.    As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

127.    In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

128.    As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

129.    Simpson, Arch, and JJ Arch have been injured, and continue to be injured, by Chassen's conversion of the Arch Companies Funds, in an amount to be determined at trial.

FILED: NEW YORK COUNTY CLERK 06/25/2024 11:23 AM
NYSCEF DOC. NO. 1

INDEX NO. 652988/2023
RECEIVED NYSCEF: 06/25/2024

24-01338, Doc 113, Filed 04/08/24, Entered 04/08/24 09:45:20, Main Document
Pg 37 of 363

## AS AND FOR A FOURTH CAUSE OF ACTION

**(Tortious Interference with Contractual Relations, Brought by Arch and JJ Arch Against Chassen)**

130.     Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

131.     Arch and JJ Arch have a valid and binding contract with a third party, *i.e.*, First Republic, pursuant to which JJ Arch, Arch, and the other Arch Companies deposit funds in bank accounts maintained by First Republic (the Arch Companies Funds), and First Republic holds such funds for the benefit of JJ Arch, Arch, and the other Arch Companies (the "First Republic Agreement").

132.     Pursuant to the First Republic Agreement, the Arch Companies Funds may be spent and distributed by a person duly authorized by JJ Arch.

133.     The sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds is Simpson.

134.     At all relevant times, Chassen knew of the First Republic Agreement, and that Simpson was the sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

135.     Chassen is a non-party to the First Republic Agreement.

136.     Chassen intentionally procured the breach, by First Republic, of the First Republic Agreement, by misrepresenting to First Republic that Chassen, and not Simpson, is the person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

137.     Arch and JJ Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result Simpson has been unable to spend, distribute, or otherwise control the Arch Companies Funds, on behalf of Arch and JJ Arch, as the

duly authorized person pursuant to the First Republic Agreement, and pursuant to his authority under the Arch Operating Agreement and the JJ Arch Amended Operating Agreement.

138.    JJ Arch and Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result, as set forth above, they have been, and remain, unable to fulfill their obligations to others, including but not limited to their employees, vendors, subcontractors, and materialmen, and as a result, those persons may cease performing services for JJ Arch and Arch, and JJ Arch and Arch may incur further obligations to those persons or to other persons in the future, or having difficulty in the future finding other persons who will be willing to work for or contract with them.

139.    Chassen's actions constitute tortious interference with the First Republic Agreement.

140.    As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

141.    In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

142.    As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

143.    Arch and JJ Arch have been injured, and continue to be injured, by Chassen's tortious interference with the Arch Contracts, in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION

### (Declaratory Judgment, Brought by All Plaintiffs, Against Chassen)

144.   Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

145.   There is a justiciable controversy between Plaintiffs on the one hand, and Chassen on the other, as to whether

(a)   the Notice to Chassen of Cause Event removed Chassen as a member of JJ Arch; and

(b)   the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch.

146.   Plaintiffs have taken the position that the Notice of Chassen of Cause Event removed Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter did not remove Simpson as a member of JJ Arch.

147.   Chassen has taken the position that the Notice of Chassen of Cause Event did not remove Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch. However, both positions taken by Chassen are incorrect.

148.   The aforesaid dispute between the parties represents a genuine, concrete dispute involving substantial legal interests.

149.   As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

150.   In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

151.    As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

152.    Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to resolve the aforesaid dispute.

153.    There is no adequate remedy at law.

### AS AND FOR A SIXTH CAUSE OF ACTION

**(Declaratory Judgment, Brought by All Plaintiffs, Against Chassen and First Republic)**

154.    Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

155.    There is a justiciable controversy between Plaintiffs on the one hand, and Defendants on the other, as to whether Simpson or Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and whether the hold on the Arch Accounts should be removed.

156.    Plaintiffs have taken the position that Simpson is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and the hold on the Arch Accounts must be released.

157.    Chassen has taken the position that Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts. However, the position taken by Chassen is incorrect.

158.    First Republic has taken the position that it cannot determine whether Simpson or Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and that the hold should remain on the Arch Accounts. However, the position taken by First Republic is incorrect.

[938459/1]                                              29

159.     The aforesaid dispute among the parties represents a genuine, concrete dispute involving substantial legal interests.

160.     As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

161.     In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

162.     As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

163.     Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to resolve the aforesaid dispute.

164.     There is no adequate remedy at law.

## AS AND FOR A SEVENTH CAUSE OF ACTION

### (Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen and First Republic)

165.     Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

166.     Plaintiffs have a likelihood of success on the merits on their claim that Simpson has the right to control, on the behalf of JJ Arch and Arch, the Arch Accounts.

167.     In the event that the hold First Republic has placed on the Arch Accounts is not lifted immediately, and the right to control the Arch Accounts is not restored to Simpson, Plaintiffs, and third parties, will experience imminent and irreparable injury.

168.    Such injury will be in the form of Arch Companies being unable to pay their employees, resulting in economic harm to such employees, and at least some of such employees imminently leaving employment with the Arch Companies and seeking work elsewhere; lack of supervision on construction projects supervised by the Arch Companies, imminently resulting in physical injury to members of the public at the construction sites; Arch Companies being unable to pay subcontractors and materialmen on projects, imminently resulting in such subcontractors and materialmen ceasing work on the projects, again imminently resulting in physical injury to members of the public at unsupervised construction sites, as well as economic injury to the Arch Companies owning the project sites, due to delayed completion of projects; and long-term economic damage to Arch Companies, as future efforts at recruiting employees and contracting with third parties are hindered due to damage to Arch Companies' reputation due to a sustained inability to fulfill their obligations.

169.    The only way forward, therefore, to protect Arch Companies, their employees, subcontractors, materialmen, and vendors, and members of the public at large, is for the Court to order that First Republic release its hold on Arch Companies' bank accounts, and restore to Simpson his contractually guaranteed exclusive right to control the finances, and the checkbooks, of Arch Companies.

170.    The balance of the equities favors Plaintiffs.

171.    Plaintiffs are entitled to a preliminary and permanent injunction requiring First Republic, immediately, to lift the hold it has placed on the Arch Accounts, and to restore to Simpson the exclusive right to control the Arch Accounts on behalf of JJ Arch and Arch.

172.    There is no adequate remedy at law.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

### (Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen)

173. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

174. Plaintiffs have a likelihood of success on the merits of their claim that Simpson is entitled to have access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

175. In the event that Simpson is unable to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site, and Plaintiffs will suffer irreparable injury.

176. The balance of the equities favors Plaintiffs.

177. Plaintiffs are entitled to a preliminary and permanent injunction requiring Chassen to take, immediately, all actions necessary to enable Simpson to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

178. There is no adequate remedy at law.

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a) On the First Cause of Action, awarding damages to Arch and Simpson against Chassen in an amount to be determined at trial;

(b) On the Second Cause of Action, awarding damages to JJ Arch and Simpson against Chassen in an amount to be determined at trial;

(c) On the Third Cause of Action, awarding damages to all Plaintiffs against Chassen in an amount to be determined at trial;

(d)     On the Fourth Cause of Action, awarding damages to Arch and JJ Arch against Chassen in an amount to be determined at trial;

(e)     On the Fifth Cause of Action, declaring that Simpson remains the managing member of JJ Arch, and Chassen is no longer a member of JJ Arch;

(f)     On the Sixth Cause of Action, declaring that Simpson is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and the hold on the Arch Accounts must be released;

(g)     On the Seventh Cause of Action, issuing a preliminary and permanent injunction First Republic, immediately, to lift the hold it has placed on the Arch Accounts, and to restore to Simpson the exclusive right to control the Arch Accounts on behalf of JJ Arch and Arch; and

(h)     On the Eighth Cause of Action, issuing a preliminary and permanent injunction requiring Chassen to take, immediately, all actions necessary to enable Simpson to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site;

(i)     Together with interest, costs, disbursements, and attorneys' fees, and such other and further relief as to the Court may seem just.

Dated: New York, New York
        August 14, 2023

                     Yours, etc.

                     ADAM LEITMAN BAILEY, P.C.

                     By: _____
                         Adam Leitman Bailey, Esq.

[938459/1]            33

FILED: NEW YORK COUNTY CLERK 06/25/2024 11:23 AM
NYSCEF DOC. NO. 1

INDEX NO. 158288/2024

RECEIVED NYSCEF: 06/25/2024

24-01336, In 24-0011139, Filed 04/08/24, Entered 04/08/24 09:45:30, Main Document
Pg 45 of 363

Brandon M. Zlotnick, Esq.
One Battery Park Plaza, 18th Floor
New York, NY 10004
Phone: (212) 825-0365
*Attorneys for Plaintiffs*

[938459/1]                                   34

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC, suing
derivatively as managing member of ARCH REAL
ESTATE HOLDINGS LLC, and JJ ARCH LLC,

*Plaintiffs-Counter-Claim
Defendants*,

- against -

Index No. 158055/2023

JARED CHASSEN, individually and derivatively on
behalf of JJ ARCH LLC, as member, and derivatively
on behalf of ARCH REAL ESTATE HOLDINGS
LLC, as member of JJ ARCH,

*Defendant/Counter-Claim
Plaintiffs*

FIRST REPUBLIC BANK,

*Defendant*

---

### DEFENDANT JARED CHASSEN'S VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT AND COUNTER-CLAIMS

Defendant Jared Chassen ("Chassen" or "Defendant"), by and through his undersigned counsel, for his verified answer to Plaintiff Jeffrey Simpson's ("Simpson" or "Plaintiff") complaint answers and alleges to each of Plaintiff's allegations in the Complaint, quoted herein followed by Defendant's answer in bold font, as well as for his affirmative defenses, and counter-claims, as follows:

NATURE OF THE ACTION

1.      This action is brought by Plaintiffs to undo a coup d'état executed by Defendant Jared Chassen ("Chassen") in an effort to seize, from Plaintiff Jeffrey Simpson ("Simpson"), control over Plaintiff entities Arch Real Estate Holdings LLC ("Arch") and JJ Arch LLC ("JJ

1

Arch") (collectively, Arch and JJ Arch are the "Arch Entities"). In addition, Plaintiffs seek to redress one of Chassen's successes in his efforts to wrest control of the Arch Entities from Simpson, *i.e.*, Chassen's inducement of a stalemate that has left Simpson unable to exercise control over bank accounts maintained by Arch Entities and their affiliates and subsidiaries at Defendant First Republic Bank ("First Republic"), which has left Arch Entities unable to use such accounts to pay for such necessities as payroll, subcontractors, materialmen, and insurance. Plaintiffs also seek to require Chassen to act to restore Simpson's access to his company email account with Arch Entities, to the Dropbox account where Arch Entities' documents are stored, and Simpsons' ability to communicate with the domain company that hosts Arch Entities' web site.

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations as to Plaintiff's motives in commencing the action, and otherwise denies the allegations in paragraph 1.**

2.      Plaintiff Simpson is a natural person who resides in the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 2.**

3.      Plaintiff Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 3.**

4.       Arch is a real estate investment management, construction management, property management, and development company.

**Answer: Defendant admits the allegations in paragraph 4.**

5.       Plaintiff JJ Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 5.**

6.       Defendant Chassen is a natural person who resides in the State of New York, County of Kings.

**Answer: Defendant admits that he is a natural person who resides in the State of New York, but denies that he resides in the County of Kings.**

7.       Defendant First Republic is a nationally chartered bank that maintains offices for the transaction of business in, among other places, the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 7.**

## FACTS APPLICABLE TO ALL CAUSES OF ACTION
## BACKGROUND

### Simpson's Tenure at Greystone

8.      Simpson grew up under modest economic circumstances in Lakewood, New Jersey. His father, who was a public planning, zoning, and construction official, passed away when Simpson was 22. For four consecutive generations including his own, Simpson's family has been in the construction business.

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations in paragraph 8.**

9.      Prior to 2017 and the start of Arch, Simpson worked for eleven (11) years at Greystone Development ("Greystone Development"), a property development company within a host of companies under the "Greystone" umbrella that performed functions related to real estate investment, capital raising, financing, development, construction, management, leasing, and sales. For the last five of those years, Simpson was the Chief Executive Officer of Greystone Development. By the time he left Greystone Development, he was supervising approximately thirty (30) employees at Greystone Development, with a total payroll of approximately $5 million. The total project volume was over $2 billion, and involved properties located in New York, Miami, and California. While he was there, he also was responsible for raising several large capital initiatives for real estate investing in multi-family housing in the southeastern United States with an institutional partner, individual loan origination on complex assignments, and capital raising for structured finance.

**Answer: Defendant admits that Plaintiff worked at Greystone, and held the role of Chief Executive Officer of Greystone Development, but lacks information sufficient to form a belief as to the truth of the remaining allegations in paragraph 9.**

10.      One employee Simpson supervised at Greystone Development was Chassen. Simpson originally hired Chassen at Greystone Development to replace an administrative assistant at Greystone Development. Once hired, Chassen performed the same duties as that administrative assistant, for the same salary as she had earned. Over time, Chassen took on other responsibilities, including helping to source properties, equity, and debt. Throughout his time at Greystone Development, Chassen reported to Simpson.

**Answer: Defendant admits that he worked for Simpson at Greystone but otherwise denies the characterization of his role at Greystone as contained in paragraph 10.**

11.      Another employee Simpson supervised at Greystone was nonparty Tristan Last ("Last"). "). Last was formerly of Brookfield with a MBA from Cornell University. She was hired as an acquisitions associate and quickly was promoted to the Director of Investments.

**Answer: Defendant admits that Tristan Last was an employee at Greystone who Simpson supervised, and had the title of Director of Investments, and otherwise lacks information sufficient to form a belief as to the truth of the allegations in paragraph 11.**

12.     A third employee Simpson supervised at Greystone was nonparty Michelle Miller ("Miller"). She was also an analyst. Miller started at Greystone Development as an intern, as a career switcher to real estate following the completion of her MBA from Northwestern. She was eventually hired full time as an analyst and grew in her role over time.

**Answer: Defendant admits that Michelle Miller was an employee at Greystone who Simpson supervised and who started as intern, but otherwise lacks information sufficient to form a belief as the truth of the allegations in paragraph 12.**

<u>Simpson's Formation of Arch and JJ Arch</u>

13.     In 2017, Simpson left Greystone Development on amicable terms with that company, and formed a new company, Plaintiff Arch.

**Answer: Defendant denies the allegations in paragraph 13, except that he admits that Simpson formed JJ Arch together with Chassen.**

14.     The original business address for Arch was Simpson's personal residence address at the time.

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations in paragraph 14.**

15.     At all times since the formation of Arch, eighty percent (80%) of the membership interest in Arch has been held by Plaintiff JJ Arch, which is the managing member of Arch. (*See* Exhibit 1, Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC ["Arch Operating Agreement"], p. 17, §§ 6.1-6.2 [providing for distributions of cash flow and acquisition fees of 80% to "JJ Member" and 20% to "Investor Member"]; *id.* p. 1 preamble [defining JJ Arch LLC as "JJ Member"]; *id.* § 1.1, p. 7 [defining "Managing Member" as JJ Member].)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 15.**

16.     At all times since the formation of Arch, the remaining twenty percent (20%) of the membership interest in Arch has been held by 608941 NJ Inc., a New Jersey corporation ("NJ Inc."), which is the investor member of Arch. (*See* Exhibit 1, Arch Operating Agreement, p. 17, §§ 6.1-6.2; *id.* p. 1 preamble [defining NJ Inc. as "Investor Member"].) NJ Inc. made an investment of approximately $50 million in Arch, but has no authority to control the operation of Arch's business.

4

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 16.**

17.     Since the formation of JJ Arch, Simpson has been the managing member of JJ Arch and has held a majority of the membership interest in JJ Arch.

**Answer: Defendant admits that Simpson was the managing member at the time JJ Arch was formed, and held a majority of the membership interests, and for four years thereafter, but otherwise denies the allegations in paragraph 17.**

18.     From the formation of JJ Arch until his forced resignation from his membership therein effective August 5, 2023, as discussed below, Chassen was a member of JJ Arch and held a minority of the membership interest in JJ Arch, and his job started out as administrative in nature.

**Answer: Defendant denies the allegations in paragraph 18.**

19.     Simpson and Chassen are the only persons who have ever been members of JJ Arch.

**Answer: Defendant admits the allegations in paragraph 19.**

<u>The Arch Companies' Growth Under Simpson's Leadership</u>

20.     Through JJ Arch, the managing member of Arch, Simpson has run all of Arch's businesses since the inception.

**Answer: Defendant denies the allegations in paragraph 20.**

21.     By 2022, five years after Simpson formed Arch with no assets, Arch had owned and invested in over $1 billion in assets.

**Answer: Defendant denies the allegations in paragraph 21 insofar as it alleges that Arch was formed with no assets, or that Simpson formed Arch, but admits that Arch owned over $1 billion in assets in 2022.**

22.     Arch has several affiliated companies, including a property management company, advising company, construction company, and asset management company, each of which provides services relating to real properties that Arch controls.

 **Answer: Defendant admits the allegations in paragraph 22.**

23.     Together, Arch and its affiliated companies have a total of approximately 100 employees. (Collectively, Arch Entities and Arch's affiliated companies are the "Arch Companies.")

**Answer: Defendant admits the allegations in paragraph 23.**

24.    The licenses and permits for each of the construction projects performed by the Arch Companies are in Simpson's name, as a licensed general contractor.

**Answer: Defendant denies the allegations in paragraph 24.**

25.    Simpson holds responsibility for managing Arch Companies' commercial real estate construction projects and coordinating licensing and permitting matters.

**Answer: Defendant denies the allegations in paragraph 25.**


<u>Chassen's Role with the Arch Companies</u>

26.    With Greystone's permission, Simpsons brought three Greystone Development employees with him to work at Arch, *i.e.*, Chassen, Last, and Miller.

**Answer: Defendant denies that Simpson brought Chassen to work with him at Arch, which he formed together with Simpson, but admits that Last and Miller were brought by Simpson and Chassen to work at JJ Arch.**

27.    From the formation of JJ Arch and Arch, Chassen has been a minority member in JJ Arch, and thus has not had the authority to exercise control over Arch as Arch's managing member.

**Answer: Defendant admits that Simpson was the majority or managing member at the formation of JJ Arch and Arch, but denies that Chassen has not had authority to exercise control over JJ Arch as JJ Arch's managing member since.**

28.    While the initial plan was for Chassen ultimately to become co-managing member, with Simpson, of JJ Arch, and thus share in Simpson's authority to control JJ Arch's exercise of its authority as managing member of Arch, Chassen's performance did not warrant this expansion of his authority, and Chassen consented to remain in his role as a minority member of JJ Arch on or about May 22, 2021.

**Answer: Defendant admits that Chassen was to become a co-managing member under the Operating Agreement, and otherwise denies the allegations in paragraph 28.**

29.    The original plan, at the time JJ Arch was formed, was that Simpson was to be its managing member, with the authority to manage, arrange, and cause to be coordinated the business, affairs, and assets of JJ Arch. (Exhibit 2, JJ Arch Limited Liability Company Operating Agreement ["JJ Arch Original Operating Agreement"], p. 7, ¶ 3.1(a).) This was to be the case prior to the fourth anniversary of JJ Arch's operating agreement, *i.e.*, December 11, 2021. (*Id.*)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 29.**

30.     However, following the fourth anniversary of the operating agreement, both Simpson and Chassen were to act as managing members of JJ Arch, with each of them holding the authority to manage, arrange, and cause to be coordinated JJ Arch's business, affairs, and assets. (Exhibit 2, JJ Arch Original Operating Agreement, p. 9 § 3.2.)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 30.**

31.     In addition, the JJ Arch Original Operating Agreement provided Chassen with a veto over certain decisions or actions with regard to JJ Arch even prior to the fourth anniversary of the JJ Arch Original Operating Agreement, such that Simpson could make certain decisions defined as "Company Major Decisions" only if he had Chassen's prior written consent. These actions included, among others, selling any asset of Arch Entities, borrowing or raising monies on behalf of Arch Entities, mortgaging Arch Entities' properties, Arch Entities' entering into any lease of space, and hiring any employee, consultant, or other personnel for Arch Entities. (*See* Exhibit 2, JJ Arch Original Operating Agreement, pp. 8-9, ¶¶ 3.1(b)(iii), (v)-(viii); *see also id.* p. 8 ¶ 3.1(b) [stating that "any action or decision that would constitute a Company Majority Decision shall be a Company Major Decision if made or taken by any Investment Entity"]; *id.* p. 4 [defining "Investment Entity" as including "AREH"]; *id.* p. 1 [defining "AREH" as Arch].)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 31.**

32.     On the other hand, Simpson could take other actions without Chassen's consent, including but not limited to conducting, managing, and controlling the affairs and business of Arch Entities; opening, maintaining and closing bank accounts and drawing checks; bringing legal actions on claims of Arch Entities; and depositing, withdrawing, investing, paying, retaining, and distributing Arch Entities' funds in a manner consistent with the provisions of the JJ Arch Original Operating Agreement. (Exhibit 2, JJ Arch Original Operating Agreement, pp. 7-8 ¶¶ 3.1(a)(i)-(ii), (v)-(vi).)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 32.**

33.     However, prior to the fourth anniversary of the JJ Arch Original Operating Agreement, Simpson had a discussion with Chassen, and informed him that Simpson did not believe Chassen had sufficient acumen in the business to be a co-managing member of JJ Arch and, by virtue of JJ Arch's managing membership in Arch, a co-managing member of Arch. Chassen agreed with Simpson about this.

**Answer: Defendant denies the allegations in paragraph 33.**

7

34.      JJ Arch's operating agreement was thus amended, with Chassen's consent, on or
about May 22, 2021. The amendment removed the authority that Chassen would have had,
following the fourth anniversary of the JJ Arch Original Operating Agreement, to manage,
arrange, and cause to be coordinated the business, affairs and assets of JJ Arch. (Exhibit 3, JJ
Arch LLC Agreement Amendment No. 1, p. 3 ¶ 2(d) [deleting § 3.2 of the JJ Arch Original
Operating Agreement].) (The JJ Arch Original Operating Agreement, as amended by JJ Arch
LLC Agreement Amendment No. 1, shall be referred to as the "JJ Arch Amended Operating
Agreement".) Thus, Chassen never had such authority. Because the list of actions and decisions
for which Chassen's consent was required, *i.e.*, the "Company Major Decisions," remained
effective only until the fourth anniversary of the JJ Arch Original Operating Agreement
(*compare id.* p. 3 § 2(d) [new § 3.2] *with* Exhibit 2, JJ Arch Original Operating Agreement, p. 8
¶ 3.1(b)), this meant that Chassen would lose, and ultimately did lose, his right to refuse consent
to Company Major Decisions after that anniversary, which occurred in December 2021.

**Answer: Defendant refers the Court to the original documents for their true contents and
otherwise denies the allegations in paragraph 32.**

35.      In addition, JJ Arch's operating agreement was amended to bar Chassen from
becoming an equal equity owner in JJ Arch. When JJ Arch was formed, it was agreed that my
share of JJ Arch's distributions, which would initially be 66.6667%, would decrease, and
Chassen's share of JJ Arch's distributions, which would initially be 33.3333%, would
commensurately increase, on an annual basis, such that, by the fourth anniversary of the
operating agreement, *i.e.*, December 11, 2021, each of them would receive equal 50% shares of
the distributions. (Exhibit 2, JJ Arch Original Operating Agreement, p. 4 § 1.1, Definition of
"Distribution Percentages"; *id.* p. 12 ¶ 5.1(a)(ii); *id.* Exhibit A.)

**Answer: Defendant refers the Court to the original documents for their true contents and
otherwise denies the allegations in paragraph 35.**

36.      However, JJ Arch's operating agreement was amended, with Chassen's consent
and as part of JJ Arch LLC Agreement Amendment No. 1 (the same amendment as discussed
above), to provide that, indefinitely, Simpson is to receive 50.1% of the distributions from JJ
Arch, and Chassen is to receive 49.9% of the distributions from JJ Arch. (Exhibit 3, JJ Arch LLC
Agreement Amendment No. 1, p. 1 ¶ 2(a).)

**Answer: Defendant refers the Court to the original documents for their true contents and
otherwise denies the allegations in paragraph 36.**

37.      In addition, Arch's operating agreement provides that "the business, affairs and
assets of [Arch] shall be managed, arranged and caused to be coordinated by Managing Member,
who shall have, except as otherwise provided in [the operating agreement] (including, but not
limited to, in Section 7.1.3), full, exclusive and complete discretion with respect thereto."
(Exhibit 1, Arch Operating Agreement, p. 17, ¶ 7.1.1.) The Managing Member, *i.e.*, JJ Arch, has
"the unilateral power and authority acting in good faith to make and implement all decisions with
respect to all matters which [Arch] has the authority to perform both directly and indirectly
through one or more Subsidiaries" (*id.* p. 18 ¶ 7.1.1), including, *inter alia*, those to "conduct,

8

manage and control the affairs and business of [Arch]" (*id.* p. 18 ¶ 7.1.1(i)); "open, maintain and close bank accounts and drew checks or other orders for the payment of monies" (*id.* ¶ 7.1.1(ii)); "deposit, withdraw, invest, pay, retain and distribute [Arch's] funds in a manner consistent with the provisions of [the Arch Operating Agreement]) (*id.* ¶ 7.1.1(vi)); and "bring or defend . . . resort to legal action, or otherwise adjust claims . . . of [Arch]" (*id.* ¶ 7.1.1(v)).

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 37.**

38.     Thus, at all times Simpson has been, and remains, the managing member of JJ Arch, and Simpson has always had exclusive authority to, *inter alia*, open, maintain, and close bank accounts on behalf of Arch Entities; to draw checks on those accounts; to deposit, withdraw, pay, and distribute Arch Entities' funds; and to bring legal actions on behalf of the Arch Entities.

**Answer:     Defendant denies the allegations in paragraph 38.**

39.     Chassen worked for Arch, and reported to Simpson. Simpson had the authority to give Chassen work assignments to do for Arch, and to take Arch work assignments away from Chassen.

**Answer: Defendant admits that he is a member of JJ Arch and that he works for JJ Arch and otherwise denies the allegations in paragraph 39.**

40.     Until the events beginning August 4, 2023, as set forth below, Last had served as managing director of Arch.

**Answer: Defendant denies the allegations in paragraph 40.**

<u>Means of Removing Members of Arch and JJ Arch</u>

41.     Under both the Arch Operating Agreement and the JJ Arch Amended Operating Agreement, members may be removed, on certain enumerated grounds, through a process that is initiated by the occurrence of a "Cause Event." The Arch Operating Agreement provides an enumerated list of eight acts, the commission of which, by the managing member, serves as a "Cause Event." (*See* Exhibit 1, Arch Operating Agreement, pp. 4-5, § 1.1, definition of "Cause Event".) The JJ Arch Amended Operating Agreement extends this definition of "Cause Event" to any member of JJ Arch. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 3, § 1.1, definition of "Cause Event.")

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 41.**

42. The acts constituting "Cause Event[s]" include, but are not limited to, "willful misconduct in relation to the business or affairs of [Arch] or a Subsidiary," "breach of fiduciary duty in relation to the business or affairs of [Arch] or a Subsidiary," and "misappropriation of

9

[Arch] or Subsidiary funds or property." (Exhibit 1, Arch Operating Agreement, § 1.1, pp. 4-5, Definition of "Cause Event.").

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 42.**

43.     Under the JJ Arch Operating Agreement, a member in JJ Arch is required to resign if a Cause Event has occurred with respect to such member, and the other member has delivered written notice thereof to that member. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 5, § 1.1, definition of "Resignation.") Notably, only "the other Member" may deliver such notice (*id.*); accordingly, only a current member of JJ Arch could trigger a member's resignation through delivering notice of a Cause Event. Upon such Resignation, that member is no longer deemed a "member" of JJ Arch, and "shall not be entitled to any rights as a Member of the Company for any period from and after such Resignation." (*Id.*, p. 15, § 7.5(a).)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 43.**

44.     Under the Arch Operating Agreement, in the event written notice of a Cause Event is delivered to JJ Arch, JJ Arch may be removed effective ten (10) business days after such delivery, or at such later date or as specified in such notice. (Exhibit 1, Arch Operating Agreement, p. 20, ¶ 7.1.4.)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 44.**

<u>CHASSEN'S MISCONDUCT</u>

<u>Chassen Placed His Interests, and Those of His Family and Friends, Above Those of JJ Arch</u>

45.     In or about July 2023, Chassen acknowledged that his duties and role could not be compensated at the same level as previously, due to higher interest rates and a slowdown in business, and Arch would not be able to afford to pay Simpson, Chassen, and other key employees their full salaries, and Simpson asked Chassen whether he would be willing to accept a substantial reduction in his pay in order to enable Arch to remain in its status quo rather than building up debt.

**Answer: Defendant denies the allegations in paragraph 45.**

46.     Chassen initially indicated to Simpson that Chassen would be willing to take such a pay cut, although at the time he did not inform Simpson how large of a pay cut he would bewilling to take.

**Answer: Defendant denies the allegations in paragraph 46.**

47. In or about early July 2023, Simpson asked Chassen how large of a pay reduction Chassen would agree to. Chassen repeatedly avoided answering Simpson's requests on this point.

**Answer: Defendant denies the allegations in paragraph 47.**

48. Finally, on or about August 2, 2023, Chassen informed Simpson that, in fact, Chassen would not be willing to accept any pay reduction.

**Answer: Defendant denies the allegations in paragraph 48.**

<u>The Coup Begins</u>

49. Chassen, apparently working in concert with NJ Inc. and with several other employees of Arch, undertook a series of actions designed to steal control of Arch and JJ Arch from Simpson, in violation of Arch and JJ Arch's respective operating agreements. First, upon information and belief, at approximately 1:15 p.m. on Friday, August 4, 2023, Chassen contacted the bank at which Arch maintains its accounts, Defendant First Republic, and instructed First Republic to remove Simpson as an authorized signatory on all accounts he maintained with First Republic in either his corporate or individual capacity, including all bank accounts that the Arch Companies maintain with First Republic (the "Arch Accounts"), and also accounts Simpson maintained individually with no connection to the Arch Companies.

**Answer: Defendant denies the allegations in paragraph 49.**

50. Chassen was neither authorized to make this change, nor did he provide Simpson with any advance notice thereof.

**Answer: Defendant denies the allegations in paragraph 50.**

51. First Republic complied with Chassen's demand. First Republic informed Simpson that it no longer permits Simpson to make transactions from any of the accounts he maintains with First Republic in either his corporate or individual capacity, or, indeed, any other account on which Simpson was the signatory, including the Arch Accounts, accounts on which he was the signatory on behalf of entities other than the Arch Companies, and his own individual accounts.

**Answer: Defendant denies the allegations in paragraph 51.**

<u>The Forced Resignation of Chassen from Arch</u>

52. On August 5, 2023, Simpson sent Chassen an email wherein Simpson provided him written notice that he had committed a Cause Event, and that accordingly, under the JJ Arch

11

Amended Operating Agreement, Chassen ceased to be a member of JJ Arch. (*See* Exhibit 4 ["Notice to Chassen of Cause Event"].)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 52.**

53. Chassen had committed a Cause Event prior to the Notice to Chassen of Cause Event, in that Chassen had, without authority, acted to deprive Simpson of his ability to make transactions on the Arch Accounts and to seize that ability for himself.

**Answer: Defendant denies the allegations in paragraph 53.**

54. Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted willful misconduct in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 54.**

55. Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a breach of fiduciary duty in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 55.**

56. Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a misappropriation of funds of Arch, JJ Arch, and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 56.**

57. Accordingly, the Notice of Chassen Cause Event triggered immediately Chassen's removal as a member of JJ Arch.

**Answer: Defendant denies the allegations in paragraph 57.**

The Coup Continues

58. Notwithstanding, Chassen proceeded in disregard of the Notice to Chassen of Cause Event. Specifically, over the weekend of August 5-6, 2023, the administrator of Arch's email and information technology systems, acting upon Chassen's instructions, locked Simpson out of his Arch Companies email account and all other Arch IT systems. Beginning no later than 5 p.m. on Sunday, August 6, 2023, Simpson no longer had access to his Arch Companies email account. At or about 10-11 a.m. on Monday, August 7, 2023, Simpson could no longer log onto his Arch-

12

issued computer. As a result, Simpson could not obtain access to the business records of the Arch
Companies, or the computer payroll program that Arch Companies use to pay their employees.
Simpson was also locked out of the server hosting Arch Companies' web site, and Chassen made
changes to such site, without Simpson's authorization, to remove references thereon to Simpson
as a managing member.

**Answer: Defendant admits that he resigned Simpson from JJ Arch, and that Simpson was
locked from accounts when he was removed and removed as a member on the company
website but lacks information sufficient to form a belief as to the truth of the exact times
Simpson could no longer access company systems and otherwise denies the allegations in
paragraph 58.**

59. Chassen also retaliated for his removal as a member of JJ Arch by sending Simpson,
by electronic mail, a signed letter on August 6, 2023, wherein he purported to inform Simpson
that Simpson was required to resign pursuant to the JJ Arch Amended Operating Agreement
("Chassen 8/6/23 Letter"). The Chassen 8/6/23 Letter asserted that Simpson had committed
multiple Cause Events, none of which had actually occurred, and asserted that, as a result, a
resignation from JJ Arch had occurred on Simpson's part and Simpson was no longer a member
of JJ Arch, nor did Simpson have any right to act on behalf of JJ Arch, Arch, or any subsidiary of
JJ Arch.

**Answer: Defendant refers the Court to the original documents for their true contents and
otherwise denies the allegations in paragraph 59.**

60. However, by the time of the Chassen 8/6/23 Letter, Chassen had already been
removed as a member of JJ Arch pursuant to the Notice to Chassen of Cause Event. Accordingly,
as noted above, Chassen could not, under the JJ Arch Amended Operating Agreement, trigger
Simpson's own resignation by delivering to him a purported notice of Cause Event.

**Answer: Defendant denies the allegations in paragraph 60.**

61. Moreover, even if the Chassen 8/6/23 Letter had been effective as a notice of Cause
Event, it was not sent to Simpson until after Chassen's instruction on August 4, 2023 to First
Republic to strip Simpson of his signatory authority, so as of the time Chassen provided such
instruction Simpson remained JJ Arch's managing member with exclusive authority over the
Arch Companies' bank accounts, and Chassen's instruction was in violation of Arch's and JJ
Arch's operating agreements.

**Answer: Defendant denies the allegations in paragraph 61.**

62. In addition, on August 6, 2023, NJ Inc., sent Simpson a letter (the "8/6/23 NJ Inc.
Letter"), wherein NJ Inc. asserted that JJ Arch, through Simpson's actions, had committed
multiple Cause Events under the Arch Operating Agreement, again none of which had actually
occurred, and asserted that NJ Inc. reserved the right to remove JJ Arch as the managing member
of Arch.

13

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 62.**

63. In addition, Chassen arranged for the deactivation of the device Simpson uses to gain access to Arch's physical office located at 88 University Place, New York, New York 10003, such that when Simpson attempted to enter his office there at 9:00 a.m. on Monday, August 7, 2023, he was unable to do so.

**Answer: Defendant denies the allegations in paragraph 63.**

64. Upon information and belief, on or about August 7, 2023, after he had already been duly removed as a member of JJ Arch, Chassen sent an email to employees of Arch Companies in which he instructed them not to come into the office to work that day, and falsely informed them that Simpson was deemed to have resigned from his managerial roles with Arch Companies. He further instructed employees to not respond to any outreach from Simpson. Even before his removal as a member of JJ Arch, Chassen had no authority to do so.

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 64.**

65. Simpson has since been able to regain access to his physical office at Arch. However, he still has only limited access to Arch's computer system, and is still unable to gain access to Arch's bank accounts. Through counsel, he demanded that First Republic restore him as a signatory on such accounts, and remove Chassen as a signatory. First Republic has refused to do so, and has advised Simpson that because it has "received conflicting instructions regarding the ownership and control" of such accounts, First Republic has placed a hold on those accounts, and will not permit any deposits or withdrawals from such accounts. (Exhibit 5, Letter from Christy Santoro, Preferred Banker at First Republic, to Jeffrey Simpson, dated Aug. 6, 2023, first page.) One hundred and fifty (150) accounts are subject to this hold. (*See id.*, second through fifth pages.) (Collectively, these are the "Arch Accounts.") These include accounts for Arch Companies, as well as accounts maintained for the purpose of holding monies held in trust for subcontractors, materialmen, and other persons involved in Arch Companies' construction projects who are beneficiaries under Article 3-A of the New York State Lien Law. First Republic has advised that it will not release the hold until it "receive[s] evidence satisfactory to us that there is no longer a dispute as to who has authority over the accounts" (*id.*, first page), or there is a court order requiring its release (*see* Exhibit 6, email from First Republic's in-house counsel to Plaintiffs' counsel).

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 65.**

66. Continuation of First Republic's hold on the Arch Companies' bank accounts would wreak havoc on the Arch Companies. Arch Companies would be unable to meet their payroll, inflicting hardship both on Arch Companies' employees, who number approximately 100, and on Arch Companies themselves when such employees ultimately leave their positions for

14

employment with companies whose minority members are not sabotaging company finances in order to extract concessions.

**Answer: Defendant denies the allegations in paragraph 66.**

67. With the hold on those bank accounts, Arch will also stand unable to pay its bills to vendors, such as insurance premiums (*see* Exhibit 7 hereto). Indeed, Arch Companies are now in default on many obligations as a result of their inability to make payments due to the hold. Arch Companies would also be unable to pay rent and other bills, and to make payments on construction loans and to investors in Arch Companies.

**Answer: Defendant denies the allegations in paragraph 67.**

68. The bank accounts that are subject to First Republic's hold also include trust accounts under Article 3-A of the New York State Lien Law, which hold funds in trust for, among others, subcontractors and materialmen on construction projects being performed for Arch Company entities. Thus, the existing account hold prevents Arch Company entities from being able to pay their subcontractors and materialmen. This is doubly harmful to the Arch Companies, in that they now cannot pay those subcontractors and materialmen, which may cause them to cease performing their present construction work, and it also may dissuade them from performing projects for the Arch Companies in the future, out of fear that another, future frivolous dispute over company control may lead to another hold on Arch Companies' bank accounts and a recurrence of delays in paying them.

**Answer: Defendant denies the allegations in paragraph 68.**

69. With both Arch Companies' employees and their subcontractors leaving active job sites, there is a further risk that such sites will not be adequately staffed or supervised, or machinery there adequately maintained, creating a public safety risk that will result in injury to those remaining employees or subcontractors, and nearby members of the public.

**Answer: Defendant denies the allegations in paragraph 69.**

70. The aforesaid effects also endanger the general reputation of Arch Companies going forward, tarnishing it with the appearance that it cannot be trusted to fulfill its obligations.

**Answer: Defendant denies the allegations in paragraph 70.**

71. Another consequence of the coup perpetrated by Chassen is that Last, Arch's managing director, has resigned from her position with Arch on or about August 7, 2023, in response to said coup. Consequently, Arch has lost the benefit of Last's performance.

**Answer: Defendant admits that the Last resigned but otherwise denies the allegations in paragraph 71.**

72. In addition, Chassen and Computero Inc. ("Computero"), the outside company acting as Arch's information technology consultant, have colluded to deny Simpson access to his Arch company email account. Computero first disregarded his instructions to remove Chassen's access to Arch's computer network and his Arch email account beginning shortly before the time Simpson provided the Notice to Chassen of Cause Event, then cut off Simpson's access to the Arch computer network and his Arch email account. Then, after Simpson made repeated requests to regain access to his email account, Computero restored his email access on the evening of Wednesday, August 9. However, approximately one hour after his email access was reinstated, it was again cut off, this time ostensibly by Microsoft. However, Chassen was Microsoft's only contact person at Arch Companies, and thus the only person who could have instructed Microsoft to cut off Simpson's email access. Simpson remains unable to gain access to his Arch email account, and thus unable to receive or respond to email communications from Arch's many employees.

**Answer: Defendant denies the allegations in paragraph 72.**

73. In addition, Simpson's access to Dropbox has not been restored, thus making it impossible for him to view the Arch Companies' internal documents, which are stored in Dropbox. Also, Chassen has engineered a situation in which he is the only contact person for the domain company that hosts Arch Companies' web site. Thus, Simpson cannot communicate with the domain company in order to update the web site, including restoring references to himself as the managing member and removing those to Chassen as a continuing employee and member of the Arch Companies following his resignation.

**Answer: Defendant denies the allegations in paragraph 73.**

74. The combined loss of email and Dropbox access have left Simpson, as the chief managerial figure at Arch Companies, effectively blind (unable to view documents) and deaf and mute (unable to communicate with the Arch Companies' employees, or with the public through Arch Companies' web site). This has rendered him unable to exercise his authority as managing member of JJ Arch, and left the Arch Companies as a rudderless ship.

**Answer: Defendant denies the allegations in paragraph 74.**

AS AND FOR A FIRST CAUSE OF ACTION
(Breach of the Amended JJ Arch Operating Agreement, Brought by Arch and by Simpson,
Against Defendant Chassen)

75. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 75 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

76. The Amended JJ Arch Operating Agreement is a valid and binding agreement between Simpson and Chassen.

16

**Answer: Paragraph 76 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

77. The Amended JJ Arch Operating Agreement is supported by valuable consideration.

**Answer: Paragraph 77 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

78. Arch is expressly mentioned in the Amended JJ Arch Operating Agreement and defined therein as an "Investment Entity".

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 78.**

79. Paragraph 3.1 of the Amended JJ Arch Operating Agreement sets forth powers that Simpson has with regard to matters which JJ Arch has the authority to perform "indirectly through an Investment Entity," *i.e.*, through Arch.

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 79.**

80. The Amended JJ Arch Operating Agreement was intended for Arch's benefit.

**Answer: Defendant denies the allegations in paragraph 80.**

81. The benefit to Arch from the Amended JJ Arch Operating Agreement is sufficiently to indicate the assumption by the contracting parties of a duty to compensate Arch if is lost.

**Answer: Defendant denies the allegations in paragraph 81.**

82. Arch is a third-party beneficiary of the Amended JJ Arch Operating Agreement.

**Answer: Paragraph 77 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

83. Chassen materially breached the Amended JJ Arch Operating Agreement by conducting, managing, and controlling the affairs and business of JJ Arch, when, under ¶ 3.1(i) of the Amended JJ Arch Operating Agreement, only Simpson had the authority to do so.

**Answer: Paragraph 83 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegations are denied.**

84. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to conduct, manage, and control the affairs of Arch Entities, and, so long as a hold remains on the Arch Companies' bank accounts,

17

he will continue to suffer a diminished ability to conduct, manage, and control the affairs of JJ Arch and of Arch.

**Answer: Defendant denies the allegations in paragraph 84.**

85. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that such breach has resulted in the resignation of Last and the loss of the value of her work to Arch; so long as a hold remains on the Arch Companies' bank accounts, it will be unable to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers; and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 85.**

86. Chassen materially breached ¶ 3.1(ii) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to control the Arch Companies' bank accounts and draw checks thereon, and transferring such authority to himself.

**Answer: Paragraph 86 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

87. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to control the Arch Companies' bank accounts and draw checks thereon, and such injury will continue into the future so long as a hold remains on the Arch Companies' bank accounts.

**Answer: Defendant denies the allegations in paragraph 87.**

88. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 88.**

89. Chassen materially breached ¶ 3.1(vi) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to withdraw, pay, and distribute the funds of Arch Companies, and transferring such authority to himself.

**Answer: Paragraph 89 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

90. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to withdraw, pay, and distribute the funds of Arch Companies, and such injury will continue into the future so long as a hold remains on the Arch Companies' bank accounts.

18

**Answer: Defendant denies the allegations in paragraph 90.**

91. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 91.**

92. Chassen materially breached the "Resignation" provision of § 1.1 of the Amended JJ Arch Operating Agreement by purporting to deliver a notice of Cause Event to Simpson, when, by the time he had done so, Chassen had been removed as a member of JJ Arch, and thus had no authority to do so, and when the purported Cause Events set forth in such notice had not occurred.

**Answer: Paragraph 92 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegations are denied.**

93. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Chassen has used it as a pretext to continue to conduct, manage, and control the affairs of Arch Entities, to the exclusion of Simpson.

**Answer: Defendant denies the allegations in paragraph 93.**

94. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that, with Chassen having using it as a pretext to dispute, to First Republic, Simpson's authority to control Arch Companies' bank accounts with First Republic, a hold has been placed on such accounts, and Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 94.**

95. By law, the Amended JJ Arch Operating Agreement contains an implied covenant of good faith and fair dealing, pursuant to which Chassen had an obligation not to act in such a manner as to injure Simpson's rights to receive the fruits of said agreement or to prevent Simpson from performing his duties under said agreement.

**Answer: Paragraph 95 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

96. Chassen prevented Simpson from performing his duties under the Amended JJ Arch Operating Agreement by acting so as to deny Simpson:

19

(a)  the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;

(b)  physical access to his office;

(c)  the use of Simpson's email account to communicate with employees of the Arch Companies;

(d)  the use of Dropbox to obtain access to the Arch Companies' corporate documents; and

(e)  the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

**Answer: Defendant denies the allegations in paragraph 96.**

97. Chassen prevented Simpson from receiving the fruits of the Amended JJ Arch Operating Agreement by purporting to terminate, upon false pretenses and without authority to do so, Simpson's role as managing member of JJ Arch by sending the Chassen 8/6/23 Letter.

**Answer: Defendant denies the allegations in paragraph 97.**

98. By his aforesaid conduct, Chassen has injured Simpson's rights to receive the fruits of the Amended JJ Arch Operating Agreement and prevented Simpson from performing his duties under said agreement.

**Answer: Defendant denies the allegations in paragraph 98.**

99. By his aforesaid conduct, Chassen has breached the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

**Answer: Paragraph 99 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

100. For the reasons set forth above, Simpson and JJ Arch have been injured by Chassen's breach of the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 100.**

101. Simpson has complied with the Amended JJ Arch Operating Agreement in all respects.

**Answer: Defendant denies the allegations in paragraph 101.**

102. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

20

**Answer: Paragraph 102 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

103. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 103 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

104. Simpson and Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 104.**

AS AND FOR A SECOND CAUSE OF ACTION<br>(Breach of Fiduciary Duty, Brought by JJ Arch and by Simpson, Against Defendant Chassen)

105. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 105 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

106. Chassen, as a member of JJ Arch, had a fiduciary duty to JJ Arch and to the other member of JJ Arch, Simpson.

**Answer: Paragraph 106 states a conclusion of law for which no responsive pleading is required, but to the extent one is required the allegations are denied.**

107.   Chassen had a duty of loyalty to JJ Arch and to Simpson.

**Answer: Paragraph 107 states a conclusion of law for which no responsive pleading is required, but to the extent one is required the allegations are denied.**

108. This duty of loyalty obligated Chassen to act in the best interests of JJ Arch and Simpson, and not to pursue Chassen's own personal interest at the expense of the well-being of JJ Arch and Simpson.

**Answer: Paragraph 108 states a conclusion of law for which no responsive pleading is required, but to the extent one is required the allegations are denied.**

109. Chassen engaged in misconduct by numerous means, including but not limited to by acting so as to deny Simpson:
> (a)  the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;

21

(b) physical access to his office;

(c) the use of Simpson's email account to communicate with employees of the Arch Companies;

(d) the use of Dropbox to obtain access to the Arch Companies' corporate documents; and

(e) the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

**Answer: Defendant denies the allegations in paragraph 109.**

110. Chassen's misconduct resulted directly in damages to Simpson, in that it deprived Simpson of the ability to manage the Arch Companies' finances, gain access to his office, communicate with the Arch Companies' employees, gain access to Arch Companies' corporate documents, and manage the Arch Companies' web site.

**Answer: Defendant denies the allegations in paragraph 110.**

111. Chassen's misconduct resulted directly in damages to JJ Arch, in that it made it impossible for Simpson to pay financial obligations of JJ Arch, communicate with the Arch Companies' employees through email, and gain access to Arch Companies' corporate documents, and it made it impossible for anyone at Arch Companies, other than Chassen, who had already been duly removed from JJ Arch, to manage the Arch Companies' web site.

**Answer: Defendant denies the allegations in paragraph 111.**

112. By seizing control of JJ Arch in violation of the JJ Arch Amended Operating Agreement, and by conducting himself, as a member of JJ Arch, in a manner that placed his own interests and those of his personal associates above those of JJ Arch and Simpson, Chassen breached his duty of loyalty.

**Answer: Defendant denies the allegations in paragraph 112.**

113. Simpson has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, as set forth above.

**Answer: Defendant denies the allegations in paragraph 113.**

114. JJ Arch has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, in that such conduct has caused economic harm to Arch as set forth above, and is expected to continue to cause such harm in the future, by virtue of present and expected future decreases in the value of JJ Arch's equity interest in Arch and decreases in the distributions JJ Arch is to receive from Arch.

**Answer: Defendant denies the allegations in paragraph 114.**

115. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 115 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

116. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 116 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

117. Simpson and JJ Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 117.**

AS AND FOR A THIRD CAUSE OF ACTION
(Conversion, Brought by All Plaintiffs Against Defendant Chassen)

118. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 105 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

119. The funds Arch Companies have on deposit in the Arch Accounts ("Arch Companies Funds") belong to Arch Companies.

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations in paragraph 119.**

120. Simpson, Arch, and JJ Arch have an immediate superior right of possession, relative to Chassen, to the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 120.**

121. The Arch Companies Funds are personal property.

23

**Answer: The allegations in paragraph 121 state a conclusion of law for which nor responsive pleading is required, but to the extent a responsive pleading is required, the allegations are denied.**

122. The Arch Companies Funds are specific, identifiable funds.

**Answer: The allegations in paragraph 121 state a conclusion of law for which nor responsive pleading is required, but to the extent a responsive pleading is required, the allegations are denied.**

123. Chassen, intentionally and without authority, acted to deprive Simpson of Simpson's authority, under the JJ Arch Amended Operating Agreement and the Arch Operating Agreement, to possess and control the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 123.**

124. Chassen has exercised unauthorized dominion over the Arch Companies Funds to the exclusion of the rights of Simpson, Arch, and JJ Arch.

**Answer: Defendant denies the allegations in paragraph 124.**

125. Chassen has an obligation to return control over the Arch Companies Funds to Simpson, Arch, and JJ Arch, but has not done so.

**Answer: Defendant denies the allegations in paragraph 125.**

126. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 126 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

127. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 127 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

128. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 128 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

24

129. Simpson, Arch, and JJ Arch have been injured, and continue to be injured, by Chassen's conversion of the Arch Companies Funds, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 129.**

AS AND FOR A FOURTH CAUSE OF ACTION
(Tortious Interference with Contractual Relations, Brought by Arch and JJ Arch Against Chassen)

130. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 130 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

131. Arch and JJ Arch have a valid and binding contract with a third party, *i.e.*, First Republic, pursuant to which JJ Arch, Arch, and the other Arch Companies deposit funds in bank accounts maintained by First Republic (the Arch Companies Funds), and First Republic holds such funds for the benefit of JJ Arch, Arch, and the other Arch Companies (the "First Republic Agreement").

**Answer: Defendant admits that Arch and JJ Arch have a banking relationship with First Republic, and have bank accounts there, but otherwise denies the allegations in paragraph 131.**

132. Pursuant to the First Republic Agreement, the Arch Companies Funds may be spent and distributed by a person duly authorized by JJ Arch.

**Answer: Defendant refers the court to the original documents and otherwise denies the allegations in paragraph 132.**

133. The sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds is Simpson.

**Answer: Defendant denies the allegations in paragraph 133.**

134. At all relevant times, Chassen knew of the First Republic Agreement, and that Simpson was the sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 134.**

135. Chassen is a non-party to the First Republic Agreement.

25

**Answer: Defendant denies the allegations in paragraph 134.**

136.    Chassen intentionally procured the breach, by First Republic, of the First Republic Agreement, by misrepresenting to First Republic that Chassen, and not Simpson, is the person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 136.**

137.    Arch and JJ Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result Simpson has been unable to spend, distribute, or otherwise control the Arch Companies Funds, on behalf of Arch and JJ Arch, as the duly authorized person pursuant to the First Republic Agreement, and pursuant to his authority under the Arch Operating Agreement and the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 137.**

138. JJ Arch and Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result, as set forth above, they have been, and remain, unable to fulfill their obligations to others, including but not limited to their employees, vendors, subcontractors, and materialmen, and as a result, those persons may cease performing services for JJ Arch and Arch, and JJ Arch and Arch may incur further obligations to those persons or to other persons in the future, or having difficulty in the future finding other persons who will be willing to work for or contract with them.

**Answer: Defendant denies the allegations in paragraph 138.**

139. Chassen's actions constitute tortious interference with the First Republic Agreement.

**Answer: Paragraph 139 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

140. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

141. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

26

**Answer: Paragraph 126 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

142. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 126 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

143. Arch and JJ Arch have been injured, and continue to be injured, by Chassen's tortious interference with the Arch Contracts, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 143.**

AS AND FOR A FIFTH CAUSE OF ACTION
(Declaratory Judgment, Brought by All Plaintiffs, Against Chassen)

144. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 144 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

145. There is a justiciable controversy between Plaintiffs on the one hand, and Chassen on the other, as to whether
   (a) the Notice to Chassen of Cause Event removed Chassen as a member of JJ Arch; and
   (b) the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch.

**Answer: Paragraph 145 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

146. Plaintiffs have taken the position that the Notice of Chassen of Cause Event removed Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter did not remove Simpson as a member of JJ Arch.

**Answer: Defendant admits the allegations in paragraph 146.**

147. Chassen has taken the position that the Notice of Chassen of Cause Event did not remove Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch. However, both positions taken by Chassen are incorrect.

**Answer: Defendant admits that he has taken those positions but denies that they are incorrect.**

27

148. The aforesaid dispute between the parties represents a genuine, concrete dispute involving substantial legal interests.

**Answer: Defendant denies the allegations in paragraph 148 because both letters were declared nullities by order of the Court.**

149. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

150. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

151. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

152. Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to resolve the aforesaid dispute.

**Answer: Paragraph 152 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

153. There is no adequate remedy at law.

**Answer: Paragraph 153 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

AS AND FOR A SIXTH CAUSE OF ACTION
(Declaratory Judgment, Brought by All Plaintiffs, Against Chassen and First Republic)

28

154. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 154 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

155. There is a justiciable controversy between Plaintiffs on the one hand, and Defendants on the other, as to whether Simpson or Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and whether the hold on the Arch Accounts should be removed.

**Answer: Paragraph 155 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

156. Plaintiffs have taken the position that Simpson is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and the hold on the Arch Accounts must be released.

**Answer: Defendant admits the allegations in paragraph 156.**

157. Chassen has taken the position that Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts. However, the position taken by Chassen is incorrect.

**Answer: Defendant admits that he has taken the position but denies the position is incorrect.**

158. First Republic has taken the position that it cannot determine whether Simpson or Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and that the hold should remain on the Arch Accounts. However, the position taken by First Republic is incorrect.

**Answer: Defendant admits that First Republic has taken the position, but denies the position is incorrect.**

159. The aforesaid dispute among the parties represents a genuine, concrete dispute involving substantial legal interests.

**Answer: Paragraph 159 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

160. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

29

**Answer: Paragraph 160 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

161. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 161 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

162. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 162 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

163. Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to resolve the aforesaid dispute.

**Answer: Paragraph 163 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

164. There is no adequate remedy at law.

**Answer: Paragraph 164 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

AS AND FOR A SEVENTH CAUSE OF ACTION
(Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen and First Republic)

165. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 165 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

166. Plaintiffs have a likelihood of success on the merits on their claim that Simpson has the right to control, on the behalf of JJ Arch and Arch, the Arch Accounts.

**Answer: Paragraph 166 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

30

167. In the event that the hold First Republic has placed on the Arch Accounts is not lifted immediately, and the right to control the Arch Accounts is not restored to Simpson, Plaintiffs, and third parties, will experience imminent and irreparable injury.

**Answer: Paragraph 167 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

168. Such injury will be in the form of Arch Companies being unable to pay their employees, resulting in economic harm to such employees, and at least some of such employees imminently leaving employment with the Arch Companies and seeking work elsewhere; lack of supervision on construction projects supervised by the Arch Companies, imminently resulting in physical injury to members of the public at the construction sites; Arch Companies being unable to pay subcontractors and materialmen on projects, imminently resulting in such subcontractors and materialmen ceasing work on the projects, again imminently resulting in physical injury to members of the public at unsupervised construction sites, as well as economic injury to the Arch Companies owning the project sites, due to delayed completion of projects; and long-term economic damage to Arch Companies, as future efforts at recruiting employees and contracting with third parties are hindered due to damage to Arch Companies' reputation due to a sustained inability to fulfill their obligations.

**Answer: Defendant denies the allegations in paragraph 168.**

169. The only way forward, therefore, to protect Arch Companies, their employees, subcontractors, materialmen, and vendors, and members of the public at large, is for the Court to order that First Republic release its hold on Arch Companies' bank accounts, and restore to Simpson his contractually guaranteed exclusive right to control the finances, and the checkbooks, of Arch Companies.

**Answer: Defendant denies the allegations in paragraph 169.**

170. The balance of the equities favors Plaintiffs.

**Answer: Defendant denies the allegations in paragraph 170.**

171. Plaintiffs are entitled to a preliminary and permanent injunction requiring First Republic, immediately, to lift the hold it has placed on the Arch Accounts, and to restore to Simpson the exclusive right to control the Arch Accounts on behalf of JJ Arch and Arch.

**Answer: Paragraph 171 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

172. There is no adequate remedy at law.

**Answer: Paragraph 172 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

31

AS AND FOR AN EIGHTH CAUSE OF ACTION
(Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen)

173. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 173 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

174. Plaintiffs have a likelihood of success on the merits of their claim that Simpson is entitled to have access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

**Answer: Paragraph 174 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

175. In the event that Simpson is unable to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site, and Plaintiffs will suffer irreparable injury.

**Answer: Paragraph 175 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

176. The balance of the equities favors Plaintiffs.

**Answer: Paragraph 176 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

177. Plaintiffs are entitled to a preliminary and permanent injunction requiring Chassen to take, immediately, all actions necessary to enable Simpson to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

**Answer: Paragraph 177 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

178. There is no adequate remedy at law.

32

**Answer: Paragraph 178 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiffs fail to state a claim as a matter of law.

### Second Affirmative Defense

Plaintiffs' claims fail based on documentary evidence.

### Third Affirmative Defense

Plaintiffs improperly intermingle their direct and derivative claims, which mandates the dismissal of the entire complaint.

### Fourth Affirmative Defense

Plaintiffs' claims should be dismissed as duplicative.

### Fifth Affirmative Defense

Plaintiffs' claims fail under the doctrine of in pari delicto.

### Sixth Affirmative Defense

Plaintiffs' claims fail because of Plaintiff's unclean hands.

### Seventh Affirmative Defense

Plaintiffs' claims fail under the doctrines of waiver and estoppel.

### Eighth Affirmative Defense

Plaintiffs' derivative claims fail because under Section 10.2 of the JJ Arch Operating Agreement, JJ Arch is obligated to indemnify Defendant for any claim "for any loss, damage, or claim  incurred" by Defendant "by reason of any act or omission performed or omitted . . . in good faith  on behalf of the Company and in a manner reasonably believed to be within the scope

33

of authority conferred . . . by this Agreement." Defendant's conduct has been entirely in good faith, on behalf of the company, and in a manner reasonably believed to be within the scope of the authority conferred by the Operating Agreement.

### Ninth Affirmative Defense

Plaintiffs' claims fail because the Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority after December 11, 2021 is unconscionable. Despite Chassen vocalizing his disagreement, Simpson presented him with the Amendment on a take-it-or-leave-it basis, threatening him that he would remove him from the business entirely if he did not sign the Amendment. Chassen signed the Amendment under undue pressure and threats. Simpson pressured Chassen not to hire his own counsel review the Amendment and limited his involvement in calls Simpson took with the shared Arch Entities' counsel David Heymann who Simpson had draft the amendment in his favor, while Heymann purported to represent both of them. Chassen was never disclosed Hyemann's actual conflicts, and Chassen did not execute any conflict waiver. Simpson was also in a relationship of confidence and trust with Defendant, who had been his mentor in the industry. Simpson took advantage of that relationship of trust.

Because of their unequal bargaining power, prior relationship, Simpson's threats, and deceptive and coercive tactics, and the parties' confidential relationship, Chassen lacked meaningful choice in entering into the Amendment.

And the Amendment itself was substantively unconscionable as it contained only favorable terms to Simpson and gave away Chassen's managerial rights as well as his membership percentage under the Operating Agreement for nothing.

34

FILED: NEW YORK COUNTY CLERK 06/25/2023 05:30 PM
NYSCEF DOC. NO. 212

INDEX NO. 658208/2023
RECEIVED NYSCEF: 06/25/2023

24-01138-mn24-Doc-1139-Filed-04/08/24-1-Entered-04/08/24-09:45:20-Main-Document

Pg 80 of 363

### Tenth Affirmative Defense

Plaintiffs' claims fail because the Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority fails for lack of consideration. The Amendment contained only favorable terms to Simpson for nothing of real value.

### Eleventh Affirmative Defense

Plaintiffs' claims fail because the Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority was the product of duress and undue influence and breaches of fiduciary duty.

### Twelfth Affirmative Defense

Plaintiffs' claims fail because Simpson was in a relationship of trust and confidence at the time of the drafting and execution of the Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority, and a special burden should be shifted to the party in whom the trust is reposed, Simpson, to disprove fraud or overreaching. *In re Estate of Greiff*, 92 N.Y.2d 341, 345 (1998). Given Chassen relationship of trust and confidence with Simpson, the burden is on Simpson to establish that he did not enter the Amended JJ Arch Operating Agreement by undue influence or coercion, which burden he cannot meet.

### Thirteenth Affirmative Defense

Plaintiffs' claims fail because Simpson breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, 35 Oak, and Arch's investors.

### Fourteenth Affirmative Defense

Plaintiffs' claims fail because Simpson was lawfully resigned from JJ Arch.

### Fifteenth Affirmative Defense

Plaintiffs' claims fail because he failed to properly serve Chassen.

35

### Sixteenth Affirmative Defense

Defendant reserves his right to assert additional affirmative defenses as additional information is learned during the course of this action.

WHEREFORE, the Court should award and enter judgment in Defendant's favor, dismiss the Complaint in its entirety, and award Defendant his legal fees and costs.

### VERIFIED COUNTER-CLAIMS

Jared Chassen ("Chassen"), individually and derivatively on behalf of JJ Arch, LLC ("JJ Arch") and Arch Real Estate Holdings, LLC ("Arch Real Estate"), for his counterclaims against Jeffrey Simpson ("Simpson"), alleges as follows:

1.      This is an action for breach of fiduciary duty, breach of contract, recission, and declaratory relief and a permanent injunction brought by Chassen in his own individual capacity, and derivatively on behalf of JJ Arch and Arch Real Estate against Simpson. Chassen seeks, among other things, to recover for Simpson's breaches of fiduciary duty and other corporate wrongdoing, to declare that Chassen is the sole managing member of JJ Arch, and to declare Simpson resigned as a member of JJ Arch.

### Parties

2.      Plaintiff Chassen is an individual residing in the State of New York. He is a member of JJ Arch, which in turn is the managing member of Arch Real Estate. Chassen has over 15 years of experience in the real estate industry. Among other work, before forming JJ Arch, he worked at Greystone Development ("Greystone") an affiliate of Greystone & Co., Inc. a firm that provides real estate services.

36

3.      Defendant Jeffery Simpson is an individual residing in the State of New York. He
is a member of JJ Arch, which in turn is the managing member of Arch Real Estate. Before forming
JJ Arch with Chassen, Simpson worked with Chassen at Greystone.

4.      Nominal Defendant JJ Arch is a New York limited liability corporation. It was
formed by Chassen and Simpson on or about December 11, 2017.

5.      Nominal Defendant Arch Real Estate is a New York limited liability corporation.
It was formed by JJ Arch and non-party 608941 NJ Inc. ("35 Oak") on or about December 11,
2017. JJ Arch and 35 Oak are the Members of Arch Real Estate.

### The JJ Arch Operating Agreement

6.      On December 11, 2017, Chassen and Simpson entered into the JJ Arch Operating
Agreement. A true and correct copy of the JJ Arch Operating Agreement is annexed hereto as
**Exhibit A**. The JJ Arch Operating Agreement identifies both Simpson and Chassen as the two
Members.  *See* Ex. A § 1.1. Section 3.1(a) of the JJ Arch Operating Agreement provides that, prior
to the fourth anniversary of the Agreement, the business and affairs of JJ Arch shall be managed
by Simpson subject to the limitations set forth in subsection (b), which provides that any Company
Major Decision, as defined in the Agreement, shall only be undertaken with Chassen's prior
written consent.  *See* Ex. A § 3.1(a)-(b).

7.      Section 3.2 of the JJ Arch Operating Agreement provides that, after the fourth
anniversary of the Agreement, that is, December 12, 2021, Simpson and Chassen were to both
have managerial authority over JJ Arch, with consent by both required for Company Major
Decisions. *See id*. § 3.2. Further, Chassen and Simpson were to be entitled to 50% of all
distributions from December 12, 2021.

### The Arch Real Estate Operating Agreement

37

8.      On December 11, 2017, the same day that Chassen and Simpson entered into the JJ Arch Operating Agreement, JJ Arch and 35 Oak entered into the Arch Real Estate Operating Agreement. A true and correct copy of the Arch Real Estate Operating Agreement is annexed hereto as **Exhibit B**. Under the Arch Real Estate Operating Agreement, JJ Arch is the Managing Member, while 35 Oak is the Investor Member. While JJ Arch has managerial rights over Arch Real Estate, 35 Oak has consent rights to certain major decisions.

### Before Becoming Partners, Simpson Had a Prior Relationship of Confidence and Trust With Chassen

9.      Chassen first met Simpson when he worked with him at Greystone, a firm that provides real estate services.  Greystone Development is a New York based full-service developer of commercial and residential real estate that provides investment, development, construction, marketing, operations, and asset management services.

10.      Simpson joined Greystone in 2007 and became the Chief Executive Officer of its development subsidiary in 2013. At the time, Dough Benach, the head of the division hired Chassen and placed him in the Development and Acquisitions team in 2012 to work with Benach and Simpson. Simpson and Benach taught him essential skills for acquiring, financing debt and equity, developing and running real estate projects, and he was promoted as the Director of Acquisitions in 2014.

11.      During his tenure at Greystone, Simpson had a reputation of being an aggressive businessperson who would pursue opportunities that others would view as unfeasible but would never yield to opposition and often caused internal conflict.

12.      Chassen viewed Simpson as his mentor and developed a close relationship with him. He reposed the utmost confidence and trust in him and even put his financial well-being in his hands.

38

13.  In 2017, Simpson left Greystone under less than favorable circumstances.

14.  Despite the public perception that the separation between Simpson and Greystone was amicable, the separation came after internal dissensions caused by numerous failed and over budget projects led by Simpson.  As a result, the Greystone Development brand downsized from 30 people to currently 3 persons and Simpson was forced to leave Greystone, and Chassen left alongside many others as the brand downsized and the jobs disappeared.

**Chassen Brings Simpson 35 Oak as an Investor and they Form JJ Arch**

15.  After departing Greystone, Simpson struggled to find investors for a new business. While still employed by Greystone, he held many meetings by himself to launch a new business which yielded no success. Through Chassen's own connections, Chassen introduced 35 Oak to Simpson while still at Greystone. Chassen and Simspon planned a new company together relying on Chassen's capital connections to make the company feasible.

16.  35 Oak is an active investor in many industries, and its principal place of business is in Toronto, Canada. After a few meetings, 35 Oak decided to invest in a joint venture with Chassen and Simpson, and on December 11, 2017, established Arch Real Estate, which is governed by the Arch Real Estate Operating Agreement. On the same day, Simpson and Chassen signed the operating agreement for JJ Arch.

17.  The real estate portfolio owned and controlled by the Arch Entities ultimately grew to more than $1Bn in assets under management, held in various single purpose companies that are affiliates of and/or controlled by the Arch Entities. The Arch Entities also have other affiliated companies, including a property management company, brokerage company, construction company, each of which provides services relating to real properties that the Arch Entities control.

**Simpson Uses His Relationship of Trust with Chassen to Coerce Chassen to Sign an Unconscionable Amended JJ Arch Operating Agreement**

39

18.    On May 22, 2021, the JJ Arch Operating Agreement was amended forcibly without Chassen's input or drafting (the "Amendment"). A true and correct copy of the Amendment is annexed hereto as **Exhibit C**. The Amendment eliminated the language in Section 3.2 of the original Agreement providing Simpson and Chassen equal rights and authority to manage the company beginning on December 11, 2021. Under the Amendment, Chassen purported to give away his managerial rights to Simpson for another four years, though Chassen retains consent right to limit Simpson's authority with respect to any Company Major Decision. *See* Ex. C § 3.1-3.2. Instead of becoming entitled to 50% of the distributions, as he was to be as of December 11, 2021, under the Amendment, Chassen was to be entitled to 49.9% of all distributions, with Simpson entitled to 50.1%.

19.    Because of their unequal bargaining power, Simpson's threats, and deceptive and coercive tactics, and the parties' confidential relationship, Chassen lacked meaningful choice in entering into the Amendment.

20.    Simpson took advantage of his confidential relationship with Chassen, as his mentor, to push a one-sided agreement. He heaped abuse on him in pressuring him to sign, repeatedly telling him he was incapable and inept. Simpson pressured Chassen to not have his own counsel review the Amendment and limited his involvement in calls Simpson took with JJ Arch's counsel David Heymann, who purported to also represent both of them, and who Simpson had draft the amendment in his favor. Heymann did not even disclose his actual conflicts in representing both JJ Arch, Simpson, and Chassen, and no conflict waiver was ever presented or agreed-to. Simpson presented Chassen with the Amendment on a take-it-or-leave-it basis, threatening him that he would just remove him from JJ Arch if he did not sign the Amendment. Chassen signed the Amendment under undue pressure and threats.

40

21.     The Amendment itself was substantively unconscionable as it contained only favorable terms to Simpson and gave away Chassen's rights under the Operating Agreement for nothing of value.

## **Simpson Takes Various Unlawful and Improper Actions**

22.     When they first started their new business, Simpson promised Chassen, Michelle Miller, and Tristan Last, employees/junior partners of the Arch Entities, that he would learn lessons from Greystone and change his aggressive behaviors. The operation of the Arch Entities did well initially, but it went downhill over the past two years.

23.     Simpson's aggressive business demeanor increasingly turned menacing inside the company, with partners, lenders and lawyers. He repeatedly acted in an intimidating manner towards employees and others. Simpson not only overloaded employees, but also regularly yelled and threatened to fire them causing a huge turnover of employees and tarnishing the Arch Entities' brand in the hiring markets. He regularly called people stupid, inept and other demeaning names, to the point of bringing them to tears. Simpson created a toxic work environment that forced many employees to leave, leading to understaffing and mismanagement of the company's real estate projects. Simpson would send messages to key employees such as "So now everyone is going to have to come to me every time they go to the bathroom to get my yes or no."

24.     Putting the companies' and investors' interests first, Chassen was willing to work to mitigate the damage caused in his wake and endure the harsh and abusive workplace that Simpson created, even to Chassen's personal detriment. Yet Simpson committed a series of misconducts that crossed the line of breaching his fiduciary duties, which the company could not withstand, and Chassen had to step up eventually.

41

25.     First, Simpson forced the team to make various misrepresentations about real estate projects to induce investments. Simpson and team members including Chassen were forced to pitch grossly under budgeted projects and promised unrealistic returns on investment to induce investors, such as 35 Oak and many others to contribute additional capital without ever disclosing risks.

26.     Disregarding the opposition of the other Arch Entities' partners and employees, including Chassen, Simpson pushed numbers aggressively and used unachievable assumptions to amplify financial outcomes. Over the years, several internal investment meetings occurred where Chassen and many team members aggressively pushed backed on his financial assumptions, but he would aggressively fight us and ultimately tell everyone to follow his path or be sidelined or fired.  Simpson also provided minimal reporting to investors, leaving them in the dark and keeping the staff overworked and understaffed and unable to do simple tasks like reporting or reconciliation. 35 Oak, the Arch Real Estate funding partner, kept funding the business and projects without proper capital calls, reporting or communication from JJ Arch, and if they ever questioned Simpson, he would threaten retribution if they did not continue to fund. He would tell them they were only good for capital and guarantees, and nothing else.

27.     Second, Simpson prioritized his personal gains over the success of the Arch Entities' projects.  For instance, the Myrtle Point development in Ridgewood, Queens, was grossly under budgeted and experienced significant delays from lack of supervision. Simpson didn't even visit the project for weeks at a time.  Recently, the project relied on one time-sensitive forbearance to move forward, yet Simpson instructed his lawyer for the Arch Entities to put pencils down and not turn over the necessary documents to 35 Oak, the guarantor.  He was planning to hold documents as leverage to cut a deal with one major lender and force 35 Oak to take certain actions

42

that would favor his personal interests.  As a result of the delay, the Myrtle Point development has been stalled for months, causing the Arch Entities to lose more than fifty percent of its necessary revenue and putting additional strain on the business and putting over $45 million of equity at risk for full loss.

28.     Third, Simpson failed to properly supervise and manage projects.  Across various projects, Simpson was not involved for months and in many instances disappeared to focus on his other businesses or personal ventures.

29.     Fourth, as cash flow started to become limited at Arch, at the extreme detriment of our managed investments and to increase income streams for the company, Simpson started a plan forcing the team leaders to take on even heavier workloads amongst senior employees, and shedding necessary employees such as project managers, construction managers, accountants, and other crucial roles to run projects. Simpson's attempt to cut expenses to generate additional income deprived many projects of proper supervision, which led to numerous failures. Despite desperate pleas from many senior Arch Entities' employees to properly staff the properties, Simpson pushed to continue to cut staff, and increase fees to JJ Arch. Investors were never made aware of these issues.

30.     Fifth, days before Chassen was forced as a fiduciary to remove Simpson, Simpson in text messages and in verbal communications to Chassen and Michelle Miller, a junior partner/employee, threatened to put all the Arch Entities into bankruptcy in order to leverage to us and 35 Oak to follow his orders without resistance or he would crash the business.  Knowing it was against the Arch and JJ Arch Operating Agreements to file such bankruptcy, Simpson openly declared his plan to blow up the business and warned others that he would do so if they disobeyed

43

him saying, "[a]nybody that chooses to do anything without my permission or my consent is no longer going to be a part of this organization."

31.    Simpson also misappropriated Arch Real Estate's funds and employees for an independent auto business owned by JJ Arch—Rêver Motors ("Rêver). Rêver is a vintage car dealership and repair shop located in Southampton, New York. For the last two years, Simpson often dedicated two to three days per week on running the Rêver business while shirking his other responsibilities. Simpson directed Arch Entities' employees to manage accounting, logistics, and facility of the Rêver business. Simpson even hired one of the Arch Real Estate's employees to work exclusively for the Rêver business and transferred funds from Arch Real Estate's construction projects to pay for their wages. In connection with the Rêver business to which he devoted much of his time, Simpson engaged in illegality such as switching a VIN number on a car. This was done without Chasen's consent.

32.    From the very beginning of the Rêver business, Chassen was very clear to Simpson that if JJ Arch purchased this business, it had to be a weekend side-business that would need full third-party management and should never at the expense of Arch Real Estate's investments. Repeatedly, Chassen asked Simpson to stop directing Arch Real Estate's employees to work for the business, but he always disregarded Chassen's pleas. Simpson also never obtained Chassen's consent before doing this despite being obligated to do so. *See* Ex. C § 3.1(b)(viii).

33.    Simpson also began devoting much of his time to other business at the expense of JJ Arch such as purchasing a farm and several unaffiliated investment properties, many with large construction components that he oversaw. Because of these other businesses, he was devoting at most 65% of his business time to JJ Arch, when the JJ Arch Operating Agreement requires that he devote substantially all his business time to JJ Arch.

44

## The Company Enters Dire Financial Circumstances Because of Simpson and Simpson Proposes that 35 Oak Take-Over JJ Arch

34.     In July 2023, Chassen asked JJ Arch's accountant about Simpson's diversion of money. Chassen had just seen a Paylocity report, a payroll document, that showed payments from Arch Real Estate to a worker at Rever, a business not associated with Arch Real Estate.

35.     The accountant confirmed that Simpson was using company funds from Arch Real Estate to pay JJ Arch expenses. She confirmed that he took Arch Real Estate money to pay auto employees and that he owed Arch Real Estate money. She also confirmed that due to extreme lack of staff there was minimal accounting of funds.

36.     JJ Arch earned its operating income from a flow of acquisitions of new properties and property management fees. For example, it earned income from finance fees from brokering loans on new acquisitions and new deals, property management fees for overseeing the properties that were owned by Arch, and construction fees on its development of properties acquired by Arch.

37.     Before 2022, Arch owned approximately 5500 units around the country, but in 2022 it sold approximately 2000 of the units, thus lessening its base for property management fees. The rise in interest rates also made Arch unable to acquire new properties to be able to earn income from finance and construction fees. Without this income, Arch was forced to lay-off employees, but without these employees, it could not properly manage the properties spread-out in different states, thus causing the properties to start failing from mismanagement.

38.     In other words, the investors were being harmed by Arch remaining as the property manager because Arch could not maintain the economies of scale required to properly run the properties once it sold many of the units in 2022. And with the real estate markets faltering, Arch also no longer had the regular income from financing fees on acquisitions by which it otherwise obtained income, or construction fees from developing newly acquired properties.

45

39. And into these dire circumstances, Simpson's erratic, volatile, and abusive behavior only made the situation worse. For example, Arch's construction entity, Arch Builders, LLC, had a staff of seven people on the ground, plus people in the office, including project managers and executives. Beginning in the summer of 2022, these people were either abused and quit or were fired by Simpson. That left no one track budgets and no one to oversee or handle Arch's ongoing construction projects, leading to the projects to fail.

40. Chassen, and others at JJ Arch, including Jason Paul and Michelle Miller, JJ Arch employees/junior partners, regularly suggested to Simpson that Arch outsource property management to independent third-party property managers who had the necessary economies of scale to oversee the properties and ensure that the investor's assets were adequately managed and protected. But JJ Arch would have less revenue by doing so, and would become a mere investment holding company, something that Simpson's ego and self-interestedness could not tolerate, even at the expense of the investors whose interests he was supposed to protect.

41. With properties failing, funds running out, and investors unprotected, in July 2023, even Simpson appeared to recognize that he should walk away and give control to Arch Real Estate's investor member, 35 Oak, who had the funds to right the ship but were not willing to continue funding a black hole where their money just disappeared into Simpson's mismanagement. On July 13, 2023, he sent a proposal through Michelle Miller, a JJ Arch employee/junior partner, to 35 Oak to "unwind" Arch. In the proposal, among other things, 35 Oak would take over ownership of JJ Arch after 60 days, and Simpson would execute a separation agreement. A true and correct copy of the July 13, 2023 email chain is annexed hereto as **Exhibit D**.

42. Later that day, Simpson responded to the email to say, among other things, "[w]e sent this email this AM seeking feedback on a path forward for everyone . . . I urge you to reply

and get to a conclusive agreement below by tomorrow, as we set up timeframes in the proposal for a particular reason. *If not, we will have to take more extreme measures to exercise Dissolution via the Agreement.*" *Id.* (emphasis added). Simpson recognized, expressed of course as a threat, that his remaining at the company would lead to the destruction of the company.

### 35 Oak's Response Enrages Simpson

43. For its own reasons, 35 Oak responded via its counsel, Haynes and Boone, LLP, on July 19, 2023 that they would agree to a proposal whereby, among other things, "Jeff immediately steps away from active day-to-day management of Arch and its subsidiaries and relinquishes authority to act on behalf of Arch and its subsidiaries . . . [and] [t]he JJ Operating Agreement is amended such that Jared has sole control over JJ." A true and correct copy of this email is annexed hereto as **Exhibit E**.

44. Chassen had no knowledge of 35 Oak's deliberations, or that it was going to make this proposal to Simpson, but now understands that 35 Oak made this proposal that Chassen have sole control of JJ Arch, rather than 35 Oak itself as suggested by Simpson, because 35 Oak was concerned it might face financial liability on its Arch loan agreements if neither Simpson nor Chassen were in control of JJ Arch. The proposal that Chassen be placed in charge, however, enraged, Simpson, and he appears to have believed that, though he himself made the proposal to 35 Oak to walk away in their stead, that Chassen somehow was behind their counterproposal that Chassen be placed in charge of JJ Arch instead. Chassen was not.

45. Rather, 35 Oak recognized that unlike Simpson, Chassen was and is a thoughtful, careful, diligent and stable person who acted with his fiduciary duties foremost in his mind and who could be trusted as a steward and fiduciary.

47

## Simpson Becomes Fixated on His Battle with 35 Oak, Which He Escalates, and Chassen Acts to Protect Arch

46. Simpson's relationship with 35 Oak then deteriorated even more and he engaged in a campaign of extortion, abuse, and threats that led 35 Oak to file an action in federal court against him. *See 608941 NJ Inc. v. Jeffrey Simpson*, 1:23-cv-07089-AT (S.D.N.Y.). A true and correct copy of the Complaint is annexed hereto as **Exhibit F**.

47. In the beginning of August, Chassen again told Simpson, the company should transition to third-party management. He responded that he would not do that because he did not want to have to rely on 35 Oak's money with whom he was fighting.

48. As detailed in 35 Oak's Complaint, as well the emails and documents attached to it showing the extensive deterioration of Simpson's relationship with Arch Real Estate's investing partner, Simpson's breached his fiduciary duties to 35 Oak and Arch Real Estate by: (1) threatening to stop work on time sensitive matters in order to blackmail 35 Oak; (2) directing counsel for Arch Real Estate not to speak to 35 Oak; (3) making misrepresentations to 35 Oak, and entering agreements at 35 Oak's expense without consent; (4) falsely advising 35 Oak that it had made capital calls to other investors to induce 35 Oak to make capital contributions; (5) threatening to fire Arch Real Estate employees and cease operations if 35 Oak did not provide money; (6) refusing to execute documents unless terms were included that would only benefit him; (7) entering into major decisions without 35 Oak's consent; (8) creating a hostile business atmosphere damaging critical relationships with lenders, contractors, tenants, etc.; and (9) making defamatory statements.

49. Simpson's battle with 35 Oak continued escalating. On or about August 3, 2023, Simpson told Chassen that if 35 Oak "didn't stop messing" with him, he was going to file for bankruptcy on all the properties and "blow the company up." This, of course, was prohibited by

48

the operating agreements, and further demonstrated to Chassen that Simpson was entirely focused on himself and his petty battle with 35 Oak.

50.     After 35 Oak's counterproposal, Simpson wanted Chassen to take a pay-cut, apparently on the delusional purported belief that such a pay-cut would make him not have to rely on 35 Oak or would demonstrate his loyalty to Simpson. When Chassen suggested that he might accede to such a pay-cut if both were to do so, Simpson refused and grew further enraged.

51.     Chassen learned on August 4, 2023 that Simpson was going to terminate Chassen and free himself to destroy the company and misappropriate company assets at will. Chassen then acted to protect the company.

52.     On August 5, 2023, Simpson sent Chassen an email with the subject line "Jared Chassen - Resignation of JJ Arch LLC." In this email, he "advised" Chassen that he had been "forced to resign as a Member" of the Arch Entities and would no longer be affiliated with the Arch Entities or any of its affiliates "effective immediately."

53.     Simpson's email to remove Chassen as a Member of JJ Arch did not comply with the JJ Arch Operating Agreement. Under the Agreement, the resignation of a Member occurs when "a Cause Event has occurred with respect to a Member and the other Member has delivered written notice thereof to such Member requiring such Member to resign." Ex. A at § 1.1 ("Resignation"). A Cause Event, as defined in the Arch Operating Agreement, includes, but is not limited to, "(i) willful misconduct in relation to the business or affairs of [the Arch Entities]," "(ii) breach of fiduciary duty in relation to the business or affairs of [the Arch Entities]," "(iii) gross negligence in relation to the business or affairs of [the Arch Entities] which results in a material loss to [the Arch Entities] or its Members," and "(v) misappropriation of [the Arch Entities' funds or property]." Ex. A at § 1.1 ("Cause Event").

49

54. Simpson made no allegation that would constitute a Cause Event warranting Chassen's resignation. In fact, all Chassen's actions have been to protect the company and its assets. Simpson's purported notice removing Chassen as a Member of the Arch Entities was nothing more than a blatant attempt to wrest sole control and management of the Arch Entities to insulate himself from his bad acts and render himself a dictator, without any checks or balances.

55. To protect the Arch Entities from further damage, on August 6, 2023, Chassen sent Simpson an email with the subject line "Limited Liability Company Operating Agreement of JJ Arch LLC/Cause Event Notice" and an attachment titled "Notice JJ Arch." In the Notice, Chassen rejected all of Simpson's assertions in the August 5, 2023 resignation email, and his purported forced resignation of Chassen as a Member of JJ Arch, noting that that he had not done any conduct that would constitute a Cause Event because "no such conduct occurred." A true and correct copy of the termination letter is annexed hereto as **Exhibit G**.

56. Chassen then informed Simpson, as required by the JJ Arch Operating Agreement, that Simpson had committed multiple Cause Events that fall into the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating Agreement, including "(a) directing lawyers for one or more Subsidiaries to stop work on extremely time sensitive matters for [his] own personal leverage, (b) making various misrepresentations to [35 Oak] and other investors to induce them to invest in deals and contribute additional capital to Subsidiaries, (c) misapplying Company resources for [his] personal use, (d) breaching [his] fiduciary duty under the LLC Agreement by *inter alia* failing to obtain [my] consent required for certain decisions as required under the LLC Agreement, (e) engaging in willful misconduct as to the business and affairs of the Company . . . [and] (f) engaging in gross negligence, which [would] result in material loss as to the business and affairs of the Company …" *Id.*

50

57.     Chassen advised Simpson that, as a result of these Cause Events, he had to resign, and no longer had the right to act on behalf of the Arch Entities.

58.     Further, Simpson's resignation was independently mandated by the JJ Arch Operating Agreement's provision that makes it a resignation event if the member fails to devote "substantially all business time for JJ Arch." Ex. A at 5. Notice is not a prerequisite to resignation for a failure to provide "substantially all" business time to JJ Arch, *id.*, as notice is only required for Cause Event.

59.     On August 6, 2023, 35 Oak also sent Simpson an email with the subject line "Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC/Cause Event Notice" and an attachment titled "Notice from 35 Oak to JJ Member (Final)." 35 Oak advised Simpson that he had committed multiple Cause Events that fall into the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating Agreement.

<u>**Simpson Files this Action and is Restored to His Managerial Position by an Injunction**</u>

60.     In response to his resignation from JJ Arch, on August 14, 2023, Simpson, individually and derivatively, as managing member of JJ Arch, sued derivatively as managing member of Arch and JJ Arch, Chassen and First Republic Bank.

61.     On August 21, 2023, the Court entered an Interim Order which restored Simpson to his managerial position but required that "[b]oth Simpson and Chassen shall maintain access to view the Arch Accounts online, and such access shall not be terminated without further order of the Court." A true and correct copy of the Interim Order is annexed hereto as **Exhibit H**. The Interim Order further provided that the "JJ Arch shall be managed in accordance with Section 3.1 of the Limited Liability Company Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended by Amendment No. 1 dated May 22, 2021." *Id.* That is, the Court ruled that "the

51

business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set

forth in Section 3.2 of the JJ Arch Operating Agreement, which provides among other things that

any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken

only with the prior written consent of Chassen." *Id.* The Court expressly ruled that "The August

2023 instruments sent by Simpson and Chassen to the other purportedly resigning or terminating

the other as a member or managing member of JJ Arch are hereby void and of no force or effect .

. ." *Id.* Importantly, the Interim Order provided that "Simpson and Chassen shall cooperate with

each other in good faith to facilitate the effective exercise of their respective roles and

responsibilities under the JJ Arch Operating Agreement and related agreements. . ." *Id.*

### Simpson Further Breaches His Fiduciary Obligations and Violates the Court's Orders, Including by Purporting to Again Terminate Chassen

62.     Simpson began violating the Interim Order right from the get-go. He immediately

rehired Tristan Last, an employee who had resigned the day after Chassen removed Simpson for

cause and increased her salary without seeking my consent even though Chassen's consent was

required. He hired a new IT company without Chassen's consent at an expense that required

Chassen's consent.

63.     He then moved all employees away from Chassen's desk, leaving Chassen on the

outskirts of the office space, and clearly intending to show staff that Chassen was no longer a co-

member of the company. While Chassen complied with the Interim Order and gave him access to

Office.com, Dropbox, Go daddy, he then used that access to read all of Chassen's emails, including

those with Chassen's counsel, and deleted Chassen's emails.

64.     Simpson also stopped paying JJ Arch bills that are connected to Chassen's credit.

For example, JJ Arch has 3 Arch trucks that are used for Arch builder entities, and Chassen

received a call from each credit company this week that payments are not being made and they are

in collections. Likewise, JJ Arch's company Visa card, Divvy, is under Chassen's credit, and Simpson removed Chassen from these accounts even though these accounts are tied to Chassen's credit. Chassen also received calls that payments are not being made on these accounts.

65.     Simpson then shut off Chassen's access to his emails, Dropbox, all company systems, and bank accounts.

66.     He demanded that Chassen consent to switch banks from First Republic, without explanation or reason, something that especially frightening considering his repeated misappropriation of company assets and the fact that Chassen would then be unable to view the accounts as required by the Interim Order.

67.     He began telling employees and third-party partners that Chassen was no longer a member of JJ Arch and started defaming him to them.

68.     On September 1, 2023, he sent another formal forced resignation letter even though the Court has just nullified both August letters and directed the parties to cooperate. This September 1, 2023 letter was predicated on false claims and was a contempt of court. It was the product of Simpson's vindictiveness and scorched earth campaign to salvage his bruised ego at the price of the Arch Entities.

### Simpson Continues to Breach his Fiduciary Obligations and Ignores Additional Court Orders Even After Chassen Files A Contempt Motion

69.     On September 14, 2023, Chassen moved to hold Simpson in contempt of Court and to direct Simpson to restore him to JJ Arch and company systems. On September 15, 2023, the Court issued a temporary restraining order, restored Chassen, and barred any further unilateral terminations. A copy of the Court's order is annexed hereto as **Exhibit I**.

70.     Even then, Simpson continued to disobey the courts orders by (1) hiring three new employees without obtaining Chassen's consent, and actually firing employees he perceives as

53

allied with Chassen; (2) opening new bank accounts at Citizens Bank without giving Chassen full access to those accounts; (3) refusing to give Chassen signing authority on bank accounts, taking the position that the orders do not require him to do so; and (4) refusing to give Chassen's full access to Juniper Square, JJ Arch's investor portal. Simpson also directed employees at Arch not to talk to Chassen and has refused to share information with Chassen.

71.     Simpson's defiance of the Operating Agreement and the Supreme Court's orders constitute independent breaches of fiduciary duty.

### Chassen Discovers that Simpson Failed to Disclose Huge Tax and Investment Losses to Investors

72.     On or about September 29, 2023, Chassen discovered that Simpson had completely breached his fiduciary obligations with respect to recent IRC Section 1031 tax exchange vehicles that Simpson advocated investors join. Chassen has just been personally hit with hundreds of thousands of dollars in unexpected tax liability that he learned of in the past few days and must pay by October 15, 2023—as have dozens of other investors—because of Simpson's complete dereliction of his managerial role, as well as his failures to adequately disclose risks to investors or adverse information.

73.     As stated above, in 2022, Arch sold approximately 2000 units and after these units were sold, Arch reached out to investors asking if they wanted to reinvest the money from the sale into other potential properties into IRC Section 1031 tax exchange vehicles, without adequately disclosing the risks that such tax benefit might not be obtained. Chassen along with numerous others did so, though Simpson put only minimal proceeds from the sale into these new vehicles.

74.     Rather than inform investors that the IRC Section 1031 tax exchanges had failed, and that investors would face huge tax liabilities, Simpson hid the information, it only coming to Chassen's attention, and other investors' attention, as investors began to get hit with massive tax

54

bills from the sale. Many investors have yet to learn of their tax liability, as their gains from the 2022 sale is reported as ordinary income, though their K-1s are not being sent out before their tax filing deadlines. Simpson has attempted to cover-up his failures through misleading communications to investors.

75.     And to top it off, Simpson put the funds into properties he is causing to fail by his insistence on mismanaging them, thus not only foisting on investors unexpected and hidden tax liability now, but the imminent complete loss of their investments.

## Demand Futility

76.     Chassen did not make a pre-suit demand because such demand would be futile. Simpson is the acting as the sole managing member and is himself accused of the wrongdoing alleged herein. He is interested in the transactions alleged herein, and has, as alleged herein, completely abdicated his fiduciary responsibilities. Simpson is incapable of making an impartial decision as to whether to bring this suit against himself. Accordingly, any demand requirement is futile and excused.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Breach of fiduciary duty against Simpson-derivative claim on behalf of JJ Arch)**

77.     Chassen repeats each of the proceeding allegations as if fully set forth herein.

78.     Chassen has standing to bring a derivative claim on behalf of JJ Arch because he is a member.

79.     Simpson, as the managing member of JJ Arch, owes JJ Arch fiduciary duties, including the duty of loyalty and good faith.

80.     Simpson breached his fiduciary duties to JJ Arch, by among other things, (1) misappropriating JJ Arch's assets; (2) engaging in abusive behavior towards JJ Arch employees

and personal and investors; (3) knowingly and utterly mismanaging JJ Arch and its properties for his own self-interest, (4) failing to maintain internal controls, (5) failing to devote his business time to JJ Arch; (6) issuing misleading disclosures; (6) refusing to provide books and records to investors even though obligated to do so, and otherwise knowingly taking decision that breached JJ Arch's fiduciary obligations and expose it to liability; (7) making decisions that were harmful to JJ Arch and investors for self-interested reasons; (5) failing to make adequate disclosures to investors; (6) unlawfully attempting to terminate Chassen; (7) failing to obtain Chassen's consent prior to taking major decisions; and (8) refusing to take necessary steps to prevent JJ Arch's properties from failing and going into default.

81.     Simpson's breaches of fiduciary duty have damaged JJ Arch.

82.     Plaintiff is entitled to recover its damages, in an amount to be determined a trial, but estimated to exceed the Commercial Division minimum.

## SECOND CAUSE OF ACTION
### (Breach of fiduciary duty against Simpson-derivative claim on behalf of Arch Real Estate)

83.     Chassen repeats each of the proceeding allegations as if fully set forth herein.

84.     Chassen has standing to bring a derivative claim on behalf of JJ Arch because he is a member of JJ Arch, which in turn is the managing member of Arch Real Estate.

85.     Simpson, as the managing member of JJ Arch, owes Arch Real Estate fiduciary duties, including the duty of loyalty and good faith.

86.     Simpson breached his fiduciary duties to Arch Real Estate, by among other things, (1) misappropriating Arch Real Estate's assets; (2) engaging in abusive behavior towards Arch Real Estate employees and personal and investors; (3) knowingly and utterly mismanaging Arch Real Estate and its properties for his own self-interest, (4) failing to maintain internal controls, (5) failing to devote his business time to Arch Real Estate; (6) issuing misleading disclosures; (6)

56

refusing to provide books and records to investors even though obligated to do so, and otherwise knowingly taking decision that breached his fiduciary obligations and exposed Arch Real Estate to liability; (7) making decisions that were harmful to Arch Real Estate and investors for self-interested reasons; (5) failing to make adequate disclosures to investors; (6) unlawfully attempting to terminate Chassen; (7) failing to obtain Chassen's consent prior to taking major decisions; and (8) refusing to take necessary steps to prevent Arch Real Estate's properties from failing and going into default.

87.     Simpson's breaches of fiduciary duty have damaged Arch Real Estate.

88.     Plaintiff is entitled to recover its damages, in an amount to be determined a trial, but estimated to exceed the Commercial Division minimum.

### THIRD CAUSE OF ACTION
### (Breach of fiduciary duty against Simpson-direct claim)

89.     Chassen repeats each of the proceeding allegations as if fully set forth herein.

90.     Simpson, as the managing member of JJ Arch, owes Chassen fiduciary duties, including the duty of loyalty and good faith.

91.     Simpson breached his fiduciary duties to Simpson, by among other things, (1) entering into the Amended JJ Arch Operating Agreement by coercion, duress, and undue influence; (2) unlawfully attempting to terminate Chassen, (3) denying Chassen access to books and records, (4) failing to make adequate disclosures to Chassen, (5) knowingly making decisions that were harmful to Chassen for self-interested reasons; (6) failing to obtain Chassen's consent prior to taking major decisions; and (7) refusing to take necessary steps to prevent Chassen's investments from failing and going into default.

92.     Simpson's breaches of fiduciary duty have damaged Chassen.

57

93.     Plaintiff is entitled to recover its damages, in an amount to be determined a trial, but estimated to exceed the Commercial Division minimum.

**FOURTH CAUSE OF ACTION**
**(Declaratory Judgment that JJ Arch Amended Operating Agreement is void on grounds of unconscionability, lack of consideration, and undue influence-direct claim)**

94.     Chassen repeats each of the proceeding allegations as if fully set forth herein.

95.     There is a justiciable controversy between Simpson and Chassen whether the JJ Arch Amended Operating Agreement is a valid and binding agreement or is void as the result of unconscionability, lack of consideration, and undue influence.

96.     The Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority after December 11, 2021 is void because it is unconscionable, was not supported by consideration, and is the product of undue influence.

97.     Simpson was in a confidential relationship with Chassen, was Chassen's mentor, and held enormous power over him. Simpson took advantage of his relationship of trust with Chassen.

98.     Despite Chassen vocalizing his disagreement, Simpson presented him with the Amendment on a take-it-or-leave-it basis, threatening him that he would remove him from the business entirely if he did not sign the Amendment.

99.     Chassen signed the Amendment under undue pressure and threats. Simpson pressured Chassen not to hire his own counsel to review the Amendment and limited his involvement in calls Simpson took with the shared Arch Entities' counsel David Heymann who Simpson had draft the amendment in his favor, while Heymann purported to represent both of them. Chassen was not disclosed Hyemann's actual conflicts, and he did not execute any conflict waiver.

58

100.    Because of their unequal bargaining power, prior relationship, Simpson's threats, and deceptive and coercive tactics, and the parties' confidential relationship, Chassen lacked meaningful choice in entering into the Amendment, and it was procedurally unconscionable. And the Amendment itself was substantively unconscionable as it contained only favorable terms to Simpson.

101.    The Amendment and gave away Chassen's managerial rights as well as his membership percentage under the Operating Agreement for nothing of value and was unsupported by consideration. It is therefore void for lack of consideration.

102.    The Amendment was the product of undue influence, including abuse and deception and is therefore void as the product of undue influence.

103.    Further, given Chassen relationship of trust and confidence with Simpson, the burden is on Simpson to establish that he did not enter the Amended JJ Arch Operating Agreement by undue influence or coercion, which burden he cannot meet.

104.    Chassen lacks an adequate remedy at law.

105.    The Court should enter a judgment declaring that the Amendment is void and that under the Operating Agreement, Chassen is a managing member of JJ Arch.

**FIFTH CAUSE OF ACTION**
**(Declaratory judgment against Simpson-direct claim)**

106.    Chassen repeats each of the proceeding allegations as if fully set forth herein.

107.    There is a justiciable controversy between Simpson and Chassen whether Chassen properly terminated Simpson because of his misconduct, breaches of fiduciary duty, and failure to devote substantially all his business time to JJ Arch.

59

108.     As alleged herein, Simpson has breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, and investors, and these breaches constitute Cause Events under the JJ Arch Operating Agreement, each warranting Simpson's resignation.

109.     Chassen lacks an adequate remedy at law.

110.     The Court should enter a judgment declaring that Chassen lawfully terminated Simpson, that Simpson may be terminated, and that Simpson is no longer a member of JJ Arch.

### SIXTH CAUSE OF ACTION
### (Permanent Injunction against Simpson–Direct Claim)

111.     Chassen repeats each of the proceeding allegations as if fully set forth herein.

112.     Simpson has breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, and investors.

113.     These breaches constitute Cause Events under the JJ Arch Operating Agreement, each warranting Simpson's resignation.

114.     Absent injunctive relief, Simpson is liable to continue to purport to act as the managing member, or member, of JJ Arch.

115.     Chassen faces irreparable injury if Simpson continues to act as managing member or member of JJ Arch.

116.     Chassen lacks an adequate remedy at law.

117.     The Court should enter a judgment permanently enjoining Simpson from acting as a member or managing member of JJ Arch.

### <u>CLAIMS FOR RELIEF</u>

**WHEREFORE**, plaintiff demands judgment as follows:

(a) On the First Cause of Action, awarding compensatory damages in an amount to be determined at trial, plus pre-judgment interest.

(b) On the Second Cause of Action, awarding compensatory damages in an amount to be determined at trial, plus pre-judgment interest.

(c) On the Third Cause of Action, awarding compensatory damages in an amount to be determined at trial, plus pre-judgment interest.

(d) On the Fourth Cause of Action, declaring that the Amendment is void and that under the Operating Agreement, Chassen is a managing member of JJ Arch.

(e) On the Fifth Cause of Action, declaring Chassen lawfully terminated Simpson, that Simpson may be terminated, and that Simpson is no longer a member of JJ Arch.

(f) On the Sixth Cause of Action, permanently enjoining Simpson from acting as a member or managing member of JJ Arch.

(g) Awarding Plaintiff all costs and expenses incurred in this action, including, but not limited to, its reasonable attorneys' fees; and

(h) Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 13, 2023

AIDALA, BERTUNA & KAMINS, P.C.

By: *John M. Leventhal*

John M. Leventhal, Esq.
546 Fifth Avenue - Sixth Floor
New York, New York 10036
(212) 486-0011 / (212) 750-9700
judgeleventhal@aidalalaw.com

*Counsel for Defendant Chassen*

Allen Schwartz, Esq. (of-counsel to Aidala,
Bertuna & Kamins, P.C.)

61

## VERIFICATION

State of New York

County of Westchester

    Jared Chassen, duly deposed, swears under penalty of perjury that I have reviewed the annexed answer and affirm that the contents are true to the best of my knowledge, unless stated on information and belief, and those allegations I believe to be true.

By: _Jared_ _(signature)_

Jared Chassen

Sworn and subscribed before me

On this 13ᵗʰ day of _Oban_ , 2023

_(signature)_
Notary Public

```
STACY FRENCH
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01FR6187456
Qualified in WESTCHESTER County
Commission Expires May 19, 20 24
```

SUPREME COURT OF THE STATE OF NEW
YORK
COUNTY OF NEW YORK                              Index No. 158055/2023

JEFFREY SIMPSON, individually and
 derivatively, as managing member of
JJ ARCH LLC, suing derivatively as
managing member of ARCH REAL ESTATE
HOLDINGS LLC, and JJ ARCH LLC,

         *Plaintiffs*

     - against -

JARED CHASSEN, and
FIRST REPUBLIC BANK,

         *Defendants.*

---

## VERIFIED ANSWER TO COUNTERCLAIMS OF JARED CHASSEN

Plaintiffs Jeffrey Simpson ("**Simpson**") and JJ Arch LLC ("**Arch**", together, the "**Plaintiffs**") by and through their undersigned counsel, as and for their answer to the counterclaims (the "**Counterclaims**") of defendant Jared Chassen ("**Defendant**" or "**Chassen**") hereby states as follows:

    1.     Plaintiffs deny knowledge or information sufficient to address what the Defendant purports to seek in the Counterclaims as alleged in paragraph one therein.

    2.     Plaintiffs admit the truth of the allegations set forth in paragraphs 2-10 of the Counterclaims.

    3.     Plaintiffs admit the truth of the allegations set forth in paragraph 11 of the Counterclaims except denies that he "would never yield to opposition and often caused internal conflict."

    4.     Plaintiffs deny knowledge or information sufficient to address how Chassen viewed

Simpson as alleged in paragraph 12 of the Counterclaims.

5.      In answering paragraphs 13-14 of the Counterclaims, the Plaintiffs admit that Simpson left Greystone but deny that it was "under less than favorable circumstances" or that his departure was by reason of "numerous failed and over budget projects."

6.      Plaintiffs deny the allegations set forth in paragraph 15 of the Counterclaims.

7.      Plaintiffs admit the allegations set forth in paragraphs 16-17 of the Counterclaims.

8.      In answering the allegations set forth in paragraph 18 of the Counterclaims, the Plaintiffs refer the Court to the document referenced therein for its full contents and meaning and deny the characterizations advanced by the Defendant set forth in the Counterclaims.

9.      Plaintiffs deny the allegations set forth in paragraphs 19-30 of the Counterclaims.

10.     In answering the allegations set forth in paragraph 31 of the Counterclaims, the Plaintiffs admit Simpson directed Arch Entities' employees to manage accounting, logistics, and facility of the Rêver business, but deny the balance of the allegations set forth therein.

11.     Plaintiffs deny the allegations set forth in paragraphs 32-33 of the Counterclaims.

12.     Plaintiffs deny knowledge or information sufficient to know what Chassen did or did not ask JJ Arch's accountant as alleged in paragraph 34 of the Counterclaims.

13.     Upon information and belief, the Plaintiffs deny the allegations set forth in paragraph 35 of the Counterclaims.

14.     Plaintiffs admit the allegations set forth in paragraph 36 of the Counterclaims.

15.     In answering the allegations set forth in paragraph 37 of the Counterclaims, the Plaintiffs admit that before 2022, Arch owned approximately 5500 units around the country, but in 2022 it sold approximately 2000 of the units but deny the balance of the allegations set forth therein.

16.     Plaintiffs deny the allegations set forth in paragraphs 38-40 of the Counterclaims.

17.     In answering the allegations set forth in paragraph 41 of the Counterclaims, the Plaintiffs refer the Court to the July 13, 2023 email chain annexed thereto as Exhibit D for its full content and meaning and deny the balance of the allegations set forth therein.

18.     Plaintiffs deny the allegations set forth in paragraph 42 of the Counterclaims.

19.     In answering the allegations set forth in paragraph 43 of the Counterclaims, the Plaintiffs refer the Court to Exhibit E for its full content and meaning and deny the balance of the allegations set forth therein.

20.     Plaintiffs deny knowledge or information sufficient to know what Chassen did or did not know of 35 Oak's deliberations as alleged in paragraph 44 of the Counterclaims but deny the balance of the allegations set forth therein.

21.     Plaintiffs deny the allegations set forth in paragraphs 45-51 of the Counterclaims.

22.     Plaintiffs admit the allegations set forth in paragraph 52 of the Counterclaims.

23.     In answering the allegations set forth in paragraph 53 of the Counterclaims, the Plaintiffs deny that "Simpson's email to remove Chassen as a Member of JJ Arch did not comply with the JJ Arch Operating Agreement," and admit the balance of the allegations set forth therein.

24.     Plaintiffs deny the allegations set forth in paragraph 54 of the Counterclaims.

25.     Plaintiffs admit that Chassen transmitted the letter referenced in paragraph 55 of the Counterclaims but deny the accuracy and meaning of its content.

26.     Plaintiffs deny the allegations set forth in paragraph 56 of the Counterclaims.

27.     In answering the allegations set forth in paragraph 57 of the Counterclaims, the Plaintiffs admit that Defendant made the alleged statement but deny it was accurate or appropriate.

28.     In answering the allegations set forth in paragraph 58 of the Counterclaims, the Plaintiffs refer the Court to Ex. A referenced therein but deny that it applies to the Plaintiffs.

29.     In answering the allegations set forth in paragraph 59 of the Counterclaims, the Plaintiffs deny Simpson "had committed multiple Cause Events that fall into the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating Agreement" but admit the referenced notice had been sent.

30.     In answering the allegations set forth in paragraph 60 of the Counterclaims, the Plaintiffs admit that Simpson, individually and derivatively, as managing member of JJ Arch, sued derivatively as managing member of Arch and JJ Arch, Chassen and First Republic Bank.

31.     In answering the allegations set forth in paragraph 61 of the Counterclaims, the Plaintiffs refer the Court to the order referenced therein for its full meaning and effect and otherwise deny the allegations set forth therein.

32.     In answering the allegations set forth in paragraph 62 of the Counterclaims, the Plaintiffs allege that Simpson was not required to get Defendant's consent to rehire Tristan Last. The prior IT could not work for the company.

33.     In answering the allegations set forth in paragraph 63 of the Counterclaims, the Plaintiffs admit the allegations in part but allege that Chassen chose to move where he did.  One hour after he moved, Simpson acceded to his request to move to another office.  Simpson chose to move the remaining staff around for efficiency.

34.      In answering the allegations set forth in paragraphs 64-65 of the Counterclaims, the Plaintiffs admit the allegations in part but allege that Simpson had the authority to adjust JJ Arch bills and payment obligations.

35.     In answering the allegations set forth in paragraph 66 of the Counterclaims, The

Plaintiffs deny that their effort to switch banks was motivated by any animus toward Defendant but arose from an independent business exigency and, in any event, was thwarted by Defendant.

36.    Plaintiffs deny the allegations set forth in paragraph 67 of the Counterclaims.

37.    In answering the allegations set forth in paragraph 68 of the Counterclaims, the Plaintiffs admit that on September 1, 2023, Simpson transmitted another formal forced resignation letter but deny the balance of the allegations set forth therein.

38.    In answering the allegations set forth in paragraph 69 of the Counterclaims, the Plaintiffs refer the Court to the order referenced therein and deny the Defendants' characterizations of same.

39.    In answering the allegations set forth in paragraph 70 of the Counterclaims, the Plaintiffs deny that they disobeyed any Court order and affirmatively allege that any action they took was in accordance with the governing operating agreement and consistent with the best needs of the company.

40.    Plaintiffs deny the allegations set forth in paragraphs 71-76 of the Counterclaims.

41.    In answering the allegations set forth in paragraph 77 of the Counterclaims, the Plaintiffs repeat and reallege each of their foregoing responses as though fully set forth herein.

42.    In answering the allegations set forth in paragraphs 78-79, 84-85, 90, 95, 101, 103 and 107 of the Counterclaims, the Plaintiffs assert that all such questions of law are referred to the Court for its disposition on the basis of a fully developed record.

43.    Plaintiffs deny the allegations set forth in paragraphs 80-82 of the Counterclaims.

44.    In answering the allegations set forth in paragraph 83 of the Counterclaims, the Plaintiffs repeat and reallege each of their foregoing responses as though fully set forth herein.

45.     Plaintiffs deny the allegations set forth in paragraphs 86-88 and 91-93 of the Counterclaims.

46.     In answering the allegations set forth in paragraph 89 of the Counterclaims, the Plaintiffs repeat and reallege each of their foregoing responses as though fully set forth herein.

47.     In answering the allegations set forth in paragraph 94 of the Counterclaims, the Plaintiffs repeat and reallege each of their foregoing responses as though fully set forth herein.

48.     Plaintiffs deny the allegations set forth in paragraphs 96-100 and 102 of the Counterclaims.

49.     Plaintiffs deny the allegations set forth in paragraphs 104-105 of the Counterclaims.

50.     In answering the allegations set forth in paragraph 106 of the Counterclaims, the Plaintiffs repeat and reallege each of their foregoing responses as though fully set forth herein.

51.     Plaintiffs deny the allegations set forth in paragraphs 108- 110 of the Counterclaims.

52.     In answering the allegations set forth in paragraph 111 of the Counterclaims, the Plaintiffs repeat and reallege each of their foregoing responses as though fully set forth herein.

53.     Plaintiffs deny the allegations set forth in paragraphs 112-117 of the Counterclaims.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Defendants fail to state a claim for which relief might be granted.

### Second Affirmative Defense

Defendants' claims fail based on documentary evidence.

### Third Affirmative Defense

Defendants' claims fail because of Defendants' unclean hands.

### Fourth Affirmative Defense

Defendants' claims fail under the doctrines of waiver and estoppel.

Dated: New York, New York
October 16, 2023

Respectfully submitted,

**SAM P. ISRAEL, P.C.**

By:_/s/ Sam Israel_
Sam P. Israel, Esq.
32 Broadway, 11th Fl.
New York, New York 10004
T: 646-787-9880|F: 646-787-9886
Email: admin@spi-pc.com

## VERIFICATION

Jeffrey Simpson, individually and derivatively, as managing member of JJ Arch LLC, hereby verifies under the penalties of perjury that the foregoing responses to the Defendant's counterclaims are true and correct to the best of my knowledge, information and belief.

BY:_____

Jeffrey Simpson

Sworn to before me this __24th__ day of October, 2023

_____
**Notary public**

TING CHOI
Notary Public - State of New York
No. 01CH6406060
Qualified in Queens County
My Commission Expires Mar. 23, 2024

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK – COMMERCIAL DIVISION

---

JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing
derivatively as managing member of ARCH REAL
ESTATE HOLDINGS LLC, and JJ ARCH LLC,

          *Plaintiff,*

    - against -

JARED CHASSEN and FIRST REPUBLIC BANK,

          *Defendants.*

Index No.: 158055/2023

**COMPLAINT**

---

608941 NJ INC.,

          *Plaintiff,*

    - against -

JEFFREY SIMPSON, JJ ARCH LLC and ARCH REAL
ESTATE HOLDINGS LLC,

          *Defendants,*

    and

ARCH REAL ESTATE HOLDINGS LLC,

          *Nominal Defendant.*

---

      608941 NJ INC. ("Oak" or "Investor Member") brings the following Complaint,[1]

individually and derivatively on behalf of ARCH REAL ESTATE HOLDINGS LLC ("AREH"),

against JEFFREY SIMPSON ("Simpson") and JJ ARCH LLC ("JJ Arch," together with Simpson,

Oak, and AREH, the "Parties"), by and through its undersigned counsel Haynes and Boone, LLP,

---

[1] Pursuant to CPLR 6401(a), Oak is a party to this proceeding, but Oak is not currently the subject of any claims
in this matter. Accordingly, this pleading is styled as a "Complaint" rather than a Counterclaim.

alleges, upon knowledge as to itself and upon information and belief as to all other matters, as follows:

## NATURE OF THE PROCEEDINGS

1.      Plaintiff 608941 NJ INC. ("Oak" or "Investor Member") and JJ Arch LLC ("JJ Arch") are parties to a December 11, 2017 Limited Liability Company Operating Agreement (the "AREH LLC Agreement") that governs the operations of AREH. Together, Oak and JJ Arch are the two members of AREH.

2.      Oak is the "money partner" in approximately ten large-scale projects that Simpson and entities controlled by him (namely, JJ Arch, AREH, and certain subsidiary entities of AREH) manage.  Oak has at least $50 million dollars invested in Simpson-managed properties, and has guaranteed loans on some of the projects, either directly or through affiliates, totaling more than $350 million dollars.  JJ Arch, in turn, is denominated the Managing Member of AREH, pursuant to the AREH LLC Agreement.  However, and as described more fully below, JJ Arch was removed as AREH's Managing Member by way of an October 31, 2023 Cause Notice (the "Removal Notice").  *See* Exhibit C to the November 3, 2023 Emergency Affirmation of Leslie C. Thorne ("Thorne Aff.").

3.      Simpson's status at JJ Arch is the subject of the above-captioned proceeding (the "JJ Arch Proceeding").  Pursuant to a series of interim orders in the JJ Arch Proceeding, Simpson has been acting as the managing member of JJ Arch.

4.      However, Oak has sought a change in management at JJ Arch.  Namely, on October 17, 2023, Oak joined this matter as a party and brought a motion by order to show cause for the appointment of a temporary receiver of JJ Arch (the "Receiver Motion," NYSCEF Doc. No 225 (Mot. Seq. No. 4)).  During a hearing on Oak's Receiver Motion, the Court suggested that as an

FILED: NEW YORK COUNTY CLERK 05/05/2023 02:03 PM INDEX NO. 650388/2023
NYSCEF DOC. NO. 319 4 RECEIVED NYSCEF: 05/05/2023

Pg 117 of 363

alternative to the appointment of a receiver, Oak may instead seek to remove the Managing Member and appoint an individual or entity with more familiarity with AREH's business, such as Oak, "whose been involved in the business and knowledgeable about real estate." (Transcript of October 19, 2023 hearing before Hon. Joel Cohen ("Hearing Tr.") at 12:20-22.)

5. Therefore, by this action and for the reasons detailed herein, Plaintiff Oak brings claims against Defendants Simpson and JJ Arch for breach of fiduciary duty, breach of contract, and declaratory judgment. Plaintiff Oak also brings derivative claims on behalf of AREH for breach of fiduciary duty against Defendants Simpson and JJ Arch. Plaintiff Oak brings claims for tortious interference with contract, tortious interference with prospective economic advantage, defamation, fraud against Simpson individually. Finally, Oak seeks an equitable accounting against Defendants JJ Arch and AREH.

6. In addition to the foregoing relief, pursuant to its concurrently filed Emergency Order to Show Cause for Temporary Restraining Order and Preliminary Injunction to Enforce JJ Arch's Removal (the "PI OSC") Oak seeks a temporary restraining order restraining Simpson and/or JJ Arch from acting as Managing Member of AREH, following Oak's removal of JJ Arch on October 31, 2023 and either of the alternatives: (i) appointment of a temporary receiver as set forth in the Receiver Motion; or, (ii) appointment of Oak as the Managing Member of JJ Arch in place of Simpson for the duration of the JJ Arch Proceeding, as elaborated in the PI OSC.

## THE PARTIES

7. Oak is a corporation duly organized and existing under, and by virtue of, the laws of the State of New Jersey, with its principal place of business in Toronto, Canada.

8. AREH is a limited liability company organized under the laws of New York. Its members are Oak, a New Jersey corporation, and JJ Arch, a New York limited liability company with New York resident members.

9.      Upon information and belief, Simpson is a resident of the State of New York, domiciled at 1055 Park Avenue Unit 4, New York, New York 10028.

10.     Upon information and belief, JJ Arch is a limited liability company organized under the laws of New York.  Its members are Simpson and Jared Chassen ("Chassen"), both residents of the State of New York.

## JURISDICTION, VENUE, AND GOVERNING LAW

11.     This Court has personal jurisdiction upon appropriate service of process over Simpson and JJ ARCH as they reside and conduct business in the State of New York, County of New York and since they commenced this action in this court.

12.     Venue is proper in the Supreme Court of the State of New York, County of New York, pursuant to CPLR 503(a) as Simpson and JJ ARCH reside and conduct business in New York County.  Venue is further proper in the Supreme Court of the State of New York, County of New York, pursuant to CPLR 507.

## FACTUAL BACKGROUND

### A.  Oak's History

13.     Oak is a subsidiary of 35 Oak Holdings Ltd. ("Oak Guarantor"), a Canadian entity owned and controlled by members of the Wiener family.

14.     Oak Guarantor is a holding company and family office. While it is today focused on investments and real estate, the family business was first created by the family patriarch, David Wiener.

15.     David Wiener started Wiener Electric, a company that would later become Visioneering Corp. Visioneering pioneered the use of a lightweight frame housing for fluorescent lighting. Under the leadership of David, and later David's son, Bill Wiener, Visioneering would become the largest independent manufacturer of lighting in Canada.

16. David was always a believer that land was the safest possible store of value, because it is finite and satisfies a basic need. Accordingly, the Wiener family began using the proceeds from Visioneering's success to invest in real estate, always adopting a conservative approach to its investment. The strategy was to choose a parcel in an area that believed to have long-term development potential and revenue streams that could cover its operating expenses, purchase the land in cash without any leverage, and hold onto the land as long as it took for its value to be realized before selling it.

17. Members of the Wiener family put together a property management company called Bilnia Investments Ltd ("Bilnia"). Bilnia sits under 35 Oak and is an affiliate of Oak. Bilnia continues to manage 35 Oak's real estate portfolio, which includes retail, office and storage facilities, primarily in Ontario and Florida.

18. AREH was formed in 2017 when Oak sought to expand its U.S. real estate holdings. Since AREH's inception, Oak has invested at least $3 million directly into AREH to fund its overhead and operations, and over $50 million in the properties developed, managed and/or controlled by AREH or JJ Arch. Oak has made the vast majority of its equity investments in the properties developed, managed and/or controlled by AREH or JJ Arch through Arch-affiliated entities and is entitled to distributions from those entities in respect of such investments in accordance with the governing documents of those entities.

19. As described more fully below, the unjustified and contractually prohibited acts and omissions of Simpson, acting on behalf of JJ Arch and AREH, have already harmed and stand to further threaten the stability of the Oak, Oak Guarantor and the Wiener family legacy.

**B. The AREH LLC Agreement**

20. Defendant AREH is governed by the AREH LLC Agreement. Pursuant to the Preamble and Section 13.1.1 of the AREH LLC Agreement, Oak is denominated the "Investor

Member" of AREH LLC and JJ Arch the "Managing Member." *See* Doc. No. 2 (AREH LLC Agreement). Currently, pursuant to the AREH LLC Agreement, JJ Arch is responsible for the management and operations of real property holdings valued in excess of $1 billion as of 2022, and in which Oak has far and away the most funds of any party.

21. Under the AREH LLC Agreement, "The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member"— referring to JJ Arch—subject to Oak's Major Decision rights, which are enumerated in Section 7 of the AREH LLC Agreement. Doc. No. 2 at §§ 7.1.1, 7.1.3.

22. The Managing Member, JJ Arch, must provide Oak with "all information reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property[,]" pursuant to Section 11.5.2 of the AREH LLC Agreement. Oak has inconsistently received required financial reports and AREH has failed to substantially fulfill its obligations under Section 11.5.

23. Oak has repeatedly made prior requests for the financial reporting required to be provided to Oak under the AREH LLC Agreement, which requests have been rebuffed, refused, or granted only subject to unreasonable and unjustified conditions.

24. On or around October 19, 2023, following the hearing on Oak's Receiver Motion, AREH began to comply with the books and records demands for AREH and all subsidiary entities to whom Oak has contributed capital or that are directly or indirectly managed by AREH (the "Applicable Entities"). However, the records and documents that have been shared to date do not satisfy the requests Oak has made, and are so incomplete that Oak still does not have access to such basic information as the balance sheets for AREH and the Applicable Entities.

**C. General Mismanagement of AREH and Misconduct by Simpson and JJ Arch Leading to Unforeseen Tax Liabilities, Defaults, and Foreclosure**

6

25.     In recent months, including through the filings in the JJ Arch Proceeding, Oak has come to learn of the serious mismanagement that has occurred and still occurring at AREH.  Such events include the following:

26.     With respect to certain properties under development, AREH purposely failed to comply with the requirements under Section 1031 of the Internal Revenue Code (the "1031 Exchange") to obtain tax benefits, the receipt of which was essential to the commercial success of the project and was the basis on which investment was sought and obtained.  Indeed, when seeking commitments to the 1031 Exchange, AREH characterized the opportunity as presenting essentially no risk because, according to a communication from AREH Investor Relations "If a satisfactory re-investment opportunity cannot be identified, funds shall be returned to investors."  *See* Doc. No. 236.  As we now know, apparently the 1031 Exchange was a failure, and investors did not receive a return of their funds.  While members of AREH's staff, and Mr. Simpson himself, were aware of the failure to obtain these benefits, they delayed revealing this information to investors with certain investors (including Oak) never receiving any formal notice of the issue.  As a result, investors in the project now face unexpected and significant tax liabilities that eclipse any possible return that could have been obtained on the property.  *See* Doc. No. 258.

27.     The circumstances surrounding AREH's abandonment of the 1031 Exchange have yet to be fully disclosed, while startling information in Chassen's October 6, 2023 affidavit in the JJ Arch Proceeding indicates that Simpson himself had minimal funds on the line, and therefore was uniquely insulated from the failure.  *See* Doc. No. 162 at ¶ 24.  This circumstance is particularly egregious because Simpson induced Oak's investment by representing that AREH was participating in the 1031 Exchange, which was not the case in fact.  *See* Doc. No. 236.

Nevertheless, Oak has yet to receive an explanation as to why it now, as the largest investor in the failed 1031 Exchange, faces millions in tax liabilities.

28.     AREH, through the acts and omissions of Simpson, has failed to make debt servicing payments as required, causing the affected properties to go into default.  As of the date of this filing, Oak has received default notices regarding at least seven properties, which number is expected to expand based on Oak's understanding that formal notices have not been sent in all applicable cases.  Similarly, one property was the subject of a foreclosure auction on October 19, 2023, and two more are scheduled for foreclosure auctions in near future.

29.     In one instance that led to a formal notice of default being issued, email correspondence reflects that despite repeated notices of the shortfall and the need to immediately remedy it, Mr. Simpson did not even respond to the debt servicer until after the initial date for payment had passed.  Mr. Simpson then failed to notify Oak until the eve of the default, which is non-remedial, in addition to having never made a capital call for the property.  *See* Exhibit 9 to the Nov. 2 Wiener Aff.

30.     A September 14, 2023 affidavit of Chassen, also filed in the JJ Arch Proceeding, similarly contains numerous statements that Simpson mismanaged AREH and the Applicable Entities, made misrepresentations to investors, and provided them with inadequate reporting, including:

a.  "The operation of the Arch Entities did well initially, but it went downhill over the past two years." Doc. No. 62 ¶ 16.

b.  "Simpson forced the team to make various misrepresentations about real estate projects to induce investments. Simpson and team members including myself were forced to pitch grossly under budgeted projects and promised unrealistic returns

on investment to induce investors, such as 35 Oak and many others to contribute additional capital without ever disclosing risks." *Id.* ¶ 19.

c. "Simpson also provided minimal reporting to investors, leaving them in the dark and keeping the staff overworked and understaffed and unable to do simple tasks like reporting or reconciliation. 35 Oak, the Arch Real Estate funding partner, kept funding the business and projects without proper capital calls, reporting or communication from JJ Arch, and if they ever questioned Simpson, he would threaten retribution if they did not continue to fund. He would tell them they were only good for capital and guarantees, and nothing else." *Id.* ¶ 19

d. "Recently, the project relied on one time-sensitive forbearance to move forward, yet Simpson instructed his lawyer for the Arch Entities to put pencils down and not turn over the necessary documents to 35 Oak, the guarantor. He was planning to hold documents as leverage to cut a deal with one major lender and force 35 Oak to take certain actions that would favor his personal interests. As a result of the delay, the Myrtle Point development has been stalled for months, causing the Arch Entities to lose more than fifty percent of its necessary revenue and putting additional strain on the business and putting over $45 million of equity at risk for full loss." *Id.* ¶ 20

e. "Simpson failed to properly supervise and manage projects. Across various projects, Simpson was not involved for months and in many instances disappeared to focus on his other businesses." *Id.* ¶ 21.

f. "[A]s cash flow started to become limited at Arch, at the extreme detriment of our managed investments and to increase income streams for the company, Simpson

started a plan forcing the team leaders to take on even heavier workloads amongst senior employees, and shedding necessary employees such as project managers, construction managers, accountants, and other crucial roles to run projects. Simpson's attempt to cut expenses to generate additional income deprived many projects of proper supervision, which led to numerous failures." *Id.* ¶ 22.

31. Accordingly, a picture emerges of a company in serious disarray and headed for imminent collapse. While Simpson has repeatedly referenced a potential need to pursue bankruptcy, apparently retained bankruptcy counsel for AREH, and strenuously opposed Oak's efforts to safeguard its consent rights under the AREH LLC Agreement in respect of any bankruptcy filing, at no point has Oak actually been presented with a bankruptcy proposal or any semblance of one either for a property or on a global basis. These circumstances raise serious questions as to the financial reality of AREH and the Applicable Entities, and as to Simpson's observance of his fiduciary and other duties.

**D. Major Misconduct Related to Spending, Budgeting and Capital Calls**

32. In addition to the foregoing misconduct, Simpson, acting on behalf of JJ Arch and AREH, has engaged in serious misconduct with respect to the financial affairs of JJ Arch and AREH. As is described more particularly below, the serious mismanagement of the businesses has led to a purported "liquidity crisis," culminating in Simpson's communication to AREH's staff furloughing them. *See* Exhibit B to the Thorne Aff. Some representative instances of such misconduct include the following:

33. Simpson failed to present a budget for Oak's approval for 2023, and when this significant lapse in protocol was brought to his attention, insisted that regardless of Oak's approval, Simpson could proceed with the prior year's budget as if approved for 2023 if he desired, in violation of the terms of the AREH LLC Agreement. *See* Exhibit 10 to the Nov. 2 Wiener Aff.

10

34.     On numerous occasions, Simpson has falsely advised Oak that certain capital calls have been made to other investors.  As a result of such misrepresentations, (1) Oak funded significant capital on behalf of such other investors, and (2) Simpson led Oak to believe that Oak's capital funding would have priority over other investors' distributions and therefore that it would effectively receive interest from the other investors who failed to contribute.

35.     Related to the above, Simpson has repeatedly demanded capital contributions from Oak without following the contractual procedures elaborated in the AREH LLC Agreement requiring the formal issuance of capital calls and regular financial reporting.  Oak has acceded to these demands from time to time under the threat from Simpson that such capital needs were urgent and that ruinous events would ensue absent an immediate contribution of capital.  Doc. No. 254,[2] a September 24, 2023 email with the subject line, "Emergency funds - URGENT reply required" is typical of the extortive demands for capital Oak has received, which flout all proper procedure for capital calls and lack virtually any explanation for the necessity of the funds.

36.     In a similar instance where Simpson made demands for capital that was purportedly urgently needed, he refused to provide a breakdown of how much money he was asking for or whether such funds were being contributed to AREH or to one of the properties subject to AREH's management.  When Oak refused, Simpson proposed "borrowing" money from the properties, regardless of whether he had consent from the investors in those properties to do so, demonstrating an exceptionally troubling attitude towards his obligations to investors, the properties, and to sound accounting practices.  *See* Doc. No. 227 (K. Wiener Aff.) ¶ 48; Doc. No. 234.

37.     Most recently, late in the evening of October 25, 2023, AREH sent a purported capital call seeking approximately $300,000 on an emergency basis to meet AREH's claimed

---

[2]     Certain redactions are applied regarding settlement, pursuant to Federal Rule of Evidence 408.

payroll needs, which AREH's purported counsel communicated was due within three business—the following Monday. Although Oak has already met its $3 million funding cap for AREH's overhead, and therefore has no obligation to make any further contributions to AREH for its payroll or any other operational expenses, Oak nevertheless entertained the request subject to certain conditions, which primarily consisted of receiving further information about the capital needs. Specifically, Oak reiterated its need for books and records—which AREH had already conceded it was under a court order to provide—and requested specific information as to which employees would be paid, in what amounts, and when the next payroll date would occur. Oak similarly sought assurances that any capital it provided in response to this request would not be used to pay certain lawyers, Simpson himself, or JJ Arch, among certain other commitments. In subsequent correspondence through counsel, Oak made clear that "[i]f there's a condition Mr. Simpson finds objectionable and there is a good reason why, we're happy to consider." *See* Exhibit B to the Thorne Aff.

38. In the intervening period between the purported capital call and communications between counsel regarding the conditions on which Oak would fund payroll, this Court entered the Interim Order Regarding Measures During the Pendency of the Order to Show Cause Regarding the Appointment of Receiver for JJ Arch (the "Interim Measures Order," NYSCEF Doc. No. 292). The Interim Measures Order ordered compliance with the AREH LLC Agreement, including the Section 7.1.3, regarding Major Decisions, reinforced Oak's entitlement to information, including through the provision of books and records, spend against the AREH budget, and generally promoted greater transparency to Oak.

39. Nevertheless, rather than providing the requested information or objecting to any of Oak's conditions for funding the payroll, and in complete disregard of the spirit of the Interim

Measures Order, purported counsel for AREH communicated that it treated Oak's conditions as a "refusal to honor any portion of the recent Capital Call" and that "AREH was required to furlough employees." Attached to this communication was a letter from Simpson informing AREH staff that, effective as of October 27, 2023, they were furloughed and should cease working immediately. *See* Exhibit B to the Thorne Aff.

40.     Counsel's incorrect characterization that Oak had "refus[ed] to honor any portion of the recent Capital Call" was further improper because (1) it failed to conform to the AREH LLC Agreement's requirements; (2) Oak had already met its funding cap; (3) and Oak was entitled to five business days to contribute capital in response to any valid capital call under Section 3.2.2 of the AREH LLC Agreement. Indeed, the purported capital call was made with fewer than five business days' notice even though AREH's payroll obligations occur on a predictable schedule, known in advance. The fact that Simpson in any event instructed all AREH employees to cease working immediately before Oak could elect to provide the requested funds, and that he did so after the Interim Measures Order was entered, indicates that Simpson has no regard for his duties to Oak, the other investors, or this Court's authority.

41.     As Simpson is aware, a furlough has immediate and irreparable consequences for AREH and the properties it manages. Indeed, with no employees carrying out the business of managing the properties, the entire business would collapse in a matter of days to weeks—wiping out Oak's investments, other investors' investments, and triggering potentially massive liabilities on Oak's and Oak Guarantor's guaranties. Since the furlough, Oak has received reports of widespread panic from property management teams around the country.

42.     While Oak remains unaware of the exact financial condition of AREH and the properties because of Simpson's obstructive and dilatory conduct in providing the necessary

information to Oak, Oak understands in the lead up to the purported "liquidity crisis" that prompted Simpson to furlough all employees, Simpson has authorized six-figure payments to counsel in recent weeks, apparently prioritizing the legal battles he has initiated (and his individual interests thereby implicated) over the functioning of the underlying business.

43. Both members of JJ Arch have accused the other of misappropriating company funds. For instance, in his September 14, 2023 affidavit (the "Chassen Affidavit"), Mr. Chassen attests as follows: "The accountant confirmed that Simpson was using company funds from Arch Real Estate to pay private expenses. She confirmed that he took Arch Real Estate money to pay auto employees and that he owed Arch Real Estate money. She also confirmed that due to extreme lack of staff there was minimal accounting of funds." *See* Doc. No. 62 at ¶ 30.

44. The Chassen Affidavit also contains numerous statements that Simpson mismanaged AREH and the Applicable Entities, made misrepresentations to investors, and provided them with inadequate reporting, including:

a. "The operation of the Arch Entities did well initially, but it went downhill over the past two years." *Id.* ¶ 16.

b. "Simpson forced the team to make various misrepresentations about real estate projects to induce investments. Simpson and team members including myself were forced to pitch grossly under budgeted projects and promised unrealistic returns on investment to induce investors, such as 35 Oak and many others to contribute additional capital without ever disclosing risks." *Id.* ¶ 19.

c. "Simpson also provided minimal reporting to investors, leaving them in the dark and keeping the staff overworked and understaffed and unable to do simple tasks like reporting or reconciliation. 35 Oak, the Arch Real Estate funding partner, kept

14

funding the business and projects without proper capital calls, reporting or communication from JJ Arch, and if they ever questioned Simpson, he would threaten retribution if they did not continue to fund. He would tell them they were only good for capital and guarantees, and nothing else." *Id.* ¶ 19

d. "Recently, the project relied on one time-sensitive forbearance to move forward, yet Simpson instructed his lawyer for the Arch Entities to put pencils down and not turn over the necessary documents to 35 Oak, the guarantor. He was planning to hold documents as leverage to cut a deal with one major lender and force 35 Oak to take certain actions that would favor his personal interests. As a result of the delay, the Myrtle Point development has been stalled for months, causing the Arch Entities to lose more than fifty percent of its necessary revenue and putting additional strain on the business and putting over $45 million of equity at risk for full loss." *Id.* ¶ 20

e. "Simpson failed to properly supervise and manage projects. Across various projects, Simpson was not involved for months and in many instances disappeared to focus on his other businesses." *Id.* ¶ 21.

f. "[A]s cash flow started to become limited at Arch, at the extreme detriment of our managed investments and to increase income streams for the company, Simpson started a plan forcing the team leaders to take on even heavier workloads amongst senior employees, and shedding necessary employees such as project managers, construction managers, accountants, and other crucial roles to run projects. Simpson's attempt to cut expenses to generate additional income deprived many projects of proper supervision, which led to numerous failures." *Id.* ¶ 22.

45.     Indeed, Simpson readily admitted to improper use of company funds, explaining that an employee of his automobile business, Rêver Motors, which is completely separate from AREH, is on the AREH payroll.  *See* Doc. No. 160 (October 2, 2023 Affidavit of Jeffrey Simpson) at ¶ 21.

46.     Discussions with Rebecca Tokarczyk, an AREH accountant, confirm the irregularities, misuse, and misappropriation of AREH funds by Simpson.  Ms. Tokarczyk has described that, among other things, AREH's accounting department was severely understaffed and the lack of personnel inhibited proper recordkeeping.  Compounding the understaffing, accounting staff was directed to "borrow" money from the various accounts under AREH's control for other entities' use, even over protestation.  Since June 2023, Simpson directed Ms. Tokarczyk to come up with creative ways to pass money through the organizations, labeling the transfers as "distributions" to AREH, but then not handling them as distributions in fact.  On at least one occasion where Ms. Tokarczyk voiced concern with these practices, Simpson declared "I'm the Managing Member and can take money from where I want."  Ms. Tokarczyk reports that AREH's funds were used to cover non-AREH expenses, including her own salary, despite the fact that she exclusively performed work for JJ Arch and its principals.  Likewise, AREH was billing properties for accountant work, but not actually paying outside accountants.

47.     Reinforcing the statements of Ms. Tokarczyk, Jason Paul, a member of the AREH team responsible for asset management, recounted in an August 9, 2023 email Simpson's plans to redirect the budget for Arch Property Management, a subsidiary of AREH, to AREH in order to cover payroll expenses of AREH, notwithstanding the "recognize[d] underperformance of property operations" at properties managed by Arch Property Management.  Paul expressed his belief that "[t]he recent actions he has taken with respect to the company restructure have crossed

the line of our fiduciary responsibilities, as the interest of our investors was no longer being made the primary objective. Ensuring that he and others would continue to receive a salary became the goal, even if this was to be at the expense of the properties and the investors." *See* Doc. No. 190.

48.     All the while, Simpson has engaged in a campaign of misinformation to investors, attempting to pin the blame on Oak the current state of affairs without naming it as such.  *See* Doc. No. 241 (M. Wiener Aff.) ¶ 44; Doc. No. 256 (Exhibit 15 to M. Wiener Aff.) (in a communication to investors, offering a seriously misleading account of the state of the project by asserting, "our investment partner has indicated they are in a position where they either unwilling or unable to contribute additional funds. This recent change has caused work to stop at the site until additional funds are infused into the project."). *See also* Doc. No. 227 (K. Wiener Aff.) ¶ 61.

### a.   Misrepresentations about Oak's Capital Contributions

49.     Simpson's failure to formally raise capital calls and prepare appropriate paperwork evidencing the basis and terms on which capital has been contributed by Oak appears to serve Simpson's modus operandi of recanting or denying the statements on which Oak's investment of further capital was predicated.

50.     October 25, 2023, Simpson sent concurrent capitals calls for AREH and the stalled Myrtle Point project. In his AREH capital call, Simpson claims that $650,000 Oak had contributed in June 2023 to cover overhead expenses instead "should have been credited" to Myrtle Point, and then used by that project to pay its payables to AREH. Simpson therefore issued a capital call for Myrtle Point, which he has purported to pay with the equity Oak had already contributed to AREH. Needless to say, there is no provision in any of the relevant operating agreements that would allow Simpson to capital call Oak through one LLC and fund it by removing and reallocating Oak's already-contributed equity from another LLC.

51.     It is unclear whether Simpson always intended to reclassify Oak's equity contribution, or if he only decided to after the money was contributed. If it is the former, then Simpson induced Oak's contribution by fraud. Oak has no obligation to provide additional equity to the Myrtle Point project. Any equity contributed to Myrtle Point gets immediately subordinated behind another investor, earns virtually no economics, and is at significant risk of loss given the present state of that project. Moreover, that LLC owes millions of dollars to various vendors and subcontractors. To the extent that Oak would wish to contribute additional funds to that project, it would be to cover invoices from subcontractors that could secure additional work from those subcontractors, so that further progress is made on the project. It would not be so that AREH could give itself a preference over all the other creditors.

52.     It was Oak's clear understanding at the time the $650,000 was contributed in June that it was being contributed under the AREH operating agreement. Oak was legally obligated to contribute funds to AREH and most of the costs being covered had nothing to do with Myrtle Point. Indeed, the email seeking the funds in June 2023 had the subject line "Corporate Cash Needs" and referred to a separate email that would be coming out later in the day for "property cash needs." While the "Corporate Cash Needs" email did refer to outstanding receivables from Myrtle Point, we merely understood that to mean that much of the $650,000 would be repaid to us when AREH's receivables were paid (whether that was through additional equity being contributed to Myrtle Point down the line or by further advances on the project's construction loan).

53.     In other words, Simpson uses a combination of fraud and accounting chicanery to try turn a clear $3-million cap into an unlimited line of capital. First, Simpson capital calls funds from Oak at the AREH level where Oak has a legal obligation to fund. Then, after Oak has already

18

funded, say that the capital "should have" been funded at the property level (where there is no obligation to fund), reclassify the funding in AREH's books and records as property-level equity, and reduce Oak's funding at the AREH level back under the cap so the entire process can begin again at the next payroll cycle. In fact, the very email from Simpson purporting to reclassify Oak's equity sets himself up to pull the same trick in the future, by including a chart stating that most of the payroll funding requested will be "reimbursable at the property level," notwithstanding that they were capital called at the AREH level.

54.     In part to avoid this unending cycle of fraudulent capital calls at the AREH level that are later reclassified to property-level funding, Oak demanded that Simpson withdraw his meritless Myrtle Point equity reclassification capital call, so that any payroll funding is property recognized as an above-cap capital contribution that cannot be reallocated into any other LLC without Oak's consent. Simpson has refused to do so, and Oak is unable to contribute further capital at the AREH level while there remains outstanding a fraudulent attempt to reclassify Oak's previously-contributed capital.

55.     As AREH has begun to release certain records to Oak pursuant to the Interim Measures Order requiring the provision of books of records, Oak has identified serious discrepancies in the records (notwithstanding that such productions have been seriously deficient, and Oak is owed substantially more documentation).  Select but representative discrepancies identified to date include:

   a. Unexplained reductions of Oak's equity. For example, for the Bushwick project, financial statements in August 2023 reflected Oak had an interest of $1.726 million, which current statements now report as only $1.150, despite no intervening events occurring that would explain this change.

19

b. Failure to account for Oak's contributions. Entire amounts advanced by Oak are simply not recorded in the tables provided, as is the case for Center Point ($5 million unaccounted for) and 16th Street ($40,070 unaccounted for).

c. Internally inconsistent tables. For example, tables provided for Center Point appear to indicate Oak holds a 28% interest when the various tiers of percentages are summed. But Oak's interest as a percentage of the total capitalization (as reported in the table) indicates a different percentage interest, and the tables inaccurately state Oak's member loans.

### E. Simpson's Past Record of Misconduct and Breaches of Fiduciary Duty

56. Other conduct that Simpson has engaged while serving as JJ Arch's Managing Member include the following:

a. Holding hostage the sale proceeds of an Oak affiliate's interest in a property on Biscayne Blvd in Miami—in which Simpson and entities controlled by him had no ownership interest at all—by demanding Oak agree to pay him approximately $60,000 in pre-development fees to which he had no legitimate claim. In order to ensure that it will have access to the sale proceeds, Oak had little choice but to give into Simpson's demands, notwithstanding his utter lack of entitlement to the fees. Simpson has since intimated that he will withhold the entire proceeds of the sale to use as leverage in his broader dispute with Oak even if the fees are paid, notwithstanding that AREH has no possible economic interest in the sale proceeds outside of the $60,000 in dispute. *See* Doc. No. 227 (K. Wiener Aff.) ¶¶ 30-37.

b. Refusing to provide basic information despite clear obligations to provide such information. For instance, regarding the flagging Myrtle development,

Simpson refused to provide any meaningful information as to the financial needs to complete the project and secure the much-needed anchor tenants, which is the only reasonable path forward to prevent a complete loss on the project. (*See* Doc. No. 249 (Exhibit 8 to M. Wiener Aff.); Oct. 6 Chassen Aff. ¶ 6). When asked to confirm the accuracy of the proposed budget to secure the anchor tenants—which Oak would contribute—Simpson set off on a tirade about the lack of funds, despite the fact that the solution under consideration was further investment from Oak: "As I previously indicated there's 200,000 to finish. . . By tomorrow, the site is getting locked down without any workers. There is no money to pay for anyone. You can't try to call the shots on this stuff when there's no money to pay for anything. It doesn't work. If you actually care about the assets and the needs that are required, that's a real dialogue." Doc. No. 249.

c. Forbidding Oak from communicating with third parties such as lender and other investors, even threatening legal action in such event. *See*, *e.g.*, Doc. No. 249 (threatening, "This is the last notice to you. You are not to reach out to anyone without my consent. If you continue, it's at your own risk and immediate legal action will be taken."). *See also* Doc. No. 227 (K. Wiener Aff.) ¶¶ 61-63 (describing Simpson's efforts to stymie the flow of information to facilitate his misdeeds and double-speak).

d. Directing counsel for AREH, certain of its subsidiaries, Oak and Oak Guarantor (as guarantor of certain loan obligations with respect to the Arch Portfolio) to stop work on critical, time sensitive work as a means of leverage to force Oak

to take certain actions. *See, e.g.*, Doc. No. 243 (July 11, 2023 11:50 PM email from J. Simpson re: Morrison Cohen, redacted due to privilege concerns but available for *in camera* review). On information and belief, Simpson continues to interfere in the representation of AREH, certain of its subsidiaries, Oak and Oak Guarantor in these time-sensitive matters, advising counsel to halt work following his removal from JJ Arch and AREH.

e. Directing counsel for AREH, certain of its subsidiaries, Oak and Oak Guarantor to not speak to Oak or Oak Guarantor, such counsel's own client. Again, Simpson's purpose was to exert leverage over Oak and Oak Guarantor. *See, e.g.*, Doc. No. 244 (August 1, 2023 5:36 PM email from J. Simpson re Nostrand).

f. Making misrepresentations to Oak concerning capital. For instance, regarding the 550 Metropolitan Avenue development in which Oak is a General Partner, it came to Oak's attention that although the relevant member loan provisions in the underlying agreements allow Oak to fund shortfalls and accrue an 18% interest rate, AREH at Simpson's direction had made a commitment to other investors that such loans would accrue at only 12%. AREH and Simpson made this commitment without Oak's knowledge, authorization, notification, or any amendment to the underlying agreements. *See* Doc. No. 245 at Section 3.2.2 (Amended and Restated Limited Liability Company Operating Agreement of 550 Metropolitan Ave Holdings LLC); Doc No. 246 (550 Member Loan Distribution Records, reflecting interest rate of 12%). Oak challenged this immediately, and Simpson attempted to justify his unauthorized and

unwarranted conduct by suggesting that family and friends would be unduly penalized under the contractually agreed 18% rate. The 550 Metropolitan Avenue development is not the only instance in which Simpson unilaterally, without Oak's knowledge, authorization, notification, or any amendment to the underlying agreements, lowered the interest rate accruing to Oak.

g.  Advising Oak that certain capital calls to other investors had been made, which was not the case in fact. As a result of such misrepresentations, (1) Oak funded significant capital on behalf of such other investors, and (2) Simpson led Oak to believe that Oak's capital funding would have priority over other investors' distributions and therefore that it would effectively receive interest from the other investors who failed to contribute. In fact, Oak had no such right to priority payments or interest, as no capital calls had occurred. *See, e.g.*, Doc No. 243 (July 11, 2023 11:50 PM email from J. Simpson re: Morrison Cohen, redacted for privilege); Doc. No. 247 (July 31, 2023 8:01 PM email from T. Last re: Myrtle).

h.  Threatening to fire all AREH employees and cease operations if Oak does not accede to demands for money, despite no capital calls having been made. *See, e.g.*, Doc. No. 248 (July 11, 2023 11:39 PM email from J. Simpson re: Meeting Recap).

i.  Engaging in conduct constituting a "Major Decision" under the AREH LLC Agreement, which requires the consent of Oak, without providing Oak any notice of such conduct nor seeking Oak's required approval. Simpson likewise attempted to circumvent his obligations to obtain Oak's consent to make a

23

Major Decision, which is defined as, among other things, a decision to "enter into any agreement requiring the expenditure of more than $50,000 per annum" by amending an agreement to facially appear to fall below the $50,000 threshold, when in fact, the contingent liabilities under said agreement well exceeded that amount.

j.    Making misrepresentations to induce Oak's investment in various properties in the Arch Portfolio; generally creating a hostile business atmosphere because of his ego that is damaging critical relationships with lenders, contractors, tenants, etc.; and making defamatory statements to third parties. *See, e.g.*, Doc. No. 249.

### F.  Simpson Refuses to Heed JJ Arch's Removal as AREH's Managing Member

57.    As noted previously, on October 31, 2023, in reaction to Simpson's furlough decision (among his various other misconduct) and to preserve any semblance of Oak's investment, Oak took action to remove JJ Arch as the managing member of AREH pursuant to its clear contractual rights under the AREH LLC Agreement and duly delivered the Removal Notice. *See* Exhibit C to the Thorne Aff.

58.    However, despite Oak asking for confirmation that Simpson and JJ Arch would honor the Removal Notice, Simpson has done the opposite.  On November 2, Simpson provided a response letter, stating that the Removal Notice "must be deemed ineffective" and "is invalid." *See* Exhibit D to the Thorne Aff.  In sum, Simpson and JJ Arch are not only refusing to carry out their duties as Managing Member by furloughing all AREH employees, but also refusing to comply with Oak's right to remove JJ Arch as the Managing Member of AREH.  Their actions are paralyzing AREH.

59.     In light of all the foregoing, Simpson and JJ Arch are acting in violation of their contractual and fiduciary duties to Oak and absent immediate relief, Oak will be irreparably harmed.  Oak is also entitled relief for the causes of action in Counts I through IV, listed below.

<u>COUNT I</u>
**Breach of Fiduciary Duty Against JJ Arch and Simpson**

60.     Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

61.     During the relevant times alleged herein, Simpson was the managing member of JJ Arch, which is the managing member of AREH.  Oak and JJ Arch are co-members of AREH.

62.     As a result of this relationship and Simpson's status as the controlling person of the JJ Arch, Simpson owed fiduciary duties to Oak.

63.     As set forth above, Simpson knowingly breached his fiduciary duties to Oak.

64.     Simpson's conduct has caused Oak to incur substantial damages, including tax liabilities, the loss of value of its investments in AREH and the related portfolio, the loss of its own time and investment in dealing with Simpson's improper conduct, and substantial legal fees.

<u>COUNT II</u>
**Breach of Contract Against JJ Arch**

65.     Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

66.     The AREH LLC Agreement is a valid and binding agreement under New York law.

67.     As discussed above, JJ Arch has breached its obligations under the AREH LLC Agreement, including its duty of good faith and fair dealing in carrying out its obligations under the AREH LLC Agreement.

68.      By reason of the foregoing, Oak has suffered and continues to suffer substantial damages.

## COUNT III
### Tortious Interference with Contract Against Simpson

69. Oak repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

70. At the time of Simpson's wrongful acts discussed above and alleged herein, Oak and JJ Arch remained bound by the provisions of the AREH LLC Agreement.

71. As set forth above, Simpson caused JJ Arch to breach its obligations to Oak pursuant to the AREH LLC Agreement.

72. Simpson's acts were intended to frustrate JJ Arch's ability to meet its obligations pursuant to the AREH LLC Agreement and did procure a breach of the agreement.

73. Simpson's conduct in interfering with the AREH LLC Agreement was intentional, willful, and calculated to cause damage to Oak. As a result of Simpson's malicious and intentional conduct, Oak has been harmed and incurred substantial damages.

## COUNT IV
### Tortious Interference with Prospective Business Advantage Against Simpson

74. Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

75. Through its investments in properties managed by AREH, Oak has investments valued in the range of $50 million.

76. AREH is responsible for the day-to-day management responsibilities of these properties.

77. As a result of his wrongful and unauthorized conduct, both before and after his removal from JJ Arch, Simpson has engaged in conduct that has caused losses to the value of Oak's investments in the properties.

78.     For example, as a result of Simpson's unilateral and unauthorized conduct in lowering the interest rate accruing to Oak from co-investors, Oak accrued less than the contractual interest rate to which it was entitled.

79.     Indeed, the tortious conduct that Simpson has already undertaken and as alleged herein has the ability to impair Oak's business interests to such a degree as to wipe out the entire equity value of all the properties the Arch Portfolio, costing Oak not only its initial investments in these properties, but the return on those investments it would have otherwise realized.

## COUNT V
**Breach of Fiduciary Duty Against JJ Arch and Simpson – Derivatively on behalf of AREH**

80.     Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

81.     During the relevant times alleged herein, Simpson was the managing member of JJ Arch, which is the managing member of AREH.  Oak and JJ Arch are co-members of AREH.

82.     As a result of this relationship and Simpson's status as the controlling person of the JJ Arch, Simpson owed fiduciary duties to AREH.

83.     As set forth above, Simpson knowingly breached his fiduciary duties to AREH.

84.     A demand to AREH would be futile because Simpson is presently in control of AREH and cannot be expected to bring claims against himself.

85.     Likewise, although AREH has purportedly retained counsel, this representation is directed by Simpson and AREH's purported counsel has been antagonistic to Oak and its interests. Accordingly, any demand to AREH's counsel to sue Simpson would also be futile.

86.     Simpson's conduct has caused AREH to incur substantial damages, including prospective liability to investors in properties managed by AREH, tax liabilities, the loss of value

of AREH as a going concern, the loss of its own time and investment in dealing with Simpson's improper conduct, and substantial legal fees.

## COUNT VI
### Defamation Against Simpson

87. Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

88. Simpson has made knowingly false statements of fact about Oak's business.

89. Simpson has made numerous statements that are defamatory per se, including statements that employees of Oak have and that prejudice Oak in its profession.

90. For instance, in an email communication in which numerous business associates of Oak were included, including Oak's counsel and employees of AREH, Simpson falsely stated, among other things, "Again, you were entered into a funding relationship without having the cash to support it so lets [*sic.*] understand the facts, you are illiquid and insolvent. Markets change, and your father entered this relationship with us as capital preservation / long-term, not fly by the seat of our pants because interest rates went up and you are out of money." *See* Doc. No. 232.

91. On information and belief, Simpson has also made false statements of fact regarding Oak's competency and capabilities in the business of real estate investment, with the purpose of damaging Oak's reputation in the industry both among potential business partners, lenders, and other business associates.

92. Simpson knew these statements were false at the time they were made, or else demonstrated reckless disregard for the truth or falsity.

93. Statements as to Oak's solvency and creditworthiness or ability to make payments when due prejudice Oak in its profession, including its ability to secure financing and co-investors in projects.

28

94.     Moreover, statements regarding the insolvency of Oak Guarantor, to which Simpson's statements also reasonably apply, would constitute a default under various lending agreements related to the Arch Portfolio.

95.     Likewise, statements as to Oak's competency prejudice Oak's ability to enter into future business relationships.

96.     Accordingly, Oak is substantially damaged by Simpson's defamatory statements.

## COUNT VII
### Fraud Against Simpson

97.     Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

98.     Simpson and those acting at his direction made material misrepresentations of fact. For instance, with regard to the 1031 Exchange, AREH Investor Relations represented to Oak that "Arch will be participating in the 1031 vehicle, so our interests are fully aligned in achieving a successful outcome." *See* Doc. No. 236. AREH Investor Relations also misrepresented that "If a satisfactory re-investment opportunity cannot be identified, funds shall be returned to investors." Simpson personally made similar representations to Oak. Neither of these statements were true in fact.

99.     Simpson, as both the person who made or else authorized these statements to be made and the person with decision-making authority with regard to the 1031 Exchange, knew these misrepresentations were false.

100.    Simpson, acting on behalf of JJ Arch and AREH, made these misrepresentations with the intent to induce Oak's reliance. Indeed, in addition to making a false assertion that there would be an alignment of interests, the communications from AREH Investor Relations

specifically stated, "you will need to rely on Arch's expertise to reinvest the proceeds at its discretion." *Id.*

101.    Oak actually, reasonably, and justifiably relied on the misrepresentations.

102.    Oak suffered damages as a result, including the loss of the funds in contributed to the failed 1031 Exchange and the tax liabilities incurred as a result of its failure.

103.    The circumstances under which Oak contributed capital to AREH in June 2023, which Simpson later purported to treat and use a capital contribution to Myrtle likewise establish fraud.  Specifically, Simpson sought and obtained capital from Oak through representations that the contributions would be treated as equity in AREH, when in fact, Simpson had no such intention.  Simpson instead classified Oak's contribution as going to Myrtle, a subsidiary entity specific to a property, and then used those funds to pay AREH's receivables on behalf of Myrtle. This scheme was intended to wrongfully prevent Oak from realizing an equity interest in AREH, as intended.  Given the distress of the Myrtle project, the entirety of the contribution (if treated as Simpson purports) will be lost.

## <u>COUNT VIII</u>
### Declaratory Judgment Against Simpson and JJ Arch

104.    Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

105.    There is a justiciable controversy because Section 7.1.4 specifically authorizes Oak to remove JJ Arch as AREH's Managing Member.  In accordance with this provision, Oak has duly notified JJ Arch of its removal as AREH's Managing Member by way of the Removal Notice, but Simpson (acting on behalf of JJ Arch) has refused to heed the Removal Notice.

106.     Accordingly, Oak desires a declaration that as of no later than 12:01am on November 17, 2023, (1) JJ Arch is no longer AREH's Managing Member, and (2) Oak is AREH's Managing Member.

<u>**COUNT IV**</u>
**Equitable Accounting Against JJ Arch and AREH**

107.     Plaintiff repeats and realleges the allegations contained in all prior paragraphs of this Complaint as if fully set forth herein.

108.     Defendant Mr. Simpson, (by virtue of his status as acting managing member of Defendant JJ Arch, which was, until the Removal Notice, the Managing Member of Defendant AREH), owes Oak (as Investor Member of AREH) a fiduciary duty or other trust-based duty with respect to the business and affairs of Defendant AREH.

109.     As a result of this trust-based relationship between Defendant Mr. Simpson, and Oak, Oak is entitled to an accounting with respect to AREH.

110.     Plaintiff has previously demanded such an accounting from Defendants.

111.     Defendants have failed and/or refused to provide such accounting.

112.     On information and belief, Defendants have failed and/or refused to provide such accounting so as to conceal defendants' wrongful acts in derogation of Oak's rights.

113.     An accounting is necessary to determine Oak's monetary damages and/or in order to determine the true and full information about the financial affairs of the AREH.

114.     The accounting is applicable to AREH for each annual year (or partial period) of its operation and its management by Defendants Simpson and JJ Arch.

## PRAYER FOR RELIEF

WHEREFORE, Oak respectfully requests that the Court issue judgment in its favor and in AREH's favor against Simpson and JJ Arch as follows:

(a)    Awarding money damages to Oak and AREH in an amount to be determined at trial;

(b)    Ordering Simpson to disgorge his ill-gotten gains as a result of his wrongful conduct;

(c)    Awarding Oak its attorneys' fees incurred in connection with the conduct described herein and its prosecution of its claims;

(d)    Enjoining Simpson and JJ Arch, and anyone acting on their behalf, from failing to meet their contractual and fiduciary obligations;

(e)    Declaring that Simpson and JJ Arch have been removed as AREH's Managing Member effective no later than 12:01am on November 17, 2023;

(f)    Ordering Simpson and JJ Arch to make an equitable accounting of AREH's assets; and

(g)    For such other and further relief as this Court may deem just and proper.

Dated: November 3, 2023

Respectfully submitted,

HAYNES AND BOONE, LLP

By:  /s/ Leslie C. Thorne
Leslie C. Thorne
Aishlinn Bottini
30 Rockefeller Plaza, 26th Floor
New York, NY 10112
(212) 835-4848
leslie.thorne@haynesboone.com
aishlinn.bottini@haynesboone.com

32

Attorneys for 608941 NJ Inc.

FILED: NEW YORK COUNTY CLERK 05/25/2024 03:33 PM
INDEX NO. 158055/2023
NYSCEF DOC. NO. 591
RECEIVED NYSCEF: 05/25/2024

24-01336, Document 24-1, 05/13/2024, Filed 04/08/24, Entered 04/08/24 09:45:20, Main Document
Pg 147 of 363

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION
-----------------------------------------------------------------------x
JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC,
suing derivatively as managing member of
ARCH REAL ESTATE HOLDINGS LLC,
and JJ ARCH LLC,

                *Plaintiffs*                    Index No. 158055/2023

                -against-

JARED CHASSEN and FIRST REPUBLIC BANK
,

                *Defendants*

-----------------------------------------------------------------------x
JARED CHASSEN, individually and derivatively
on behalf of JJ ARCH LLC, as member,
and derivatively on behalf of
ARCH REAL ESTATE HOLDINGS LLC,
as member of JJ ARCH,

                *Counterclaim Plaintiff*

  -against-                        **<u>COUNTERCLAIM SUMMONS</u>**

JEFFREY SIMPSON and YJ SIMCO LLC,

                *Counterclaim Defendants*

                -and-

JJ ARCH LCC and
ARCH REAL ESTATE HOLDINGS LLC,

                *Nominal Defendants*
-----------------------------------------------------------------------x

1

**TO THE ABOVE-NAMED COUNTER-CLAIM DEFENDANT(S):**

      **YOU ARE HEREBY SUMMONED** to answer the amended counterclaims in this action and to serve a copy of your answer, or, if the amended counterclaims not served with this summons, to serve a notice of appearance, on counsel for Counter-Claim Plaintiff's ("Plaintiff") Attorney within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to answer or appear, judgment will be taken against you by default for the relief demanded in the notice set forth below and in the complaint.

      Plaintiffs designate New York County as the venue for trial. The basis for venue is that at least one party resides in New York County.

Dated: New York, New York
      December 6, 2023

AIDALA, BERTUNA & KAMINS, P.C.

By: *John M Leventhal*
     John M. Leventhal, Esq.
546 Fifth Avenue - Sixth Floor
New York, New York 10036
(212) 486-0011 / (212) 750-9700
judgeleventhal@aidalalaw.com

*Counsel for Jared Chassen*

Allen Schwartz, Esq.
(of-counsel to Aidala, Bertuna & Kamins, P.C.)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION
--------------------------------------------------------------------x
JEFFREY SIMPSON, individually and derivatively,
as managing member of JJ ARCH LLC,
suing derivatively as managing member of
ARCH REAL ESTATE HOLDINGS LLC,
and JJ ARCH LLC,


                   *Plaintiffs*                                Index No. 158055/2023

                  -against-


JARED CHASSEN and FIRST REPUBLIC BANK,

                   *Defendants*
--------------------------------------------------------------------x
JARED CHASSEN, individually and derivatively
on behalf of JJ ARCH LLC, as member,
and derivatively on behalf of
ARCH REAL ESTATE HOLDINGS LLC,
as member of JJ ARCH,

                   *Counterclaim Plaintiff*

                  -against-

JEFFREY SIMPSON and YJ SIMCO LLC,

                   *Counterclaim Defendants*

                    -and-

JJ ARCH LLC and
ARCH REAL ESTATE HOLDINGS LLC,

                   *Nominal Defendants*
--------------------------------------------------------------------x
608941 NJ INC.,

                   *Plaintiff*,

                  -against-

JEFFREY SIMPSON, JJ ARCH LLC and ARCH
REAL ESTATE HOLDINGS LLC,

      *Defendants*

      -and

ARCH REAL ESTATE HOLDINGS LLC,

      *Nominal Defendant*

-----------------------------------------------------------------x

### **DEFENDANT JARED CHASSEN'S AMENDED VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT AND AMENDED COUNTER-CLAIMS**

Defendant Jared Chassen ("Chassen" or "Defendant"), by and through his undersigned counsel, for his amended verified answer to Plaintiff Jeffrey Simpson's ("Simpson" or "Plaintiff") complaint answers and alleges to each of Plaintiff's allegations in the Complaint, quoted herein followed by Defendant's answer in bold font, as well as for his affirmative defenses, and amended counterclaims against Simpson and YJ Simco LLC, states as follows:

### **VERIFIED ANSWER**

### NATURE OF THE ACTION

1.     This action is brought by Plaintiffs to undo a coup d'état executed by Defendant Jared Chassen ("Chassen") in an effort to seize, from Plaintiff Jeffrey Simpson ("Simpson"), control over Plaintiff entities Arch Real Estate Holdings LLC ("Arch") and JJ Arch LLC ("JJ Arch") (collectively, Arch and JJ Arch are the "Arch Entities"). In addition, Plaintiffs seek to redress one of Chassen's successes in his efforts to wrest control of the Arch Entities from Simpson, *i.e.*, Chassen's inducement of a stalemate that has left Simpson unable to exercise control over bank accounts maintained by Arch Entities and their affiliates and subsidiaries at Defendant First Republic Bank ("First Republic"), which has left Arch Entities unable to use such accounts to pay for such necessities as payroll, subcontractors, materialmen, and insurance. Plaintiffs also seek to require Chassen to act to restore Simpson's access to his company email account with Arch Entities, to the Dropbox account where Arch Entities' documents are stored, and Simpsons' ability to communicate with the domain company that hosts Arch Entities' web site.

2

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations as to Plaintiff's motives in commencing the action, and otherwise denies the allegations in paragraph 1.**

2.      Plaintiff Simpson is a natural person who resides in the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 2.**

3.      Plaintiff Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 3.**

4.      Arch is a real estate investment management, construction management, property management, and development company.

**Answer: Defendant admits the allegations in paragraph 4.**

5.      Plaintiff JJ Arch is a limited liability company formed under the laws of the State of New York, with a principal place of business in the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 5.**

6.      Defendant Chassen is a natural person who resides in the State of New York, County of Kings.

**Answer: Defendant admits that he is a natural person who resides in the State of New York, but denies that he resides in the County of Kings.**

7.      Defendant First Republic is a nationally chartered bank that maintains offices for the transaction of business in, among other places, the State of New York, County of New York.

**Answer: Defendant admits the allegations in paragraph 7.**

<u>FACTS APPLICABLE TO ALL CAUSES OF ACTION</u>
<u>BACKGROUND</u>

<u>Simpson's Tenure at Greystone</u>

8.      Simpson grew up under modest economic circumstances in Lakewood, New Jersey. His father, who was a public planning, zoning, and construction official, passed away when Simpson was 22. For four consecutive generations including his own, Simpson's family has been in the construction business.

3

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations in paragraph 8.**

9.      Prior to 2017 and the start of Arch, Simpson worked for eleven (11) years at Greystone Development ("Greystone Development"), a property development company within a host of companies under the "Greystone" umbrella that performed functions related to real estate investment, capital raising, financing, development, construction, management, leasing, and sales. For the last five of those years, Simpson was the Chief Executive Officer of Greystone Development. By the time he left Greystone Development, he was supervising approximately thirty (30) employees at Greystone Development, with a total payroll of approximately $5 million. The total project volume was over $2 billion, and involved properties located in New York, Miami, and California. While he was there, he also was responsible for raising several large capital initiatives for real estate investing in multi-family housing in the southeastern United States with an institutional partner, individual loan origination on complex assignments, and capital raising for structured finance.

**Answer: Defendant admits that Plaintiff worked at Greystone, and held the role of Chief Executive Officer of Greystone Development, but lacks information sufficient to form a belief as to the truth of the remaining allegations in paragraph 9.**

10.     One employee Simpson supervised at Greystone Development was Chassen. Simpson originally hired Chassen at Greystone Development to replace an administrative assistant at Greystone Development. Once hired, Chassen performed the same duties as that administrative assistant, for the same salary as she had earned. Over time, Chassen took on other responsibilities, including helping to source properties, equity, and debt. Throughout his time at Greystone Development, Chassen reported to Simpson.

**Answer: Defendant admits that he worked for Simpson at Greystone but otherwise denies the characterization of his role at Greystone as contained in paragraph 10.**

11.     Another employee Simpson supervised at Greystone was nonparty Tristan Last ("Last"). "). Last was formerly of Brookfield with a MBA from Cornell University. She was hired as an acquisitions associate and quickly was promoted to the Director of Investments.

**Answer: Defendant admits that Tristan Last was an employee at Greystone who Simpson supervised, and had the title of Director of Investments, and otherwise lacks information sufficient to form a belief as to the truth of the allegations in paragraph 11.**

12.     A third employee Simpson supervised at Greystone was nonparty Michelle Miller ("Miller"). She was also an analyst. Miller started at Greystone Development as an intern, as a career switcher to real estate following the completion of her MBA from Northwestern. She was eventually hired full time as an analyst and grew in her role over time.

**Answer: Defendant admits that Michelle Miller was an employee at Greystone who Simpson supervised and who started as intern, but otherwise lacks information sufficient to form a belief as the truth of the allegations in paragraph 12.**

4

### Simpson's Formation of Arch and JJ Arch

13.     In 2017, Simpson left Greystone Development on amicable terms with that company, and formed a new company, Plaintiff Arch.

**Answer: Defendant denies the allegations in paragraph 13, except that he admits that Simpson formed JJ Arch together with Chassen.**

14.     The original business address for Arch was Simpson's personal residence address at the time.

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations in paragraph 14.**

15.     At all times since the formation of Arch, eighty percent (80%) of the membership interest in Arch has been held by Plaintiff JJ Arch, which is the managing member of Arch. (*See* Exhibit 1, Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC ["Arch Operating Agreement"], p. 17, §§ 6.1-6.2 [providing for distributions of cash flow and acquisition fees of 80% to "JJ Member" and 20% to "Investor Member"]; *id.* p. 1 preamble [defining JJ Arch LLC as "JJ Member"]; *id.* § 1.1, p. 7 [defining "Managing Member" as JJ Member].)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 15.**

16.     At all times since the formation of Arch, the remaining twenty percent (20%) of the membership interest in Arch has been held by 608941 NJ Inc., a New Jersey corporation ("NJ Inc."), which is the investor member of Arch. (*See* Exhibit 1, Arch Operating Agreement, p. 17, §§ 6.1-6.2; *id.* p. 1 preamble [defining NJ Inc. as "Investor Member"].) NJ Inc. made an investment of approximately $50 million in Arch, but has no authority to control the operation of Arch's business.

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 16.**

17.     Since the formation of JJ Arch, Simpson has been the managing member of JJ Arch and has held a majority of the membership interest in JJ Arch.

**Answer: Defendant admits that Simpson was the managing member at the time JJ Arch was formed, and held a majority of the membership interests, and for four years thereafter, but otherwise denies the allegations in paragraph 17.**

18.     From the formation of JJ Arch until his forced resignation from his membership therein effective August 5, 2023, as discussed below, Chassen was a member of JJ Arch and held

a minority of the membership interest in JJ Arch, and his job started out as administrative in nature.

**Answer: Defendant denies the allegations in paragraph 18.**

19.     Simpson and Chassen are the only persons who have ever been members of JJ Arch.

**Answer: Defendant admits the allegations in paragraph 19.**

<u>The Arch Companies' Growth Under Simpson's Leadership</u>

20.     Through JJ Arch, the managing member of Arch, Simpson has run all of Arch's businesses since the inception.

**Answer: Defendant denies the allegations in paragraph 20.**

21.     By 2022, five years after Simpson formed Arch with no assets, Arch had owned and invested in over $1 billion in assets.

**Answer: Defendant denies the allegations in paragraph 21 insofar as it alleges that Arch was formed with no assets, or that Simpson formed Arch, but admits that Arch owned over $1 billion in assets in 2022.**

22.     Arch has several affiliated companies, including a property management company, advising company, construction company, and asset management company, each of which provides services relating to real properties that Arch controls.

 **Answer: Defendant admits the allegations in paragraph 22.**

23.     Together, Arch and its affiliated companies have a total of approximately 100 employees. (Collectively, Arch Entities and Arch's affiliated companies are the "Arch Companies.")

**Answer: Defendant admits the allegations in paragraph 23.**

24.     The licenses and permits for each of the construction projects performed by the Arch Companies are in Simpson's name, as a licensed general contractor.

**Answer: Defendant denies the allegations in paragraph 24.**

25.     Simpson holds responsibility for managing Arch Companies' commercial real estate construction projects and coordinating licensing and permitting matters.

**Answer: Defendant denies the allegations in paragraph 25.**

Chassen's Role with the Arch Companies

26.      With Greystone's permission, Simpsons brought three Greystone Development employees with him to work at Arch, *i.e.*, Chassen, Last, and Miller.

**Answer: Defendant denies that Simpson brought Chassen to work with him at Arch, which he formed together with Simpson, but admits that Last and Miller were brought by Simpson and Chassen to work at JJ Arch.**

27.      From the formation of JJ Arch and Arch, Chassen has been a minority member in JJ Arch, and thus has not had the authority to exercise control over Arch as Arch's managing member.

**Answer: Defendant admits that Simpson was the majority or managing member at the formation of JJ Arch and Arch, but denies that Chassen has not had authority to exercise control over JJ Arch as JJ Arch's managing member since.**

28.      While the initial plan was for Chassen ultimately to become co-managing member, with Simpson, of JJ Arch, and thus share in Simpson's authority to control JJ Arch's exercise of its authority as managing member of Arch, Chassen's performance did not warrant this expansion of his authority, and Chassen consented to remain in his role as a minority member of JJ Arch on or about May 22, 2021.

**Answer: Defendant admits that Chassen was to become a co-managing member under the Operating Agreement, and otherwise denies the allegations in paragraph 28.**

29.      The original plan, at the time JJ Arch was formed, was that Simpson was to be its managing member, with the authority to manage, arrange, and cause to be coordinated the business, affairs, and assets of JJ Arch. (Exhibit 2, JJ Arch Limited Liability Company Operating Agreement ["JJ Arch Original Operating Agreement"], p. 7, ¶ 3.1(a).) This was to be the case prior to the fourth anniversary of JJ Arch's operating agreement, *i.e.*, December 11, 2021. (*Id.*)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 29.**

30.      However, following the fourth anniversary of the operating agreement, both Simpson and Chassen were to act as managing members of JJ Arch, with each of them holding the authority to manage, arrange, and cause to be coordinated JJ Arch's business, affairs, and assets. (Exhibit 2, JJ Arch Original Operating Agreement, p. 9 § 3.2.)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 30.**

31.      In addition, the JJ Arch Original Operating Agreement provided Chassen with a veto over certain decisions or actions with regard to JJ Arch even prior to the fourth anniversary of the JJ Arch Original Operating Agreement, such that Simpson could make certain decisions

defined as "Company Major Decisions" only if he had Chassen's prior written consent. These actions included, among others, selling any asset of Arch Entities, borrowing or raising monies on behalf of Arch Entities, mortgaging Arch Entities' properties, Arch Entities' entering into any lease of space, and hiring any employee, consultant, or other personnel for Arch Entities. (*See* Exhibit 2, JJ Arch Original Operating Agreement, pp. 8-9, ¶¶ 3.1(b)(iii), (v)-(viii); *see also id.* p. 8 ¶ 3.1(b) [stating that "any action or decision that would constitute a Company Majority Decision shall be a Company Major Decision if made or taken by any Investment Entity"]; *id.* p. 4 [defining "Investment Entity" as including "AREH"]; *id.* p. 1 [defining "AREH" as Arch].)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 31.**

32.     On the other hand, Simpson could take other actions without Chassen's consent, including but not limited to conducting, managing, and controlling the affairs and business of Arch Entities; opening, maintaining and closing bank accounts and drawing checks; bringing legal actions on claims of Arch Entities; and depositing, withdrawing, investing, paying, retaining, and distributing Arch Entities' funds in a manner consistent with the provisions of the JJ Arch Original Operating Agreement. (Exhibit 2, JJ Arch Original Operating Agreement, pp. 7-8 ¶¶ 3.1(a)(i)-(ii), (v)-(vi).)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 32.**

33.     However, prior to the fourth anniversary of the JJ Arch Original Operating Agreement, Simpson had a discussion with Chassen, and informed him that Simpson did not believe Chassen had sufficient acumen in the business to be a co-managing member of JJ Arch and, by virtue of JJ Arch's managing membership in Arch, a co-managing member of Arch. Chassen agreed with Simpson about this.

**Answer: Defendant denies the allegations in paragraph 33.**

34.     JJ Arch's operating agreement was thus amended, with Chassen's consent, on or about May 22, 2021. The amendment removed the authority that Chassen would have had, following the fourth anniversary of the JJ Arch Original Operating Agreement, to manage, arrange, and cause to be coordinated the business, affairs and assets of JJ Arch. (Exhibit 3, JJ Arch LLC Agreement Amendment No. 1, p. 3 ¶ 2(d) [deleting § 3.2 of the JJ Arch Original Operating Agreement].) (The JJ Arch Original Operating Agreement, as amended by JJ Arch LLC Agreement Amendment No. 1, shall be referred to as the "JJ Arch Amended Operating Agreement".) Thus, Chassen never had such authority. Because the list of actions and decisions for which Chassen's consent was required, *i.e.*, the "Company Major Decisions," remained effective only until the fourth anniversary of the JJ Arch Original Operating Agreement (*compare id.* p. 3 § 2(d) [new § 3.2] *with* Exhibit 2, JJ Arch Original Operating Agreement, p. 8 ¶ 3.1(b)), this meant that Chassen would lose, and ultimately did lose, his right to refuse consent to Company Major Decisions after that anniversary, which occurred in December 2021.

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 32.**

35.     In addition, JJ Arch's operating agreement was amended to bar Chassen from becoming an equal equity owner in JJ Arch. When JJ Arch was formed, it was agreed that my share of JJ Arch's distributions, which would initially be 66.6667%, would decrease, and Chassen's share of JJ Arch's distributions, which would initially be 33.3333%, would commensurately increase, on an annual basis, such that, by the fourth anniversary of the operating agreement, *i.e.*, December 11, 2021, each of them would receive equal 50% shares of the distributions. (Exhibit 2, JJ Arch Original Operating Agreement, p. 4 § 1.1, Definition of "Distribution Percentages"; *id.* p. 12 ¶ 5.1(a)(ii); *id.* Exhibit A.)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 35.**

36.     However, JJ Arch's operating agreement was amended, with Chassen's consent and as part of JJ Arch LLC Agreement Amendment No. 1 (the same amendment as discussed above), to provide that, indefinitely, Simpson is to receive 50.1% of the distributions from JJ Arch, and Chassen is to receive 49.9% of the distributions from JJ Arch. (Exhibit 3, JJ Arch LLC Agreement Amendment No. 1, p. 1 ¶ 2(a).)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 36.**

37.     In addition, Arch's operating agreement provides that "the business, affairs and assets of [Arch] shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in [the operating agreement] (including, but not limited to, in Section 7.1.3), full, exclusive and complete discretion with respect thereto." (Exhibit 1, Arch Operating Agreement, p. 17, ¶ 7.1.1.) The Managing Member, *i.e.*, JJ Arch, has "the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which [Arch] has the authority to perform both directly and indirectly through one or more Subsidiaries" (*id.* p. 18 ¶ 7.1.1), including, *inter alia*, those to "conduct, manage and control the affairs and business of [Arch]" (*id.* p. 18 ¶ 7.1.1(i)); "open, maintain and close bank accounts and drew checks or other orders for the payment of monies" (*id.* ¶ 7.1.1(ii)); "deposit, withdraw, invest, pay, retain and distribute [Arch's] funds in a manner consistent with the provisions of [the Arch Operating Agreement]) (*id.* ¶ 7.1.1(vi)); and "bring or defend . . . resort to legal action, or otherwise adjust claims . . . of [Arch]" (*id.* ¶ 7.1.1(v)).

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 37.**

38.     Thus, at all times Simpson has been, and remains, the managing member of JJ Arch, and Simpson has always had exclusive authority to, *inter alia*, open, maintain, and close bank accounts on behalf of Arch Entities; to draw checks on those accounts; to deposit, withdraw, pay, and distribute Arch Entities' funds; and to bring legal actions on behalf of the Arch Entities.

9

FILED: NEW YORK COUNTY CLERK 05/25/2023 03:23 PM
NYSCEF DOC. NO. 592
INDEX NO. 650288/2023
RECEIVED NYSCEF: 05/25/2023

24-01358, in 24 Doc 0113Filed 04/08/24 Entered 04/08/24 09:45:20e 3Mainf762ument

Pg 158 of 363

**Answer:**      **Defendant denies the allegations in paragraph 38.**

39.      Chassen worked for Arch, and reported to Simpson. Simpson had the authority to give Chassen work assignments to do for Arch, and to take Arch work assignments away from Chassen.

**Answer: Defendant admits that he is a member of JJ Arch and that he works for JJ Arch and otherwise denies the allegations in paragraph 39.**

40.      Until the events beginning August 4, 2023, as set forth below, Last had served as managing director of Arch.

**Answer: Defendant denies the allegations in paragraph 40.**

<u>Means of Removing Members of Arch and JJ Arch</u>

41.      Under both the Arch Operating Agreement and the JJ Arch Amended Operating Agreement, members may be removed, on certain enumerated grounds, through a process that is initiated by the occurrence of a "Cause Event." The Arch Operating Agreement provides an enumerated list of eight acts, the commission of which, by the managing member, serves as a "Cause Event." (*See* Exhibit 1, Arch Operating Agreement, pp. 4-5, § 1.1, definition of "Cause Event".) The JJ Arch Amended Operating Agreement extends this definition of "Cause Event" to any member of JJ Arch. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 3, § 1.1, definition of "Cause Event.")

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 41.**

42. The acts constituting "Cause Event[s]" include, but are not limited to, "willful misconduct in relation to the business or affairs of [Arch] or a Subsidiary," "breach of fiduciary duty in relation to the business or affairs of [Arch] or a Subsidiary," and "misappropriation of [Arch] or Subsidiary funds or property." (Exhibit 1, Arch Operating Agreement, § 1.1, pp. 4-5, Definition of "Cause Event.").

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 42.**

43.      Under the JJ Arch Operating Agreement, a member in JJ Arch is required to resign if a Cause Event has occurred with respect to such member, and the other member has delivered written notice thereof to that member. (*See* Exhibit 2, JJ Arch Amended Operating Agreement, p. 5, § 1.1, definition of "Resignation.") Notably, only "the other Member" may deliver such notice (*id.*); accordingly, only a current member of JJ Arch could trigger a member's resignation through delivering notice of a Cause Event. Upon such Resignation, that member is no longer deemed a "member" of JJ Arch, and "shall not be entitled to any rights as a Member of the Company for any period from and after such Resignation." (*Id.*, p. 15, § 7.5(a).)

10

Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 43.

44.     Under the Arch Operating Agreement, in the event written notice of a Cause Event is delivered to JJ Arch, JJ Arch may be removed effective ten (10) business days after such delivery, or at such later date or as specified in such notice. (Exhibit 1, Arch Operating Agreement, p. 20, ¶ 7.1.4.)

Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 44.

<u>CHASSEN'S MISCONDUCT</u>

<u>Chassen Placed His Interests, and Those of His Family and Friends, Above Those of JJ Arch</u>

45.     In or about July 2023, Chassen acknowledged that his duties and role could not be compensated at the same level as previously, due to higher interest rates and a slowdown in business, and Arch would not be able to afford to pay Simpson, Chassen, and other key employees their full salaries, and Simpson asked Chassen whether he would be willing to accept a substantial reduction in his pay in order to enable Arch to remain in its status quo rather than building up debt.

Answer: Defendant denies the allegations in paragraph 45.

46.     Chassen initially indicated to Simpson that Chassen would be willing to take such a pay cut, although at the time he did not inform Simpson how large of a pay cut he would be willing to take.

Answer: Defendant denies the allegations in paragraph 46.

47. In or about early July 2023, Simpson asked Chassen how large of a pay reduction Chassen would agree to. Chassen repeatedly avoided answering Simpson's requests on this point.

Answer: Defendant denies the allegations in paragraph 47.

48. Finally, on or about August 2, 2023, Chassen informed Simpson that, in fact, Chassen would not be willing to accept any pay reduction.

Answer: Defendant denies the allegations in paragraph 48.

<u>The Coup Begins</u>

11

49. Chassen, apparently working in concert with NJ Inc. and with several other employees of Arch, undertook a series of actions designed to steal control of Arch and JJ Arch from Simpson, in violation of Arch and JJ Arch's respective operating agreements. First, upon information and belief, at approximately 1:15 p.m. on Friday, August 4, 2023, Chassen contacted the bank at which Arch maintains its accounts, Defendant First Republic, and instructed First Republic to remove Simpson as an authorized signatory on all accounts he maintained with First Republic in either his corporate or individual capacity, including all bank accounts that the Arch Companies maintain with First Republic (the "Arch Accounts"), and also accounts Simpson maintained individually with no connection to the Arch Companies.

**Answer: Defendant denies the allegations in paragraph 49.**

50. Chassen was neither authorized to make this change, nor did he provide Simpson with any advance notice thereof.

**Answer: Defendant denies the allegations in paragraph 50.**

51. First Republic complied with Chassen's demand. First Republic informed Simpson that it no longer permits Simpson to make transactions from any of the accounts he maintains with First Republic in either his corporate or individual capacity, or, indeed, any other account on which Simpson was the signatory, including the Arch Accounts, accounts on which he was the signatory on behalf of entities other than the Arch Companies, and his own individual accounts.

**Answer: Defendant denies the allegations in paragraph 51.**

<u>The Forced Resignation of Chassen from Arch</u>

52. On August 5, 2023, Simpson sent Chassen an email wherein Simpson provided him written notice that he had committed a Cause Event, and that accordingly, under the JJ Arch Amended Operating Agreement, Chassen ceased to be a member of JJ Arch. (*See* Exhibit 4 ["Notice to Chassen of Cause Event"].)

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 52.**

53. Chassen had committed a Cause Event prior to the Notice to Chassen of Cause Event, in that Chassen had, without authority, acted to deprive Simpson of his ability to make transactions on the Arch Accounts and to seize that ability for himself.

**Answer: Defendant denies the allegations in paragraph 53.**

54. Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted willful misconduct in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

12

**Answer: Defendant denies the allegations in paragraph 54.**

55. Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a breach of fiduciary duty in relation to the business or affairs of Arch and JJ Arch and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 55.**

56. Chassen's acting, without authority, to deprive Simpson of his ability to make transactions on the Arch Accounts, and to seize that ability for himself, constituted a misappropriation of funds of Arch, JJ Arch, and their subsidiaries, and therefore constituted a Cause Event under the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 56.**

57. Accordingly, the Notice of Chassen Cause Event triggered immediately Chassen's removal as a member of JJ Arch.

**Answer: Defendant denies the allegations in paragraph 57.**

<u>The Coup Continues</u>

58. Notwithstanding, Chassen proceeded in disregard of the Notice to Chassen of Cause Event. Specifically, over the weekend of August 5-6, 2023, the administrator of Arch's email and information technology systems, acting upon Chassen's instructions, locked Simpson out of his Arch Companies email account and all other Arch IT systems. Beginning no later than 5 p.m. on Sunday, August 6, 2023, Simpson no longer had access to his Arch Companies email account. At or about 10-11 a.m. on Monday, August 7, 2023, Simpson could no longer log onto his Arch-issued computer. As a result, Simpson could not obtain access to the business records of the Arch Companies, or the computer payroll program that Arch Companies use to pay their employees. Simpson was also locked out of the server hosting Arch Companies' web site, and Chassen made changes to such site, without Simpson's authorization, to remove references thereon to Simpson as a managing member.

**Answer: Defendant admits that he resigned Simpson from JJ Arch, and that Simpson was locked from accounts when he was removed and removed as a member on the company website but lacks information sufficient to form a belief as to the truth of the exact times Simpson could no longer access company systems and otherwise denies the allegations in paragraph 58.**

59. Chassen also retaliated for his removal as a member of JJ Arch by sending Simpson, by electronic mail, a signed letter on August 6, 2023, wherein he purported to inform Simpson that Simpson was required to resign pursuant to the JJ Arch Amended Operating Agreement ("Chassen 8/6/23 Letter"). The Chassen 8/6/23 Letter asserted that Simpson had committed

13

multiple Cause Events, none of which had actually occurred, and asserted that, as a result, a resignation from JJ Arch had occurred on Simpson's part and Simpson was no longer a member of JJ Arch, nor did Simpson have any right to act on behalf of JJ Arch, Arch, or any subsidiary of JJ Arch.

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 59.**

60. However, by the time of the Chassen 8/6/23 Letter, Chassen had already been removed as a member of JJ Arch pursuant to the Notice to Chassen of Cause Event. Accordingly, as noted above, Chassen could not, under the JJ Arch Amended Operating Agreement, trigger Simpson's own resignation by delivering to him a purported notice of Cause Event.

**Answer: Defendant denies the allegations in paragraph 60.**

61. Moreover, even if the Chassen 8/6/23 Letter had been effective as a notice of Cause Event, it was not sent to Simpson until after Chassen's instruction on August 4, 2023 to First Republic to strip Simpson of his signatory authority, so as of the time Chassen provided such instruction Simpson remained JJ Arch's managing member with exclusive authority over the Arch Companies' bank accounts, and Chassen's instruction was in violation of Arch's and JJ Arch's operating agreements.

**Answer: Defendant denies the allegations in paragraph 61.**

62. In addition, on August 6, 2023, NJ Inc., sent Simpson a letter (the "8/6/23 NJ Inc. Letter"), wherein NJ Inc. asserted that JJ Arch, through Simpson's actions, had committed multiple Cause Events under the Arch Operating Agreement, again none of which had actually occurred, and asserted that NJ Inc. reserved the right to remove JJ Arch as the managing member of Arch.

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 62.**

63. In addition, Chassen arranged for the deactivation of the device Simpson uses to gain access to Arch's physical office located at 88 University Place, New York, New York 10003, such that when Simpson attempted to enter his office there at 9:00 a.m. on Monday, August 7, 2023, he was unable to do so.

**Answer: Defendant denies the allegations in paragraph 63.**

64. Upon information and belief, on or about August 7, 2023, after he had already been duly removed as a member of JJ Arch, Chassen sent an email to employees of Arch Companies in which he instructed them not to come into the office to work that day, and falsely informed them that Simpson was deemed to have resigned from his managerial roles with Arch Companies. He further instructed employees to not respond to any outreach from Simpson. Even before his removal as a member of JJ Arch, Chassen had no authority to do so.

14

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 64.**

65. Simpson has since been able to regain access to his physical office at Arch. However, he still has only limited access to Arch's computer system, and is still unable to gain access to Arch's bank accounts. Through counsel, he demanded that First Republic restore him as a signatory on such accounts, and remove Chassen as a signatory. First Republic has refused to do so, and has advised Simpson that because it has "received conflicting instructions regarding the ownership and control" of such accounts, First Republic has placed a hold on those accounts, and will not permit any deposits or withdrawals from such accounts. (Exhibit 5, Letter from Christy Santoro, Preferred Banker at First Republic, to Jeffrey Simpson, dated Aug. 6, 2023, first page.) One hundred and fifty (150) accounts are subject to this hold. (*See id.*, second through fifth pages.) (Collectively, these are the "Arch Accounts.") These include accounts for Arch Companies, as well as accounts maintained for the purpose of holding monies held in trust for subcontractors, materialmen, and other persons involved in Arch Companies' construction projects who are beneficiaries under Article 3-A of the New York State Lien Law. First Republic has advised that it will not release the hold until it "receive[s] evidence satisfactory to us that there is no longer a dispute as to who has authority over the accounts" (*id.*, first page), or there is a court order requiring its release (*see* Exhibit 6, email from First Republic's in-house counsel to Plaintiffs' counsel).

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 65.**

66. Continuation of First Republic's hold on the Arch Companies' bank accounts would wreak havoc on the Arch Companies. Arch Companies would be unable to meet their payroll, inflicting hardship both on Arch Companies' employees, who number approximately 100, and on Arch Companies themselves when such employees ultimately leave their positions for employment with companies whose minority members are not sabotaging company finances in order to extract concessions.

**Answer: Defendant denies the allegations in paragraph 66.**

67. With the hold on those bank accounts, Arch will also stand unable to pay its bills to vendors, such as insurance premiums (*see* Exhibit 7 hereto). Indeed, Arch Companies are now in default on many obligations as a result of their inability to make payments due to the hold. Arch Companies would also be unable to pay rent and other bills, and to make payments on construction loans and to investors in Arch Companies.

**Answer: Defendant denies the allegations in paragraph 67.**

68. The bank accounts that are subject to First Republic's hold also include trust accounts under Article 3-A of the New York State Lien Law, which hold funds in trust for, among others, subcontractors and materialmen on construction projects being performed for Arch Company entities. Thus, the existing account hold prevents Arch Company entities from being able to pay

15

their subcontractors and materialmen. This is doubly harmful to the Arch Companies, in that they now cannot pay those subcontractors and materialmen, which may cause them to cease performing their present construction work, and it also may dissuade them from performing projects for the Arch Companies in the future, out of fear that another, future frivolous dispute over company control may lead to another hold on Arch Companies' bank accounts and a recurrence of delays in paying them.

**Answer: Defendant denies the allegations in paragraph 68.**

69. With both Arch Companies' employees and their subcontractors leaving active job sites, there is a further risk that such sites will not be adequately staffed or supervised, or machinery there adequately maintained, creating a public safety risk that will result in injury to those remaining employees or subcontractors, and nearby members of the public.

**Answer: Defendant denies the allegations in paragraph 69.**

70. The aforesaid effects also endanger the general reputation of Arch Companies going forward, tarnishing it with the appearance that it cannot be trusted to fulfill its obligations.

**Answer: Defendant denies the allegations in paragraph 70.**

71. Another consequence of the coup perpetrated by Chassen is that Last, Arch's managing director, has resigned from her position with Arch on or about August 7, 2023, in response to said coup. Consequently, Arch has lost the benefit of Last's performance.

**Answer: Defendant admits that the Last resigned but otherwise denies the allegations in paragraph 71.**

72. In addition, Chassen and Computero Inc. ("Computero"), the outside company acting as Arch's information technology consultant, have colluded to deny Simpson access to his Arch company email account. Computero first disregarded his instructions to remove Chassen's access to Arch's computer network and his Arch email account beginning shortly before the time Simpson provided the Notice to Chassen of Cause Event, then cut off Simpson's access to the Arch computer network and his Arch email account. Then, after Simpson made repeated requests to regain access to his email account, Computero restored his email access on the evening of Wednesday, August 9. However, approximately one hour after his email access was reinstated, it was again cut off, this time ostensibly by Microsoft. However, Chassen was Microsoft's only contact person at Arch Companies, and thus the only person who could have instructed Microsoft to cut off Simpson's email access. Simpson remains unable to gain access to his Arch email account, and thus unable to receive or respond to email communications from Arch's many employees.

**Answer: Defendant denies the allegations in paragraph 72.**

73. In addition, Simpson's access to Dropbox has not been restored, thus making it impossible for him to view the Arch Companies' internal documents, which are stored in

16

Dropbox. Also, Chassen has engineered a situation in which he is the only contact person for the domain company that hosts Arch Companies' web site. Thus, Simpson cannot communicate with the domain company in order to update the web site, including restoring references to himself as the managing member and removing those to Chassen as a continuing employee and member of the Arch Companies following his resignation.

**Answer: Defendant denies the allegations in paragraph 73.**

74. The combined loss of email and Dropbox access have left Simpson, as the chief managerial figure at Arch Companies, effectively blind (unable to view documents) and deaf and mute (unable to communicate with the Arch Companies' employees, or with the public through Arch Companies' web site). This has rendered him unable to exercise his authority as managing member of JJ Arch, and left the Arch Companies as a rudderless ship.

**Answer: Defendant denies the allegations in paragraph 74.**

AS AND FOR A FIRST CAUSE OF ACTION
(Breach of the Amended JJ Arch Operating Agreement, Brought by Arch and by Simpson,
Against Defendant Chassen)

75. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 75 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

76. The Amended JJ Arch Operating Agreement is a valid and binding agreement between Simpson and Chassen.

**Answer: Paragraph 76 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

77. The Amended JJ Arch Operating Agreement is supported by valuable consideration.

**Answer: Paragraph 77 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

78. Arch is expressly mentioned in the Amended JJ Arch Operating Agreement and defined therein as an "Investment Entity".

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 78.**

79. Paragraph 3.1 of the Amended JJ Arch Operating Agreement sets forth powers that Simpson has with regard to matters which JJ Arch has the authority to perform "indirectly through an Investment Entity," *i.e.*, through Arch.

17

**Answer: Defendant refers the Court to the original documents for their true contents and otherwise denies the allegations in paragraph 79.**

80. The Amended JJ Arch Operating Agreement was intended for Arch's benefit.

**Answer: Defendant denies the allegations in paragraph 80.**

81. The benefit to Arch from the Amended JJ Arch Operating Agreement is sufficiently to indicate the assumption by the contracting parties of a duty to compensate Arch if is lost.

**Answer: Defendant denies the allegations in paragraph 81.**

82. Arch is a third-party beneficiary of the Amended JJ Arch Operating Agreement.

**Answer: Paragraph 77 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

83. Chassen materially breached the Amended JJ Arch Operating Agreement by conducting, managing, and controlling the affairs and business of JJ Arch, when, under ¶ 3.1(i) of the Amended JJ Arch Operating Agreement, only Simpson had the authority to do so.

**Answer: Paragraph 83 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegations are denied.**

84. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to conduct, manage, and control the affairs of Arch Entities, and, so long as a hold remains on the Arch Companies' bank accounts, he will continue to suffer a diminished ability to conduct, manage, and control the affairs of JJ Arch and of Arch.

**Answer: Defendant denies the allegations in paragraph 84.**

85. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that such breach has resulted in the resignation of Last and the loss of the value of her work to Arch; so long as a hold remains on the Arch Companies' bank accounts, it will be unable to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers; and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 85.**

86. Chassen materially breached ¶ 3.1(ii) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to control the Arch Companies' bank accounts and draw checks thereon, and transferring such authority to himself.

**Answer: Paragraph 86 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

87. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to control the Arch Companies' bank accounts and draw checks thereon, and such injury will continue into the future so long as a hold remains on the Arch Companies' bank accounts.

**Answer: Defendant denies the allegations in paragraph 87.**

88. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 88.**

89. Chassen materially breached ¶ 3.1(vi) of the Amended JJ Arch Operating Agreement by stripping Simpson of the authority to withdraw, pay, and distribute the funds of Arch Companies, and transferring such authority to himself.

**Answer: Paragraph 89 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

90. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that it has caused him to lose the ability to withdraw, pay, and distribute the funds of Arch Companies, and such injury will continue into the future so long as a hold remains on the Arch Companies' bank accounts.

**Answer: Defendant denies the allegations in paragraph 90.**

91. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 91.**

92. Chassen materially breached the "Resignation" provision of § 1.1 of the Amended JJ Arch Operating Agreement by purporting to deliver a notice of Cause Event to Simpson, when, by the time he had done so, Chassen had been removed as a member of JJ Arch, and thus had no authority to do so, and when the purported Cause Events set forth in such notice had not occurred.

19

**Answer: Paragraph 92 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegations are denied.**

93. Simpson has been injured by this breach of the Amended JJ Arch Operating Agreement, in that Chassen has used it as a pretext to continue to conduct, manage, and control the affairs of Arch Entities, to the exclusion of Simpson.

**Answer: Defendant denies the allegations in paragraph 93.**

94. Arch has been injured by this breach of the Amended JJ Arch Operating Agreement, in that, with Chassen having using it as a pretext to dispute, to First Republic, Simpson's authority to control Arch Companies' bank accounts with First Republic, a hold has been placed on such accounts, and Arch has lost the ability to meet its financial obligations, including but not limited to paying its employees and vendors, including but not limited to its insurers. Arch will continue to suffer such injury so long as a hold remains on the Arch Companies' bank accounts, and Arch is likely to suffer reputational harm in the future.

**Answer: Defendant denies the allegations in paragraph 94.**

95. By law, the Amended JJ Arch Operating Agreement contains an implied covenant of good faith and fair dealing, pursuant to which Chassen had an obligation not to act in such a manner as to injure Simpson's rights to receive the fruits of said agreement or to prevent Simpson from performing his duties under said agreement.

**Answer: Paragraph 95 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

96. Chassen prevented Simpson from performing his duties under the Amended JJ Arch Operating Agreement by acting so as to deny Simpson:
  (a) the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;
  (b) physical access to his office;
  (c) the use of Simpson's email account to communicate with employees of the Arch Companies;
  (d) the use of Dropbox to obtain access to the Arch Companies' corporate documents; and
  (e) the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

**Answer: Defendant denies the allegations in paragraph 96.**

97. Chassen prevented Simpson from receiving the fruits of the Amended JJ Arch Operating Agreement by purporting to terminate, upon false pretenses and without authority to do so, Simpson's role as managing member of JJ Arch by sending the Chassen 8/6/23 Letter.

**Answer: Defendant denies the allegations in paragraph 97.**

20

98. By his aforesaid conduct, Chassen has injured Simpson's rights to receive the fruits of the Amended JJ Arch Operating Agreement and prevented Simpson from performing his duties under said agreement.

**Answer: Defendant denies the allegations in paragraph 98.**

99. By his aforesaid conduct, Chassen has breached the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

**Answer: Paragraph 99 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

100. For the reasons set forth above, Simpson and JJ Arch have been injured by Chassen's breach of the implied covenant of good faith and fair dealing in the Amended JJ Arch Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 100.**

101. Simpson has complied with the Amended JJ Arch Operating Agreement in all respects.

**Answer: Defendant denies the allegations in paragraph 101.**

102. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 102 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

103. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 103 states a legal conclusion for which no responsive pleading is required, but to the extent such a response is required, the allegation is denied.**

104. Simpson and Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 104.**

AS AND FOR A SECOND CAUSE OF ACTION
(Breach of Fiduciary Duty, Brought by JJ Arch and by Simpson, Against Defendant Chassen)

21

105. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 105 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

106. Chassen, as a member of JJ Arch, had a fiduciary duty to JJ Arch and to the other member of JJ Arch, Simpson.

**Answer: Paragraph 106 states a conclusion of law for which no responsive pleading is required, but to the extent one is required the allegations are denied.**

107.    Chassen had a duty of loyalty to JJ Arch and to Simpson.

**Answer: Paragraph 107 states a conclusion of law for which no responsive pleading is required, but to the extent one is required the allegations are denied.**

108.This duty of loyalty obligated Chassen to act in the best interests of JJ Arch and Simpson, and not to pursue Chassen's own personal interest at the expense of the well-being of JJ Arch and Simpson.

**Answer: Paragraph 108 states a conclusion of law for which no responsive pleading is required, but to the extent one is required the allegations are denied.**

109. Chassen engaged in misconduct by numerous means, including but not limited to by acting so as to deny Simpson:
> (a)  the ability to manage the Arch Companies' finances, by depriving Simpson of his ability to make transactions using the Arch Accounts;
> (b)  physical access to his office;
> (c)  the use of Simpson's email account to communicate with employees of the Arch Companies;
> (d)  the use of Dropbox to obtain access to the Arch Companies' corporate documents; and
> (e)  the ability to manage Arch Companies' web site by communicating with the domain company that hosts such web site.

**Answer: Defendant denies the allegations in paragraph 109.**

110. Chassen's misconduct resulted directly in damages to Simpson, in that it deprived Simpson of the ability to manage the Arch Companies' finances, gain access to his office, communicate with the Arch Companies' employees, gain access to Arch Companies' corporate documents, and manage the Arch Companies' web site.

**Answer: Defendant denies the allegations in paragraph 110.**

111. Chassen's misconduct resulted directly in damages to JJ Arch, in that it made it impossible for Simpson to pay financial obligations of JJ Arch, communicate with the Arch Companies' employees through email, and gain access to Arch Companies' corporate documents, and it made it impossible for anyone at Arch Companies, other than Chassen, who had already been duly removed from JJ Arch, to manage the Arch Companies' web site.

**Answer: Defendant denies the allegations in paragraph 111.**

112. By seizing control of JJ Arch in violation of the JJ Arch Amended Operating Agreement, and by conducting himself, as a member of JJ Arch, in a manner that placed his own interests and those of his personal associates above those of JJ Arch and Simpson, Chassen breached his duty of loyalty.

**Answer: Defendant denies the allegations in paragraph 112.**

113. Simpson has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, as set forth above.

**Answer: Defendant denies the allegations in paragraph 113.**

114. JJ Arch has been damaged, and continues to be damaged, by Chassen's conduct in violation of his duty of loyalty, in that such conduct has caused economic harm to Arch as set forth above, and is expected to continue to cause such harm in the future, by virtue of present and expected future decreases in the value of JJ Arch's equity interest in Arch and decreases in the distributions JJ Arch is to receive from Arch.

**Answer: Defendant denies the allegations in paragraph 114.**

115. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 115 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

116. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 116 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

117. Simpson and JJ Arch have suffered damages, and in the future will continue to suffer damages, in an amount to be determined at trial.

23

**Answer: Defendant denies the allegations in paragraph 117.**

## AS AND FOR A THIRD CAUSE OF ACTION
### (Conversion, Brought by All Plaintiffs Against Defendant Chassen)

118. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 105 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

119. The funds Arch Companies have on deposit in the Arch Accounts ("Arch Companies Funds") belong to Arch Companies.

**Answer: Defendant lacks information sufficient to form a belief as to the truth of the allegations in paragraph 119.**

120. Simpson, Arch, and JJ Arch have an immediate superior right of possession, relative to Chassen, to the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 120.**

121. The Arch Companies Funds are personal property.

**Answer: The allegations in paragraph 121 state a conclusion of law for which nor responsive pleading is required, but to the extent a responsive pleading is required, the allegations are denied.**

122. The Arch Companies Funds are specific, identifiable funds.

**Answer: The allegations in paragraph 121 state a conclusion of law for which nor responsive pleading is required, but to the extent a responsive pleading is required, the allegations are denied.**

123. Chassen, intentionally and without authority, acted to deprive Simpson of Simpson's authority, under the JJ Arch Amended Operating Agreement and the Arch Operating Agreement, to possess and control the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 123.**

124. Chassen has exercised unauthorized dominion over the Arch Companies Funds to the exclusion of the rights of Simpson, Arch, and JJ Arch.

**Answer: Defendant denies the allegations in paragraph 124.**

24

125. Chassen has an obligation to return control over the Arch Companies Funds to Simpson, Arch, and JJ Arch, but has not done so.

**Answer: Defendant denies the allegations in paragraph 125.**

126. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 126 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

127. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 127 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

128. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 128 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

129. Simpson, Arch, and JJ Arch have been injured, and continue to be injured, by Chassen's conversion of the Arch Companies Funds, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 129.**

AS AND FOR A FOURTH CAUSE OF ACTION
(Tortious Interference with Contractual Relations, Brought by Arch and JJ Arch Against Chassen)

130. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 130 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

131. Arch and JJ Arch have a valid and binding contract with a third party, *i.e.*, First Republic, pursuant to which JJ Arch, Arch, and the other Arch Companies deposit funds in bank accounts maintained by First Republic (the Arch Companies Funds), and First Republic holds

25

such funds for the benefit of JJ Arch, Arch, and the other Arch Companies (the "First Republic Agreement").

**Answer: Defendant admits that Arch and JJ Arch have a banking relationship with First Republic, and have bank accounts there, but otherwise denies the allegations in paragraph 131.**

132. Pursuant to the First Republic Agreement, the Arch Companies Funds may be spent and distributed by a person duly authorized by JJ Arch.

**Answer: Defendant refers the court to the original documents and otherwise denies the allegations in paragraph 132.**

133. The sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds is Simpson.

**Answer: Defendant denies the allegations in paragraph 133.**

134.   At all relevant times, Chassen knew of the First Republic Agreement, and that Simpson was the sole person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 134.**

135.   Chassen is a non-party to the First Republic Agreement.

**Answer: Defendant denies the allegations in paragraph 134.**

136.   Chassen intentionally procured the breach, by First Republic, of the First Republic Agreement, by misrepresenting to First Republic that Chassen, and not Simpson, is the person duly authorized by JJ Arch to spend and distribute monies from the Arch Companies Funds.

**Answer: Defendant denies the allegations in paragraph 136.**

137.   Arch and JJ Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result Simpson has been unable to spend, distribute, or otherwise control the Arch Companies Funds, on behalf of Arch and JJ Arch, as the duly authorized person pursuant to the First Republic Agreement, and pursuant to his authority under the Arch Operating Agreement and the JJ Arch Amended Operating Agreement.

**Answer: Defendant denies the allegations in paragraph 137.**

138. JJ Arch and Arch have been damaged by Chassen's procurement of First Republic's breach of the First Republic Agreement, in that as a result, as set forth above, they have been,

26

and remain, unable to fulfill their obligations to others, including but not limited to their employees, vendors, subcontractors, and materialmen, and as a result, those persons may cease performing services for JJ Arch and Arch, and JJ Arch and Arch may incur further obligations to those persons or to other persons in the future, or having difficulty in the future finding other persons who will be willing to work for or contract with them.

**Answer: Defendant denies the allegations in paragraph 138.**

139. Chassen's actions constitute tortious interference with the First Republic Agreement.

**Answer: Paragraph 139 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

140. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

141. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 126 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

142. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 126 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

143. Arch and JJ Arch have been injured, and continue to be injured, by Chassen's tortious interference with the Arch Contracts, in an amount to be determined at trial.

**Answer: Defendant denies the allegations in paragraph 143.**

AS AND FOR A FIFTH CAUSE OF ACTION
(Declaratory Judgment, Brought by All Plaintiffs, Against Chassen)

144. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

27

**Answer: Paragraph 144 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

145. There is a justiciable controversy between Plaintiffs on the one hand, and Chassen on the other, as to whether

(a) the Notice to Chassen of Cause Event removed Chassen as a member of JJ Arch; and

(b) the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch.

**Answer: Paragraph 145 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

146. Plaintiffs have taken the position that the Notice of Chassen of Cause Event removed Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter did not remove Simpson as a member of JJ Arch.

**Answer: Defendant admits the allegations in paragraph 146.**

147. Chassen has taken the position that the Notice of Chassen of Cause Event did not remove Chassen as a member of JJ Arch, and the Chassen 8/6/23 Letter removed Simpson as a member of JJ Arch. However, both positions taken by Chassen are incorrect.

**Answer: Defendant admits that he has taken those positions but denies that they are incorrect.**

148. The aforesaid dispute between the parties represents a genuine, concrete dispute involving substantial legal interests.

**Answer: Defendant denies the allegations in paragraph 148 because both letters were declared nullities by order of the Court.**

149. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

150. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

151. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 140 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

152. Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to resolve the aforesaid dispute.

**Answer: Paragraph 152 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

153. There is no adequate remedy at law.

**Answer: Paragraph 153 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

AS AND FOR A SIXTH CAUSE OF ACTION
(Declaratory Judgment, Brought by All Plaintiffs, Against Chassen and First Republic)

154. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 154 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

155. There is a justiciable controversy between Plaintiffs on the one hand, and Defendants on the other, as to whether Simpson or Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and whether the hold on the Arch Accounts should be removed.

**Answer: Paragraph 155 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

156. Plaintiffs have taken the position that Simpson is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and the hold on the Arch Accounts must be released.

**Answer: Defendant admits the allegations in paragraph 156.**

157. Chassen has taken the position that Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts. However, the position taken by Chassen is incorrect.

**Answer: Defendant admits that he has taken the position but denies the position is incorrect.**

158. First Republic has taken the position that it cannot determine whether Simpson or Chassen is the individual at JJ Arch and Arch entitled to exercise control over the Arch Accounts, and that the hold should remain on the Arch Accounts. However, the position taken by First Republic is incorrect.

**Answer: Defendant admits that First Republic has taken the position, but denies the position is incorrect.**

159. The aforesaid dispute among the parties represents a genuine, concrete dispute involving substantial legal interests.

**Answer: Paragraph 159 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

160. As the managing member of JJ Arch expressly empowered to bring suit on behalf of JJ Arch pursuant to JJ Arch Amended Operating Agreement (Exhibit 3, JJ Arch Amended Operating Agreement, ¶ 3.1(a)(v)), Simpson may assert this claim of JJ Arch's under JJ Arch's name.

**Answer: Paragraph 160 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant refers the Court to the original document for its true contents and otherwise denies the allegations.**

161. In the alternative, as a member of JJ Arch, Simpson has standing to assert this claim derivatively on behalf of JJ Arch.

**Answer: Paragraph 161 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

162. As managing member of JJ Arch, which in turn is the managing member of Arch, Simpson has standing to bring this claim derivatively on behalf of Arch.

**Answer: Paragraph 162 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

30

163. Plaintiffs are therefore entitled to a declaration of the legal rights of the parties to resolve the aforesaid dispute.

**Answer: Paragraph 163 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

164. There is no adequate remedy at law.

**Answer: Paragraph 164 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

AS AND FOR A SEVENTH CAUSE OF ACTION
(Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen and First Republic)

165. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 165 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

166. Plaintiffs have a likelihood of success on the merits on their claim that Simpson has the right to control, on the behalf of JJ Arch and Arch, the Arch Accounts.

**Answer: Paragraph 166 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

167. In the event that the hold First Republic has placed on the Arch Accounts is not lifted immediately, and the right to control the Arch Accounts is not restored to Simpson, Plaintiffs, and third parties, will experience imminent and irreparable injury.

**Answer: Paragraph 167 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

168. Such injury will be in the form of Arch Companies being unable to pay their employees, resulting in economic harm to such employees, and at least some of such employees imminently leaving employment with the Arch Companies and seeking work elsewhere; lack of supervision on construction projects supervised by the Arch Companies, imminently resulting in physical injury to members of the public at the construction sites; Arch Companies being unable to pay subcontractors and materialmen on projects, imminently resulting in such subcontractors and materialmen ceasing work on the projects, again imminently resulting in physical injury to members of the public at unsupervised construction sites, as well as economic injury to the Arch Companies owning the project sites, due to delayed completion of projects; and long-term economic damage to Arch Companies, as future efforts at recruiting employees and contracting with third parties are hindered due to damage to Arch Companies' reputation due to a sustained inability to fulfill their obligations.

31

**Answer: Defendant denies the allegations in paragraph 168.**

169. The only way forward, therefore, to protect Arch Companies, their employees, subcontractors, materialmen, and vendors, and members of the public at large, is for the Court to order that First Republic release its hold on Arch Companies' bank accounts, and restore to Simpson his contractually guaranteed exclusive right to control the finances, and the checkbooks, of Arch Companies.

**Answer: Defendant denies the allegations in paragraph 169.**

170. The balance of the equities favors Plaintiffs.

**Answer: Defendant denies the allegations in paragraph 170.**

171. Plaintiffs are entitled to a preliminary and permanent injunction requiring First Republic, immediately, to lift the hold it has placed on the Arch Accounts, and to restore to Simpson the exclusive right to control the Arch Accounts on behalf of JJ Arch and Arch.

**Answer: Paragraph 171 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

172. There is no adequate remedy at law.

**Answer: Paragraph 172 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

AS AND FOR AN EIGHTH CAUSE OF ACTION
(Preliminary and Permanent Injunction, Brought by All Plaintiffs Against Chassen)

173. Plaintiffs repeat and reiterate each and every allegation in the foregoing paragraphs as if fully set forth herein.

**Answer: Paragraph 173 does not require a responsive pleading, but to the extent it does, the allegations are denied.**

174. Plaintiffs have a likelihood of success on the merits of their claim that Simpson is entitled to have access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

**Answer: Paragraph 174 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

32

175. In the event that Simpson is unable to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site, and Plaintiffs will suffer irreparable injury.

**Answer: Paragraph 175 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

176. The balance of the equities favors Plaintiffs.

**Answer: Paragraph 176 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

177. Plaintiffs are entitled to a preliminary and permanent injunction requiring Chassen to take, immediately, all actions necessary to enable Simpson to gain access to his email account with Arch Companies, have access to Arch Companies' Dropbox file, and communicate with the company hosting the Arch Companies' web site.

**Answer: Paragraph 177 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

178. There is no adequate remedy at law.

**Answer: Paragraph 178 states conclusions of law for which no responsive pleading is required, but to the extent such a response is required, Defendant denies the allegations.**

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiffs fail to state a claim as a matter of law.

### Second Affirmative Defense

Plaintiffs' claims fail based on documentary evidence.

### Third Affirmative Defense

Plaintiffs improperly intermingle their direct and derivative claims, which mandates the dismissal of the entire complaint.

33

### Fourth Affirmative Defense

Plaintiffs' claims should be dismissed as duplicative.

### Fifth Affirmative Defense

Plaintiffs' claims fail under the doctrine of in pari delicto.

### Sixth Affirmative Defense

Plaintiffs' claims fail because of Plaintiff's unclean hands.

### Seventh Affirmative Defense

Plaintiffs' claims fail under the doctrines of waiver and estoppel.

### Eighth Affirmative Defense

Plaintiffs' derivative claims fail because under Section 10.2 of the JJ Arch Operating

Agreement, JJ Arch is obligated to indemnify Defendant for any claim "for any loss, damage, or

claim incurred" by Defendant "by reason of any act or omission performed or omitted . . . in

good faith on behalf of the Company and in a manner reasonably believed to be within the scope

of authority conferred . . . by this Agreement." Defendant's conduct has been entirely in good

faith, on behalf of the company, and in a manner reasonably believed to be within the scope of

the authority conferred by the Operating Agreement.

### Ninth Affirmative Defense

Plaintiffs' claims fail because the Amended JJ Arch Operating Agreement by which

Simpson purported to retain sole managerial authority after December 11, 2021 is

unconscionable. Despite Chassen vocalizing his disagreement, Simpson presented him with the

Amendment on a take-it-or-leave-it basis, threatening him that he would remove him from the

business entirely if he did not sign the Amendment. Chassen signed the Amendment under undue

pressure and threats. Simpson pressured Chassen not to hire his own counsel to review the

34

Amendment and limited his involvement in calls Simpson took with the shared Arch Entities'

counsel David Heymann who Simpson had draft the amendment in his favor, while Heymann

purported to represent both of them. Chassen was never disclosed Hyemann's actual conflicts,

and Chassen did not execute any conflict waiver. Simpson was also in a relationship of

confidence and trust with Defendant, who had been his mentor in the industry. Simpson took

advantage of that relationship of trust.

Because of their unequal bargaining power, prior relationship, Simpson's threats, and

deceptive and coercive tactics, and the parties' confidential relationship, Chassen lacked

meaningful choice in entering into the Amendment.

And the Amendment itself was substantively unconscionable as it contained only

favorable terms to Simpson and gave away Chassen's managerial rights as well as his

membership percentage under the Operating Agreement for nothing.

### Tenth Affirmative Defense

Plaintiffs' claims fail because the Amended JJ Arch Operating Agreement by which

Simpson purported to retain sole managerial authority fails for lack of consideration. The

Amendment contained only favorable terms to Simpson for nothing of real value.

### Eleventh Affirmative Defense

Plaintiffs' claims fail because the Amended JJ Arch Operating Agreement by which

Simpson purported to retain sole managerial authority was the product of duress and undue

influence and breaches of fiduciary duty.

### Twelfth Affirmative Defense

35

Plaintiffs' claims fail because Simpson was in a relationship of trust and confidence at the time of the drafting and execution of the Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority, and a special burden should be shifted to the party in whom the trust is reposed, Simpson, to disprove fraud or overreaching. *In re Estate of Greiff*, 92 N.Y.2d 341, 345 (1998). Given Chassen relationship of trust and confidence with Simpson, the burden is on Simpson to establish that he did not enter the Amended JJ Arch Operating Agreement by undue influence or coercion, which burden he cannot meet.

### Thirteenth Affirmative Defense

Plaintiffs' claims fail because Simpson breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, 35 Oak, and Arch's investors.

### Fourteenth Affirmative Defense

Plaintiffs' claims fail because Simpson was lawfully resigned from JJ Arch.

### Fifteenth Affirmative Defense

Plaintiffs' claims fail because he failed to properly serve Chassen.

### Sixteenth Affirmative Defense

Defendant reserves his right to assert additional affirmative defenses as additional information is learned during the course of this action.

WHEREFORE, the Court should award and enter judgment in Defendant's favor, dismiss the Complaint in its entirety, and award Defendant his legal fees and costs.

### AMENDED VERIFIED COUNTER-CLAIMS

Jared Chassen ("Chassen"), individually and derivatively on behalf of JJ Arch, LLC ("JJ Arch") and Arch Real Estate Holdings, LLC ("Arch Real Estate"), for his amended

36

counterclaims against Jeffrey Simpson ("Simpson") and YJ Simco LLC ("Simco"), alleges as follows:

1.      This is an action for breach of fiduciary duty, breach of contract, recission, accounting, and declaratory relief and a permanent injunction brought by Chassen in his own individual capacity, and derivatively on behalf of JJ Arch and Arch Real Estate against Simpson, as well as a direct action by Chassen against Simpson and Simco for breach of contract, specific performance, and a declaratory judgment. Chassen seeks, among other things, to recover for Simpson's breaches of fiduciary duty and other corporate wrongdoing, to declare that Chassen is the sole managing member of JJ Arch, and to declare Simpson resigned as a member of JJ Arch.

## Parties

2.      Plaintiff Chassen is an individual residing in the State of New York. He is a member of JJ Arch, which in turn is the managing member of Arch Real Estate. Chassen has over 15 years of experience in the real estate industry. Among other work, before forming JJ Arch, he worked at Greystone Development ("Greystone") an affiliate of Greystone & Co., Inc. a firm that provides real estate services.

3.      Defendant Simpson is an individual residing in the State of New York. He is a member of JJ Arch, which in turn is the managing member of Arch Real Estate. Before forming JJ Arch with Chassen, Simpson worked with Chassen at Greystone.

4.      Defendant Simco is a New York limited liability corporation that upon information and belief has two members, Simpson and his wife Yael Simpson.

5.      Nominal Defendant JJ Arch is a New York limited liability corporation. It was formed by Chassen and Simpson on or about December 11, 2017. Chassen and Simpson are the only two members of JJ Arch.

37

6.     Nominal Defendant Arch Real Estate is a New York limited liability corporation. It was formed by JJ Arch and 35 Oak on or about December 11, 2017. JJ Arch and 35 Oak are the only two members of Arch Real Estate.

### The JJ Arch Operating Agreement

7.     On December 11, 2017, Chassen and Simpson entered into the JJ Arch Operating Agreement. A true and correct copy of the JJ Arch Operating Agreement is annexed hereto as **Exhibit A**. The JJ Arch Operating Agreement identifies both Simpson and Chassen as the two Members. *See* Ex. A § 1.1. Section 3.1(a) of the JJ Arch Operating Agreement provides that, prior to the fourth anniversary of the Agreement, the business and affairs of JJ Arch shall be managed by Simpson subject to the limitations set forth in subsection (b), which provides that any Company Major Decision, as defined in the Agreement, shall only be undertaken with Chassen's prior written consent.  *See* Ex. A § 3.1(a)-(b).

8.     Section 3.2 of the JJ Arch Operating Agreement provides that, after the fourth anniversary of the Agreement, that is, December 12, 2021, Simpson and Chassen were to both have managerial authority over JJ Arch, with consent by both required for Company Major Decisions. *See id*. § 3.2. Further, Chassen and Simpson were to be entitled to 50% of all distributions from December 12, 2021.

### The Arch Real Estate Operating Agreement

9.     On December 11, 2017, the same day that Chassen and Simpson entered into the JJ Arch Operating Agreement, JJ Arch and 35 Oak entered into the Arch Real Estate Operating Agreement. A true and correct copy of the Arch Real Estate Operating Agreement is annexed hereto as **Exhibit B**. Under the Arch Real Estate Operating Agreement, JJ Arch is the Managing

38

Member, while 35 Oak is the Investor Member. While JJ Arch was conferred with managerial rights over Arch Real Estate, 35 Oak was given consent rights to certain major decisions.

### Before Becoming Partners, Simpson Had a Prior Relationship of Confidence and Trust With Chassen

10.     Chassen first met Simpson when he worked with him at Greystone, a firm that provides real estate services. Greystone Development is a New York based full-service developer of commercial and residential real estate that provides investment, development, construction, marketing, operations, and asset management services.

11.     Simpson joined Greystone in 2007 and became the Chief Executive Officer of its development subsidiary in 2013. At the time, Dough Benach, the head of the division hired Chassen and placed him in the Development and Acquisitions team in 2012 to work with Benach and Simpson. Simpson and Benach taught him essential skills for acquiring, financing debt and equity, developing and running real estate projects, and he was promoted as the Director of Acquisitions in 2014.

12.     During his tenure at Greystone, Simpson had a reputation of being an aggressive businessperson who would pursue opportunities that others would view as unfeasible but would never yield to opposition and often caused internal conflict.

13.     Chassen viewed Simpson as his mentor and developed a close relationship with him. He reposed the utmost confidence and trust in him and even put his financial well-being in his hands.

14.     In 2017, Simpson left Greystone under less than favorable circumstances.

15.     Despite the public perception that the separation between Simpson and Greystone was amicable, the separation came after internal dissensions caused by numerous failed and over budget projects led by Simpson. As a result, the Greystone Development brand downsized from

30 people to currently 3 persons and Simpson was forced to leave Greystone, and Chassen left alongside many others as the brand downsized and the jobs disappeared.

### **Chassen Brings Simpson 35 Oak as an Investor and they Form JJ Arch**

16.     After departing Greystone, Simpson struggled to find investors for a new business. While still employed by Greystone, he held many meetings by himself to launch a new business which yielded no success. Through Chassen's own connections, Chassen introduced 35 Oak to Simpson while still at Greystone. Chassen and Simpson planned a new company together relying on Chassen's capital connections to make the company feasible.

17.     35 Oak is an active investor in many industries, and its principal place of business is in Toronto, Canada. After a few meetings, 35 Oak decided to invest in a joint venture with Chassen and Simpson, and on December 11, 2017, established Arch Real Estate, which is governed by the Arch Real Estate Operating Agreement. On the same day, Simpson and Chassen signed the operating agreement for JJ Arch.

18.     The real estate portfolio owned and controlled by Arch Real Estate and its affiliates and subsidiaries ("Arch" or "Arch Entities") ultimately grew to more than $1Bn in assets under management, held in various single purpose companies that are affiliates of and/or controlled by the Arch Entities. The Arch Entities have affiliated companies, including a property management company, brokerage company, and a construction company, each of which provides services relating to real properties that the Arch Entities control.

### **Simpson Uses His Relationship of Trust with Chassen to Coerce Chassen to Sign an Unconscionable Amended JJ Arch Operating Agreement**

19.     On May 22, 2021, the JJ Arch Operating Agreement was amended forcibly without Chassen's input or drafting (the "Amendment"). A true and correct copy of the Amendment is annexed hereto as **Exhibit C**. The Amendment eliminated the language in Section 3.2 of the

40

original Agreement providing Simpson and Chassen equal rights and authority to manage the company beginning on December 11, 2021. Under the Amendment, Chassen purported to give away his managerial rights to Simpson for another four years, though Chassen retains consent right to limit Simpson's authority with respect to any Company Major Decision. *See* Ex. C § 3.1-3.2. Instead of becoming entitled to 50% of the distributions, as he was to be as of December 11, 2021, under the Amendment, Chassen was to be entitled to 49.9% of all distributions, with Simpson entitled to 50.1%.

20.     Because of their unequal bargaining power, Simpson's threats, his deceptive and coercive tactics, and the parties' confidential relationship, Chassen lacked meaningful choice in entering the Amendment.

21.     Simpson took advantage of his confidential relationship with Chassen, including as Chassen's mentor, to push a one-sided agreement. He heaped abuse on him and pressured him to sign, repeatedly telling him he was incapable and inept. Simpson also pressured Chassen to not have his own counsel review the Amendment and limited his involvement in calls Simpson took with JJ Arch and Arch Entities' counsel David Heymann, who purported to also represent both of them, and who Simpson had draft the amendment in his favor. Heymann did not disclose his actual conflicts in representing both JJ Arch, Simpson, and Chassen, and no conflict waiver was ever presented or agreed-to. Simpson presented Chassen with the Amendment on a take-it-or-leave-it basis, threatening him that he would just remove him from JJ Arch if he did not sign the Amendment. Chassen signed the Amendment under undue pressure and threats.

22.     The Amendment itself was substantively unconscionable as it contained only favorable terms to Simpson and gave away Chassen's rights under the Operating Agreement for nothing of value.

41

## **Simpson Takes Various Unlawful and Improper Actions**

23.     When they first started their new business, Simpson promised Chassen, Michelle Miller, and Tristan Last, employees/junior partners of the Arch Entities, that he would learn lessons from Greystone and reform his aggressive behavior. The operation of the Arch Entities did well initially, but it went downhill over the past two years.

24.     Simpson's aggressive business demeanor increasingly turned menacing inside the company, including with partners, lenders and lawyers. He repeatedly acted in an intimidating manner towards employees and others. Simpson not only overloaded employees, but also regularly yelled and threatened to fire them causing a huge turnover of employees and tarnishing the Arch Entities' brand in the hiring markets. He regularly called people stupid, inept and other demeaning names, to the point of bringing them to tears. Simpson created a toxic work environment that forced many employees to leave, leading to understaffing and mismanagement of the company's real estate projects. Simpson would send messages to key employees such as "so now everyone is going to have to come to me every time they go to the bathroom to get my yes or no."

25.     Putting the companies' and investors' interests first, Chassen was willing to work to mitigate the damage caused in Simpson'a wake and endure the harsh and abusive workplace that Simpson created, even to Chassen's personal detriment. Yet Simpson committed a series of misconducts that crossed the line of breaching his fiduciary duties, which the company could not withstand, and Chassen had to step up eventually.

26.     First, Simpson forced the team to make various misrepresentations about real estate projects to induce investments. Simpson and team members including Chassen were forced to pitch grossly under budgeted projects and promised unrealistic returns on investment to induce

42

investors, such as 35 Oak and many others to contribute additional capital without ever disclosing risks.

27. Disregarding the opposition of the other Arch Entities' partners and employees, including Chassen, Simpson pushed numbers aggressively and used unachievable assumptions to amplify financial outcomes. Over the years, several internal investment meetings occurred where Chassen and many team members aggressively pushed back on his financial assumptions, but he would aggressively fight us and ultimately tell everyone to follow his path or be sidelined or fired. Simpson also provided minimal reporting to investors, leaving them in the dark and keeping the staff overworked and understaffed and unable to do simple tasks like reporting or reconciliation. 35 Oak, the Arch Real Estate funding partner, kept funding the business and projects without proper capital calls, reporting or communication from JJ Arch, and if they ever questioned Simpson, he would threaten retribution if they did not continue to fund. He would tell them they were only good for capital and guarantees, and nothing else.

28. Second, Simpson prioritized his personal gains over the success of the Arch Entities' projects. For instance, the Myrtle Point development in Ridgewood, Queens, was grossly under budgeted and experienced significant delays from lack of supervision. Simpson didn't even visit the project for weeks at a time. Recently, the project relied on one time-sensitive forbearance to move forward, yet Simpson instructed his lawyer for the Arch Entities to put pencils down and not turn over the necessary documents to 35 Oak, the guarantor. He was planning to hold documents as leverage to cut a deal with one major lender and force 35 Oak to take certain actions that would favor his personal interests. As a result of the delay, the Myrtle Point development has been stalled for months, causing the Arch Entities to lose more than fifty percent of its necessary

revenue and putting additional strain on the business and putting over $45 million of equity at risk for full loss.

29.     Third, Simpson failed to properly supervise and manage projects.  Across various projects, Simpson was not involved for months and in many instances disappeared to focus on his other businesses or personal ventures.

30.     Fourth, as cash flow started to become limited at Arch, at the extreme detriment of our managed investments and to increase income streams for the company, Simpson started a plan forcing the team leaders to take on even heavier workloads amongst senior employees, and shedding necessary employees such as project managers, construction managers, accountants, and other crucial roles to run projects. Simpson's attempt to cut expenses to generate additional income deprived many projects of proper supervision, which led to numerous failures. Despite desperate pleas from many senior Arch Entities' employees to properly staff the properties, Simpson pushed to continue to cut staff, and increase fees to JJ Arch. Investors were never made aware of these issues.

31.     Fifth, days before Chassen was forced as a fiduciary to remove Simpson, Simpson in text messages and in verbal communications to Chassen and Michelle Miller, a junior partner/employee, threatened to put all the Arch Entities into bankruptcy in order to leverage 35 Oak to follow his orders without resistance or he would crash the business. Knowing it was against the Arch and JJ Arch Operating Agreements to file such bankruptcy, Simpson openly declared his plan to blow up the business and warned others that he would do so if they disobeyed him saying, "[a]nybody that chooses to do anything without my permission or my consent is no longer going to be a part of this organization."

32.     Simpson also misappropriated Arch Real Estate's funds and employees for an independent auto business—Rêver Motors ("Rêver). Rêver is a vintage car dealership and repair shop located in Southampton, New York. For the last two years, Simpson often dedicated two to three days per week on running the Rêver business while shirking his other responsibilities. Simpson directed Arch Entities' employees to manage the accounting, logistics, and the property of the Rêver business. Simpson even hired one of the Arch Real Estate's employees to work exclusively for the Rêver business and transferred funds from Arch Real Estate's construction projects to pay their wages. In connection with the Rêver business to which he devoted much of his time, Simpson engaged in illegality such as switching a VIN number on a car. This was all done without Chasen's consent.

33.     From the very beginning of the Rêver business, Chassen was very clear to Simpson that if they purchased this business, it had to be a weekend side-business that would need full third-party management and should never be at the expense of Arch Real Estate's investments. Repeatedly, Chassen asked Simpson to stop directing Arch Real Estate's employees to work for the business, but he always disregarded Chassen's pleas. Simpson also never obtained Chassen's consent before doing this despite being obligated to do so. *See* Ex. C § 3.1(b)(viii).

34.     Simpson also began devoting much of his time to other business at the expense of JJ Arch and Arch Real Estate. Because of these other businesses, he was devoting at most 65% of his business time to JJ Arch, when the JJ Arch Operating Agreement requires that he devote substantially all his business time to JJ Arch.

## The Company Enters Dire Financial Circumstances Because of Simpson and Simpson Proposes that 35 Oak Take-Over JJ Arch

45

35.     In July 2023, Chassen asked JJ Arch's accountant about Simpson's diversion of money. Chassen had just seen a Paylocity report, a payroll document, that showed payments from Arch Real Estate to a worker at Rever, a business not associated with Arch Real Estate.

36.     The accountant confirmed that Simpson was using company funds from Arch Real Estate to pay JJ Arch and other expenses. She confirmed that he took Arch Real Estate money to pay auto employees and that he owed Arch Real Estate money. In fact, Simpson also used employees at Construction Services and Solutions LLC, a wholly owned Arch business, to work on his home and on other JJ Arch owned properties without 35 Oak or Chassen's consent and without reimbursing Arch, who paid these employees. She also confirmed that due to extreme lack of staff there was minimal accounting of funds.

37.     Arch's precarious situation has its origins in Simpson's refusal to act in Arch's best interests, as Simpson has little invested in Arch, while he earns money from fees. By way of background, JJ Arch earned its operating income from a flow of acquisitions of new properties and property management fees. For example, it earned income from finance fees from brokering loans on new acquisitions and new deals, property management fees for overseeing the properties that were owned by Arch, and construction fees on its development of properties acquired by Arch.

38.     Before 2022, Arch owned approximately 5500 units around the country, but in 2022 it sold approximately 2000 of the units, thus lessening its base for property management fees. The rise in interest rates also made Arch unable to acquire new properties to be able to earn income from finance and construction fees. Without this income, Arch was forced to lay-off employees, but without these employees, it could not properly manage the properties spread-out in different states, thus causing the properties to start failing from mismanagement.

46

39.      In other words, the investors were being harmed by Arch remaining as the property manager because Arch could not maintain the economies of scale required to properly run the properties once it sold many of the units in 2022. And with the real estate markets faltering, Arch also no longer had the regular income from financing fees on acquisitions by which it otherwise obtained income, or construction fees from developing newly acquired properties.

40.      And in these dire circumstances, Simpson's erratic, volatile, and abusive behavior only made the situation worse. For example, Arch's construction entity, Arch Builders, LLC, had a staff of seven people on the ground, plus people in the office, including project managers and executives. Beginning in the summer of 2022, these people were either abused and quit or were fired by Simpson. That left no one track budgets and no one to oversee or handle Arch's ongoing construction projects, leading to the projects to fail.

41.      Chassen, and others at JJ Arch, including Jason Paul and Michelle Miller, JJ Arch employees/junior partners, regularly suggested to Simpson that Arch outsource property management to independent third-party property managers who had the necessary economies of scale to oversee the properties and ensure that the investor's assets were adequately managed and protected. But JJ Arch would have less revenue by doing so, and would become a mere investment holding company, something that did not serve Simpson's personal financial interests given his minimal investment in Arch, and something his ego could not tolerate, even at the expense of the investors whose interests he was supposed to protect.

42.      With properties failing, funds running out, and investors unprotected, in July 2023, even Simpson appeared to recognize that he should walk away and give control to Arch Real Estate's investor member, 35 Oak, who had the funds to right the ship but were not willing to continue funding a black hole where their money just disappeared into Simpson's mismanagement.

47

On July 13, 2023, he sent a proposal through Michelle Miller, a JJ Arch employee/junior partner, to 35 Oak to "unwind" Arch. In the proposal, among other things, 35 Oak would take over ownership of JJ Arch after 60 days, and Simpson would execute a separation agreement. A true and correct copy of the July 13, 2023 email chain is annexed hereto as **Exhibit D**.

43.      Later that day, Simpson responded to the email to say, among other things, "[w]e sent this email this AM seeking feedback on a path forward for everyone . . . I urge you to reply and get to a conclusive agreement below by tomorrow, as we set up timeframes in the proposal for a particular reason. *If not, we will have to take more extreme measures to exercise Dissolution via the Agreement.*" *Id.* (emphasis added). Simpson recognized, expressed of course as a threat, that his remaining at the company would lead to the destruction of the company.

### 35 Oak's Response Enrages Simpson

44.      For its own reasons, 35 Oak responded via its counsel, Haynes and Boone, LLP, on July 19, 2023 that they would agree to a proposal whereby, among other things, "Jeff immediately steps away from active day-to-day management of Arch and its subsidiaries and relinquishes authority to act on behalf of Arch and its subsidiaries . . . [and] [t]he JJ Operating Agreement is amended such that Jared has sole control over JJ." A true and correct copy of this email is annexed hereto as **Exhibit E**.

45.      Chassen had no knowledge of 35 Oak's deliberations, or that it was going to make this proposal to Simpson, but now understands that 35 Oak made this proposal that Chassen have sole control of JJ Arch, rather than 35 Oak itself as suggested by Simpson, because 35 Oak was concerned it might face financial liability on its Arch loan agreements if neither Simpson nor Chassen were in control of JJ Arch. The proposal that Chassen be placed in charge, however, enraged, Simpson, and he appears to have believed that, though he himself made the proposal to

35 Oak to walk away in their stead, that Chassen somehow was behind their counterproposal that Chassen be placed in charge of JJ Arch instead. Chassen was not.

46.     Rather, 35 Oak recognized that unlike Simpson, Chassen was and is a thoughtful, careful, diligent and stable person who acted with his fiduciary duties foremost in his mind and who could be trusted as a steward and fiduciary.

### Simpson Becomes Fixated on His Battle with 35 Oak, Which He Escalates, and Chassen Acts to Protect Arch

47.     Simpson's relationship with 35 Oak then deteriorated even more and he engaged in a campaign of extortion, abuse, and threats that led 35 Oak to file an action in federal court against him. *See 608941 NJ Inc. v. Jeffrey Simpson*, 1:23-cv-07089-AT (S.D.N.Y.). A true and correct copy of the Complaint is annexed hereto as **Exhibit F**.

48.     As detailed in 35 Oak's Complaint, as well the emails and documents attached to it showing the extensive deterioration of Simpson's relationship with Arch Real Estate's investing partner, Simpson's breached his fiduciary duties to 35 Oak and Arch Real Estate by: (1) threatening to stop work on time sensitive matters in order to blackmail 35 Oak; (2) directing counsel for Arch Real Estate not to speak to 35 Oak; (3) making misrepresentations to 35 Oak, and entering agreements at 35 Oak's expense without consent; (4) falsely advising 35 Oak that it had made capital calls to other investors to induce 35 Oak to make capital contributions; (5) threatening to fire Arch Real Estate employees and cease operations if 35 Oak did not provide money; (6) refusing to execute documents unless terms were included that would only benefit him; (7) entering into major decisions without 35 Oak's consent; (8) creating a hostile business atmosphere damaging critical relationships with lenders, contractors, tenants, etc.; and (9) making defamatory statements.

49

49.     In the beginning of August, Chassen and many others again advised Simpson that Arch should transition the management of Arch's properties from self-management to third-party management. Simpson responded that he would not do that because he would lose his fee-revenue stream and would further have to rely on 35 Oak's money, the investor he was focused on bullying.

50.     Simpson's battle with 35 Oak continued escalating. On or about August 3, 2023, Simpson told Chassen that if 35 Oak "didn't stop messing" with him, he was going to file for bankruptcy on all the properties and "blow the company up." This, of course, was prohibited by the operating agreements, and further demonstrated to Chassen that Simpson was entirely focused on himself and his petty battle with 35 Oak.

51.     After 35 Oak's counterproposal, Simpson wanted Chassen to take a pay-cut, apparently on the delusional purported belief that such a pay-cut would make him not have to rely on 35 Oak or would demonstrate his loyalty to Simpson. When Chassen suggested that he might accede to such a pay-cut if both were to do so, Simpson refused and grew further enraged.

52.     Chassen learned on August 4, 2023 that Simpson was going to terminate Chassen and free himself to destroy the company and misappropriate company assets at will. Chassen then acted to protect the company.

53.     On August 5, 2023, Simpson sent Chassen an email with the subject line "Jared Chassen - Resignation of JJ Arch LLC." In this email, he "advised" Chassen that he had been "forced to resign as a Member" of the Arch Entities and would no longer be affiliated with the Arch Entities or any of its affiliates "effective immediately."

54.     Simpson's email to remove Chassen as a Member of JJ Arch did not comply with the JJ Arch Operating Agreement. Under the Agreement, the resignation of a Member occurs when "a Cause Event has occurred with respect to a Member and the other Member has delivered written

50

FILED: NEW YORK COUNTY CLERK 05/25/2023 03:33 PM   INDEX NO. 558288/2023
NYSCEF DOC. NO. 592
24-01358, Doc 113-1, Filed 04/08/24, Entered 04/08/24 09:45:20, Main Document
RECEIVED NYSCEF: 05/25/2023

Pg 199 of 363

notice thereof to such Member requiring such Member to resign." Ex. A at § 1.1 ("<u>Resignation</u>").

A Cause Event, as defined in the Arch Operating Agreement, includes, but is not limited to, "(i)

willful misconduct in relation to the business or affairs of [the Arch Entities]," "(ii) breach of

fiduciary duty in relation to the business or affairs of [the Arch Entities]," "(iii) gross negligence

in relation to the business or affairs of [the Arch Entities] which results in a material loss to [the

Arch Entities] or its Members," and "(v) misappropriation of [the Arch Entities' funds or

property]." Ex. A at § 1.1 ("<u>Cause Event</u>").

55.     Simpson made no allegation that would constitute a Cause Event warranting

Chassen's resignation. In fact, all Chassen's actions have been to protect the company and its

assets. Simpson's purported notice removing Chassen as a Member of the Arch Entities was

nothing more than a blatant attempt to wrest sole control and management of the Arch Entities to

insulate himself from his bad acts and render himself a dictator, without any checks or balances.

56.     To protect the Arch Entities from further damage, on August 6, 2023, Chassen sent

Simpson an email with the subject line "Limited Liability Company Operating Agreement of JJ

Arch LLC/Cause Event Notice" and an attachment titled "Notice JJ Arch." In the Notice, Chassen

rejected all of Simpson's assertions in the August 5, 2023 resignation email, and his purported

forced resignation of Chassen as a Member of JJ Arch, noting that that he had not done any conduct

that would constitute a Cause Event because "no such conduct occurred." A true and correct copy

of the termination letter is annexed hereto as **<u>Exhibit G</u>**.

57.     Chassen then informed Simpson, as required by the JJ Arch Operating Agreement,

that Simpson had committed multiple Cause Events that fall into the willful misconduct and breach

of fiduciary duty categories identified in the JJ Arch Operating Agreement, including "(a) directing

lawyers for one or more Subsidiaries to stop work on extremely time sensitive matters for [his]

51

own personal leverage, (b) making various misrepresentations to [35 Oak] and other investors to induce them to invest in deals and contribute additional capital to Subsidiaries, (c) misapplying Company resources for [his] personal use, (d) breaching [his] fiduciary duty under the LLC Agreement by *inter alia* failing to obtain [my] consent required for certain decisions as required under the LLC Agreement, (e) engaging in willful misconduct as to the business and affairs of the Company . . . [and] (f) engaging in gross negligence, which [would] result in material loss as to the business and affairs of the Company …" *Id*.

58.     Chassen advised Simpson that, as a result of these Cause Events, he had to resign, and no longer had the right to act on behalf of the Arch Entities.

59.     Further, Simpson's resignation was independently mandated by the JJ Arch Operating Agreement's provision that makes it a resignation event if the member fails to devote "substantially all business time for JJ Arch." Ex. A at 5. Notice is not a prerequisite to resignation for a failure to provide "substantially all" business time to JJ Arch, *id.*, as notice is only required for Cause Event.

60.     On August 6, 2023, 35 Oak also sent Simpson an email with the subject line "Limited Liability Company Operating Agreement of Arch Real Estate Holdings LLC/Cause Event Notice" and an attachment titled "Notice from 35 Oak to JJ Member (Final)." 35 Oak advised Simpson that he had committed multiple Cause Events that fall into the willful misconduct and breach of fiduciary duty categories identified in the JJ Arch Operating Agreement.

## Simpson Files this Action and is Restored to His Managerial Position by an Injunction

61.     In response to his resignation from JJ Arch, on August 14, 2023, Simpson, individually and derivatively, as managing member of JJ Arch, sued derivatively as managing member of Arch and JJ Arch, Chassen and First Republic Bank.

62.     On August 21, 2023, the Court entered an Interim Order which restored Simpson to his managerial position but required that "[b]oth Simpson and Chassen shall maintain access to view the Arch Accounts online, and such access shall not be terminated without further order of the Court." A true and correct copy of the Interim Order is annexed hereto as **Exhibit H**. The Interim Order further provided that the "JJ Arch shall be managed in accordance with Section 3.1 of the Limited Liability Company Operating Agreement of JJ Arch LLC, dated December 11, 2017, as amended by Amendment No. 1 dated May 22, 2021." *Id.* That is, the Court ruled that "the business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in Section 3.2 of the JJ Arch Operating Agreement, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen." *Id.* The Court expressly ruled that "The August 2023 instruments sent by Simpson and Chassen to the other purportedly resigning or terminating the other as a member or managing member of JJ Arch are hereby void and of no force or effect . . ." *Id.* Importantly, the Interim Order provided that "Simpson and Chassen shall cooperate with each other in good faith to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement and related agreements. . ." *Id.*

### Simpson Further Breaches His Fiduciary Obligations and Violates the Court's Orders, Including by Purporting to Again Terminate Chassen

63.     Simpson began violating the Interim Order right from the get-go. He immediately rehired Tristan Last, an employee who had resigned the day after Chassen removed Simpson for cause and increased her salary without seeking my consent even though Chassen's consent was required. He hired a new IT company without Chassen's consent at an expense that required Chassen's consent.

64.     Simpson then moved all employees away from Chassen's desk, leaving Chassen on the outskirts of the office space, and clearly intending to show staff that Chassen was no longer a co-member of the company. While Chassen complied with the Interim Order and gave him access to Office.com, Dropbox, Go daddy, Simpson then used that access to read all of Chassen's emails, including those with Chassen's counsel, and deleted Chassen's emails.

65.     Simpson also stopped paying JJ Arch bills connected to Chassen's credit. For example, JJ Arch has 3 Arch trucks that are used for Arch builder entities, and Chassen received a call from each credit company this week that payments are not being made and they are in collections. Likewise, JJ Arch's company Visa card, Divvy, is under Chassen's credit, and Simpson removed Chassen from these accounts even though these accounts are tied to Chassen's credit. Chassen also received calls that payments are not being made on these accounts.

66.     Simpson then shut off Chassen's access to his emails, Dropbox, all company systems, and bank accounts.

67.     He demanded that Chassen consent to switch banks from First Republic, without explanation or reason, something that was especially frightening considering his repeated misappropriation of company assets and the fact that Chassen would then be unable to view the accounts as required by the Interim Order.

68.     He began telling employees and third-party partners that Chassen was no longer a member of JJ Arch and started defaming him to them.

69.     On September 1, 2023, he sent another formal forced resignation letter even though the Court has just nullified both August letters and directed the parties to cooperate. This September 1, 2023 letter was predicated on entirely false claims and was itself a contempt of court. The letter merely represented the another act in Simpson's scorched earth retribution campaign.

54

**Simpson Continues to Breach his Fiduciary Obligations and Ignores Additional
Court Orders Even After Chassen Files A Contempt Motion**

70.     On September 14, 2023, Chassen moved to hold Simpson in contempt of Court and
to direct Simpson to restore him to JJ Arch and company systems. On September 15, 2023, the
Court issued a temporary restraining order, restored Chassen, and barred any further unilateral
terminations. A copy of the Court's order is annexed hereto as **Exhibit I**.

71.     Even then, Simpson continued to disobey the courts orders by (1) hiring three new
employees without obtaining Chassen's consent, and actually firing employees he perceives as
allied with Chassen; (2) opening new bank accounts at Citizens Bank without giving Chassen full
access to those accounts; (3) refusing to give Chassen signing authority on bank accounts, taking
the position that the orders do not require him to do so; and (4) refusing to give Chassen's full
access to Juniper Square, JJ Arch's investor portal. Simpson also directed employees at Arch not
to talk to Chassen and has refused to share information with Chassen.

72.     Simpson's breaches of the JJ Arch Operating Agreement and his defiance the
Supreme Court's orders constitute independent breaches of fiduciary duty.

**Chassen Discovers that Simpson Failed to Disclose Huge Tax and Investment Losses
to Investors**

73.     On or about September 29, 2023, Chassen discovered that Simpson had completely
breached his fiduciary obligations with respect to recent IRC Section 1031 tax exchange vehicles
that Simpson advocated investors join. Chassen has just been personally hit with hundreds of
thousands of dollars in unexpected tax liability that he learned of in the past few days and must
pay by October 15, 2023—as have dozens of other investors—because of Simpson's complete
dereliction of his managerial role, as well as his failures to adequately disclose risks to investors
or adverse information.

55

74.     As stated above, in 2022, Arch sold approximately 2000 units and after these units were sold, Arch reached out to investors asking if they wanted to reinvest the money from the sale into other potential properties into IRC Section 1031 tax exchange vehicles, without adequately disclosing the risks that such tax benefit might not be obtained. Chassen along with numerous others did so, though Simpson put only minimal proceeds from the sale into these new vehicles.

75.     Rather than inform investors that the IRC Section 1031 tax exchanges had failed, and that investors would face huge tax liabilities, Simpson hid the information, it only coming to Chassen's attention, and other investors' attention, as investors began to get hit with massive tax bills from the sale. Many investors have yet to learn of their tax liability, as their gains from the 2022 sale is reported as ordinary income, though their K-1s are not being sent out before their tax filing deadlines. Simpson has attempted to cover-up his failures through misleading communications to investors.

76.     And to top it off, Simpson put the funds into properties he is causing to fail by his insistence on mismanaging them, thus not only foisting on investors unexpected and hidden tax liability now, but the imminent complete loss of their investments.

### 35 Oak Terminates JJ Arch as Managing Member of Arch Real Estate Because of Simpson's Breaches of Fiduciary Duty

77.     On or about October 17, 2023, 35 Oak moved to have a temporary receiver appointed over JJ Arch, detailing numerous instances of misconduct by Simpson.

78.     On October 30, 2023, the Court entered an interim order in connection with 35 Oak's receiver motion that required Simpson and JJ Arch to comply with Oak's consent rights under the Arch Real Estate Operating Agreement. Later that day, in retaliation, Simpson furloughed all of Arch's employees.

79. On October 31, 2023, 35 Oak removed JJ Arch as managing member of Arch Real Estate. 35 Oak removed JJ Arch, because JJ Arch through the actions of Jeffrey Simpson (the managing member of JJ Member), committed multiple Cause Events, including, without limitation, (1) willful misconduct, (2) breach of fiduciary duty, (3) gross negligence which has resulted in material loss to the Company, its Subsidiaries and its Members and (4) misappropriation of Company or Subsidiary funds, in each case, in relation to the business and affairs of the Company and various Subsidiaries, such as, without limitation, (a) making material misrepresentations and otherwise fraudulently inducing Investor Member and other equity holders to invest in certain transactions on the basis of obtaining material economic benefit from an exchange under section 1031 of the Internal Revenue Code, and failing to satisfy the requirements of such 1031 exchanges; (b) hiring and rehiring of individuals as an employees of Arch without Investor Member consent; (c) failing to provide access to books and records of the Company and to otherwise provide all financial reports required under the LLC Agreement; (d) modifying the Company lease at the 88 University property; (e) making threats against employees, family members of employees, and vendors; (f) using Arch employees for non-Arch purposes to benefit Mr. Simpson and his separate businesses; (g) using Arch bank accounts for personal purposes, (h) retaining counsel for the Company in violation of the LLC Agreement, and (i) furloughing the entire staff of Arch and causing the important work of the company to come to a complete halt.

80. 35 Oak filed an emergency order to show cause on November 3, 2023 to enforce its termination of JJ Arch, and the Court granted a temporary restraining order enjoining Simpson and JJ Arch from acting as the managing member of Arch Real Estate. 35 Oak also filed a complaint in this action against Simpson. A true and correct copy of the 35 Oak's Complaint is annexed hereto as **Exhibit J**.

57

81. Because of Simpson's misconduct, JJ Arch has already lost its managerial rights in Arch Real Estate and faces liability from investor suits.

**Simpson Pays for His Legal Bills through JJ Arch Without Posting an Undertaking to JJ Arch**

82. Simpson has been improperly paying his counsel in this action from JJ Arch accounts in violation of the JJ Arch Operating Agreement. Section 10.2 of the JJ Arch Operating Agreement provides that Chassen and Simpson can be indemnified from certain claims against them "by reason of any act or omission performed or omitted . . . in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of [their] authority . . . except that that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of gross negligence or willful misconduct with respect to such acts or omissions."

83. Section 10.3 of the JJ Arch Operating Agreement further provides that legal expenses shall be advanced "prior to the final disposition or such claim, demand, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in Section 10.2 hereof."

84. Simpson has failed to post an undertaking to JJ Arch, while using JJ Arch assets to fund his legal expenses in this action. This violates both his contractual and fiduciary obligations to JJ Arch.

85. Further, because Simpson has engaged in gross negligence and willful misconduct, he will not be entitled to indemnification, and his payment of legal bills without posting an undertaking amount to theft of JJ Arch's funds and assets, as he attempts to strip JJ Arch of its assets during the pendency of this action.

58

### The JJ Arch Properties Simpson and Chassen Own Through JJ Arch

86.     JJ Arch is a member in several corporate entities that are independent of Arch, and that are owned by Simpson and Chassen.

87.     Simpson and Chassen only entered personal investments through JJ Arch because Simpson told Chassen doing so would save time and expenses since the structure was already in place from past deals and it would be the easiest and most efficient way to proceed to quickly close on the deals.

88.     JJ Arch is the sole-member of 225 HPR LLC ("HPR LLC"), which owns a residential property known as 225 Head of Pond Road, Water Mill NY 11976 ("Head of Pond"). Simpson and Chassen (and Chassen's family members) purchased Head of Pond in 2022 through HPR LLC and renovated the home for several months. Since then, the home has become a permit holding rental property. Simpson has been uninvolved in this business, and Chassen hired the third-party manager who has successfully managed the property for approximately 2 years as an Airbnb property. Head of Pond has been cash flowing and neither took distributions.

89.     Simpson, in a further retaliatory act, decided to stop allowing Chassen to pay the rental property manager for his monthly reimbursements, including his payments to cleaning staff to clean and repair the property. After being denied reimbursements, the property manager continued to front these expenses and is now owed monies from HPR LLC.

90.     Simpson also recently told the property manager that he wants him to stop renting out the property, and that Simpson's wife will replace him, though such a hiring requires Chassen's consent, and is contrary to Simpson's fiduciary obligations. Simpson then threatened to contact the police if the property manager rents the property to any Airbnb customers leading the property manager to resign.

91.     In addition to refusing to pay for property upkeep, Simpson has also been taking money without Chassen's consent from the HPR LLC accounts to pay his own personal expenses. On November 5, 2023, Chassen discovered that Simpson has been taking money without Chassen's consent from the HPR LLC accounts and instructed employees to hide it from Chassen. These payments include a $10,000 payment on October 11, 2023, a $2,000 payment on October 19, 2023, and a $3,000 payment on October 31, 2023. Simpson has left the HPR LLC account without funds to pay its mortgage, a mortgage jointly guaranteed by Chassen's wife.

92.     By forcing the property manager to resign and looting the HPR LLC account, Simpson is ensuring that HPR LLC will default on its mortgage loan. Simpson is destroying the property to strip it value and take it for himself and as part of his vendetta against Chassen.

93.     JJ Arch is also the sole-member of JJ NY 550 LLC ("JJ 550"), which owns real property known as 550 Metropolitan Avenue, Brooklyn, New York 11211 ("550 Metropolitan"). 550 Metropolitan is a retail condo, and Chassen was solely responsible for it, dealing with its acquisition, financing, and tenant sourcing. 550 Metropolitan has been cash flow positive, but recently the tenant went out of business, and JJ Arch needs a new tenant. Chassen's ability to source a new tenant or sell the asset are being stymied by Simpson in breach of his fiduciary obligations.

94.     JJ Arch is also the sole member of 1640 Montauk LLC ("1640 Montauk"), owner of real property known as 1640 Montauk Hwy, Water Mill, NY 11976 ("Rêver Property"). Simpson and Chassen created 1640 Montauk and through it bought the Rêver Property and the underlying auto business that was at the Property, then operating under a different name.

95.     Yechiel Lehrfield organized another entity, 1640 Motors LLC ("1640 Motors"), to operate the business with a partner, but upon information and belief there was no executed

60

operating agreement for 1640 Motors, and no formal designation of membership. Upon information and belief, the member of 1640 Motors is 1640 Montauk. Upon information and belief, Simpson purported to operate Rêver through 1640 Motors. The acquisition of the Rever Property and management of Rêver was Simpson's brainchild, which Simpson sold to Chassen as a simple business where they would each invest $500,000.00 maximum, hire someone to operate it, and Chassen and Arch personnel would not need to be involved.

96.     After Simpson blew through this projection, and their initial $500,000.00 contributions, Simpson insisted that he would continue to fund Rêver Motors himself, his dream business, and that it would not affect Chassen's ownership or equity position at JJ Arch or in any way dilute or affect him with interest or penalties. Indeed, Simpson never issued any capital calls in connection with this, or any other shared, business.

97.     To gain more insight into Simpson's actions at Rêver, among other of the businesses, Chassen sent a books and records request to Simpson on November 9, 2023. Simpson immediately rejected the demand in an email on November 12, 2023. His counsel also sent a letter falsely claiming Chassen has access to all documents. Also, he opened a new bank account for 1640 Montauk at Citizens Bank, which he never told Chassen about and which Chassen has no visibility on.  Simpson has left Chassen in the dark. He has also engaged in illegality at Rêver Motors, including switching a VIN number on a car in violation of federal laws.

98.     In fact, Simpson has asserted dictatorial powers to loot all the businesses based on his own fabricated numbers, saying, "I have the full and exclusive right [to] issue capital calls and you owe $1.2 million so I can take whatever cash I need without your consent." Simpson has already unlawfully taken hundreds of thousands of dollars out of these businesses in the past two months.

### The August 1, 2023 Contract Between Chassen, Simpson and YJ Simco

99.     On August 1, 2023, Chassen entered a contract with Simpson and Simco in which Chassen agreed to transfer any membership interest he has in 1640 Montauk and 1640 Motors to Simpson in exchange for $675,938.35 (the "Contract"). A true and correct copy of the Contract is annexed hereto as **Exhibit K.** Further, in the Contract, Simpson agreed that HPR LLC "will be managed collectively by both Simpson and Chassen, regardless of the organizational documents of 225 HPR." The organizational documents of HPR state that JJ Arch is the sole member, Simpson is the President, and Chassen the Vice President. A copy of the HPR LLC Operating Agreement is annexed hereto as **Exhibit L**.

100.     Pursuant to paragraph 2 of Contract, Simpson agreed to make an initial payment to Chassen of $500,000 "simultaneously with the closing by Simpson of that certain loan from Connect One Bank in the principal amount of $995,000 (the "Loan")," with the balance of the "Purchase Price . . . paid to Chassen from the distributions paid to Simpson by 1640 Montauk, 225 HPR and 1640 Opco, which payments shall be made to Chassen at Simpson discretion, provided that the balance of the Purchase Price shall be paid to Chassen at the sooner of (i) a capital event for the above listed Companies or (ii) the date that is twenty four (24) months following the Closing Date."

101.     The buyout calculation in Exhibit B of the Contract expressly incorporated that Simpson had repaid in or about June 2023 a prior ConnectOne Bank line of credit that was made personally to Simpson and Chassen (the "Personal Line of Credit"). The ConnectOne Bank line of credit loan documents are annexed hereto as **Exhibit M.** As evidenced from these loan documents, the total line of credit was for $1,000,000.00, but deducted $3,788.00 in various fees at closing.

62

102.     Simpson's repayment of the Personal Line of Credit was expressly incorporated into the Contract and is the $497,500.00 deducted from the initial buyout amount as calculated in Exhibit B of the Contract, leading to the total buyout amount of $675,983.35.

103.     The Contract also recognized and was premised upon a 50-50 distribution from the sale of property owned in part by Chassen and Simpson known as 88 Schwenks, Watermill, NY 11976 ("88 Schwenks"), a farmland in the Hamptons. 88 Schwenks was a property they purchased in June of 2022, in which they had a 50% interest, with another investor having the other 50% share. Simpson and Chassen were thus 50/50 partners in 50% of this asset.

104.     Their business plan was to create a working farm or to lease the land to an operator. This investment did not work out and Simpson and Chassen decided to sell the property in the spring of 2023 at a loss, with Simpson suggesting Chassen that they should sell the asset and split proceeds 50/50 so that both would have some cashflow. 88 Schwenks was sold a few days before the Contract was executed. The Contract expressly recognized that the 88 Schwenks proceeds were split 50-50, providing in Exhibit B that the distribution of the Schwenks money had been split 50-50.

105.     Simpson quickly renounced and breached the Contract, declaring it terminated and refused to proceed to close on the new loan. Indeed, on August 2, 2023 after the loan documents were fully executed and the closing fees debited from the account, ConnectOne Bank asked Chassen and Simpson to re-sign a certain form as they had sent the incorrect version, which Chassen did, but which Simpson refused to do, thereby preventing the loan from being issued.

106.     Simpson has claimed that Chassen failed to exceed the 50% liquidity covenant required by the lender but this is false and the lender in fact approved Chassen, approved the loan, and was at the closing table.

63

107.     Simpson and YJ Simco have purposefully and in bad-faith frustrated performance of the Contract and Simpson unlawfully declared that he would not comply with it.

108.     As further detailed herein, failing to comply with the Contract, Simpson has also inflated his contributions to JJ Arch, unlawfully taken monies from JJ Arch, and is looting the shared properties so that Chassen will be left with nothing.

**The Fraudulent August 31, 2023 Capital Call**

109.     After breaching the Contract, and one-day prior to purporting to re-terminate Chassen from JJ Arch, on August 31, 2023 Simpson purported to serve a capital call on Chassen (the "Fraudulent Capital Call"). A copy of the Fraudulent Capital Call is annexed hereto as **Exhibit N**.

110.     The Fraudulent Capital Call demanded that Chassen retroactively reimburse Simpson for $1,241,230 that he allegedly had put into JJ Arch.

111.     Simpson reached that number by claiming that Chassen owes $741,230 to "balance 50/50 for 225 HPR, 550 Met, 1640, 1640 Motors, and 146 E. 89th." Further, the Fraudulent Capital Call claims that Simpson be reimbursed for his alleged payment of the $1,000.000 million Personal Line of Credit.

112.     The Fraudulent Capital Call separately claims that Chassen improperly took a total of $34,400 on August 4, 2023 and August 9, 2023.

113.     Finally, the Fraudulent Capital Call claims that Chassen owes $70,500 from 88 Schwenks because "the 88 Schwenks closing distribution was not properly allocated per the Capital accounts in the transaction."

64

114.     The Fraudulent Capital Call is in breach of the JJ Arch Operating Agreement, was issued in bad faith to retaliate against Chassen and to create a pretext for Simpson to loot JJ Arch and the jointly owned assets.

115.     Each of the Operating Agreements for 1640 Montauk, HPR LLC and JJ 550 provide that JJ Arch is the sole member and JJ Arch "shall have no obligation to make any further capital contributions to" these entities. A true and correct copy of the 1640 Montauk Operating Agreement is annexed hereto as **Exhibit O**. A true and correct copy of the JJ 550 LLC Operating Agreement is annexed hereto as **Exhibit P**. Further, there is no Operating Agreement for 1640 Motors, no formally designated members, and JJ Arch has no obligation to that entity. In short, JJ Arch had no capital call obligations to any of these entities.

116.      Further, no capital calls were ever issued to JJ Arch from those entities.

117.     While Section 4.2 of the JJ Arch Operating Agreement provides that Simpson could issue a capital call to fund JJ Arch when "additional funds are required by the Company to meet its general and administrative expenses," it did not allow Simpson to issue capital calls to cover other companies' expenses where there was no obligation to fund any capital calls at those entities, and those entities never even made any capital calls to JJ Arch.

118.     Further, the purported contributions, nor the underlying expenditures, were made with notice or consent.

119.     Simpson also refers in the Fraudulent Capital Call to purported contributions he made to "146 E. 89th," a property that is owned by three limited liability corporations, 146 E. 89 Borrower 1 LLC ("Borrower 1"), 146 E. 89 Borrower 2 LLC ("Borrower 2"), and 146 E. 89 Borrower 3 LLC ("Borrower 3"). Borrower 1 has two members, JJ Arch and Jonathan Peldman. A copy of the Borrower 1 Operating Agreement is annexed hereto as **Exhibit Q.** Borrower 2 has

65

one member Kay Properties LLC, though JJ Arch is designated as the manager. A copy of the Borrower 2 Operating Agreement is annexed hereto as **Exhibit R**. Borrower 3 also has one member, 40 Neutral LLC, though JJ Arch is designated as the manager. A copy of the Borrower 3 Operating Agreement is annexed hereto as **Exhibit S**.

120.     Under Section 3.2 of the Borrower 2 and Borrower 3 Operating Agreements, JJ Arch has no capital call obligation to Borrower 2 or 3 but may issue capital calls to the member of those entities. In the event the member does not pay it, JJ Arch has the right to then issue a loan to Borrower 2 or Borrower 3. Under Section 3.2 of the Borrower 1 Operating Agreement, JJ Arch may issue capital calls to the members, and in the event a member does not pay the capital call, JJ Arch then has the right to make that payment as a loan. JJ Arch has not issued any capital calls to the members of Borrower 1, Borrower 2, or Borrower 3 and no payments have been made by JJ Arch to or on behalf of these entities that were authorized or proper under the relevant operating agreements. In fact, the property held by that entity is now in default because of Simpson's mismanagement.

121.     The Fraudulent Capital Call is also improper because the parties' rights and interests in HPR LLC, 1640 Montauk, 1640 Motors, and JJ NY were contractually agreed to in the Contract.

122.     Simpson also relied on his repayment of the Personal Line of Credit but this loan was not issued to JJ Arch, and thus its repayment was not an obligation of JJ Arch. Indeed, the Personal Line of Credit was issued personally to Simpson and Chassen. Further, the loan proceeds themselves were not used for JJ Arch, but for other business and Simpson's own personal use. Simpson cannot use his repayment of a personal loan that was not made to JJ Arch, or indeed to any companies owned by JJ Arch, as a basis to issue a retroactive JJ Arch capital call. Further, the

alleged repayment of Personal Line of Credit was expressly incorporated into the calculations in the Contract and cannot for the basis for the Fraudulent Capital Call.

123. Under the JJ Arch Operating Agreement, Simpson was also required to prospectively give written notice that JJ Arch needed funds "for its general and administrative expenses," and then "[e]ach of Simpson and Chassen shall be obligated to make an additional Capital Contribution to the Company . . ." Nothing in the JJ Arch Operating Agreement allowed Simpson to issue a retroactive capital call for reimbursement of payments he allegedly previously made in connection with other entities.

124. The Fraudulent Capital Call is also in derogation of the JJ Arch Operating Agreement because nothing in the JJ Arch Operating Agreement allowed Simpson to allocate payments he allegedly made to into Rêver as JJ Arch expenses. Further, Simpson repeatedly stated that his payments into Rêver were being voluntarily made by him and would not affect Chassen and Simpson's equity positions in JJ Arch.

125. The Fraudulent Capital Call also claims that Chassen improperly took $34,400, but these funds were GP draws that Chassen was owed by JJ Arch, and there was nothing wrongful or improper in these disbursements.

126. Finally, the Fraudulent Capital Call claims that Chassen owes $70,500 from 88 Schwenks because "the 88 Schwenks closing distribution was not properly allocated per the Capital accounts in the transaction." The 88 Schwenks distribution was allocated 50-50 as always agreed to by Simpson, including in the Contract where that distribution was memorialized in Exhibit B therein.

67

## Demand Futility

127.     Chassen did not make a pre-suit demand because such demand would be futile. Simpson is acting as the sole managing member JJ Arch and is himself accused of the wrongdoing alleged herein. He is interested in the transactions alleged herein, and has, as alleged herein, completely abdicated his fiduciary responsibilities. Simpson is incapable of making an impartial decision as to whether to bring this suit against himself. Accordingly, any demand requirement is futile and excused.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Breach of fiduciary duty against Simpson-derivative claim on behalf of JJ Arch)**

128.     Chassen repeats each of the preceding allegations as if fully set forth herein.

129.     Chassen has standing to bring a derivative claim on behalf of JJ Arch because he is a member.

130.     Simpson, as the managing member of JJ Arch, owes JJ Arch fiduciary duties, including the duty of loyalty and good faith.

131.     Simpson breached his fiduciary duties to JJ Arch, by among other things, (1) misappropriating JJ Arch's assets; (2) engaging in abusive behavior towards JJ Arch employees and personal and investors; (3) knowingly and utterly mismanaging JJ Arch and its properties for his own self-interest, (4) failing to maintain internal controls, (5) failing to devote his business time to JJ Arch; (6) issuing misleading disclosures; (6) refusing to provide books and records to investors even though obligated to do so, and otherwise knowingly taking decision that breached JJ Arch's fiduciary obligations and expose it to liability; (7) making decisions that were harmful to JJ Arch and investors for self-interested reasons; (5) failing to make adequate disclosures to investors; (6) unlawfully attempting to terminate Chassen; (7) failing to obtain Chassen's consent

68

prior to taking major decisions; (8) refusing to take necessary steps to prevent JJ Arch's properties from failing and going into default; (9) unlawfully paying his legal expenses without posting an undertaking to JJ Arch; (10) issuing a Fraudulent Capital Call to Chassen and depleting accounts; and (11) causing JJ Arch to breach its fiduciary duties to Arch Real Estate.

132.     Simpson's breaches of fiduciary duty have damaged JJ Arch.

133.     The Court should enter a judgment against Simpson awarding JJ Arch its damages, including consequential damages, in an amount to be determined a trial, but estimated to exceed $1 million.

## SECOND CAUSE OF ACTION
### (Breach of fiduciary duty against Simpson-derivative claim on behalf of Arch Real Estate)

134.     Chassen repeats each of the preceding allegations as if fully set forth herein.

135.     Chassen has standing to bring a derivative claim on behalf of JJ Arch because he is a member of JJ Arch, which in turn is the managing member of Arch Real Estate.

136.     Simpson, as the managing member of JJ Arch, owes Arch Real Estate fiduciary duties, including the duty of loyalty and good faith.

137.     Simpson breached his fiduciary duties to Arch Real Estate, by among other things, (1) misappropriating Arch Real Estate's assets; (2) engaging in abusive behavior towards Arch Real Estate employees and personal and investors; (3) knowingly and utterly mismanaging Arch Real Estate and its properties for his own self-interest, (4) failing to maintain internal controls, (5) failing to devote his business time to Arch Real Estate; (6) issuing misleading disclosures; (6) refusing to provide books and records to investors even though obligated to do so, and otherwise knowingly taking decision that breached his fiduciary obligations and exposed Arch Real Estate to liability; (7) making decisions that were harmful to Arch Real Estate and investors for self-interested reasons; (5) failing to make adequate disclosures to investors; (6)

69

unlawfully attempting to terminate Chassen; (7) failing to obtain Chassen's consent prior to taking major decisions; and (8) refusing to take necessary steps to prevent Arch Real Estate's properties from failing and going into default.

138.    Simpson's breaches of fiduciary duty have damaged Arch Real Estate.

139.    The Court should enter a judgment against Simpson awarding Arch Real Estate its damages, including consequential damages, in an amount to be determined a trial, but estimated to exceed $1 million.

### THIRD CAUSE OF ACTION
**(Breach of fiduciary duty against Simpson-direct claim)**

140.    Chassen repeats each of the preceding allegations as if fully set forth herein.

141.    Simpson, as the managing member of JJ Arch, owes Chassen fiduciary duties, including the duty of loyalty and good faith.

142.    Simpson breached his fiduciary duties to Simpson, by among other things, (1) entering into the Amended JJ Arch Operating Agreement by coercion, duress, and undue influence; (2) unlawfully attempting to terminate Chassen, (3) denying Chassen access to books and records, (4) failing to make adequate disclosures to Chassen, (5) knowingly making decisions that were harmful to Chassen for self-interested reasons; (6) failing to obtain Chassen's consent prior to taking major decisions; (7) improperly taking funds; (8) refusing to provide books and records; (9) issuing a Fraudulent Capital Call; and (10) refusing to take necessary steps to prevent Chassen's investments from failing and going into default.

143.    Simpson's breaches of fiduciary duty have damaged Chassen.

144.    The Court should enter a judgment against Simpson awarding Chassen his damages, including consequential damages, in an amount to be determined a trial, but estimated to exceed $1 million.

## FOURTH CAUSE OF ACTION
**(Declaratory Judgment that JJ Arch Amended Operating Agreement is void on grounds of unconscionability, lack of consideration, duress, and undue influence-direct claim)**

145.     Chassen repeats each of the preceding allegations as if fully set forth herein.

146.     There is a justiciable controversy between Simpson and Chassen whether the JJ Arch Amended Operating Agreement is a valid and binding agreement or is void as the result of unconscionability, lack of consideration, and undue influence.

147.     The Amended JJ Arch Operating Agreement by which Simpson purported to retain sole managerial authority after December 11, 2021 is void because it is unconscionable, was not supported by consideration, and is the product of undue influence.

148.     Simpson was in a confidential relationship with Chassen, was Chassen's mentor, and held enormous power over him. Simpson took advantage of his relationship of trust with Chassen.

149.     Despite Chassen vocalizing his disagreement, Simpson presented him with the Amendment on a take-it-or-leave-it basis, threatening him that he would remove him from the business entirely if he did not sign the Amendment.

150.     Chassen signed the Amendment under undue pressure and threats. Simpson pressured Chassen not to hire his own counsel to review the Amendment and limited his involvement in calls Simpson took with the shared JJ Arch and Arch Entities' counsel David Heymann who Simpson had draft the amendment in his favor, while Heymann purported to represent both of them. Chassen was not disclosed Heymann's actual conflicts, and he did not execute any conflict waiver.

151.     Because of their unequal bargaining power, prior relationship, Simpson's threats, and deceptive and coercive tactics, and the parties' confidential relationship, Chassen lacked

71

meaningful choice in entering into the Amendment, and it was procedurally unconscionable. And the Amendment itself was substantively unconscionable as it contained only favorable terms to Simpson.

152. The Amendment gave away Chassen's managerial rights as well as his membership percentage under the JJ Arch Operating Agreement for nothing of value and was unsupported by consideration. It is therefore void for lack of consideration.

153. The Amendment was the product of undue influence, including abuse and deception and is therefore void as the product of undue influence.

154. Further, given Chassen relationship of trust and confidence with Simpson, the burden is on Simpson to establish that he did not enter the Amended JJ Arch Operating Agreement by undue influence or coercion, which burden he cannot meet.

155. Chassen lacks an adequate remedy at law.

156. The Court should enter a judgment declaring that the Amendment is void and that under the Operating Agreement, Chassen is a managing member of JJ Arch.

### FIFTH CAUSE OF ACTION
**(Declaratory judgment against Simpson-direct claim)**

157. Chassen repeats each of the preceding allegations as if fully set forth herein.

158. There is a justiciable controversy between Simpson and Chassen whether Chassen properly terminated Simpson because of his misconduct, breaches of fiduciary duty, and failure to devote substantially all his business time to JJ Arch.

159. As alleged herein, Simpson has breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, and investors, and these breaches constitute Cause Events under the JJ Arch Operating Agreement, each warranting Simpson's resignation.

160. Chassen lacks an adequate remedy at law.

161.    The Court should enter a judgment declaring that Chassen lawfully terminated Simpson, that Simpson is properly terminated, and that Simpson is no longer a member of JJ Arch.

## SIXTH CAUSE OF ACTION
### (Permanent Injunction against Simpson-direct claim)

162.    Chassen repeats each of the preceding allegations as if fully set forth herein.

163.    Simpson has breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, and investors.

164.    These breaches constitute Cause Events under the JJ Arch Operating Agreement, each warranting Simpson's resignation.

165.    Simpson has also breached the JJ Arch Operating Agreement by issuing the Fraudulent Capital Call, and has used the Fraudulent Capital Call to loot JJ Arch of its assets.

166.    Absent injunctive relief, Simpson is liable to continue to purport to act as the managing member, or member, of JJ Arch, and will continue to loot JJ Arch of its assets in order to deprive Chassen of any recovery.

167.    Chassen faces irreparable injury if Simpson continues to act as managing member or member of JJ Arch, relies on the Fraudulent Capital Call, loots JJ Arch of its assets, or unlawfully pays his legal expenses with JJ Arch assets.

168.    Chassen lacks an adequate remedy at law.

169.    The Court should enter a judgment permanently enjoining Simpson from acting as a member or managing member of JJ Arch, taking distributions from JJ Arch without Chassen's consent, relying on the Fraudulent Capital Call, or paying his legal expenses from JJ Arch without an undertaking.

73

## SEVENTH CAUSE OF ACTION
### (Permanent Injunction against Simpson-derivative claim on behalf of JJ Arch)

170.     Chassen repeats each of the preceding allegations as if fully set forth herein.

171.     Simpson has breached his fiduciary duties to Chassen, JJ Arch, Arch Real Estate, and investors.

172.     These breaches constitute Cause Events under the JJ Arch Operating Agreement, each warranting Simpson's resignation.

173.     Simpson has also breached the JJ Arch Operating Agreement by issuing the Fraudulent Capital Call and has used the Fraudulent Capital Call to loot JJ Arch of its assets.

174.     Absent injunctive relief, Simpson is liable to continue to purport to act as the managing member, or member, of JJ Arch, and will continue to loot JJ Arch of its assets in order to deprive Chassen of any recovery.

175.     JJ Arch faces irreparable injury if Simpson continues to act as managing member or member of JJ Arch, relies on the Fraudulent Capital Call, loots JJ Arch of its assets, or unlawfully pays his legal expenses with JJ Arch assets.

176.     JJ Arch lacks an adequate remedy at law.

177.     The Court should enter a judgment permanently enjoining Simpson from acting as a member or managing member of JJ Arch, taking distributions from JJ Arch without Chassen's consent, relying on the Fraudulent Capital Call, or paying his legal expenses from JJ Arch without an undertaking.

## EIGHTH CAUSE OF ACTION
### (Breach of Contract against Simpson and Simco-direct claim)

178.     Chassen repeats each of the preceding allegations as if fully set forth herein.

74

179.    On August 1, 2023, Chassen entered the Contract with Simpson and Simco pursuant to which Simpson was to buy-out Chassen of certain shared properties owned by JJ Arch and in which Simpson acknowledged their joint control of Head of Pond.

180.    Simpson promptly repudiated the Contract by declaring it terminated and refusing to proceed to finalize the loan by which he was to pay Chassen. He is now taking monies from Head of Pond without Chassen's consent, in an effort to loot the property, and is attempting to replace the property manager without Chassen's consent.

181.    Chassen was, and is, fully ready, willing, and able to perform the contract.

182.    Chassen has been damaged by Simpson and Simco's anticipatory repudiation, purported termination, and failure to perform.

183.    The Court should enter a judgment against Simpson and Simco awarding Chassen his damages, including consequential damages and pre-judgment interest, in an amount to be determined at trial, but estimated to exceed $1 million dollars.

## NINTH CAUSE OF ACTION
### (Specific Performance against Simpson and Simco-direct claim)

184.    Chassen repeats each of the preceding allegations as if fully set forth herein.

185.    On August 1, 2023, Chassen entered the Contract with Simpson and Simco pursuant to which Simpson was to buy-out Chassen of certain shared properties owned by JJ Arch and in which Simpson acknowledged their joint control of Head of Pond.

186.    Simpson promptly repudiated the contract by declaring it terminated and refusing to proceed to finalize the loan. He has also taken monies from Head of Pond without Chassen's consent and replaced the property manager without Chassen's consent.

187.    Chassen was, and is, fully ready, willing, and able to perform the Contract.

188.    Chassen has been damaged by Simpson and Simco's anticipatory repudiation, purported termination, and failure to perform.

189.    Chassen lacks an adequate remedy at law.

190.    The Court should enter a judgment against Simpson and Simco awarding Chassen specific performance of the Contract, including compelling Simpson to proceed with the loan or authorizing Chassen to do so on Simpson's behalf.

## TENTH CAUSE OF ACTION
### (Declaratory Judgment against Simpson and Simco-direct claim)

191.    Chassen repeats each of the preceding allegations as if fully set forth herein.

192.    There is a justiciable controversy between Simpson and Chassen whether Simpson has unlawfully repudiated and terminated the Contract and is obligated to comply with it.

193.    On August 1, 2023, Chassen entered the Contract with Simpson and Simco pursuant to which Simpson was to buy-out Chassen of certain shared properties owned by JJ Arch and in which Simpson acknowledged their joint control of HPR LLC.

194.    Simpson promptly repudiated the contract by declaring it terminated and refusing to proceed to finalize the loan. He has also taken monies from Head of Pond without Chassen's consent and has effectuated the termination of the property manager without Chassen's consent.

195.    Chassen was, and is, fully ready, willing, and able to perform the Contract.

196.    Chassen lacks an adequate remedy at law.

197.    The Court should enter a judgment declaring that Simpson and Simco materially breached the Contract and unlawfully repudiated it.

## ELEVENTH CAUSE OF ACTION
### (Declaratory Judgement against Simpson-direct claim)

198.　　Chassen repeats each of the preceding allegations as if fully set forth herein.

199.　　There is a justiciable controversy between Simpson and Chassen whether Chassen is entitled to act as co-manager of HPR LLC together with Simpson.

200.　　 On August 1, 2023, Chassen entered the Contract with Simpson and Simco pursuant to which Simpson acknowledged their joint managerial control of HPR LLC.

201.　　Simpson has since unlawfully renounced the Contract and has acted in derogation of Chassen's managerial rights in HPR LLC.

202.　　Chassen was, and is, fully ready, willing, and able to perform the Contract.

203.　　Chassen lacks an adequate remedy at law.

204.　　The Court should enter a judgment declaring that Chassen is entitled to co-managerial rights over HPR LLC pursuant to the Contract.

## TWELVTH CAUSE OF ACTION
### (Declaratory Judgment against Simpson-direct claim)

205.　　Chassen repeats each of the preceding allegations as if fully set forth herein.

206.　　There is a justiciable controversy between Simpson and Chassen whether the Fraudulent Capital Call was ultra vires, fraudulent, and unlawful, and in violation of the JJ Arch Operating Agreement.

207.　　The Fraudulent Capital Call violates the JJ Arch Operating Agreement, is based on fabricated numbers, and is without legal effect. Simpson issued it in order to justify his looting of JJ Arch.

208.　　Chassen lacks an adequate remedy at law.

209.    The Court should enter a judgment against Simpson declaring that the Fraudulent

Capital Call is ultra vires, fraudulent, unlawful, and without legal effect.

**THIRTENTH CAUSE OF ACTION**
**(Declaratory Judgment against Simpson–derivative claim on behalf of JJ Arch)**

210.    Chassen repeats each of the preceding allegations as if fully set forth herein.

211.    There is a justiciable controversy between JJ Arch, Simpson, and Chassen

whether the Fraudulent Capital Call was ultra vires, fraudulent, and unlawful, and in violation of

the JJ Arch Operating Agreement.

212.    The Fraudulent Capital Call violates the JJ Arch Operating Agreement, is based

on fabricated numbers, and is without legal effect. Simpson issued it in order to justify his

looting of JJ Arch.

213.    JJ Arch lacks an adequate remedy at law.

214.    The Court should enter a judgment against Simpson declaring that the Fraudulent

Capital Call is ultra vires, fraudulent, unlawful, and without legal effect.

**FOURTEENTH CAUSE OF ACTION**
**(Breach of Contract against Simpson–direct claim)**

215.    Chassen repeats each of the preceding allegations as if fully set forth herein.

216.    As detailed herein, Simpson has breached his contractual obligations under the JJ

Arch Operating Agreement, including by failing to obtain Chassen's consent prior to Major

Decisions, issuing the Fraudulent Capital Call, looting JJ Arch of assets, and paying his legal

expenses without posting an undertaking.

217.    Chassen has fully performed his contractual obligations and remains ready willing

and able to do so.

218.    Chassen has been damaged by Simpson's breaches of contract.

78

219.     The Court should enter a judgment against Simpson awarding Chassen his damages, including consequential damages, in an amount to be determined at trial, but estimated to exceed $1 million dollars.

### FIFTEENTH CAUSE OF ACTION
### (Declaratory Judgment against Simpson-direct claim)

220.     Chassen repeats each of the preceding allegations as if fully set forth herein.

221.     There is a justiciable controversy between Simpson and Chassen whether Simpson has committed gross negligence and willful misconduct and whether he is entitled to indemnification of his legal expenses from JJ Arch.

222.     Simpson has been using JJ Arch's funds to pay for his legal representation in this action.

223.     Simpson is not entitled to indemnification from JJ Arch because he has committed gross negligence and willful misconduct.

224.     The Court should enter a judgment declaring that Simpson's wrongdoing was committed with gross negligence or was willful and that he is not entitled to indemnification from JJ Arch of his legal expenses and authorizing that JJ Arch may collect upon any undertaking provided by Simpson and requiring that Simpson reimburse JJ Arch for all his legal expenses in this proceeding that are paid for by JJ Arch.

### SIXTEENTH CAUSE OF ACTION
### (Declaratory Judgment against Simpson-derivative claim on behalf of JJ Arch)

225.     Chassen repeats each of the preceding allegations as if fully set forth herein.

226.     There is a justiciable controversy between JJ Arch, Simpson and Chassen whether Simpson has committed gross negligence and willful misconduct and whether he is entitled to indemnification of his legal expenses from JJ Arch.

79

227.    Simpson has been using JJ Arch's funds to pay for his legal representation in this action.

228.    Simpson is not entitled to indemnification from JJ Arch because he has committed gross negligence and willful misconduct.

229.    The Court should enter a judgment declaring that Simpson's wrongdoing was committed with gross negligence or was willful and that he is not entitled to indemnification from JJ Arch of his legal expenses and authorizing that JJ Arch may collect upon any undertaking provided by Simpson and requiring that Simpson reimburse JJ Arch for all his legal expenses in this proceeding.

### SEVENTEENTH CAUSE OF ACTION
**(Accounting-direct claim)**

230.    Chassen repeats each of the preceding allegations as if fully set forth herein.

231.    As set forth above, Simpson has engaged in theft, diversion of funds, and breaches of fiduciary duty.

232.    Despite due demand, Simpson has refused to provide Chassen with an accounting of JJ Arch, Arch Real Estate, or their jointly owned assets.

233.    Chassen lacks an adequate remedy at law.

234.    Chassen is entitled to a judgement directing Simpson to account to Chassen for all financial accounts, distributions, withdrawals, and any other transactions in which Simpson engaged in connection with JJ Arch, Arch Real Estate, 1640 Montauk, 1640 Motors, HPR LLC, 550 LLC, Borrower 1, Borrower 2, Borrower 3, and all assets in which Chassen has a financial interest with Simpson.

80

## EIGHTEENTH CAUSE OF ACTION
### (Books and Records-direct claim)

235.    Chassen repeats each of the preceding allegations as if fully set forth herein.

236.    Pursuant to the New York LLC Law, as a member of JJ Arch, Chassen is entitled to inspect books and records.

237.    The JJ Arch Operating Agreement also provides Chassen with the right to inspect books and records.

238.    Chassen has repeatedly demanded access to JJ Arch's books and records.

239.    Simpson has wrongfully refused to provide Chassen with access to books and records.

240.    Chassen lacks an adequate remedy at law.

241.    Chassen is entitled to a judgement directing that Simpson provide all books and records to Chassen in connection with JJ Arch, Arch Real Estate, 1640 Montauk, 1640 Motors, HPR LLC, 550 LLC, Borrower 1, Borrower 2, Borrower 3, and all assets in which Chassen has a financial interest with Simpson.

## CLAIMS FOR RELIEF

**WHEREFORE**, plaintiff demands judgment as follows:

(a) On the First Cause of Action, against Simpson awarding JJ Arch its damages, including consequential damages, in an amount to be determined a trial, but estimated to exceed $1 million.

(b) On the Second Cause of Action, against Simpson awarding Arch Real Estate its damages, including consequential damages, in an amount to be determined a trial, but estimated to exceed $1 million.

81

(c) On the Third Cause of Action, against Simpson awarding Chassen his damages, including consequential damages, in an amount to be determined a trial, but estimated to exceed $1 million.

(d) On the Fourth Cause of Action, declaring that the Amendment is void and that under the Operating Agreement, Chassen is a managing member of JJ Arch.

(e) On the Fifth Cause of Action, declaring that Chassen lawfully terminated Simpson, that Simpson is properly terminated, and that Simpson is no longer a member of JJ

(f) On the Sixth Cause of Action, permanently enjoining Simpson from acting as a member or managing member of JJ Arch, taking distributions from JJ Arch without Chassen's consent, relying on the Fraudulent Capital Call, or paying his legal expenses from JJ Arch without first posting an undertaking.

(g) On the Seventh Cause of Action, permanently enjoining Simpson from acting as a member or managing member of JJ Arch, taking distributions from JJ Arch without Chassen's consent, relying on the Fraudulent Capital Call, or paying his legal expenses from JJ Arch without an undertaking.

(h) On the Eighth Cause of Action, against Simpson and Simco, jointly and severally, and awarding Chassen his damages, including consequential damages and pre-judgment interest, in an amount to be determined at trial, but estimated to exceed $1 million dollars.

(i) On the Ninth Cause of Action, against Simpson and Simco awarding Chassen specific performance of the Contract, including compelling Simpson to proceed with the loan or authorizing Chassen to do so on Simpson's behalf.

82

(j) On the Tenth Cause of Action, declaring that Simpson and Simco materially breached the Contract and unlawfully repudiated it.

(k) On the Eleventh Cause of Action, declaring that Chassen is entitled to co-managerial rights over HPR LLC pursuant to the Contract.

(l) On the Twelfth Cause of Action, declaring that the Fraudulent Capital Call is ultra vires, fraudulent, unlawful, and without legal effect.

(m) On the Thirteenth Cause of Action, declaring that the Fraudulent Capital Call is ultra vires, fraudulent, unlawful, and without legal effect.

(n) On the Fourteenth Cause of Action, against Simpson awarding Chassen his damages, including consequential damages, in an amount to be determined at trial, but estimated to exceed $1 million dollars.

(o) On the Fifteenth Cause of Action, declaring that Simpson's wrongdoing was committed with gross negligence or was willful and that he is not entitled to indemnification from JJ Arch of his legal expenses, and authorizing that JJ Arch may collect upon any undertaking provided by Simpson and requiring that Simpson reimburse JJ Arch for all his legal expenses in this proceeding.

(p) On the Sixteenth Cause of Action, declaring that Simpson's wrongdoing was committed with gross negligence or was willful and that he is not entitled to indemnification from JJ Arch of his legal expenses, and authorizing that JJ Arch may collect upon any undertaking provided by Simpson and requiring that Simpson reimburse JJ Arch for all his legal expenses in this proceeding.

(q) On the Seventeenth Cause of Action, directing Simpson to account to Chassen for all financial accounts, distributions, withdrawals, and any other transactions in which

83

Simpson engaged in connection with JJ Arch, Arch Real Estate, 1640 Montauk, 1640 Motors, HPR LLC, 550 LLC, Borrower 1, Borrower 2, Borrower 3, and all assets in which Chassen has a financial interest with Simpson.

(r)  On the Eighteenth Cause of Action, directing that Simpson provide all books and records to Chassen in connection with JJ Arch, Arch Real Estate, 1640 Montauk, 1640 Motors, HPR LLC, 550 LLC, Borrower 1, Borrower 2, Borrower 3, and all assets in which Chassen has a financial interest with Simpson.

(s)  Awarding Plaintiff all costs and expenses incurred in this action, including, but not limited to, its reasonable attorneys' fees; and

(t)  Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
        November 17, 2023

AIDALA, BERTUNA & KAMINS, P.C.

By:_____*John M Leventhal*_____
        John M. Leventhal, Esq.
546 Fifth Avenue - Sixth Floor
New York, New York 10036
(212) 486-0011 / (212) 750-9700
judgeleventhal@aidalalaw.com

*Counsel for Defendant Chassen*

Allen Schwartz, Esq. (of-counsel to Aidala,
Bertuna & Kamins, P.C.)

84

## VERIFICATION

State of New York

County of New York

Jared Chassen, duly deposed, swears under penalty of perjury that I have reviewed the annexed amended answer, counterclaims and third party complaint and affirm that the contents are true to the best of my knowledge, unless stated on information and belief, and those allegations I believe to be true.

By: _____
Jared Chassen

Sworn and subscribed before me

On this 17 day of November, 2023

GANESH JUNIOR RAM
Notary Public - State of New York
No. 01RA6418262
Qualified in Queens County
My Commission Expires 06/07/2025

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 3

_____

JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively
as managing member of ARCH REAL ESTATE
HOLDINGS LLC and JJ ARCH LLC,

                Plaintiff,

      -against-

JARED CHASSEN and FIRST REPUBLIC BANK,

                Defendants.

_____

JARED CHASSEN, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively
as managing member of ARCH REAL ESTATE
HOLDINGS LLC and JJ ARCH LLC,

                Counterclaim-Plaintiff,

      -against-

JEFFREY SIMPSON and YJ SIMCO LLC,

                Counterclaim-Defendants,

      And

JJ ARCH LLC and ARCH REAL ESTATE HOLDINGS LLC,

                Nominal Defendants.

_____

608941 NJ INC.,

                Plaintiff,

      -against-

JEFFREY SIMPSON, JJ ARCH LLC and ARCH
REAL ESTATE HOLDINGS LLC,

                Defendants,

      and

ARCH REAL ESTATE HOLDINGS LLC,

                Nominal Defendant.

_____

Index No. 158055/23

(Justice Joel M. Cohen)

**ANSWER AND
COUNTERCLAIM
AGAINST
<u>608941 NJ INC.</u>**

Plaintiff-Intervenor Defendant Jeffrey Simpson ("Plaintiff" or "Simpson"), by his attorneys Altman & Company P.C., for his Answer and Counterclaim to the Complaint filed by Intervenor Plaintiff 608941 NJ Inc. (NYSCEF Doc. No. 318, the "Complaint"), both individually and as the Managing Member of JJ Arch LLC, alleges as follows:

**NATURE OF THIS ACTION AND THE PROCEEDINGS TO DATE**

1.      Plaintiff Simpson formed Arch Real Estate Holdings LLC ("AREH") in 2017.  AREH owns and controls more than $500 million in real estate in and around New York.  Mr. Simpson was the progenitor of AREH.  He structured the company and was responsible for all of its investments in and management of the real properties that comprise the AREH portfolio of companies.

2.      Mr. Simpson owns and controls 80% of AREH through JJ Arch LLC ("JJ Arch").  Mr. Simpson is the managing member of JJ Arch.  Defendant Jared Chassen, a subordinate of Mr. Simpson at a predecessor firm who assisted in AREH's formation, owns a minority interest in JJ Arch.

3.      Intervenor plaintiff 608941 NJ Inc. (which is commonly referred to by all of the parties as "Oak") owns 20% of AREH.

4.      AREH's Operating Agreement provides that Mr. Simpson (through JJ Arch) is the "Managing Member" of AREH and Oak is its "Investor Member."

5.      The genesis of the dispute between the parties is Oak's blatant breach of the AREH Operating Agreement and failure to meet its financial obligations to AREH as its Investor Member.

6.      Oak's Complaint is part of an elaborate illegal effort to obscure its refusal to meet Capital Calls duly made to them by Mr. Simpson.  Oak's failures to pay monies

requested by and due and owing AREH are clear breaches of Oak's contractual obligations under the AREH Operating Agreement and contrary to numerous written and oral confirmations and promises by Oak's principals that they would fund AREH's continuing operations. As detailed below, Oak's principals Kevin and Michael Wiener, have sought to and are carrying out their illicit plan by conspiring with defendant Chassen to oust Mr. Simpson from AREH and JJ Arch, falsely claiming that AREH's financial difficulties are not based on the recent and significant downturn in real estate market conditions but were somehow solely attributable to alleged mismanagement of AREH about which Oak feigns to have been unaware.

7. The Wieners, with Defendant Chassen's substantial assistance, have gone to great lengths thus far in this litigation to cast aspersions against Mr. Simpson concerning the manner in which he speaks to and about people, while the Wieners have attempted to portray themselves as gentlemanly. They are, however, far from genteel. In an email sent to defendant Chassen and Michael Wiener on August 11, 2023, Kevin Wiener referred to predecessor counsel for Mr. Simpson, Adam Leitman Bailey, and his colleague Colin Kaufman in the following derogatory terms:

> Lol what a fucking dick.
>
> His decrepit former prosecutor law partner does not have the ability to magically summon criminal charges from the ether.

(8/11/23 email from K. Wiener to Mr. Chassen and M. Wiener)

8. The truth will ultimately be revealed as the evidence at trial will show that Oak failed and refused to fund AREH in breach of the the AREH Operating Agreement, and the fiduciary duties it owes to JJ Arch.

3

## PARTIES

9.      Plaintiff Jeffrey Simpson is an individual.  He resides in New York

County, New York.

10.     Defendant 608941 NJ Inc. a/k/a Oak is, on information and belief, a New

Jersey corporation.  Its principal place of business is in Toronto, Canada.

## JURISDICTION AND VENUE

11.     Jurisdiction in this Court is proper on plaintiff Simpson's counterclaims

against Oak pursuant to CPLR § 3019(a) in that they involve causes of action by Mr. Simpson in

response to claims alleged by intervenor plaintiff Oak against him.

12.     Venue is proper in this Court pursuant to CPLR §§ 503(a) and 507 because

plaintiff Simpson resides in the State of New York in this County, and the subject matter of Mr.

Simpson's counterclaims action involves real property located in this County, and a substantial

part of the events or omissions giving rise to the claims in this action occurred in this County.

## FACTS COMMON TO MR. SIMPSON'S ANSWER
## AND HIS COUNTERCLAIM AGAINST OAK

**1.      Mr. Simpson's Initial Complaint Against Mr. Chassen and
the Court's Interim Resolution of the Wrongdoing By Him**

13.     This action began as a claim by Mr. Simpson against defendant Chassen

based on his (Mr. Chassen's) unauthorized, ultra vires instruction to First Republic Bank

("FRB") to remove Mr. Simpson as an authorized signer on all accounts he (Mr. Simpson)

maintained in either his corporate or individual capacity at FRB, and Mr. Chassen locking Mr.

Simpson out of his Arch company email account, all other Arch IT systems and Arch's offices.

(NYSCEF Doc. No. 1: Complaint ¶ ¶ 49, 58, 63)  Those matters were heard and resolved by the

Court previously.

4

14.     In accordance with the Order Regarding Interim Procedures dated August

21, 2023, Mr. Simpson's access to the FRB accounts, his AREH email and AREH's office were

restored.  As to the then continuing operations of AREH and JJ Arch, the Court's August 21,

2023 Order Regarding Interim Procedures provides plainly and clearly as follows:

> **Specifically, the business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in Section 3.2 of the JJ Arch Operating Agreement**, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen.  **Simpson and Chassen shall cooperate with each other in good faith to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement and related agreements**

(NYSCEF Doc. No. 36: Order p. 2, ¶ 3) (emphasis added)  Pursuant to the Decision + Order on

Motion dated September 29, 2023 (NYSCEF Doc. No. 159), the Court's August 21, 2023

Interim Order remains in full force and effect.

15.     As the Court expressly noted on the record during the proceedings on

September 29, 2023:

> THE COURT:   **Well, look unless and until this partnership [JJ Arch] is broken up, Mr. Chassen is a 49 percent member without managerial control.  *  *  *  But I think the way the contract works, you know substantive decisions are up to Mr. Simpson.**

(Transcript of Proceedings - 9/29/23 Tr. 54, lines 6-17) (emphasis added)

16.     The Court further specifically held on September 29 that "**the [JJ Arch]**

**Operating Agreement does put Mr. Simpson in charge of the business.  So, Mr. Chassen**

**does not have independent authority to spend corporate funds on anything without Mr.**

**Simpson's approval.**"  (Id.: Tr. 52, lines 3-7) (emphasis added)

5

2.      **Oak's Failure to Fund Arch Was and Is a**
        **Blatant Breach of the AREH Operating Agreement**

17.      In December 2022, as the result of general economic and depressed real estate market conditions, AREH needed additional money to meet general and administrative expenses and fund its continuing operations.  So Mr. Simpson asked Oak for additional capital contributions to meet those needs as was specifically contemplated by and authorized in Section 3.2 of the AREH Operating Agreement.  That request was based on detailed forecasts Mr. Simpson prepared with respect to all of the Arch portfolio properties.  Initially, Oak agreed to provide that additional funding and more.

18.      On December 20, 2022, Frank van Beisen, Oak's CFO, specifically stated and represented to Mr. Simpson (and Mr. Chassen) as follows: "I expect we could have as much as $15-$20 million available over the coming year" to fund AREH continuing operations.  (Exh. C: 12/20/22 email to Messrs. Simpson and Chassen on which Michael Weiner and Bill Weiner were copied)  But sometime thereafter Oak's principals changed their minds, and Oak failed to make good on that promise by Mr. van Biesen.

19.      Consequently, in accordance with the terms of Section 3.2 of the AREH Operating Agreement, numerous capital calls were made to Oak, and monies were specifically requested from Oak to fund payroll and otherwise pay bills in the ordinary course.  While some modest amounts of money were provided, Oak has not made good on Mr. van Biesen's December 2022 promise (in breach of the AREH Operating Agreement), and the Wieners have made clear they do not intend to cause Oak to invest any more money in AREH.

20.      The reason for Oak's change in position and refusal to invest further in AREH is that its principals, Kevin Wiener and Michael Wiener, know that under the AREH Operating Agreement it would be difficult if not impossible for them to recoup those monies

6

given the current economic environment. The Wieners' preference was to do what they have done and are doing; that is, breach their agreements, improperly seize control of AREH, shut it down, attempt to sell off or walk away from AREH's assets, and take whatever steps may be necessary to reduce the individual exposure on personal guarantees they have provided on several of the AREH portfolio company projects to the detriment of Mr. Simpson and approximately 200 other limited partners. The Wieners have admitted to Mr. Simpson and others that is what they have done and these are their continuing intentions.

**3.      Oak and its Principal, Kevin and Michael Wiener Have Grossly Misled the Court**

21.      In the proceedings to date, Oak's principals – Kevin Wiener and Michael Wiener – have attempted to falsely portray themselves as unwitting dupes. Nothing could be farther from the truth. The Wieners have been for some time and continue to be the aggressors.

22.      Beginning in July 2023 (and perhaps earlier), totally unbeknownst to Mr. Simpson, the Wieners were plotting and planning with Mr. Chassen to take over AREH and throw Mr. Simpson out. Secret meetings were held between Mr. Chassen and the Wieners at Mr. Chassen's cousin's business offices and Mr. Chassen instructed AREH employees not to tell Mr. Simpson about them.

23.      By email dated July 19, 2023, counsel for Oak sent counsel for Mr. Chassen a proposal that required Mr. Simpson to "immediately step[] away from active day-to-day management of Arch and its subsidiaries and relinquish[] authority to act on behalf of Arch and its subsidiaries" and require an amendment of the JJ Arch Operating Agreement "such that Jared [Chassen] has sole control over JJ [Arch]." (7/19/23 email from Andrew Silverstein, Esq. at Haynes and Boone, LLP to Len Breslow, Esq. at Breslow & Walker , LLP) Mr. Chassen shared that proposal with his cousin David Berg, who is a principal at the Infinity Collective

7

which is an investor in some of the Arch projects, and Mr. Berg commented on it. (7/20/23 email from David Berg to Mr. Chassen)

24.     By early August 2023, a deal between Mr. Chassen and the Wieners was apparently struck and they were working together to dream up supposed justifications to remove Mr. Simpson. One example of this is the email dated August 7, 2023, Mr. Chassen wrote to the Wieners in which stated:

> Boys, need to speak in morning, need to work on cause event
> backup together.

(8/7/23 email from Mr. Chassen to Kevin Weiner and Michael Wiener)

25.     On August 8, 2023, Mr. Chassen asked the Wieners for "some guidance" on how to deal with questions being raised by Mr. Simpson's personal accountant "so it does not subject me with a damage claim that somehow I messed up those properties or businesses." (8/8/23 email from Mr. Chassen to Kevin and Michael Wiener)

26.     In an email to Mr. Chassen on August 9, 2023, Michael Wiener brazenly instructed Mr. Chassen that "**directions from Jeff [Simpson] should be ignored, as he lacks any and all authority to act on behalf of JJ Arch and the Arch companies**." (August 9, 2023 email) (emphasis added) Mr. Weiner of course had absolutely no right to give such a direction to Mr. Chassen.

27.     The Wieners and Oak do not and have never had any ownership or economic interest in JJ Arch. Section 1.1 of the JJ Arch Operating Agreement does not permit the transfer of JJ Arch Company Interests by its Members. On information and belief, Oak has in violation of the JJ Arch Operating Agreement entered into an agreement with Mr. Chassen pursuant to which Mr. Chassen has transferred all or a portion of his rights in JJ Arch and AREH to the Wieners and Oak.

8

28.     With Oak's assistance and imprimatur Mr. Chassen even enlisted AREH's

Director of Human Resources, Karolina Bortko, in his (and the Wieners') disloyal plans asking

her to "please provide all the emails you have implicating Jeff into the dropbox." (8/9/23 email

from Mr. Chassen to Ms. Bortko) Not surprisingly, Ms. Bortko asked Mr. Chassen and the

Wieners for "formal assurance of protection" and an affirmation "that the Company will assume

full responsibility for any liabilities" including any legal fees she may incur if she cooperated

with them, which Oak has provided. (8/9/23 email from Ms. Bortko to Mr. Chassen and Kevin

and Michael Wiener)

29.     Further evidence of Oak's conspiring with Mr. Chassen to wrongfully

depose Mr. Simpson from AREH is an email dated August 10, 2023, in which Mr. Chassen asked

Oak's lawyers, the Wieners and yet another AREH employee, Michelle Miller, for "a company

line and what I am saying when backup questions arise." (8/10/23 email from Mr. Chasen to

Jeffrey Dayon, Esq., Brad Lavender, Esq., the Wieners and Ms. Miller)

30.     Perhaps the most damning evidence of the collusion between Mr. Chassen

and Oak, however, is the email dated August 13, 2023, Mr. Chassen sent to van Biesen, on which

the Wieners were copied, in which Mr. Chassen requested asked that Oak pay $250,000 in legal

fees to his (Mr. Chassen's) lawyers:

> Hey, we need to fund retainers please
>
> Jeff Dayon's firm requesting $50,000
> Fried Frank requesting $200,000
>
> I[']ll send retainers and wire instructions under separate cover.

(8/13/23 email from Mr. Chassen to Mr. van Biesen and the Wieners)

31.     How these law firms were able to accept the engagements is mystifying

given their apparent conflicts of interest. Mr. Dayon previously represented AREH on multiple

9

matters while Mr. Simpson was running the company, as did lawyers at Fried Frank on corporate matters. And, astonishingly, Fried Frank was – contemporaneously with its representation of Mr. Chassen – seeking to foreclose on one of the AREH properties on behalf of another client.

32. Mr. van Biesen nevertheless agreed to pay those legal fees for Mr. Chassen, but inquired "who is Fried Frank" to which Mr. Chassen responded: "Litigation firm for me. Brad [Lavender, Esq. of Haynes Boone]'s recommendation." (8/13/23 email from Mr. Chassen to Mr. van Biesen) And it cannot be disputed that thereafter Mr. Chasen's lawyers at Fried Frank were conversing openly with the Wieners, of course without Mr. Simpson's knowledge at the time. (8/17/23 email from Emily Cooper, Esq. to Kevin Wiener)

33. Subsequently in this litigation, Oak, Mr. Chassen and their counsel both individually and collectively have repeatedly misstated and omitted from their submissions numerous and sundry material facts concerning their own wrongful self-interested conduct, AREH, JJ Arch, and AREH's assets, liabilities and the present and historic conditions of the real properties owned by AREH, and the controlling agreements between the parties.

34. For example, Oak contends that Mr. Simpson improperly "furlough[ed]" AREH employees suggesting that it was due to employee disloyalty to him. (See NYSCEF Doc. No. 319: Complaint ¶ ¶ 40-41) That is simply false. AREH employees were treated honestly and fairly. They were informed of Oak's failures and refusal to provide additional funding in breach of the clear terms of AREH's Operating Agreement and that no monies were available to pay them.

35. Similarly, Mr. Simpson did not engage in any improper conduct when, as AREH's Managing Member, he instructed outside corporate counsel to cease work. The Wieners repeatedly stated that they were going to meet their Capital Calls so those counsel fees could be

10

paid; but Oak never did.  So, Mr. Simpson did what honest business people do -- he told AREH's lawyers not to run up further receivables.

36.     While Oak and Mr. Chassen were contriving together and creating a false narrative about AREH's business affairs, Mr. Simpson was selflessly not taking distributions to which he was and is unconditionally entitled.   Believing Oak might actually live up to its contractual obligations, Mr. Simpson personally contributed more than $2 million in an effort to keep AREH afloat.

37.     Mr. Simpson denies all of the material allegations in Oak's Complaint (see pp. 15-26, below), and specifically asserts the following Counterclaims against Oak.

## <u>COUNTERCLAIMS</u>

### COUNT I
### (Breach of Contract)

38.      Plaintiff Simpson realleges and incorporate by reference the allegations stated in paragraphs 1 through 37 above as if stated here in full.

39.     Under New York law, the elements of a breach of contract cause of action are (1) a valid contract, (2) a material breach, and (3) damages.  All of those elements are present in this case.

40.     The AREH Operating Agreement is a valid contract between Mr. Simpson in his capacity as the Managing Member of JJ Arch and Oak.

42.     JJ Arch is the Managing Member of AREH pursuant to the Preamble and Section 1.1 of the AREH Operating Agreement.

43.     Oak is the Investor Member of AREH pursuant to the Preamble and Section 1.1 of the AREH Operating Agreement.

11

41.     Section 3.2.1 of the AREH Operating Agreement provides, in pertinent

part, that:

> 3.2.1. If, at any time or from time to time, Managing
> Member determines that additional funds are required by the
> Company (x) to meet its general and administrative expenses in
> connection with the Approved Budget exclusive of those related to
> a Permitted Investment or (y) to satisfy the costs associated with
> the Company's due diligence in connection with approved Eligible
> Assets, Managing Member shall deliver a written notice to Investor
> Member (a "Capital Call Notice") setting forth the total amount of
> capital required (the "Capital Call Amount") and the purpose of
> such Capital Call.

42.     Simpson made numerous Capital Calls to Oak pursuant to Section 3.2.1 of

the AREH Operating Agreement.

43.     Oak was required, pursuant to Section 3.2.2 of the AREH Operating

Agreement, to meet those Capital Calls "in immediately available funds within five (5) Business

Days of receipt."  When each of those Capital Calls were made, contrary to Oak's demonstrably

false contentions, Oak's Unreturned Capital Contributions did not exceed its Member Maximum

Capital Contributions as those terms are defined under the AREH Operating Agreement.

44.     Oak has materially breached the AREH Operating Agreement by failing to

make those Capital Calls in accordance with Sections 3.2.1 and 3.2.2, which failures have not

been excused.

45.     In addition, Mr. Simpson as the Managing Member of JJ Arch was

specifically entitled to certain "Guaranteed Payment" pursuant to Section 7.3.1 of the AREh

Operating Agreement:

> 7.3.1. Guaranteed Payment. As compensation for its
> various undertaking and capital commitments hereunder,
> Managing Member shall be entitled to a monthly guaranteed
> payment from the Company equal to the amount set forth in the

12

Annual Budget as "Managing Member Guaranteed Payment" which shall be payable by the Company in advance.

46.     Mr. Simpson is currently owed more than $400,000 in that "Guaranteed Payment" from AREH. Oak has refused to cause AREH to pay those monies to Mr. Simpson despite Mr. Simpson's proper demand for them.

47.     Oak has materially breached the AREH Operating Agreement by failing to cause the Guaranteed Payment to be made to Mr. Simpson in accordance with Section 7.3.1, which failure has not been excused. No provision in the AREH Operating Agreement allows Oak to withhold the Guaranteed Payment to Mr. Simpson or "offset" payment of it against any purported claims against him.

48.     Oak is also liable to indemnify Mr. Simpson under Section 13.1 of the AREH Operating Agreement for all legal fees he has paid and incurred to date as the result of Oak's willful misconduct in seeking to oust him from the company for the sole benefit of its principals, Kevin and Michael Wiener personally, and to the detriment of Mr. Simpson and the approximately 200 investors in the companies that own the properties in the AREH portfolio.

49.     Oak has further breached the AREH Operating Agreement and oral and other written promises by failing to pay AREH's lawyers for corporate and transactional work performed prior to the commencement of this action.

50.     Plaintiff Simpson has suffered damages in excess of $5,000,000 as the result of these breaches by Oak of the AREH Operating Agreement.

### COUNT II
### (Breach of Fiduciary Duty - Individually
### and Derivatively on Behalf of JJ Arch and AREH)

51.     Plaintiff Simpson realleges and incorporates by reference the allegations stated in paragraphs 1 through 50 above as if stated here in full.

13

52.     Oak owed fiduciary duties to Mr. Simpson by virtue of its being the
Investor Member in AREH.

53.     Oak breached its fiduciary duties to Mr. Simpson and JJ Arch by, among
other untoward acts, (i) conspiring with defendant Chassen to oust Mr. Simpson from JJ Arch
and AREH in order to mask its efforts to hide its refusal to fund AREH's continued operations;
(ii) failing and refusing to make Capital Calls duly demanded of it under the terms of the AREH
Operating Agreement; (iii) failing and refusing to pay Mr. Simpson and JJ Arch the Guaranteed
Payment due under the terms of the AREH Operating Agreement; (iv) failing and refusing to pay
bills for legal services rendered by AREH's outside counsel prior to the commencement of this
action; and (v) causing Mr. Simpson to pay and incur substantial legal fees defending Oak's
specious claims against him.

54.     To the extent that Mr. Simpson's claims are derivative on behalf of JJ Arch
and AREH, demands to Oak would have been and are futile because, as the result of the fraud it
occasioned on the Court, Oak is temporarily in control of AREH and is not expected to bring
claims against itself and counsel purporting to represent AREH is not independent of and, on
information and belief, controlled and being paid by Oak and the Kevin and Michael Wiener.

55.     As the direct result of Oak's breaches of its fiduciary duties, Mr. Simpson
has suffered damages in excess of $5,000,000.

56.     Mr. Simpson is also entitled to recover punitive damages against Oak, in
an amount to be determined at trial, because breaches of the fiduciary duty it owes to him and
derivatively to JJ Arch and AREH were conscious acts that willfully and wantonly disregarded
his rights and were intentional, deliberate, and outrageous.  Evidence in support of Mr.
Simpson's claims for punitive damages include the statement by Oak's principal Michael Wiener

14

that he (Mr. Simpson) "ruined his life" and that he (Michael Wiener) intends to continue to (falsely) pursue Mr. Simpson "until he declares bankruptcy and is broke."

## SPECIFIC RESPONSES TO THE ALLEGATIONS IN OAK'S COMPLAINT

### As to the alleged "NATURE OF THE PROCEEDINGS"

1. Admits the allegations in paragraph 1 of the Complaint.

2. Denies the allegations in paragraph 2 of the Complaint, except admits that Oak is the "Investment Member" in AREH and that Oak has invested $50 million in AREH, and avers that the parties' rights and obligations between them are governed by the AREH Operating Agreement and that the October 31, 2023 purported "Removal Notice" was a sham intended to benefit Oak to the detriment of the Plaintiff and the approximately 200 other investors in AREH.

3. Denies the allegations in paragraph 3 of the Complaint, and avers that the JJ Arch proceeding was brought initially to address defendant Chassen's unauthorized removal of Mr. Simpson as an authorized signer on all of his personal and AREH's accounts at FNB bank, and Mr. Chassen locking Mr. Simpson out of AREH's email, IT systems and physical offices.

4. As to the allegations in paragraph 4 of the Complaint, admits that Oak "has sought a change in management at JJ Arch" and intervened in this action in an effort to secure that change, and otherwise refers to the transcript of the proceedings before the Court on October 19, 2023 for the meaning and full context of the comments by the Court.

5. As to the allegations in paragraph 5 of the Complaint, admits that Oak has asserted certain claims against him in this action which he denies in their entirety.

6. As to the allegations in paragraph 6 of the Complaint, admits that Oak has asserted certain claims against him in this action which he denies in their entirety.

15

### As to the "PARTIES"

7.    Admits, on information and belief, the allegations in paragraph 7 of the Complaint.

8.    Admits the allegations in paragraph 8 of the Complaint, and avers that pursuant to the AREH Operating Agreement, JJ Arch is the Managing Member of AREH and Oak is its Investment Member.

9.    Admits the allegations in paragraph 9 of the Complaint.

10.    Admits the allegations in paragraph 10 of the Complaint, except avers on information and belief that defendant Chassen is a resident of New Jersey.

### As to "JURISDICTION, VENUE AND GOVERNING LAW"

11.    Admits the allegations in paragraph 11 of the Complaint.

12.    Admits the allegations in paragraph 12 of the Complaint.

### As to the alleged "FACTUAL BACKGROUND: Oak's History"

13.    Admits, on information and belief, the allegations in paragraph 13 of the Complaint.

14.    Admits, on information and belief, the allegations in paragraph 14 of the Complaint.

15.    Denies knowledge and information sufficient to form a belief as to the allegations in paragraph 15 of the Complaint.

16.    Denies knowledge and information sufficient to form a belief as to the allegations in paragraph 16 of the Complaint.

17.    Denies knowledge and information sufficient to form a belief as to the allegations in paragraph 17 of the Complaint.

16

18. Denies knowledge and information sufficient to form a belief as to the allegations in paragraph 18 of the Complaint concerning Oak's formation and business plans, admits that Oak invested $50 million in AREH, but otherwise denies the allegations in paragraph 18 of the Complaint.

19. Denies the allegations in paragraph 19 of the Complaint.

<u>As to "The AREH LLC Agreement"</u>

20. Admits the allegations in paragraph 20 of the Complaint, except denies that the value of the real property holdings was in excess of $1 billion in 2022 and that "Oak has far and away the most funds of any party" as Oak owns only 20% of AREH pursuant to the AREH Operating Agreement.

21. Admits the allegations in paragraph 21 of the Complaint.

22. Denies the allegations in paragraph 22 of the Complaint, except admits that it properly quotes a portion of the Section 11.5.2 of the AREH Operating Agreement.

23. Denies the allegations in paragraph 23 of the Complaint.

24. Denies the allegations in paragraph 24 of the Complaint.

**As to the alleged "General Mismanagement of AREH and Misconduct by Simpson and JJ Arch Leading to Unforeseen Tax Liabilities, Defaults, and Foreclosure"**

25. Denies the allegations in paragraph 25 of the Complaint.

26. Denies the allegations in paragraph 26 of the Complaint.

27. Denies the allegations in paragraph 27 of the Complaint.

28. Denies the allegations in paragraph 28 of the Complaint, and avers that AREH's failure to make debt servicing payments was due to Oak's intentional failure and refusal to meet its contractual obligations to continue to fund AREH's business.

29. Denies the allegations in paragraph 29 of the Complaint.

17

30.     Denies the allegations in paragraph 30 of the Complaint, except admits that defendant Chassen filed a demonstrably false and misleading affidavit dated September 14, 2023 in this action.

31.     Denies the allegations in paragraph 31 of the Complaint, and avers that the Wieners have told Mr. Simpson they would not consent to any bankruptcy filing because they (falsely) believed that any such filing might potentially trigger personal guarantees they signed in connection with several of the AREH portfolio properties, and that those guarantees had already become live as the result of Oak's seeking a receiver for JJ Arch in this action.

**As to alleged "Major Misconduct Relating to Spending, Budgeting and Capital Calls"**

32.     Denies the allegations in paragraph 32 of the Complaint.

33.     Denies the allegations in paragraph 33 of the Complaint.

34.     Denies the allegations in paragraph 34 of the Complaint.

35.     Denies the allegations in paragraph 35 of the Complaint, except admits that Mr. Simpson did make Capital Calls to Oak in accordance with AREH's Operating Agreement and that Oak met some of them.

36.     Denies the allegations in paragraph 36 of the Complaint, and avers that at all times Mr. Simpson complied with the terms of the AREH Operating Agreement despite Oak's failure to do so.

37.     Denies the allegations in paragraph 37 of the Complaint, except admits that Mr. Simpson made a proper Capital Call to Oak on October 25, 2023 in accordance with the terms of the AREH Operating Agreement and avers that Oak failed and refused to meet that Capital Call based on a blatant contortion and misreading of the agreement.

18

38.     As to the allegations in paragraph 38, refers to the full terms of the Court's Order, NYSCEF Doc. No. 292) and avers that Oak and its counsel made numerous false and misleading representations and omissions to the Court which resulted in that ruling.

39.     Denies the allegations in paragraph 39 of the Complaint, except admits that Mr. Simpson communicated with AREH staff following Oak's refusal to honor his properly made Capital Call.

40.     Denies the allegations in paragraph 40 of the Complaint.

41.     Denies the allegations in paragraph 41 of the Complaint, and avers that any asserted "widespread panic" resulted solely from Oak's (and defendant Chassen's) nefarious conduct.

42.     Denies the allegations in paragraph 42 of the Complaint.

43.     As to the allegations in paragraph 43 of the Complaint, admits that defendant Chassen has misappropriated funds for personal use and that falsely accused Mr. Simpson of wrongdoing and specifically denies the purported claim that he used AREH funds in any way improperly.

44.     As to the allegations in paragraph 44 of the Complaint, admits that the Chassen Affidavit makes various false allegations concerning Mr. Simpson all of which Mr. Simpson denies.

45.     Denies the allegations in paragraph 45 of the Complaint.

46.     Denies the allegations in paragraph 46 of the Complaint, except admits that AREH's accounting department was recently understaffed and avers that the circumstance was due to Oak's failure to fund AREH operations, and avers that no billing practices at AREH in which Mr. Simpson was involved was in any way improper.

19

47.     As to the allegations in paragraph 47 of the Complaint, admits that Mr.

Paul sent Mr. Simpson an email on August 9, 2023, avers that the email was wrongfully solicited

by defendant Chassen and denies that he acted at any time in violation of his fiduciary duties.

48.     Denies the allegations in paragraph 48 of the Complaint.

**As to the alleged "Misrepresentations about Oak's Capital Contributions"**

49.     Denies the allegations in paragraph 49 of the Complaint.

50.     Denies the allegations in paragraph 50 of the Complaint, except admits

that he properly sent Capital Calls to Oak on October 25, 2023 in accordance with the express

terms of the AREH Operating Agreement, and avers that Oak wrongfully ignored them, falsely

claiming them to be improper for the sole purpose of advancing their scheme to take over AREH

and shutter if for the sole benefit of the Wieners personally in breach of the AREH Operating

Agreement and in violation of their fiduciary duties.

51.     Denies the allegations in paragraph 51 of the Complaint.

52.     Denies the allegations in paragraph 52 of the Complaint.

53.     Denies the allegations in paragraph 53 of the Complaint.

54.     Denies the allegations in paragraph 54 of the Complaint.

55.     Denies the allegations in paragraph 55 of the Complaint, and avers that

there are no discrepancies in AREH's books and records.

**As to the false allegations of**
**"Simpson's Past Record of Misconduct and Breaches of Fiduciary Duty"**

56.     Denies the allegations in paragraph 56 of the Complaint, and averring that

he never "held hostage" any funds due Oak, he provided extensive information to Oak

concerning the status of their investment in AREH and the AREH portfolio properties, never

improperly threatened legal action against Oak, never wrongly directed counsel for AREH to

20

stop work.  To the contrary, Mr. Simpson appropriately and properly advised counsel to discontinue work when it was clear AREH was refusing to fund operations and there were insufficient funds to pay AREH's then outstanding legal bills.  He never made any misrepresentations to Oak concerning capital, never acted in any way inconsistent with the clear terms of the AREH Operating Agreement, and never misled Oak in any way concerning its investments in AREH.

**As to the allegations**
**"Simpson Refuses to Head JJ Arch's Removal as AREH's Managing Member"**

57.     Denies the allegations in paragraph 57 of the Complaint and avers that Oak's efforts to remove JJ Arch as the Managing Member of AREH was illegal and based on numerous false statements and misrepresentations to the Court.

58.     Denies the allegations of paragraph 58 of the Complaint, except admits that he has properly opposed Oak's efforts to remove JJ Arch as AREH's Managing Member and wrongfully prohibit him from involvement in AREH's business.

59.     Denies the allegations of paragraph 59 of the Complaint.

21

### As to "COUNT I"
### (For alleged Breach of Fiduciary Duty Against JJ Arch and Simpson)

60.     As to the allegations in paragraph 60 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 59 above as if stated here in full.

61.     Admits the allegations in paragraph 66 of the Complaint, except denies that Oak and JJ Arch are "co-members of AREH."

62.     Denies the allegations of paragraph 62 of the Complaint, except admits that JJ Arch as the Managing Member of AREH owed fiduciary duties to Oak.

63.     Denies the allegations in paragraph 63 of the Complaint.

64.     Denies the allegations in paragraph 64 of the Complaint.

### As to "COUNT II"
### (For alleged Breach of Contract Against JJ Arch)

65.     As to the allegations in paragraph 65 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 64 above as if stated here in full.

66.     Admits the allegations in paragraph 66 of the Complaint.

67.     Denies the allegations in paragraph 67 of the Complaint.

68.     Denies the allegations in paragraph 68 of the Complaint.

### As to "COUNT III"
### (For alleged Tortious Interference Against Simpson)

69.     As to the allegations in paragraph 69 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 68 above as if stated here in full.

70.     Denies the allegations in paragraph 70 of the Complaint.

22

71.     Denies the allegations in paragraph 71 of the Complaint.

72.     Denies the allegations in paragraph 72 of the Complaint.

73.     Denies the allegations in paragraph 73 of the Complaint.

**As to "COUNT IV"**
**(For alleged Tortious Interference with Prospective Business Advantage Against Simpson)**

74.     As to the allegations in paragraph 74 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 73 above as if stated here in full.

75.     Admits, on information and belief, the allegations in paragraph 75 of the Complaint.

76.     Admits the allegations in paragraph 76 of the Complaint.

77.     Denies the allegations in paragraph 77 of the Complaint.

78.     Denies the allegations in paragraph 78 of the Complaint.

79.     Denies the allegations in paragraph 79 of the Complaint.

**As to "COUNT V"**
**(For alleged Breach of Fiduciary Duty Against JJ Arch and Simpson**
**- derivatively on behalf of AREH)**

80.     As to the allegations in paragraph 80 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 79 above as if stated here in full.

81.     Admits the allegations in paragraph 81 of the Complaint, except denies that Oak and JJ Arch are "co-members of AREH."

82.     Denies the allegations of paragraph 82 of the Complaint, except admits that JJ Arch as the Managing Member of AREH owed fiduciary duties to Oak.

83.     Denies the allegations in paragraph 83 of the Complaint.

23

84.    Denies the allegations in paragraph 84 of the Complaint.

85.    Denies the allegations in paragraph 85 of the Complaint.

86.    Denies the allegations in paragraph 86 of the Complaint.

### As to "COUNT VI"
**(For an Equitable Accounting Against JJ Arch and AREH)**

87.    As to the allegations in paragraph 87 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 86 above as if stated here in full.

88.    Denies the allegations in paragraph 88 of the Complaint.

89.    Denies the allegations in paragraph 89 of the Complaint.

90.    Denies the allegations in paragraph 90 of the Complaint, and avers that the statements in the referenced email were in all respects true.

91.    Denies the allegations in paragraph 91 of the Complaint.

92.    Denies the allegations in paragraph 92 of the Complaint.

93.    Denies the allegations in paragraph 93 of the Complaint.

94.    Denies the allegations in paragraph 94 of the Complaint.

95.    Denies the allegations in paragraph 95 of the Complain, except aver that false and misleading statements and omissions by Oak's principals. Kevin Wiener and Michael Wiener have damaged Mr. Simpson' reputation and prejudiced his ability currently to enter into business relationships.

96.    Denies the allegations in paragraph 96 of the Complaint.

24

### As to "COUNT VII"
### (For alleged Fraud Against Simpson)

97.     As to the allegations in paragraph 97 of the Complaint, repeat and
incorporate by reference the responses and allegations stated in paragraphs 1 through 96 above as
if stated here in full.

98.     Denies the allegations in paragraph 98 of the Complaint, except admits
that a 1031 Exchange was considered.

99.     Denies the allegations in paragraph 99 of the Complaint.

100.    Denies the allegations in paragraph 100 of the Complaint.

101.    Denies the allegations in paragraph 101 of the Complaint.

102.    Denies the allegations in paragraph 102 of the Complaint.

103.    Denies the allegations in paragraph 103 of the Complaint, and aver that all
capital contributions were properly accounted for in AREH's books and records.

### As to "COUNT VIII"
### (For a Declaratory Judgment Against Simpson and JJ Arch)

104.    As to the allegations in paragraph 104 of the Complaint, repeat and
incorporate by reference the responses and allegations stated in paragraphs 1 through 103 above
as if stated here in full.

105.    Admits that there is a justiciable controversy between the parties as to
Oak's improper removal of JJ Arch as the Managing Member of AREH, denies that Oak's
removal provision was proper and avers that it was not.

106.    Admits the allegations in paragraph 106 of the Complaint insofar as Oak
improperly sought the removal of JJ Arch as the Managing Member of AREH.

25

### As to "COUNT IX"
**(For an Equitable Accounting Against JJ Arch and AREH)**

107.    As to the allegations in paragraph 107 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 106 above as if stated here in full.

108.    As to the allegations in paragraph 108 of the Complaint, admits that Mr. Simpson is the Managing member of JJ Arch and that fiduciary duties are owed by Mr. Simpson to Oak and Oak to Mr. Simpson, subject to the terms and conditions of AREH Operating Agreement.

109.    Denies the allegations in paragraph 109 of the Complaint.

110.    Denies the allegations in paragraph 110 of the Complaint.

111.    Denies the allegations in paragraph 111 of the Complaint.

112.    Denies the allegations in paragraph 112 of the Complaint.

113.    Denies the allegations in paragraph 113 of the Complaint.

114.    Denies the allegations in paragraph 114 of the Complaint.

### AFFIRMATIVE DEFENSES

1.    All of Mr. Simpson's actions were authorized by the AREH Operating Agreement and the JJ Arch Operating Agreement.

2.    All of Mr. Simpson's actions were proper in accordance with and not actionable under the Business Judgment Rule.

3.    All of the claims against Mr. Simpson should be dismissed in whole or part because Section 3.6 of the AREH Operating Agreement specifically states that "no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof" and Mr. Simpson's conduct did not involve bad faith,

26

intentional misconduct, a knowing violation of law, or secure for him financial profits or other advantages to which he was not legally entitled.

4.      None of Mr. Simpson's actions amounted to wilfull misconduct, corporate waste or involved improperly conflicted corporate transactions.

5.      Oak breached the AREH Operating Agreement by (i) conspiring with defendant Chassen to oust Mr. Simpson from JJ Arch and AREH in order to mask its efforts to hide its refusal to fund AREH's continued operations; (ii) failing and refusing to make Capital Calls duly demanded of it under the terms of the AREH Operating Agreement; (iii) failing and refusing to pay Mr. Simpson and JJ Arch the Guaranteed Payment due under the terms of the AREH Operating Agreement; (iv) failing and refusing to pay bills for legal services rendered by AREH's outside counsel prior to the commencement of this action; and (v) causing Mr. Simpson to pay and incur substantial legal fees defending Oak's specious claims against him.

6.      Oak committed fraud by falsely stating that it would meet its Capital requirements, pay AREH's lawyers and fund AREH's ongoing operations.

7.      Oak should be equitable estopped from any recovery in this action due to its intentionally wrongful conduct and unclean hands.

8.      Additionally as to "COUNT I," the claim should be dismissed because it is duplicative of Count II, which alleges breach of contract against JJ Arch, and Count V, which alleges breach of fiduciary duty against JJ Arch and Mr. Simpson.

9.      Additionally as to "COUNT II," the claim should be dismissed because it is duplicative of Count I, which alleges breach of fiduciary duty against JJ Arch and Mr. Simpson, and Count V, which also alleges breach of fiduciary duty against JJ Arch and Mr. Simpson.

27

10.    Additionally as to "COUNT III" and "COUNT IV," the claims should be dismissed Mr. Simpson had the legal right to take all of the actions he did and he did not wrongfully interfere with the rights of any party.

11.    Additionally as to "COUNT V," the claim should be dismissed because it is duplicative of Count I, which alleges breach of fiduciary duty against JJ Arch and Mr. Simpson, and Count II, which alleges breach of contract against JJ Arch.

12.    Additionally as to "COUNT VI," the claim should be dismissed because all of the allegedly actionable statements were either the truth or protected opinion, as they are matters that can neither be proven or disproven as objectively true or false.

13.    Additionally as to "COUNT VII," the claims should be dismissed because none of the referenced statements were false or materially misleading when made.

14.    Additionally as to "COUNT VIII," the claim should be dismissed because the Removal Notice on which Oak's claim is based was false and misleading in that the purported bases stated in it were untrue and it was issued under false pretenses as part of Oak's fraudulent efforts to oust Mr. Simpson from AREH and JJ Arch for its own benefit and to the detriment of AREH and the approximately 200 other investors in the companies that own the AREH portfolio of real estate assets.

15.    Additionally as to "COUNT IX," the claim should be dismissed because (a) Oak failed to make a formal demand for an accounting before seeking judicial relief, and (b) Oak has failed to and cannot demonstrate that it does not have an adequate remedy at law.

28

WHEREFORE, plaintiff-intervenor defendant Jeffrey Simpson, both individually and derivatively on behalf of JJ Arch LLC and Arch Real Estate Holdings LLC, demands judgment as follows:

A. That the Complaint of 608941 NJ Inc. be dismissed in its entirety with prejudice;

B. That Mr. Simpson's Counterclaims against 608941 NJ Inc. be sustained and that, on them, the Court enter judgment:

(i) vacating and declaring null and void in its entirety the Court's Amended Decision + Order on Motion dated November 22, 2023 (NYSCEF Doc. No. 418),

(ii) directing 608941 NJ Inc. and its principals Kevin Wiener and Michael Wiener to fulfill all of its obligations under the AREH Operating Agreement including, but not limited to, (a) meeting all Capital Calls, and (b) immediately paying the Guaranteed Payment to Mr. Simpson, (c) paying AREH's corporate counsel's, and (d) indemnifying Mr. Simpson for all of his legal bills paid and incurred to date in connection with this action, and

(iii) awarding Mr. Simpson compensatory and punitive damages in amounts to be awarded at trial; and

C. Such other and further relief as the Court deems just and proper.

29

Southampton, New York
January 5, 2024

ALTMAN & COMPANY P.C.

By: **_/s/Steven Altman____**
     Steven Altman
P.O. Box 590, 123 N. Sea Road
Southampton, New York 11969
(917) 207-3001 - phone
(646) 349-3387 - fax
Steve@CommercialTrialLawyer.com

*Attorneys for*
   *Plaintiff/Intervenor-Defendant*
   *Jeffrey Simpson*

30

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 3

_____

JEFFREY SIMPSON, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively
as managing member of ARCH REAL ESTATE
HOLDINGS LLC and JJ ARCH LLC,

                    Plaintiff,

       -against-

JARED CHASSEN and FIRST REPUBLIC BANK,

                    Defendants.

_____

JARED CHASSEN, individually and derivatively, as
managing member of JJ ARCH LLC, suing derivatively
as managing member of ARCH REAL ESTATE
HOLDINGS LLC and JJ ARCH LLC,

                    Counterclaim-Plaintiff,

       -against-

JEFFREY SIMPSON and YJ SIMCO LLC,

                    Counterclaim-Defendants,

       And

JJ ARCH LLC and ARCH REAL ESTATE HOLDINGS LLC,

                    Nominal Defendants.

_____

608941 NJ INC.,

                    Plaintiff,

       -against-

JEFFREY SIMPSON, JJ ARCH LLC and ARCH
REAL ESTATE HOLDINGS LLC,

                    Defendants,

      and

ARCH REAL ESTATE HOLDINGS LLC,

                    Nominal Defendant.

_____

Index No. 158055/23

(Justice Joel M. Cohen)

**JJ ARCH LLC's
ANSWER AND
COUNTERCLAIM
AGAINST
<u>608941 NJ INC.</u>**

Derivative-Plaintiff/Nominal-Defendant JJ Arch LLC ("JJ Arch"), by its attorneys Altman & Company P.C., for its Answer and Counterclaim to the Complaint filed by Intervenor Plaintiff 608941 NJ Inc. (NYSCEF Doc. No. 318, the "Complaint"), alleges as follows:

## NATURE OF THIS ACTION AND THE PROCEEDINGS TO DATE

1.      Plaintiff/Intervenor-Defendant Jeffrey Simpson ("Plaintiff" or "Simpson") formed Arch Real Estate Holdings LLC ("AREH") in 2017.  AREH owns and controls more than $500 million in real estate in and around New York.  Mr. Simpson was the progenitor of AREH.  He structured the company and was responsible for all of its investments in and management of the real properties that comprise the AREH portfolio of companies.

2.      Mr. Simpson owns and controls 80% of AREH through JJ Arch and is its managing member.  Defendant Jared Chassen, a subordinate of Mr. Simpson at a predecessor firm who assisted in AREH's formation, owns a minority interest in JJ Arch.

3.      Intervenor-Plaintiff 608941 NJ Inc. (which is commonly referred to by all of the parties as "Oak") owns 20% of AREH.

4.      AREH's Operating Agreement provides that Mr. Simpson (through JJ Arch) is the "Managing Member" of AREH and Oak is its "Investor Member."

5.      The genesis of the dispute between the parties is Oak's blatant breach of the AREH Operating Agreement and failure to meet its financial obligations to AREH as its Investor Member.

6.      Oak's Complaint is part of an elaborate illegal effort to obscure its refusal to meet Capital Calls duly made to them by Mr. Simpson.  Oak's failures to pay monies requested by and due and owing AREH are clear breaches of Oak's  contractual obligations under the AREH Operating Agreement and contrary to numerous written and oral confirmations

2

and promises by Oak's principals that they would fund AREH's continuing operations.  As

detailed below, Oak's principals Kevin and Michael Wiener, have sought to and are carrying out

their illicit plan by conspiring with Defendant Chassen to oust Mr. Simpson from AREH and JJ

Arch, falsely claiming that AREH's financial difficulties are not based on the recent and

significant downturn in real estate market conditions but were somehow solely attributable to

alleged mismanagement of AREH about which Oak feigns to have been unaware.

7.      The Wieners, with Defendant Chassen's substantial assistance, have gone

to great lengths in this litigation to cast aspersions against Mr. Simpson concerning the manner in

which he speaks to and about people, while the Wieners have attempted to portray themselves as

gentlemanly.  They are, however, far from genteel.  In an email sent to Defendant Chassen and

Michael Wiener on August 11, 2023, Kevin Wiener referred to predecessor counsel for Mr.

Simpson, Adam Leitman Bailey, and his colleague Colin Kaufman in the following derogatory

terms:

> Lol what a fucking dick.
>
> His decrepit former prosecutor law partner does not have the
> ability to magically summon criminal charges from the ether.

(8/11/23 email from K. Wiener to Mr. Chassen and M. Wiener)

8.      The truth will ultimately be revealed as the evidence at trial will show that

Oak failed and refused to fund AREH in breach of the the AREH Operating Agreement, and the

fiduciary duties it owes to JJ Arch.

## **PARTIES**

9.      Derivative-Plaintiff/Nominal-Defendant JJ Arch is a New York limited

liability company.  Its principal place of business has at all times been in New York County,

3

New York.  Plaintiff Simpson is and at all relevant times has been its managing member.

Simpson resides in New York County, New York.

10. Defendant 608941 NJ Inc. a/k/a Oak is, on information and belief, a New

Jersey corporation.  Its principal place of business is in Toronto, Canada.

## JURISDICTION AND VENUE

11. Jurisdiction in this Court is proper on JJ Arch's counterclaims against Oak

pursuant to CPLR § 3019(a) in that they involve causes of action by JJ Arch in response to

claims alleged by Intervenor-Plaintiff Oak against JJ Arch and its managing member Simpson.

12. Venue is proper in this Court pursuant to CPLR §§ 503(a) and 507

because JJ Arch resides in the State of New York in this County, the subject matter of JJ Arch's

counterclaims action involves real property located in this County, and a substantial part of the

events or omissions giving rise to the claims in this action occurred in this County.

### FACTS COMMON TO JJ ARCH'S ANSWER
### AND ITS COUNTERCLAIM AGAINST OAK

1. **Mr. Simpson's Initial Complaint Against Mr. Chassen and
   the Court's Interim Resolution of the Wrongdoing By Him**

13. This action began as a claim by Mr. Simpson against Defendant Chassen

based on his (Mr. Chassen's) unauthorized, ultra vires instruction to First Republic Bank

("FRB") to remove Mr. Simpson as an authorized signer on all accounts he (Mr. Simpson)

maintained in either his corporate or individual capacity at FRB, and Mr. Chassen locking Mr.

Simpson out of his Arch company email account, all other Arch IT systems and Arch's offices.

(NYSCEF Doc. No. 1: Complaint ¶¶ 49, 58, 63)  Those matters were heard and resolved by the

Court previously.

4

14.     In accordance with the Order Regarding Interim Procedures dated August

21, 2023, Mr. Simpson's access to the FRB accounts, his AREH email and AREH's office were

restored.  As to the then continuing operations of AREH and JJ Arch, the Court's August 21,

2023 Order Regarding Interim Procedures provides plainly and clearly as follows:

> **Specifically, the business, affairs, and assets of JJ Arch shall be managed by Simpson, subject to the limitations set forth in Section 3.2 of the JJ Arch Operating Agreement**, which provides among other things that any Company Major Decision, as defined in the JJ Arch Operating Agreement, shall be undertaken only with the prior written consent of Chassen.  **Simpson and Chassen shall cooperate with each other in good faith to facilitate the effective exercise of their respective roles and responsibilities under the JJ Arch Operating Agreement and related agreements**

(NYSCEF Doc. No. 36: Order p. 2, ¶3) (emphasis added)  Pursuant to the Decision + Order on

Motion dated September 29, 2023 (NYSCEF Doc. No. 159), the Court's August 21, 2023

Interim Order remains in full force and effect.

15.     As the Court expressly noted on the record during the proceedings on

September 29, 2023:

> THE COURT:  **Well, look unless and until this partnership [JJ Arch] is broken up, Mr. Chassen is a 49 percent member without managerial control.  *  *  *  But I think the way the contract works, you know substantive decisions are up to Mr. Simpson.**

(Transcript of Proceedings - 9/29/23 Tr. 54, lines 6-17) (emphasis added)

16.     The Court further specifically held on September 29 that "**the [JJ Arch]**

**Operating Agreement does put Mr. Simpson in charge of the business.  So, Mr. Chassen**

**does not have independent authority to spend corporate funds on anything without Mr.**

**Simpson's approval**."  (<u>Id</u>.: Tr. 52, lines 3-7) (emphasis added)

5

2.      Oak's Failure to Fund Arch Was and Is a
        Blatant Breach of the AREH Operating Agreement

        17.     In December 2022, as the result of general economic and depressed real

estate market conditions, AREH needed additional money to meet general and administrative

expenses and fund its continuing operations.  So Mr. Simpson asked Oak for additional capital

contributions to meet those needs as was specifically contemplated by and authorized in Section

3.2 of the AREH Operating Agreement.  That request was based on detailed forecasts Mr.

Simpson prepared with respect to all of the Arch portfolio properties.  Initially, Oak agreed to

provide the additional funding and more.

        18.     On December 20, 2022, Frank van Beisen, Oak's CFO, specifically stated

and represented to Mr. Simpson (and Mr. Chassen) as follows: "I expect we could have as much

as $15-$20 million available over the coming year" to fund AREH continuing operations.  (Exh.

C: 12/20/22 email to Messrs. Simpson and Chassen on which Michael Weiner and Bill Weiner

were copied.  But sometime thereafter Oak's principals changed their minds, and Oak failed to

make good on that promise by Mr. van Biesen.

        19.     Between December 2022 and June of 2023, Mr. van Biesen admitted to

Mr. Simpson that Oak was out of money.  Michael Wiener confirmed that he and his family/Oak

had no money, specifically telling Mr. Simpson that Oak had to borrow money if it was going to

put any more into AREH.  By email dated May 1, 2023, Mr. van Biesen sent Mr. Simpson a

projected "capital position and recovery forecast" for each of the AREH Portfolio properties,

which showed a shortfall of more than $24 million, and stating that he had not nor would he

(then) discuss it with Oak's principals Michael and Kevin Wiener.  Ten days later, on May 11,

2023, Mr. Simpson sent Mr. van Biesen a detailed workout plan for the Portfolio.  Mr. van

Biesen ignored that plan.  Neither he nor the Wieners responded to it substantively because

6

unbeknownst to Mr. Simpson, Oak's plans had changed. By email dated June 15, 2023, Bill

Wiener (Kevin and Michael's father) preferred secrecy and declined Mr. Simpson's suggestion

that "[a]ll decisions with serious ramifications and risk [] be documented, and acknowledged by

the parties."

20.     Consequently, in accordance with the terms of Section 3.2 of the AREH

Operating Agreement, numerous capital calls were made to Oak, and monies were specifically

requested from Oak to fund payroll and otherwise pay bills in the ordinary course. While some

modest amounts of money were provided, Oak has not made good on Mr. van Biesen's

December 2022 promise (in breach of the AREH Operating Agreement), and the Wieners have

made clear they do not intend to cause Oak to invest any more money in AREH.

21.     The reason for Oak's change in position and refusal to invest further in

AREH is that its principals, Kevin Wiener and Michael Wiener, know that under the AREH

Operating Agreement it would be difficult if not impossible for them to recoup those monies

given the current economic environment. The Wieners' preference was to do what they have

done and are doing; that is, breach their agreements, improperly seize control of AREH, shut it

down, attempt to sell off or walk away from AREH's assets, and take whatever steps may be

necessary to reduce the individual exposure on personal guarantees they have provided on

several of the AREH portfolio company projects to the detriment of Mr. Simpson and

approximately 200 other investors. The Wieners have admitted to Mr. Simpson and others that

is what they have done and these are their continuing intentions.

7

3.     **Oak and its Principal, Kevin and Michael Wiener Have Grossly Misled the Court**

22.     In the proceedings to date, Oak's principals – Kevin Wiener and Michael Wiener – have attempted to falsely portray themselves as unwitting dupes.  Nothing could be farther from the truth.  The Wieners have been for some time and continue to be the aggressors.

23.     Beginning in July 2023 (and perhaps earlier), totally unbeknownst to Mr. Simpson, the Wieners were plotting and planning with Mr. Chassen to take over AREH and throw Mr. Simpson out.  Secret meetings were held between Mr. Chassen and the Wieners at Mr. Chassen's cousin's business offices and Mr. Chassen instructed AREH employees not to tell Mr. Simpson about them.

24.     By email dated July 19, 2023, counsel for Oak sent counsel for Mr. Chassen a proposal that required Mr. Simpson to "immediately step[] away from active day-to-day management of Arch and its subsidiaries and relinquish[] authority to act on behalf of Arch and its subsidiaries" and require an amendment of the JJ Arch Operating Agreement "such that Jared [Chassen] has sole control over JJ [Arch]."  (7/19/23 email from Andrew Silverstein, Esq. at Haynes and Boone, LLP to Len Breslow, Esq. at Breslow & Walker , LLP)  Mr. Chassen shared that proposal with his cousin David Berg, who is a principal at the Infinity Collective which is an investor in some of the Arch projects, and Mr. Berg commented on it.  (7/20/23 email from David Berg to Mr. Chassen)

25.     By early August 2023, a deal between Mr. Chassen and the Wieners was apparently struck and they were working together to dream up supposed justifications to remove Mr. Simpson.  One example of this is the email dated August 7, 2023, Mr. Chassen wrote to the Wieners which stated:

> Boys, need to speak in morning, need to work on cause event backup together.

8

(8/7/23 email from Mr. Chassen to Kevin Weiner and Michael Wiener)

26.     On August 8, 2023, Mr. Chassen asked the Wieners for "some guidance" on how to deal with questions being raised by Mr. Simpson's personal accountant "so it does not subject me with a damage claim that somehow I messed up those properties or businesses." (8/8/23 email from Mr. Chassen to Kevin and Michael Wiener)

27.     In an email to Mr. Chassen on August 9, 2023, Michael Wiener brazenly instructed Mr. Chassen that "**directions from Jeff [Simpson] should be ignored, as he lacks any and all authority to act on behalf of JJ Arch and the Arch companies**." (August 9, 2023 email) (emphasis added) Mr. Weiner of course had absolutely no right to give such a direction to Mr. Chassen.

28.     The Wieners and Oak do not and have never had any ownership or economic interest in JJ Arch. Section 1.1 of the JJ Arch Operating Agreement does not permit the transfer of JJ Arch Company Interests by its Members. On information and belief, Oak has in violation of the JJ Arch Operating Agreement entered into an agreement with Mr. Chassen pursuant to which Mr. Chassen has transferred all or a portion of his rights in JJ Arch and AREH to the Wieners and Oak.

29.     With Oak's assistance and imprimatur Mr. Chassen even enlisted AREH's Director of Human Resources, Karolina Bortko, in his (and the Wieners') disloyal plans asking her to "please provide all the emails you have implicating Jeff into the dropbox." (8/9/23 email from Mr. Chassen to Ms. Bortko) Not surprisingly, Ms. Bortko asked Mr. Chassen and the Wieners for "formal assurance of protection" and an affirmation "that the Company will assume full responsibility for any liabilities" including any legal fees she may incur if she cooperated

with them, which Oak has provided.  (8/9/23 email from Ms. Bortko to Mr. Chassen and Kevin and Michael Wiener)

30.     Further evidence of Oak's conspiring with Mr. Chassen to wrongfully depose Mr. Simpson from AREH is an email dated August 10, 2023, in which Mr. Chassen asked Oak's lawyers, the Wieners and yet another AREH employee, Michelle Miller, for "a company line and what I am saying when backup questions arise."  (8/10/23 email from Mr. Chasen to Jeffrey Dayon, Esq., Brad Lavender, Esq., the Wieners and Ms. Miller)

31.     Perhaps the most damning evidence of the collusion between Mr. Chassen and Oak, however, is the email dated August 13, 2023, Mr. Chassen sent to van Biesen, on which the Wieners were copied, in which Mr. Chassen requested asked that Oak pay $250,000 in legal fees to his (Mr. Chassen's) lawyers:

> Hey, we need to fund retainers please
>
> Jeff Dayon's firm requesting $50,000
> Fried Frank requesting $200,000
>
> I[']ll send retainers and wire instructions under separate cover.

(8/13/23 email from Mr. Chassen to Mr. van Biesen and the Wieners)

32.     How these law firms were able to accept the engagements is mystifying given their apparent conflicts of interest.  Mr. Dayon previously represented AREH on multiple matters while Mr. Simpson was running the company, as did lawyers at Fried Frank on corporate matters.  And, astonishingly, Fried Frank was – contemporaneously with its representation of Mr. Chassen – seeking to foreclose on one of the AREH properties on behalf of another client.

33.     Mr. van Biesen nevertheless agreed to pay those legal fees for Mr. Chassen, but inquired "who is Fried Frank" to which Mr. Chassen responded: "Litigation firm for me.  Brad [Lavender, Esq. of Haynes Boone]'s recommendation."  (8/13/23 email from Mr.

10

Chassen to Mr. van Biesen)  And it cannot be disputed that thereafter Mr. Chasen's lawyers at Fried Frank were conversing openly with the Wieners, without Mr. Simpson's knowledge at the time.  (8/17/23 email from Emily Cooper, Esq. to Kevin Wiener)

34.     Subsequently in this litigation, Oak, Mr. Chassen and their counsel both individually and collectively have repeatedly misstated and omitted from their submissions numerous and sundry material facts concerning their own wrongful self-interested conduct, AREH, JJ Arch, and AREH's assets, liabilities and the present and historic conditions of the real properties owned by AREH, and the controlling agreements between the parties.

35.     For example, Oak contends that Mr. Simpson improperly "furlough[ed]" AREH employees suggesting that it was due to employee disloyalty to him.  (See NYSCEF Doc. No. 319: Complaint ¶¶ 40-41)  That is simply false.  AREH employees were treated honestly and fairly.  They were informed of Oak's failures and refusal to provide additional funding in breach of the clear terms of AREH's Operating Agreement and that no monies were available to pay them.

36.     Similarly, Mr. Simpson did not engage in any improper conduct when, as AREH's Managing Member, he instructed outside corporate counsel to cease work.  The Wieners repeatedly stated that they were going to meet their Capital Calls so those counsel fees could be paid; but Oak never did.  So, Mr. Simpson did what honest business people do -- he told AREH's  lawyers not to run up further receivables.

37.     While Oak and Mr. Chassen were contriving together and creating a false narrative about AREH's business affairs, Mr. Simpson was selflessly not taking distributions to which he was and is unconditionally entitled.   Believing Oak might actually live up to its

11

contractual obligations, Mr. Simpson personally contributed more than $2 million in an effort to keep AREH afloat.

38.     Derivative-Plaintiff/Nominal-Defendant JJ Arch denies all of the material allegations in Oak's Complaint (see pp. 16-29, below), and specifically asserts the following Counterclaims against Oak.

## COUNTERCLAIMS

### COUNT I
### (Breach of Contract)

39.      Derivative-Plaintiff/Nominal-Defendant JJ Arch realleges and incorporate by reference the allegations stated in paragraphs 1 through 38 above as if stated here in full.

40.     Under New York law, the elements of a breach of contract cause of action are (1) a valid contract, (2) a material breach, and (3) damages.  All of those elements are present in this case.

41.     The AREH Operating Agreement is a valid contract between Mr. Simpson in his capacity as the Managing Member of JJ Arch and Oak.

42.     JJ Arch is the Managing Member of AREH pursuant to the Preamble and Section 1.1 of the AREH Operating Agreement.

43.     Oak is the Investor Member of AREH pursuant to the Preamble and Section 1.1 of the AREH Operating Agreement.

44.     Section 3.2.1 of the AREH Operating Agreement provides, in pertinent part, that:

> 3.2.1. If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (x) to meet its general and administrative expenses in connection with the Approved Budget exclusive of those related to a Permitted Investment or (y) to satisfy the costs associated with

12

the Company's due diligence in connection with approved Eligible
Assets, Managing Member shall deliver a written notice to Investor
Member (a "Capital Call Notice") setting forth the total amount of
capital required (the "Capital Call Amount") and the purpose of
such Capital Call.

45.     Simpson made numerous Capital Calls to Oak pursuant to Section 3.2.1 of

the AREH Operating Agreement.

46.     Oak was required, pursuant to Section 3.2.2 of the AREH Operating

Agreement, to meet those Capital Calls "in immediately available funds within five (5) Business

Days of receipt."  When each of those Capital Calls were made, contrary to Oak's demonstrably

false contentions, Oak's Unreturned Capital Contributions did not exceed its Member Maximum

Capital Contributions as those terms are defined under the AREH Operating Agreement.

47.     Oak has materially breached the AREH Operating Agreement by failing to

make those Capital Calls in accordance with Sections 3.2.1 and 3.2.2, which failures have not

been excused.

48.     In addition, Mr. Simpson as the Managing Member of JJ Arch was

specifically entitled to certain "Guaranteed Payment" pursuant to Section 7.3.1 of the AREh

Operating Agreement:

> 7.3.1. Guaranteed Payment. As compensation for its
> various undertaking and capital commitments hereunder,
> Managing Member shall be entitled to a monthly guaranteed
> payment from the Company equal to the amount set forth in the
> Annual Budget as "Managing Member Guaranteed Payment"
> which shall be payable by the Company in advance.

49.     Mr. Simpson is currently owed more than $400,000 in that "Guaranteed

Payment" from AREH.  Oak has refused to cause AREH to pay those monies to Mr. Simpson

despite Mr. Simpson's proper demand for them.

13

50.     Oak has materially breached the AREH Operating Agreement by failing to cause the Guaranteed Payment to be made to Mr. Simpson in accordance with Section 7.3.1, which failure has not been excused.  No provision in the AREH Operating Agreement allows Oak to withhold the Guaranteed Payment to Mr. Simpson or "offset" payment of it against any purported claims against him.

51.     Oak is also liable to indemnify Mr. Simpson and JJ Arch under Section 13.1 of the AREH Operating Agreement for all legal fees Mr. Simpson and JJ Arch have paid and incurred to date as the result of Oak's willful misconduct in seeking to oust him from the company for the sole benefit of its principals, Kevin and Michael Wiener personally, and to the detriment of Mr. Simpson and the approximately 200 investors in the companies that own the properties in the AREH portfolio.

52.     Oak has further breached the AREH Operating Agreement and oral and other written promises by failing to pay AREH's lawyers for corporate and transactional work performed prior to the commencement of this action.

53.     Derivative-Plaintiff/Nominal-Defendant JJ Arch has suffered damages in excess of $5,000,000 as the result of these breaches by Oak of the AREH Operating Agreement.

### COUNT II
### (Breach of Fiduciary Duty)

54.      Derivative-Plaintiff/Nominal-Defendant JJ Arch realleges and incorporates by reference the allegations stated in paragraphs 1 through 53 above as if stated here in full.

55.     Oak owed fiduciary duties to JJ Arch by virtue of its being the Investor Member in AREH.

14

56.     Oak breached its fiduciary duties to JJ Arch by, among other untoward acts, (i) conspiring with defendant Chassen to oust Mr. Simpson from JJ Arch and AREH in order to mask its efforts to hide its refusal to fund AREH's continued operations; (ii) failing and refusing to make Capital Calls duly demanded of it under the terms of the AREH Operating Agreement; (iii) failing and refusing to pay Mr. Simpson and JJ Arch the Guaranteed Payment due under the terms of the AREH Operating Agreement; (iv) failing and refusing to pay bills for legal services rendered by AREH's outside counsel prior to the commencement of this action; and (v) causing Mr. Simpson to pay and incur substantial legal fees defending Oak's specious claims against him.

57.     For JJ Arch to have made a demand on Oak with respect to the claims asserted in this Counterclaim would have been and are futile because, as the result of the fraud it occasioned on the Court, Oak is temporarily in control of AREH and is not expected to bring claims against itself and counsel purporting to represent AREH is not independent of and, on information and belief, controlled and being paid by Oak and the Kevin and Michael Wiener.

58.     As the direct result of Oak's breaches of its fiduciary duties, Derivative-Plaintiff/Nominal-Defendant JJ Arch has suffered damages in excess of $5,000,000.

59.     Derivative-Plaintiff/Nominal-Defendant JJ Arch is also entitled to recover punitive damages against Oak, in an amount to be determined at trial, because breaches of the fiduciary duty it owes to JJ Arch and AREH were conscious acts that willfully and wantonly disregarded his rights and were intentional, deliberate, and outrageous.  Evidence in support of JJ Arch's claims for punitive damages include the statement by Oak's principal Michael Wiener that Mr. Simpson "ruined his life" and that he (Michael Wiener) intends to continue to (falsely) pursue Mr. Simpson "until he declares bankruptcy and is broke."

15

## SPECIFIC RESPONSES TO THE ALLEGATIONS IN OAK'S COMPLAINT

### As to the alleged "NATURE OF THE PROCEEDINGS"

1.     Admits the allegations in paragraph 1 of the Complaint.

2.     Denies the allegations in paragraph 2 of the Complaint, except admits that Oak is the "Investment Member" in AREH and that Oak has invested $50 million in AREH, and avers that the parties' rights and obligations between them are governed by the AREH Operating Agreement and that the October 31, 2023 purported "Removal Notice" was a sham intended to benefit Oak to the detriment of JJ Arch and the approximately 200 other investors in AREH.

3.     Denies the allegations in paragraph 3 of the Complaint, and avers that this action was brought initially to address Defendant Chassen's unauthorized removal of Mr. Simpson as an authorized signer on all of his personal and AREH's accounts at FNB bank, and Mr. Chassen locking Mr. Simpson out of AREH's email, IT systems and physical offices.

4.     As to the allegations in paragraph 4 of the Complaint, admits that Oak "has sought a change in management at JJ Arch" and intervened in this action in an effort to secure that change, and otherwise refers to the transcript of the proceedings before the Court on October 19, 2023 for the meaning and full context of the comments by the Court.

5.     As to the allegations in paragraph 5 of the Complaint, admits that Oak has asserted certain claims against Mr. Simpson in this action which he and JJ Arch deny in their entirety.

6.     As to the allegations in paragraph 6 of the Complaint, admits that Oak has asserted certain claims against Mr. Simpson in this action which he and JJ Arch deny in their entirety.

16

### As to the "PARTIES"

7.        Admits, on information and belief, the allegations in paragraph 7 of the Complaint.

8.        Admits the allegations in paragraph 8 of the Complaint, and avers that pursuant to the AREH Operating Agreement, JJ Arch is the Managing Member of AREH and Oak is its Investment Member, and Mr. Simpson is the Managing Member of JJ Arch.

9.        Admits the allegations in paragraph 9 of the Complaint.

10.        Admits the allegations in paragraph 10 of the Complaint, except avers on information and belief that Defendant Chassen is a resident of New Jersey.

### As to "JURISDICTION, VENUE AND GOVERNING LAW"

11.        Admits the allegations in paragraph 11 of the Complaint.

12.        Admits the allegations in paragraph 12 of the Complaint.

### As to the alleged "FACTUAL BACKGROUND: Oak's History"

13.        Admits, on information and belief, the allegations in paragraph 13 of the Complaint.

14.        Admits, on information and belief, the allegations in paragraph 14 of the Complaint.

15.        Denies knowledge and information sufficient to form a belief as to the allegations in paragraph 15 of the Complaint.

16.        Denies knowledge and information sufficient to form a belief as to the allegations in paragraph 16 of the Complaint.

17.        Denies knowledge and information sufficient to form a belief as to the allegations in paragraph 17 of the Complaint.

17

18.     Denies knowledge and information sufficient to form a belief as to the allegations in paragraph 18 of the Complaint concerning Oak's formation and business plans, admits that Oak invested $50 million in AREH, but otherwise denies the allegations in paragraph 18 of the Complaint.

19.     Denies the allegations in paragraph 19 of the Complaint.

### As to "The AREH LLC Agreement"

20.     Admits the allegations in paragraph 20 of the Complaint, except denies that the value of the real property holdings was in excess of $1 billion in 2022 and that "Oak has far and away the most funds of any party" as Oak owns only 20% of AREH pursuant to the AREH Operating Agreement.

21.     Admits the allegations in paragraph 21 of the Complaint.

22.     Denies the allegations in paragraph 22 of the Complaint, except admits that it properly quotes a portion of the Section 11.5.2 of the AREH Operating Agreement.

23.     Denies the allegations in paragraph 23 of the Complaint.

24.     Denies the allegations in paragraph 24 of the Complaint.

### As to the alleged "General Mismanagement of AREH and Misconduct by Simpson and JJ Arch Leading to Unforeseen Tax Liabilities, Defaults, and Foreclosure"

25.     Denies the allegations in paragraph 25 of the Complaint.

26.     Denies the allegations in paragraph 26 of the Complaint.

27.     Denies the allegations in paragraph 27 of the Complaint.

28.     Denies the allegations in paragraph 28 of the Complaint, and avers that AREH's failure to make debt servicing payments was due to Oak's intentional failure and refusal to meet its contractual obligations to continue to fund AREH's business.

29.     Denies the allegations in paragraph 29 of the Complaint.

18

30.     Denies the allegations in paragraph 30 of the Complaint, except admits that Defendant Chassen filed a demonstrably false and misleading affidavit dated September 14, 2023 in this action.

31.     Denies the allegations in paragraph 31 of the Complaint, and avers that the Wieners have told Mr. Simpson they would not consent to any bankruptcy filing because they (falsely) believed that any such filing might potentially trigger personal guarantees they signed in connection with several of the AREH portfolio properties, and that those guarantees had already become live as the result of Oak's seeking a receiver for JJ Arch in this action.

**As to alleged "Major Misconduct Relating to Spending, Budgeting and Capital Calls"**

32.     Denies the allegations in paragraph 32 of the Complaint.

33.     Denies the allegations in paragraph 33 of the Complaint.

34.     Denies the allegations in paragraph 34 of the Complaint.

35.     Denies the allegations in paragraph 35 of the Complaint, except admits that Mr. Simpson did make Capital Calls to Oak in accordance with AREH's Operating Agreement and that Oak met some of them and only in small amounts.

36.     Denies the allegations in paragraph 36 of the Complaint, and avers that at all times Mr. Simpson complied with the terms of the AREH Operating Agreement despite Oak's failure to do so.

37.     Denies the allegations in paragraph 37 of the Complaint, except admits that Mr. Simpson made a proper Capital Call to Oak on October 25, 2023 in accordance with the terms of the AREH Operating Agreement and avers that Oak failed and refused to meet that Capital Call based on a blatant contortion and misreading of the agreement.

19

38.     As to the allegations in paragraph 38, refers to the full terms of the Court's Order (NYSCEF Doc. No. 292), and avers that Oak and its counsel made numerous false and misleading representations and omissions to the Court which resulted in that ruling.

39.     Denies the allegations in paragraph 39 of the Complaint, except admits that Mr. Simpson communicated with AREH staff following Oak's refusal to honor his properly made Capital Call.

40.     Denies the allegations in paragraph 40 of the Complaint.

41.     Denies the allegations in paragraph 41 of the Complaint, and avers that any asserted "widespread panic" resulted solely from Oak's (and Defendant Chassen's) nefarious conduct.

42.     Denies the allegations in paragraph 42 of the Complaint.

43.     As to the allegations in paragraph 43 of the Complaint, admits that Defendant Chassen has misappropriated funds for personal use and falsely accused Mr. Simpson of wrongdoing, and specifically denies the purported claim that Mr. Simpson used AREH funds in any way improperly.

44.     As to the allegations in paragraph 44 of the Complaint, admits that the Chassen Affidavit makes various false allegations concerning Mr. Simpson all of which Mr. Simpson and JJ Arch deny.

45.     Denies the allegations in paragraph 45 of the Complaint.

46.     Denies the allegations in paragraph 46 of the Complaint, except admits that AREH's accounting department was recently understaffed in the Spring and Summer of 2023, and avers that the circumstance was due to Oak's failure to fund AREH operations, and

20

that no billing practices at AREH in which Mr. Simpson were involved was in any way
improper.

47.     As to the allegations in paragraph 47 of the Complaint, admits that Mr.
Paul sent Mr. Simpson an email on August 9, 2023, avers that the email was wrongfully solicited
by Defendant Chassen and denies that Mr. Simpson acted at any time in violation of his fiduciary
duties to JJ Arch and/or AREH.

48.     Denies the allegations in paragraph 48 of the Complaint.

### As to the alleged "Misrepresentations about Oak's Capital Contributions"

49.     Denies the allegations in paragraph 49 of the Complaint.

50.     Denies the allegations in paragraph 50 of the Complaint, except admits
that Mr. Simpson properly sent Capital Calls to Oak on October 25, 2023 in accordance with the
express terms of the AREH Operating Agreement, and avers that Oak wrongfully ignored them,
falsely claiming them to be improper for the sole purpose of advancing their scheme to take over
AREH and shutter it for the sole benefit of the Wieners personally in breach of the AREH
Operating Agreement and in violation of their fiduciary duties.

51.     Denies the allegations in paragraph 51 of the Complaint.

52.     Denies the allegations in paragraph 52 of the Complaint.

53.     Denies the allegations in paragraph 53 of the Complaint.

54.     Denies the allegations in paragraph 54 of the Complaint.

55.     Denies the allegations in paragraph 55 of the Complaint, and avers that
there are no discrepancies in AREH's books and records.

21

**As to the false allegations of**
**"Simpson's Past Record of Misconduct and Breaches of Fiduciary Duty"**

56.     Denies the allegations in paragraph 56 of the Complaint, and avers that

Mr. Simpson never "held hostage" any funds due Oak, he provided extensive information to Oak

concerning the status of their investment in AREH and the AREH portfolio properties, never

improperly threatened legal action against Oak, and never wrongly directed counsel for AREH to

stop work.  To the contrary, Mr. Simpson appropriately and properly advised counsel to

discontinue work when it was clear Oak was refusing to fund operations and there were

insufficient funds to pay AREH's then outstanding legal bills.  Mr. Simpson never made any

misrepresentations to Oak concerning capital, never acted in any way inconsistent with the clear

terms of the AREH Operating Agreement, and never misled Oak in any way concerning its

investments in AREH.

**As to the allegations**
**"Simpson Refuses to Head JJ Arch's Removal as AREH's Managing Member"**

57.     Denies the allegations in paragraph 57 of the Complaint and avers that

Oak's efforts to remove JJ Arch as the Managing Member of AREH was illegal and based on

numerous false statements and misrepresentations to the Court.

58.     Denies the allegations of paragraph 58 of the Complaint, except admits

that Mr. Simpson properly opposed Oak's efforts to remove JJ Arch as AREH's Managing

Member and wrongfully prohibit him from involvement in AREH's business.

59.     Denies the allegations of paragraph 59 of the Complaint.

22

### As to "COUNT I"
### (For alleged Breach of Fiduciary Duty Against JJ Arch and Simpson)

60.     As to the allegations in paragraph 60 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 59 above as if stated here in full.

61.     Admits the allegations in paragraph 66 of the Complaint, except denies that Oak and JJ Arch are "co-members of AREH."

62.     Denies the allegations of paragraph 62 of the Complaint, except admits that JJ Arch as the Managing Member of AREH owed fiduciary duties to Oak.

63.     Denies the allegations in paragraph 63 of the Complaint.

64.     Denies the allegations in paragraph 64 of the Complaint.

### As to "COUNT II"
### (For alleged Breach of Contract Against JJ Arch)

65.     As to the allegations in paragraph 65 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 64 above as if stated here in full.

66.     Admits the allegations in paragraph 66 of the Complaint.

67.     Denies the allegations in paragraph 67 of the Complaint.

68.     Denies the allegations in paragraph 68 of the Complaint.

### As to "COUNT III"
### (For alleged Tortious Interference Against Simpson)

69.     As to the allegations in paragraph 69 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 68 above as if stated here in full.

70.     Denies the allegations in paragraph 70 of the Complaint.

23

71.     Denies the allegations in paragraph 71 of the Complaint.

72.     Denies the allegations in paragraph 72 of the Complaint.

73.     Denies the allegations in paragraph 73 of the Complaint.

### As to "COUNT IV"
### (For alleged Tortious Interference with Prospective Business Advantage Against Simpson)

74.     As to the allegations in paragraph 74 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 73 above as if stated here in full.

75.     Admits, on information and belief, the allegations in paragraph 75 of the Complaint.

76.     Admits the allegations in paragraph 76 of the Complaint.

77.     Denies the allegations in paragraph 77 of the Complaint.

78.     Denies the allegations in paragraph 78 of the Complaint.

79.     Denies the allegations in paragraph 79 of the Complaint.

### As to "COUNT V"
### (For alleged Breach of Fiduciary Duty Against JJ Arch and Simpson
### - derivatively on behalf of AREH)

80.     As to the allegations in paragraph 80 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 79 above as if stated here in full.

81.     Admits the allegations in paragraph 81 of the Complaint, except denies that Oak and JJ Arch are "co-members of AREH."

82.     Denies the allegations of paragraph 82 of the Complaint, except admits that JJ Arch as the Managing Member of AREH owed fiduciary duties to Oak.

83.     Denies the allegations in paragraph 83 of the Complaint.

24

84.     Denies the allegations in paragraph 84 of the Complaint.

85.     Denies the allegations in paragraph 85 of the Complaint.

86.     Denies the allegations in paragraph 86 of the Complaint.

## As to "COUNT VI"
### (For an Equitable Accounting Against JJ Arch and AREH)

87.     As to the allegations in paragraph 87 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 86 above as if stated here in full.

88.     Denies the allegations in paragraph 88 of the Complaint.

89.     Denies the allegations in paragraph 89 of the Complaint.

90.     Denies the allegations in paragraph 90 of the Complaint, and avers that the statements in the referenced email were in all respects true.

91.     Denies the allegations in paragraph 91 of the Complaint.

92.     Denies the allegations in paragraph 92 of the Complaint.

93.     Denies the allegations in paragraph 93 of the Complaint.

94.     Denies the allegations in paragraph 94 of the Complaint.

95.     Denies the allegations in paragraph 95 of the Complain, except avers that false and misleading statements and omissions by Oak's principals. Kevin Wiener and Michael Wiener have damaged Mr. Simpson's reputation and prejudiced his ability currently to enter into business relationships.

96.     Denies the allegations in paragraph 96 of the Complaint.

25

**As to "COUNT VII"**
**(For alleged Fraud Against Simpson)**

97.     As to the allegations in paragraph 97 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 96 above as if stated here in full.

98.     Denies the allegations in paragraph 98 of the Complaint, except admits that a 1031 Exchange was considered.

99.     Denies the allegations in paragraph 99 of the Complaint.

100.    Denies the allegations in paragraph 100 of the Complaint.

101.    Denies the allegations in paragraph 101 of the Complaint.

102.    Denies the allegations in paragraph 102 of the Complaint.

103.    Denies the allegations in paragraph 103 of the Complaint, and avers that all capital contributions were properly accounted for in AREH's books and records.

**As to "COUNT VIII"**
**(For a Declaratory Judgment Against Simpson and JJ Arch)**

104.    As to the allegations in paragraph 104 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 103 above as if stated here in full.

105.    Admits that there is a justiciable controversy between the parties as to Oak's improper removal of JJ Arch as the Managing Member of AREH, denies that Oak's removal provision was proper and avers that it was not.

106.    Admits the allegations in paragraph 106 of the Complaint insofar as Oak improperly sought the removal of JJ Arch as the Managing Member of AREH.

26

### As to "COUNT IX"
### (For an Equitable Accounting Against JJ Arch and AREH)

107.    As to the allegations in paragraph 107 of the Complaint, repeat and incorporate by reference the responses and allegations stated in paragraphs 1 through 106 above as if stated here in full.

108.    As to the allegations in paragraph 108 of the Complaint, admits that Mr. Simpson is the Managing Member of JJ Arch and that fiduciary duties are owed by Mr. Simpson to Oak and Oak to Mr. Simpson, subject to the terms and conditions of AREH Operating Agreement.

109.    Denies the allegations in paragraph 109 of the Complaint.

110.    Denies the allegations in paragraph 110 of the Complaint.

111.    Denies the allegations in paragraph 111 of the Complaint.

112.    Denies the allegations in paragraph 112 of the Complaint.

113.    Denies the allegations in paragraph 113 of the Complaint.

114.    Denies the allegations in paragraph 114 of the Complaint.

## AFFIRMATIVE DEFENSES

1.    All of Mr. Simpson's actions on behalf of JJ Arch were authorized by the AREH Operating Agreement and the JJ Arch Operating Agreement.

2.    All of Mr. Simpson's actions on behalf of JJ Arch were proper in accordance with and not actionable under the Business Judgment Rule.

3.    All of the claims against JJ Arch should be dismissed in whole or part because Section 3.6 of the AREH Operating Agreement specifically states that "no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof" and Mr. Simpson's conduct on behalf of JJ Arch did not

27

involve bad faith, intentional misconduct, a knowing violation of law, or secure for him financial profits or other advantages to which he was not legally entitled.

4.     None of Mr. Simpson's actions on behalf of JJ Arch amounted to willful misconduct, corporate waste or involved improperly conflicted corporate transactions.

5.     Oak breached the AREH Operating Agreement by (i) conspiring with Defendant Chassen to oust Mr. Simpson from JJ Arch and AREH in order to mask its efforts to hide its refusal to fund AREH's continued operations; (ii) failing and refusing to make Capital Calls duly demanded of it under the terms of the AREH Operating Agreement; (iii) failing and refusing to pay Mr. Simpson and JJ Arch the Guaranteed Payment due under the terms of the AREH Operating Agreement; (iv) failing and refusing to pay bills for legal services rendered by AREH's outside counsel prior to the commencement of this action; and (v) causing Mr. Simpson and JJ Arch to pay and incur substantial legal fees defending Oak's specious claims against him.

6.     Oak committed fraud by falsely stating that it would meet AREH's capital requirements, pay AREH's lawyers and fund AREH's ongoing operations.

7.     Oak should be equitable estopped from any recovery in this action due to its intentionally wrongful conduct and unclean hands.

8.     Additionally as to "COUNT I," the claim should be dismissed because it is duplicative of Count II, which alleges breach of contract against JJ Arch, and Count V, which alleges breach of fiduciary duty against JJ Arch and Mr. Simpson.

9.     Additionally as to "COUNT II," the claim should be dismissed because it is duplicative of Count I, which alleges breach of fiduciary duty against JJ Arch and Mr. Simpson, and Count V, which also alleges breach of fiduciary duty against JJ Arch and Mr. Simpson.

28

10.     Additionally as to "COUNT III" and "COUNT IV," the claims should be dismissed because Mr. Simpson as the managing member of JJ Arch had the legal right to take all of the actions he did and he did not wrongfully interfere with the rights of any party.

11.     Additionally as to "COUNT V," the claim should be dismissed because it is duplicative of Count I, which alleges breach of fiduciary duty against JJ Arch and Mr. Simpson, and Count II, which alleges breach of contract against JJ Arch.

12.     Additionally as to "COUNT VI," the claim should be dismissed because all of the allegedly actionable statements were either the truth or protected opinion, as they are matters that can neither be proven or disproven as objectively true or false.

13.     Additionally as to "COUNT VII," the claims should be dismissed because none of the referenced statements were false or materially misleading when made.

14.     Additionally as to "COUNT VIII," the claim should be dismissed because the Removal Notice on which Oak's claim is based was false and misleading in that the purported bases stated in it were untrue and it was issued under false pretenses as part of Oak's fraudulent efforts to oust Mr. Simpson from AREH and JJ Arch for its own benefit and to the detriment of JJ Arch, AREH and the approximately 200 other investors in the companies that own the AREH portfolio of real estate assets.

15.     Additionally as to "COUNT IX," the claim should be dismissed because (a) Oak failed to make a formal demand for an accounting before seeking judicial relief, and (b) Oak has failed to and cannot demonstrate that it does not have an adequate remedy at law.

29

WHEREFORE, Derivative-Plaintiff/Nominal-Defendant JJ Arch LLC demands judgment as follows:

A. That the Complaint of 608941 NJ Inc. be dismissed in its entirety with prejudice;

B. That JJ Arch LLC's Counterclaims against 608941 NJ Inc. be sustained and that, on them, the Court enter judgment:

(i) vacating and declaring null and void in its entirety the Court's Amended Decision + Order on Motion dated November 22, 2023 (NYSCEF Doc. No. 418),

(ii) directing 608941 NJ Inc. and its principals Kevin Wiener and Michael Wiener to fulfill all of their obligations under the AREH Operating Agreement including, but not limited to, (a) meeting all Capital Calls, (b) immediately paying the Guaranteed Payment to Mr. Simpson, (c) paying AREH's corporate counsel's, and (d) indemnifying JJ Arch and Mr. Simpson for all of the legal bills they have paid and incurred to date and continue to incur in connection with this action, and

(iii) awarding JJ Arch compensatory and punitive damages in amounts to be awarded at trial; and

C. Such other and further relief as the Court deems just and proper.

30

Southampton, New York
January 16, 2024

ALTMAN & COMPANY P.C.


By: */s/Steven Altman*
Steven Altman
P.O. Box 590, 123 N. Sea Road
Southampton, New York 11969
(917) 207-3001 - phone
(646) 349-3387 - fax
Steve@CommercialTrialLawyer.com

*Attorneys for*
*Derivative-Plaintiff/Nominal-Defendant*
*JJ Arch LLC*